**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Charles David Ellison,

        Petitioner,

v.

Ryan Thornell, et al.,

        Respondents.

No. CV-16-8303-PHX-DWL

**ORDER**

<u>DEATH PENALTY CASE</u>

    Petitioner Charles David Ellison is an Arizona death row inmate seeking habeas relief pursuant to 28 U.S.C. § 2254.  Before the Court are his habeas petition and his request for evidentiary development.  (Docs. 21, 41.)  Respondents filed an answer to the petition and an opposition to the request for evidentiary development.  (Docs. 30, 50.)  The petition and the request for evidentiary development are denied for the reasons set forth below.

## BACKGROUND

    On January 18, 2002, a jury in Mohave County convicted Ellison of two counts of first-degree murder and one count of first-degree burglary.  In February 2004, following sentencing proceedings before a separate jury, the superior court sentenced him to death for each murder and to a concurrent sentence of 12.5 years for the burglary conviction.  The Arizona Supreme Court described the facts surrounding the crimes in its opinion affirming the convictions and sentences.  *State v. Ellison*, 140 P.3d 899, 906-08 (Ariz. 2006).  These facts, summarized below, are "presumed correct."  *Atwood v. Ryan*, 870 F.3d 1033, 1039 (9th Cir. 2017) (citing 28 U.S.C. § 2254(e)(1)).

On the morning of February 26, 1999, police went to the home of Joseph and Lillian Boucher after their daughter, Vivian Brown, was unable to contact them.  When no one answered the door, police entered the home through the kitchen, where they noticed a telephone with its line cut and cord missing and a knife block with a missing knife.

Police discovered the body of Joseph Boucher, age 79, on a bed in one bedroom.  He had defensive wounds and cuts and scrapes on his wrists and arms indicating he had been bound.  Police found Lillian Boucher's body on the floor in another bedroom.  Mrs. Boucher, 73, had bruises on her face and body consistent with an altercation and a small amount of blood around her nose.  According to the medical examiner, Mr. Boucher had been asphyxiated by smothering.  Mrs. Boucher had been asphyxiated by smothering or a combination of smothering and strangulation.  A number of items were missing from the house, including a .22 caliber handgun, a pellet gun, and items of jewelry belonging to each victim.

On February 26, 1999, Brad Howe contacted police with information that he had obtained from Richard Finch.  Finch worked for Howe and his father as a "lot boy" at their auto dealership in Lake Havasu City and lived at Howe's house.  According to Howe, Finch was "simple" and, because Finch could not manage his own finances, Howe and his father gave Finch money only as he needed it.

Howe told the police he did not see Finch on the night of February 24, 1999.  The next night, however, they went drinking at several bars.  Howe offered to pay as usual, but Finch surprised him by offering to buy drinks and displaying $250 to $300.  Howe told police that Finch was drinking heavily and acting as if something was on his mind.  Howe repeatedly asked Finch what was distracting him.  Finch became "very upset" and admitted he had been involved in "some bad things."  The two then left the bar.  On the drive home, Finch told Howe more details about what had happened.

Once home, Finch, upset and crying, retrieved a bag and showed Howe the contents.  Howe did not want the items in his house, so he took the bag and hid it in the desert in the early morning hours of February 26, 1999.  He later led police to the bag, which contained

several items stolen from the Bouchers' home.

The same day, police officers went to Howe's house and arrested Finch, who had packed his belongings as if planning to leave.  After being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), Finch agreed to speak with police.  In a taped interview, Finch confessed his involvement in the murders.  He identified a man called "Slinger" as his companion in the crimes.  Slinger was a nickname used by Ellison.  Two days later, Finch helped police find the missing kitchen knife in a field behind the Bouchers' house.

On March 1, 1999, after unsuccessfully searching for Ellison at the house of his girlfriend, Cathie Webster-Hauver, Kingman Police Department detectives Steven Auld and Lyman Watson learned that Ellison had been arrested in Lake Havasu.  After informing Ellison of his *Miranda* rights, the detectives interviewed him at the Lake Havasu police station just before 9:00 a.m.

Ellison told the detectives he had met Finch two or three weeks earlier at Darby's, a Lake Havasu bar.  The two men met again at Darby's on February 24, 1999, where Ellison agreed to do "a job" with Finch in Kingman.  Ellison said that he intended only to commit a burglary, not to kill anyone.

After leaving Darby's that night, Ellison and Finch drove Ellison's van to Kingman, where they stopped at the Sundowner's Bar.  According to the bartender, Jeannette Avila, Ellison entered the bar first, ordered and paid for beers, talked to her at length, and led the way when the two men left.  Finch never spoke to Avila but sat at the bar without removing his sunglasses.  Avila later identified Ellison in a photographic line-up but was unable to identify Finch.

Ellison said he and Finch next drove to a nearby movie theater and parked the van.  According to Ellison, Finch led the way to the Bouchers' house and entered first.  Once inside, Ellison and Finch ordered Mrs. Boucher from the living room and into Mr. Boucher's bedroom.  Ellison admitted binding the victims with the phone cords and masking tape but claimed to have done so only at Finch's direction.

- 3 -

Ellison said Finch then pointed a gun at him and ordered him to kill Mr. Boucher. By his account, Ellison held a pillow over Mr. Boucher's face for a period of time, possibly only a few seconds, while Finch strangled Mrs. Boucher. Ellison said he removed the pillow when Mr. Boucher stopped struggling but claimed he thought Mr. Boucher was still alive because his chest was moving up and down. Ellison said he told Finch that Finch would have to finish off Mr. Boucher. Ellison also said that Finch moved Mrs. Boucher's body to another bedroom after strangling her.

Ellison claimed that it was Finch's idea to "hit" the house and that he did not know how Finch had picked the Bouchers' home. Ellison admitted he was somewhat familiar with the area because his parents lived nearby. Additionally, at trial, Vivian Brown (the Bouchers' daughter) identified Ellison as having worked on her parents' home in October 1997 and at a nearby house the next year. According to Howe, Finch did not possess a gun or a vehicle and had never been to Kingman before February 24, 1999.

No physical evidence proved who killed either victim. None of the fingerprints found in the house matched Ellison or Finch. However, police found a latex glove in the Bouchers' yard, and Ellison later admitted he had supplied the latex gloves that he and Finch wore during the burglary. None of the Bouchers' property was found on Ellison, in his van, or at his girlfriend's home. Ellison, however, was not arrested until five days after the murders. Ellison admitted removing jewelry from Mrs. Boucher's body but said he did so only at Finch's direction. He also admitted using $20 stolen from the Bouchers to buy gas for his van.

The detectives attempted to record their initial interview with Ellison but failed to do so. Detective Watson re-interviewed Ellison at 10:06 a.m. In this nine-minute recorded interview, Detective Watson tried to summarize the main points of the first interview. This tape was played for the jury during the guilt phase of trial.

On March 4, 1999, Ellison and Finch were indicted for the murders and first-degree burglary. The State sought the death penalty for each defendant. Judge Robert R. Moon severed their trials. In September 2000, a jury convicted Finch on the murder and burglary

charges.  In March 2001, Judge Moon sentenced Finch to natural life imprisonment, finding, among other things, mitigating factors due to Finch's having acted under duress from Ellison and later cooperating with police in the investigation.

Ellison was represented at trial by Vincent Iannone as lead counsel and Eric Engan as co-counsel.[1]  Iannone, a private attorney, was appointed in October 2000.

Ellison was tried in January 2002 before Judge Moon.  The jury convicted Ellison on the murder and burglary charges, finding him guilty of both premeditated and felony murder of the Bouchers.  The jury also found that he had either killed, intended to kill, or acted with reckless indifference.

Before Ellison was sentenced, the Supreme Court decided *Ring v. Arizona* ("*Ring II*"), 536 U.S. 584 (2002), which held that Arizona's capital sentencing scheme, in which judges rather than juries made the findings rendering a defendant death-eligible, was unconstitutional.  The Arizona legislature then amended Arizona's statutes to provide for jury findings of aggravating and mitigating circumstances and jury sentencing. A.R.S. § 13-703.01.  A newly-impaneled jury heard Ellison's sentencing proceeding in January and February 2004.  The jury found six aggravating factors: (1) Ellison had a previous serious felony conviction; (2) the murders were committed for pecuniary gain; (3) the murders were especially cruel; (4) the murders were committed while Ellison was on parole; (5) there were multiple murders; and (6) the victims were more than 70 years old. The jury determined that death was the appropriate sentence for each murder.

The Arizona Supreme Court affirmed the convictions and sentences.  *Ellison*, 140 P.3d 899.  Ellison then pursued post-conviction relief ("PCR").  The state court[2] ultimately denied his claims and the Arizona Supreme Court summarily denied Ellison's petition for

---

[1]     Kenneth Everett and Stephen Wallin from the Mohave County Public Defender's Office represented Ellison until the Office withdrew in October 2000.

[2]     Visiting Judge Michael Jones, of the Maricopa County Superior Court, presided over Ellison's PCR proceedings.

1    review.[3]

2        In 2016, Ellison filed a notice of intent to pursue habeas relief in this Court.  (Doc.

3    1.)  The Court appointed the Federal Public Defender for the District of Arizona to

4    represent him.  (Doc. 5.)  Ellison filed a petition for writ of habeas corpus in August 2017

5    and an amended petition on March 23, 2018.  (Docs. 18, 21.)

6                                    **APPLICABLE LAW**

7        Ellison's request for habeas relief is governed by the Antiterrorism and Effective

8    Death Penalty Act of 1996 ("AEDPA").[4]   The following legal framework guides the

9    analysis of Ellison's claims.

10   I.    Exhaustion And Procedural Default

11       A writ of habeas corpus cannot be granted unless the petitioner has exhausted all

12   available state court remedies.  28 U.S.C. § 2254(b)(1).  *See also Coleman v. Thompson*,

13   501 U.S. 722, 731 (1991) ("This Court has long held that a state prisoner's federal habeas

14   petition should be dismissed if the prisoner has not exhausted available state remedies as

15   to any of his federal claims.").  To exhaust state remedies, the petitioner must "fairly

16   present[]" his claims to the state's highest court in a procedurally appropriate manner.

17   *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). A claim is "fairly presented" if the

18   petitioner has described the operative facts and the federal legal theory on which the claim

19   is based.  *Anderson v. Harless*, 459 U.S. 4, 6 (1982). A petitioner must "clearly alert[] the

20   [state] court that he is alleging a specific federal constitutional violation."  *Casey v. Moore*,

21   386 F.3d 896, 913 (9th Cir. 2004).  He must make the federal basis of the claim explicit,

22   either by citing specific provisions of federal law, even if the federal basis of a claim is

23   "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state

24   cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*,

25   _____

26   [3]    When the state's highest court denies a claim summarily, a federal court looks
27   through to the last reasoned decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

28   [4]    Ellison's challenge to the constitutionality of AEDPA (Doc. 21 at 43-46) is
     foreclosed by Ninth Circuit law.  *Crater v. Galaza*, 491 F.3d 1119, 1125-26 (9th Cir. 2007).

319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings. It provides that a petitioner is precluded from relief on any claim that could have been raised on direct appeal or in a prior PCR petition. *See* Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a)(3) may be avoided only if a claim falls within certain exceptions and the petitioner can justify the claim's omission from a prior petition.[5] *See* Ariz. R. Crim. P. 32.1(b)-(h), 32.2(b), 32.4(b).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id.* at 735 n.1. If no remedies are currently available, the claim is "technically" exhausted but procedurally defaulted. *Id. See also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011).

II.   AEDPA

Under AEDPA, a petitioner is not entitled to habeas relief on any claim adjudicated on the merits in state court unless the state court's ruling (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

"A state-court decision is contrary to Supreme Court precedent if the state court

---

[5]   To the extent this order concludes that Ellison does not have an available remedy in state court, because claims or portions of claims would be precluded pursuant to Rule 32.2(a)(3), Ellison does not assert that any exceptions to preclusion are applicable. *Beaty v. Stewart,* 303 F.3d 975, 987 & n.5 (9th Cir. 2002) (finding no available state court remedies and noting that petitioner did not attempt to raise any exceptions to Rule 32.2(a)).

arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's.  A decision involves an 'unreasonable application' of clearly established federal law under § 2254(d)(1) if it identifies the correct governing legal principle but unreasonably applies that principle to the facts of the prisoner's case.  The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable." *Hooper v. Shinn*, 985 F.3d 594, 614 (9th Cir. 2021) (cleaned up).

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 407 (2000).  "[T]he ruling must be 'objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017) (citation omitted).  The burden is on the petitioner to demonstrate "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).  "The prisoner must show that the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Shinn v. Kayer*, 529 U.S. 111, 118 (2020) (citation omitted).  This standard is meant to be "difficult to meet." *Id.* (citation omitted).

As noted, under § 2254(d)(2), habeas relief is also available if the state court decision was based on an unreasonable determination of the facts. *Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S. 231, 240 (2005).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003) (citations omitted).  A "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first

instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see also Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (explaining that § 2254(d)(2) requires federal courts to "accord the state trial court substantial deference"); *Walden v. Shinn*, 990 F.3d 1183, 1196 (9th Cir. 2021) (same); *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) ("A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them.") (citation omitted).

The Supreme Court has clarified that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Additionally, the Ninth Circuit has observed that "*Pinholster* and the statutory text make clear that this evidentiary limitation is applicable to § 2254(d)(2) claims as well."  *Gulbrandson v. Ryan*, 738 F.3d 976, 993 n.6 (9th Cir. 2013).  Therefore, "for claims that were adjudicated on the merits in state court, petitioners can rely only on the record before the state court in order to satisfy the requirements of § 2254(d).  This effectively precludes federal evidentiary hearings for such claims because the evidence adduced during habeas proceedings in federal court could not be considered in evaluating whether the claim meets the requirements of § 2254(d)." *Id.* at 993-94.

III.   *Martinez* And *Ramirez*

Procedural default is not an insurmountable bar to relief.  A petitioner may raise a defaulted claim if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.  "Cause to excuse default exists if a petitioner can demonstrate that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule.  Prejudice is actual harm resulting from the alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998) (citations omitted).

Because the acts of a petitioner's counsel are not external to the defense, they are generally attributable to the petitioner, and thus negligence, ignorance, or inadvertence on counsel's part does not qualify as "cause." *Coleman*, 501 U.S. at 752-54.  However, where

the ineffective assistance of counsel amounts to an independent constitutional violation, it can establish cause. *Id.* at 753-54.

Although *Coleman* held that ineffective assistance of counsel in PCR proceedings cannot establish cause for a claim's procedural default, the Supreme Court created a "narrow exception" to that rule in *Martinez v. Ryan*, 566 U.S. 1 (2012). There, the Court explained:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 17.

"Thus, under *Martinez*, a petitioner may establish cause for procedural default of a trial IAC claim, where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) counsel in the [PCR] proceeding, where the claim should have been raised, was ineffective . . . , and (2) the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (cleaned up).

As for the former requirement, a petitioner must "establish that both (a) [PCR] counsel's performance was deficient, and (b) there was a reasonable probability that, absent the deficient performance, the result of the [PCR] proceedings would have been different." *Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, 819 (9th Cir. 2015). As for the latter requirement, the standard for finding the underlying IAC claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc). Under that standard, a claim is "substantial" if "reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Id.* (citing *Miller-El I*, 537 U.S. at 336).

The *Martinez* exception to procedural default applies only to claims of ineffective assistance of trial counsel.  It has not been expanded to other types of claims.  *Martinez v. Ryan*, 926 F.3d 1215, 1225 (9th Cir. 2019) ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Davila v. Davis*, 582 U.S. 521, 525 (2017) ("The question in this case is whether we should extend that [*Martinez*] exception to allow federal courts to consider a different kind of defaulted claim—ineffective assistance of appellate counsel.  We decline to do so.").

Finally, the Supreme Court has limited the evidence that may be presented in support of a *Martinez* argument (*i.e.*, an argument that PCR counsel performed ineffectively for purposes of cause and prejudice).  In *Shinn v. Ramirez*, 142 S. Ct. 1718 (2022), the Court held that with respect to claims that were not adjudicated on the merits in state court, "a federal court may not hold an evidentiary hearing—or otherwise consider new evidence," unless the "stringent requirements" of 28 U.S.C. § 2254(e)(2) are met.  *Id.* at 1739.

## ANALYSIS

I.  <u>Guilt-Phase Claims</u>

A.  **Claim 1**

In Claim 1, Ellison alleges that his statements to the detectives were obtained and admitted at trial in violation of the Fifth, Sixth, and Fourteenth Amendments.  (Doc. 21 at 47-59.)  More specifically, he argues that (1) the statements were taken in violation of his right to counsel and his right to remain silent; and (2) he involuntarily waived his rights based on promises of leniency.  (*Id.*)  The Arizona Supreme Court denied this claim on direct appeal.  *Ellison*, 140 P.3d at 908-11.

…

…

…

…

1           1.      Additional background

Before trial, Ellison moved to suppress his statements to the police, arguing that they were involuntary and obtained in violation of *Miranda*. (ROA, Vol. I, Doc. 18.)[6] As a result, the trial court held a voluntariness hearing at which Detective Watson, Detective Auld, and Ellison testified.

Detective Watson testified that on March 1, 1999, he and Detective Auld interrogated Ellison twice, the second time because their attempt to record the first interview failed. (RT 7/20/99 at 8-10.) More specifically, Detective Watson testified that he borrowed a micro-cassette recorder from one of the Lake Havasu City officers and concealed it in a manilla envelope to record the interrogation without Ellison knowing he was being taped, but when the interrogation was over and Detective Watson played the tape, he discovered it was blank. (*Id.* at 8-9.)

Detective Watson testified, with respect to the initial interview, that he advised Ellison of his *Miranda* rights at 8:56 a.m. (*Id.* at 10-11.) According to Detective Watson, he advised Ellison as follows:

> You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to the presence of an attorney to assist you during questioning. If you cannot afford an attorney, one will be provided to you by the court. You also have the right to refuse to answer any questions at any time if you decide to do so. And like what that last one means is if I ask you something too personal about your sex life, you don't have to answer it just because I'm a cop. Do you understand that?

(*Id.* at 33.) According to Detective Watson, Ellison stated he understood his rights and agreed to talk to the detectives. (*Id.* at 11.)

Detective Watson testified that he told Ellison he had details of Ellison's and Finch's

---

6       "ROA" refers to the Record on Appeal in Ellison's direct appeal to the Arizona Supreme Court. The index to the ROA, which is divided into six volumes, identifies various documents in chronological order and assigns a number to each such document. Here, the cited document is Document 18, which appears in Volume I of the ROA. The ROA also includes various hearing transcripts. Each transcript will be cited as "RT" followed by the relevant hearing date.

participation in the crimes.  (*Id.*)  Detective Auld told Ellison he "did not believe he [Ellison] was a bad guy."  (*Id.* at 12.)  Detective Watson then told Ellison that he "didn't believe that he . . . . intended for those people to die."  (*Id.*)

According to Detective Watson, "Ellison immediately sat back in his chair and said, 'Die?  I don't know what you're talking about.'  And then shortly after that said, 'I think I might want a lawyer.'"  (*Id.*)

Detective Auld similarly testified that Ellison "acted shocked.  Sat back in his chair; said 'Die?  I don't know what you're talking about.'"  (*Id.* at 68.)  Likewise, Detective Auld testified (consistent with Detective Watson) that Ellison then said, "'I think I might want a lawyer.'" (*Id.* at 69.)

Detective Watson testified that, at this point in the interview, he and Detective Auld told Ellison that they "could not talk to him any further until" until they had a clear "yes or no" answer as to whether Ellison wanted an attorney.  (*Id.* at 13.)  Detective Auld told Ellison that they had "a mountain of physical evidence and one side of the story" but they couldn't talk to him if he wanted a lawyer.  (*Id.* at 13-14, 70.)  The detectives also told Ellison they had Finch in custody.  (*Id.* at 14, 71.)

Detective Auld testified that he tried to get Ellison "to make it clear to me whether or not he wanted a lawyer."  (*Id.* at 69.)  Detective Auld testified that Ellison asked questions about the charges, but either Detective Auld or Detective Watson told him they could not continue the interview unless Ellison made it clear whether he wanted a lawyer. (*Id.* at 69-70.)

Detective Auld then left the room, saying "Okay. That's it, then. We're done."  (*Id.* at 14, 71.)  He testified that he left because he was unsure whether Ellison wanted an attorney.  (*Id.* at 71.)  According to Detective Watson, who stayed in the room, Ellison still had not given a clear answer as to whether he wanted an attorney.  (*Id.* at 15.)

At this point, according to Detective Watson, Ellison asked what he was being charged with.  (*Id.*)  Detective Watson responded, "two counts of first degree murder." (*Id.*)  Ellison "appeared to be very upset" and agitated.  (*Id.* at 16.)  He asked: "Can't we

just forget about the lawyer thing?" (*Id.*)  Detective Watson replied: "No.  If I'm not going to lie to you, I'm not going to lie to a judge.  We can't just forget about the lawyer thing." (*Id.*)  He told Ellison: "You need to be very clear.  Do you want to talk to us or do you not?" (*Id.*)  In response, Ellison said "I will talk to you" and told Detective Watson that he did not want an attorney.  (*Id.*)

Detective Watson then called Detective Auld back into the room.  (*Id.*)  Detective Auld advised Ellison that he had "a right to remain silent, that he had a right to have a lawyer, that he needed to make it clear to us that he didn't want a lawyer anymore, and that he could stop talking to us at any time if he chose to or wanted to."  (*Id.* at 72.)  Ellison repeated that he was willing to talk and did not want a lawyer.  (*Id.* at 17, 72-73.)

Ellison then spoke with the detectives.  Both detectives testified that Ellison, just before returning to his cell, offered to testify against Finch.  (*Id.* at 19, 75.)  According to Detective Watson, testifying against Finch was Ellison's idea.  (*Id.* at 19.)  Detective Watson told Ellison he would relay the offer to the county attorney.  (*Id.* at 20.)

Detective Watson denied making any promises of leniency or reduced charges or using threats or physical force against Ellison.  (*Id.* at 20-21.)  Detective Watson specifically denied that he or Detective Auld told Ellison he would not be charged with murder if he cooperated.  (*Id.* at 21.)

When Detective Watson realized the interview had not been recorded, he returned to the jail to get "the highlights of the interview clarified on tape."  (*Id.*)  A transcript of the second, taped interview was admitted at the voluntariness hearing.  (*Id.* at 22.)  During the second interview, Detective Watson asked Ellison:

> I advised you of your rights before we talked right?  Okay, during the interview, you said you wanted an attorney.  Then you said, "No, I will talk to you."  You made it real clear to Steve and I that you would talk to us;  is that correct?  That's a yes if you're nodding your head.  At that point Ellison says "'Yeah.'"

(*Id.* at 24.)  Detective Watson also told Ellison:

> Remember the deal, I'm not lying to you, I'm not going to bullshit you.

1
2
3

That's what got this whole thing started. . . .  The reason I've come back down here is I want to make sure it's clear and there's no mistakes.  And when I talk to the county attorney and you said you'd testify, I want to have what you were saying real clear about the fact that this was Richard's idea.

4

(*Id.* at 23-24.)

5
6
7
8
9

During his testimony, Detective Watson reiterated that in the first interview Ellison said "I think I might want a lawyer" and not, as phrased by Detective Watson in the second interview, "you wanted an attorney."  (*Id.* at 26-27.)  Detective Watson further testified that the "deal" did not refer to leniency.  (*Id.* at 37.)  He stated that "deal" referred to statements he made in the first interview about not lying or playing games.  (*Id.* at 37.)

10
11
12
13
14
15
16
17
18
19
20

Ellison also testified during the voluntariness hearing and provided a very different account of his interviews.  He testified that the detectives informed him of his *Miranda* rights and then "started talking about, you know, we know you're not the bad guy here, we know you didn't kill anybody."  (RT 11/23/99 at 16.)  According to Ellison, at that point he "freaked out" and "said I want a lawyer."  (*Id.* at 16-17.)  Ellison testified that Detective Auld responded by asking if he wanted an attorney and he again said yes.  (*Id.* at 17.)  Ellison testified that he believed Detective Auld was trying to intimidate him.  (*Id.*)  Ellison also testified that the detectives talked about the mountain of physical evidence they had against him and the fact that they only had one side of the story.  (*Id.*)  According to Ellison, they asked him if he knew anything about the crimes.  (*Id.* at 18.)

21
22
23
24
25
26
27
28

Ellison testified that Detective Auld "got mad and left."  (*Id.*)  According to Ellison, Detective Watson then said if he testified against Finch, Detective Watson would get the county attorney to reduce the charges to burglary.  (*Id.*)  According to Ellison, only then did he agree to talk.  (*Id.* at 18-19.)  Ellison testified that he would not have talked to the detectives without the promise of leniency.  (*Id.* at 26.)  Ellison also denied the detectives' claim that testifying against Finch was his idea.  (*Id.* at 30.)  Ellison testified that he did not make any specific statements about reduced charges or leniency during the taped interview because he "thought it was clear what was going on."  (*Id.* at 31.)

Following Ellison's testimony and the parties' arguments, Judge Moon denied the

motion to suppress.  (*Id.* at 49.)  He found that Ellison's statements to Detectives Auld and Watson were "made in compliance with the requirements of the *Miranda* decision."  (*Id.*)  He further found that Ellison understood those rights and voluntarily waived them— including his right to the assistance of an attorney—before speaking with the detectives.  (*Id.* at 49, 50.)  Judge Moon found Ellison's testimony to be "highly suspect," in part because of Ellison's prior felony convictions.[7]  (*Id.* at 49.)  Judge Moon also found that Ellison "did not initially clearly invoke his right to an attorney or request an attorney, but . . . made an equivocal statement to the effect that he thought he might want an attorney, and that the police did what the law requires them to do, which is . . . to get an unequivocal answer that he's either asking for an attorney or he's agreeing to talk without an attorney."  (*Id.* at 49-50.)  Finally, Judge Moon determined that the detectives did not make "an express or implied promise of any kind of leniency for making a statement" and that Ellison did not rely on any promises in making his statements.  (*Id.* at 50.)

> 2.    Analysis

> a.    **Right To Counsel**

The Arizona Supreme Court denied Ellison's claim that his rights under *Miranda* were violated.  *Ellison*, 140 P.3d at 909-10.  That decision was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

When a suspect invokes his Fifth Amendment right to have counsel present during a custodial interrogation, "the interrogation must cease until an attorney is present."  *Miranda*, 384 U.S. at 474.  Police may not continue questioning such a suspect without counsel present "unless the accused himself initiates further communication."  *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).  However, only an unambiguous invocation of the right to counsel triggers protection under *Edwards*.  *Davis v. United States*, 512 U.S. 452, 459 (1994) ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal

---

[7]    Ellison testified that he had prior felony convictions for possession of marijuana and armed robbery.  (RT 11/23/99 at 27.)

1    in that a reasonable officer in light of the circumstances would have understood only that

2    the suspect *might* be invoking the right to counsel, our precedents do not require the

3    cessation of questioning.").  An invocation is unambiguous if the accused "articulate[s] his

4    desire to have counsel present sufficiently clearly that a reasonable police officer in the

5    circumstances would understand the statement to be a request for an attorney." *Id.*  "Mere

6    mention of an attorney does not constitute an [un]equivocal request for counsel, as the word

7    'attorney' is not talismanic." *Norman v. Ducharme*, 871 F.2d 1483, 1486 (9th Cir. 1989).

8    In sum, nothing prevents police from questioning a suspect "when the suspect *might* want

9    a lawyer. Unless the suspect actually requests an attorney, questioning may continue."

10   *Davis*, 512 U.S. at 462.  *See also Arnold v. Runnels*, 421 F.3d 859, 865 (9th Cir. 2005)

11   ("[J]ust as in *Davis*, where a suspect's request for counsel is qualified with words such as

12   'maybe' or 'might,' we have concluded that the suspect did not unambiguously invoke his

13   right to counsel.").

14          The Arizona Supreme Court held that Ellison made only "an equivocal request for

15   counsel." *Ellison*, 140 P.3d at 910.  The court first noted that "[t]he only evidence

16   regarding Ellison's reference to a lawyer is the conflicting testimony of Ellison and the

17   detectives" and that "Judge Moon, who was able to assess the witnesses during the

18   voluntariness hearing, determined that the officers' account was more credible." *Id.*

19   Viewing the evidence in the light most favorable to upholding the judge's ruling, the court

20   assumed that Ellison said "I think I might want an attorney." *Id.*  This is a factual

21   determination entitled to a presumption of correctness.  28 U.S.C. § 2254(e)(1); *Robinson

22   v. Borg*, 918 F.2d 1387, 1390 (9th Cir. 1990) ("The state court's determination of what is

23   said during an interrogation constitutes a factual finding entitled to a presumption of

24   correctness . . . .").  Ellison has not rebutted that presumption of correctness with the

25   required "clear and convincing" evidence. *Marshall v. Lonberger*, 459 U.S. 422, 434,

26   (1983) ("[F]ederal habeas courts [have] no license to redetermine credibility of witnesses

27   whose demeanor has been observed by the state trial court, but not by them."); 

28   *Sophanthavong v. Palmateer,* 378 F.3d 859, 867 (9th Cir. 2004) ("Here, because the state

1   court conducted an evidentiary hearing in which [petitioner] testified, we are required to

2   defer to the state court's credibility findings.") (citations omitted).

3        Next, relying on *Davis* and *State v. Eastlack*, 883 P.2d 999 (Ariz. 1994), the Arizona

4   Supreme Court held the detectives were not required to stop questioning Ellison after his

5   equivocal statement "I think I might want a lawyer" and were not required to limit their

6   questions to clarifying Ellison's request for counsel.  *Ellison*, 140 P.3d at 910. The court

7   thus concluded that the detective's continued questioning of Ellison was proper.  *Id.*

8        The Arizona Supreme Court reasonably applied *Davis* in finding that Ellison did

9   not clearly and unambiguously invoke his right to counsel.  In *Davis*, the Supreme Court

10  held that the defendant's statement "maybe I should talk to a lawyer" was not an

11  unambiguous request for counsel.  512 U.S. at 459.  Likewise, in *United States v. Younger*,

12  398 F.3d 1179 (9th Cir. 2005), the Ninth Circuit concluded that a defendant's statement

13  "But, excuse me, if I am right, I can have a lawyer present through all this, right?" did not

14  constitute an unambiguous invocation of right to counsel.  *Id.* at 1187.  And again, in *Clark*

15  *v. Murphy*, 331 F.3d 1062 (9th Cir. 2003), the Ninth Circuit held that the Arizona Supreme

16  Court was not objectively unreasonable in its conclusion that a statement similar to (and

17  arguably less ambiguous than) Ellison's—"I think I would like to talk to a lawyer"—was

18  not an unequivocal request for counsel.  *Id.* at 1069-70.  *See also Diaz v. Senkowski,* 76

19  F.3d 61, 64-65 & n.1 (2d Cir. 1996) ("I think I want a lawyer" did not "effectively assert

20  [defendant's] right to counsel"); *United States v. Mullikin,* 534 F. Supp. 2d 734, 743 (E.D.

21  Ky. 2006) ("Defendant did not invoke his right to counsel because the statement was

22  equivocal and ambiguous.  The credible testimony of Detective Stowers shows that

23  Defendant stated, 'I think I might need a lawyer' . . . .").

24        In an attempt to establish that he unequivocally invoked his right to counsel, Ellison

25  cites an unpublished Ninth Circuit decision and several state-court cases.  However, such

26  decisions do not constitute clearly established federal law for AEPDA purposes.  At any

27  rate, the invocations offered by the defendants in Ellison's cited cases—*United States v.*

28  *Escobedo-Gomez*, 715 F. App'x 743, 744 (9th Cir. 2018) ("I guess I'll, I'll wait for the

attorney."); *State v. Jackson*, 497 S.E. 2d 409, 412 (N.C. 1998) ("I think I need a lawyer present."); *McDaniel v. Commonwealth*, 518 S.E. 2d 851, 852 (Va. 1999) ("I think I would rather have an attorney here to speak for me.")—are distinguishable from Ellison's statement "I think I *might* want a lawyer" because they lacked the modifier "might." *Arnold*, 421 F.3d at 865 ("[W]here a suspect's request for counsel is qualified with words such as 'maybe' or 'might,' we have concluded that the suspect did not unambiguously invoke his right to counsel.").[8]

Ellison also contends that the contemporaneous responses of Detectives Watson and Auld demonstrated that they understood him to be asking for a lawyer.  (Doc. 21 at 52-53.) This assertion is belied by the record.  The testimony at the voluntariness hearing showed that, following Ellison's statement, the detectives attempted to clarify whether he wanted an attorney or wanted to speak with them.  The testimony did not show, as Ellison contends, that "it became clear that Ellison declined to talk without an attorney and in fact remained silent."  (Doc. 21 at 53.)  To the contrary, Detective Watson testified that he told Ellison that Finch had been arrested and Ellison responded, "You've arrested Richard?"  (RT 7/20/99 at 14.)  Ellison also asked the detectives what he was being charged with and if it would affect his parole.[9]  (*Id.* at 15, 69.)  The detectives continued to speak with Ellison

---

[8]     In his reply, Ellison cites cases in which courts assumed or accepted the following statements to be unequivocal requests for counsel: "I think I should call my lawyer," *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991); "I think I should call an attorney," *Shedelbower v. Estelle*, 885 F.2d 570, 571 (9th Cir. 1989); and "I think I want to talk to a lawyer," *United States v. Perkins*, 608 F.2d 1064, 1066 (5th Cir. 1979).  But again, these cases do not qualify as clearly established law under AEDPA and they are factually distinguishable because the invocations at issue lacked the ambiguity the word "might" injected into Ellison's statement.  *Arnold*, 421 F.3d at 865. Also, unlike Detectives Watson and Auld, the officers in those cases responded to the statements in ways that indicated they understood the defendant was requesting counsel.  *Cannady*, 931 F.2d at 755 (officer "pushed phone toward Cannady and waited for him to make the call"); *Shedelbower*, 885 F.2d at 571-72 (officer told defendant he would have to call a private attorney or wait until the next morning for appointment of a public defender); *Perkins*, 608 F.2d at 1066 (officer handed Perkins the Yellow Pages).

[9]     Citing *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), Respondents contend that even if Ellison unambiguously invoked his right to counsel, he waived that right when he

about whether he wanted a lawyer but Ellison never provided a clear answer. (*Id.*) Thus, contrary to Ellison's argument, the actions of Detectives Watson and Auld were consistent with a belief that Ellison had not unequivocally invoked his right to counsel.

Finally, Ellison argues that his waiver of his right to counsel could not be valid given Detective Watson's explanation of the right to remain silent: "if I ask you something too personal about your sex life, you don't have to answer it just because I'm a cop." (Doc. 21 at 54.) This argument is unavailing. "*Miranda* prescribed the following four now-familiar warnings: 'A suspect must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Florida. v. Powell*, 559 U.S. 50, 59-60 (2010) (cleaned up). Although these four warnings are "invariable," the Supreme Court "has not dictated the words in which the essential information must be conveyed." *Id.* at 60. "Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (cleaned up).

The totality of the circumstances demonstrates that Detective Watson adequately informed Ellison of his right to remain silent. Watson recited the four *Miranda* warnings, informing Ellison he had "the right to remain silent" and that "[a]nything you say can and will be used against you in a court of law." (RT 7/20/99 at 33.) Given this clear language, and Ellison's familiarity with the *Miranda* advisory—he testified that it had been read to him before and that he understood his rights (RT 11/23/99 at 28)—Detective Watson's

---

reinitiated conversation with the detectives. (Doc. 30 at 36-38.) The Court disagrees. If Ellison had unequivocally invoked his right to counsel, the detectives would have been required under *Miranda* and *Edwards* to cease their interrogation (which they did not do). *Anderson v. Terhune*, 516 F.3d 781, 791 (9th Cir. 2008) ("[A]ll questioning must immediately cease once the right to remain silent is invoked, and . . . any subsequent statements by the defendant in response to continued interrogation cannot be used to find a waiver or cast ambiguity on the earlier invocation.").

1    elaboration on "the right to refuse to answer questions at any time if you decide to do so"

2    (RT 7/10/99 at 33) did not prevent the warnings from reasonably conveying Ellison's

3    *Miranda* rights. *Duckworth*, 492 U.S. at 203-05; *Prysock*, 453 U.S. at 361.[10]

4              **b.    Voluntariness**

5          The Arizona Supreme Court denied Ellison's claim that his confession was

6    involuntary due to the promises of leniency offered by the detectives. *Ellison*, 140 P.3d at

7    910-11. The court concluded that Judge Moon did not abuse his discretion in finding the

8    confession voluntary. *Id.* The court first noted that, "[t]o be admissible, a statement must

9    be voluntary, not obtained by coercion or improper inducement." *Id.* at 910 (citing *Haynes*

10   *v. Washington*, 373 U.S. 503, 513-14 (1963)). "Promises of benefits or leniency, whether

11   direct or implied, even if only slight in value, are impermissibly coercive." *Id.* (quotation

12   omitted). The court explained that although "[i]n Arizona, a suspect's statement is

13   presumptively involuntary," "[a] prima facie case for admission of a confession is made

14   when the officer testifies that the confession was obtained without threat, coercion or

15   promises of immunity or a lesser penalty." *Id.* (quotation omitted). The court then noted

16   that Detectives Watson and Auld "testified that they never asked Ellison to testify against

17   Finch and never suggested any charges would be dropped if he testified; nor did they

18   threaten or otherwise intimidate him." *Id.* at 911. The court explained that Ellison's claim

19   that his confession was induced by promises of leniency "presume[d] the truth of his

20   version of events, despite contrary testimony by the detectives." *Id.* The court continued:

21   _____

22   [10]      Ellison argues that Arizona Supreme Court failed to rule on a portion of his *Miranda*
     claim—namely, the allegation that his right to remain silent was violated as well as his
23   right to an attorney. He thus contends that this Court must review that portion of his claim
     *de novo*. (Doc. 21 at 55 n.11.) But even assuming the *de novo* standard applies, this claim
24   fails on the merits. Like the right to counsel, the right to remain silent must be invoked
     unambiguously. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). If a suspect makes
25   a statement concerning his right to silence "'that is ambiguous or equivocal' or makes no
     statement, the police are not required to end the interrogation, or ask questions to clarify
26   whether the accused wants to invoke his or her *Miranda* rights." *Id.* (citation omitted).
     Here, Ellison made no statement, let alone an unambiguous one, concerning his right to
27   remain silent.

28

Judge Moon, however, concluded that Detective Watson's testimony was more credible and determined the evidence did not show any express or implied promises of leniency. Moreover, it does not appear that Ellison's will was overborne by any promises of leniency. Although he agreed to talk with the detectives, he maintained that Finch was the ringleader and that he acted only under duress. Ellison also admitted being familiar with, and understanding, his *Miranda* rights.

*Id.* This decision was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

A statement is involuntary if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (cleaned up). When considering whether a confession is voluntary, "[t]he test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Guerrero*, 847 F.2d 1363, 1365 (9th Cir. 1988). "As long as the decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993) (cleaned up).

Ellison's involuntariness claim fails because, as the state courts found, the detectives did not make promises of leniency, express or implied, to Ellison. Instead, it was Ellison who volunteered to testify against Finch. This factual finding is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1); *Robinson*, 918 F.2d at 1390; *Lonberger*, 459 U.S. at 434; *Sophanthavong*, 378 F.3d at 867. Ellison has not rebutted that presumption with clear and convincing evidence. Although Watson used the word "deal" in the second, recorded interview, he explained (and Judge Moon accepted) that he was referring not to leniency but to his statements to Ellison in the first interview about being honest and not playing games.

At any rate, the conduct alleged by Ellison would not have rendered his confession involuntary. "[C]oercive police activity is a necessary predicate to the finding that a

confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).  Significantly, although Ellison argues that "[Detective] Watson's promise to talk to the county attorney and secure reduced charges rendered Ellison's statements involuntary" (Doc. 21 at 58), the Ninth Circuit has clarified that "in most circumstances, speculation that cooperation will benefit the defendant or *even promises to recommend leniency* are not sufficiently compelling to overbear a defendant's will."  *United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) (emphasis added).  *See also Williams v. Woodford*, 384 F.3d 567, 594 (9th Cir. 2004) ("An interrogating agent's suggestion that a suspect's cooperation with the government will have a positive effect on the suspect's possible sentence is not an improper inducement that causes the suspect's later testimony for the government to be involuntary.") (citing *Guerrero*, 847 F.2d at 1366).

B.   **Claim 2**

In Claim 2, Ellison alleges that his convictions and sentences must be vacated because the trial judge was "prejudiced and biased" in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. 21 at 59-65.)  The Arizona Supreme Court rejected this claim on direct appeal.  *Ellison*, 140 P.3d at 911-12.

1.   Background

During a pretrial conference, Ellison's counsel questioned Judge Moon about his impartiality in light of newspaper accounts of the sentencing proceedings in Finch's trial. (RT 3/30/01 at 8 ["[W]hat is attributed to you are statements to the effect that you believe my client [Ellison] to be the more culpable of the two, you believed that Finch was afraid of my client at the time he did what he did.  And this gives [us] some pause to consider Your Honor's impartiality as is relates to this particular defendant . . . ."].)  Counsel then asked Judge Moon to recuse himself.  (*Id.*)  The judge responded that he had made specific findings in Finch's case based on the evidence presented at that trial but invited defense counsel to file a motion for recusal.  (*Id.* at 12-14 ["I don't feel that I cannot be fair and impartial in the rest of the proceedings against Mr. Ellison.  But, you know, you're free to

1    file a motion, ask another judge to make that decision.”].)  Counsel did not file such a

2    motion.

3            In denying this claim on direct appeal, the Arizona Supreme Court first noted that

4    “[j]udges are presumed to be impartial, and the party moving for change of judge must

5    prove a judge’s bias or prejudice by a preponderance of the evidence.”  *Ellison*, 140 P.3d

6    at 911 (citation omitted).  The court explained that “there is no *per se* disqualification of a

7    sentencing trial judge who presides over a codefendant’s trial,” nor is “bias or prejudice

8    inherent in presiding over a defendant’s subsequent proceeding, even though the judge has

9    heard unfavorable remarks about the defendant in prior proceedings, particularly when the

10   judge states he will keep an open mind.”  *Id.* at 912 (citation omitted). Citing *Liteky v.*

11   *United States*, 510 U.S. 540 (1994), the court emphasized that only rarely do judicial

12   rulings or opinions formed by a judge during current or prior proceedings form the grounds

13   for a bias or partiality motion.  *Id.*

14           Against this backdrop, the court rejected Ellison’s argument “that the sentencing of

15   Finch reflect[ed] that Judge Moon was biased against Ellison.”  *Id.*  The court noted that

16   “Judge Moon . . . emphasized that his decisions in Finch’s case were based on the evidence

17   presented at that trial.  He also promised to make his decisions in Ellison’s case based

18   solely on the evidence produced during Ellison’s trial.”  *Id.*  Finally, the court noted that

19   “Judge Moon did not err in any of the challenged evidentiary rulings . . . and ruled in

20   Ellison’s favor to exclude several hearsay statements.”  (*Id.*)  The court therefore concluded

21   that Ellison “failed to show bias or prejudice that would require Judge Moon’s

22   disqualification . . . .”  (*Id.*)

23                   2.   Analysis

24           The Arizona Supreme Court’s decision was not contrary to or an unreasonable

25   application of clearly established federal law, nor was it based on an unreasonable

26   determination of the facts.  The Due Process Clause guarantees a criminal defendant the

27   right to a fair and impartial judge.  *In re Murchison*, 349 U.S. 133, 136 (1955); *Rhoades v.*

28   *Henry*, 598 F.3d 511, 519 (9th Cir. 2010) (“Due process requires that trials be conducted

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

free of actual bias as well as the appearance of bias."). "To succeed on a judicial bias claim, however, the petitioner must 'overcome a presumption of honesty and integrity in those serving as adjudicators.'"  *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (citation omitted).

The Ninth Circuit has "repeatedly concluded that a state court's finding that the trial judge was impartial . . . is a finding of historical fact that is entitled to a presumption of correctness under 28 U.S.C. § 2254(d)."  *Sivak v. Hardison*, 658 F.3d 898, 924 (9th Cir. 2011) (citation omitted). This Court, applying the "twin presumptions," *id.*, of deference to the state courts' determination that Judge Moon was not biased and the presumption of judicial integrity, concludes that Ellison's judicial bias claim is meritless.

First, the fact that Judge Moon presided over Finch's trial does not support a finding of bias.  In *Paradis v. Arave*, 20 F.3d 950 (9th Cir. 1994), the Ninth Circuit found no bias where the judge presided over the co-defendant's trial and sentenced the co-defendant to death.  *Id.* at 958.  The court rejected the "mistaken notion that a trial judge's exposure to evidence, standing alone, demonstrated bias." *Id.  See also United States v. Monaco*, 852 F.2d 1143, 1147 (9th Cir. 1988) ("[K]nowledge obtained from judicial proceedings involving a co-defendant does not require recusal.").

Next, Judge Moon's comments about the evidence or about Ellison are insufficient to support a finding a bias.  In *Liteky*, the Supreme Court explained that a judge's conduct at trial may be "characterized as bias or prejudice" only if "it is so extreme as to display clear inability to render fair judgment" or "display[s] a deep-seated favoritism or antagonism that would make fair judgment impossible."  510 U.S. at 551, 555.  "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases" do not establish bias unless "they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."  *Id.* at 555.  That standard was not met here.

Moreover, none of Judge Moon's remarks "emanate[d] from an extrajudicial source."  *Monaco*, 852 F.2d at 1147 ("[T]he comments made by the judge do not

1   demonstrate pervasive bias or prejudice.  These statements simply reflect that the judge

2   was appropriately outraged at the enormity of the crime that had taken place. . . .").  "In

3   the absence of any evidence of some extrajudicial source of bias or partiality, neither

4   adverse rulings nor impatient remarks are generally sufficient to overcome the presumption

5   of judicial integrity."  *Larson*, 515 F.3d at 1067.  *See also Liteky*, 510 U.S. at 555

6   ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in

7   the course of the current proceedings, or of prior proceedings, do not constitute a basis for

8   a bias or partiality motion unless they display a deep-seated favoritism or antagonism that

9   would make fair judgment impossible.").

10          Finally, as the Arizona Supreme Court noted, "judicial rulings alone almost never

11   constitute [a] valid basis for a bias or partiality recusal motion."  *Ellison*, 140 P.3d at 912

12   (quoting *Liteky*, 510 U.S. at 555).  As discussed below, there is nothing in the trial court's

13   rulings that overcomes the presumption of impartiality.

14          Respondents correctly note that Ellison did not allege actual bias in his habeas

15   petition.  (Doc. 30 at 43.)  They then cite *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007),

16   in which the Ninth Circuit observed that "Supreme Court precedent reveals only three

17   circumstances in which an appearance of bias—as opposed to evidence of actual bias—

18   necessitates recusal."  *Id.* at 1131.  According to *Crater*, due process requires recusal when

19   (1) a judge has a pecuniary interest in the outcome of the litigation, *Tumey v. Ohio*, 273

20   U.S. 510, 523 (1927); (2) a judge is "embroiled in a running, bitter controversy" with one

21   of the parties, *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1970); and (3) a judge acts

22   as "part of the accusatory process," *Murchison*, 349 U.S. at 137.  *Crater*, 491 F.3d at

23   1131.[11]  In his reply, Ellison argues that actual bias was demonstrated because Judge Moon

---

25   [11]      Although "circuit precedent does not constitute 'clearly established Federal law'"
26   and "cannot form the basis for habeas relief under AEDPA," *Parker v. Matthews*, 567 U.S.
     37, 48-49 (2012), a reviewing court may look to such precedent "to ascertain whether it
27   has already held that the particular point in issue is clearly established by Supreme Court
     precedent."  *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).  This distinction "is subtle, yet
28   substantial."  *Marshall*, 569 U.S. at 64.

1    prejudged his case and made disparaging remarks about him during the sentencing

2    proceedings in Finch's case, using words like "ghastly" and "the devil" to describe

3    Ellison's appearance.[12] (Doc. 38 at 26-28.) Ellison also argues that an impermissible

4    appearance of bias existed because he and Judge Moon were involved in a "bitter

5    controversy." (*Id.* at 28.)

6         These arguments are unpersuasive in light of *Crater*.  There, during a pretrial

7    conference following the armed robbery and murder convictions of Crater's co-defendant,

8    the judge met with Crater and the prosecutor to discuss a proposed plea deal.  491 F.3d at

9    1121.  Although the prosecutor made the "major concession" of offering to drop the special

10   circumstance allegation, Crater was reluctant to accept the offer.  *Id.*  In attempting to

11   persuade Crater that the deal was in his best interest, the trial judge introduced himself and

12   stated: "I'm going to be trying your case.  And I'm going to be sentencing you as well if

13

---

14   [12]     Ellison focuses on remarks Judge Moon made when addressing Finch's argument
15   that he committed the murder of Mrs. Boucher under unusual substantial duress from
     Ellison—a mitigating circumstance conceded by the State and found by the court.  (Doc.
16   43-1 at 20.)    Ellison quotes Judge Moon (Doc. 21 at 62), but the cited passage omits
     significant context surrounding the judge's comments.  Judge Moon first stated he didn't
17   "know how many people honestly in that situation could do other than what Mr. Finch
     did." (Doc. 43 at 41 [RT 2/20/01 at 41].)  Judge Moon continued, however, that he didn't
18   "know that many people who would ever have been in that situation in the first place."
19   (*Id.*)  Judge Moon then offered the remarks which Ellison quotes, in part, to show bias:

20            *The testimony about how* ghastly *Ellison looked and what terrible stories he*
21            *possessed, he looked that way before they ever got in the car together.*  He's
              tatted up, he looks like a—you know, an Aryan Brotherhood member, if he
22            isn't.  And so this—it wasn't a guy who was wearing some kind of religious
23            cloak and hood who suddenly ripped them off and said, "See, I'm really the
              devil."  He looked like the devil to begin with.  And so why a guy would ever
24            go along with that is something that's hard for me to understand.  *Hearing*
              *some of the testimony about his upbringing makes it somewhat more*
25            *understandable.  But the duress issue is—is an important issue to me.  And*
26            *there are others.*

27   (*Id.* at 41-42.) When quoting this passage, Ellison omits the italicized portions, which
     clarify that the judge's comments about Ellison's appearance were based on the evidence
28   and were offered for the specific purpose of evaluating Finch's mitigating evidence.

you're found guilty, which I expect will happen." *Id.* at 1130.  The judge continued:

> Based upon what I know about this case—and I'm in a very unique position in this case, because I've already heard all of the witnesses, I know everything that happened that night, and I have assessed everything that the witnesses have said, and therefore, I know what they are going to say about you.  And based upon what I've heard about this case, I'm real sure that you're going to be convicted of all of those robberies, that you're going to be convicted of shooting the first robbery victim.  You're going to be convicted of all of the attempted robberies, and you're going to be found guilty of murder in the first degree.  I'm real sure all that's going to happen.
>
> . . . .
>
> A jury is not going to like you. A jury is going to be frightened by what they hear from these witnesses occurring that night. . . .  You have very little to go on in this case.  You might beat the special circumstance; I don't think you will. . . .  And I, as the judge, am supposed to keep an open mind about what sentence to impose. . . .  This much I can tell you, I would have no discretion on first degree murder, none. . . .  I can also tell you that most judges looking at what happened that night would probably be inclined to impose consecutive penalties. . . .  So most judges, I think, would throw the book at you.

*Id.* at 1130-31.

Crater rejected the deal and moved to excuse the judge for bias.  *Id.* at 1121.  The judge denied the motion.  *Id.*  Crater went to trial and was convicted on all counts and the special circumstance.  *Id.*  On habeas review, the district court denied his claim of judicial bias.  *Id.*  The Ninth Circuit affirmed, concluding that none of the three circumstances requiring recusal based on an appearance of bias applied to Crater's case.  *Id.* at 1131-32.  The court noted that the judge did not become "'personally embroiled' in a controversy with Crater, and Crater directed no 'highly personal aspersions' against him."  *Id.* at 1132 (citation omitted).

Here too, where the trial judge at most signaled his opinion of the defendant's guilt and predicted the jury's negative reaction to the defendant, Ellison's claim of judicial bias fails.  Like the judge's comments in *Crater*, Judge Moon's comments about Ellison were "founded upon his legitimate knowledge of the proceedings and outcome in [the co-defendant's] case."  *Id.* at 1132.  They "offer no evidence to overcome the presumption of

[judicial] honesty and integrity." *Id.* (cleaned up).

In his reply, Ellison argues that Judge Moon's comments about *him* indicated there was a "bitter controversy." (Doc. 38 at 28.)  This argument lacks merit.  The concern in *Mayberry* was the judge's ability to remain fair while being personally insulted by the defendant during the latter's trial for contempt.  400 U.S. at 466.  Judge Moon's comments were based on the evidence presented at Finch's trial, just as the comments of the judge in *Crater* were based on evidence presented in the trial of Crater's co-defendant.

Ellison also cites *Porter v. Singletary*, 49 F.3d 1483 (11th Cir. 1995) (per curiam), and *Franklin v. McCaughtry*, 398 F.3d 955 (7th Cir. 2005).  (Doc. 38 at 26.)  But his claim "pales in comparison" to the evidence of bias in those cases.  *Sivak*, 658 F.3d at 925.  In *Porter*, the Eleventh Circuit remanded where there was "specific and ostensibly reliable evidence that the [state trial] judge had a fixed predisposition to sentence this particular defendant to death if he were convicted by the jury."  49 F.3d at 1489.  The court clerk submitted a declaration stating that "before or during Porter's trial," the trial judge said that "'he would send Porter to the chair.'"  *Id.* at 1487.  In *Franklin*, the trial judge "took the highly unusual step of filing a memorandum with the state court of appeals" in an unrelated case in which he referred to Franklin's case "as an example of the terrible things that happen when indigent prisoners are released on bail pending their appeals."  *Id.* at 957.  The judge also spoke with the media about the *Franklin* case.  *Id.* at 961.  In finding impermissible bias, the Seventh Circuit noted that, under *Liteky*, both the memorandum and the judge's contacts with the newspaper were "extrajudicial activities vis-à-vis Franklin's own case." *Id.*  Here, in contrast, there were no extra-judicial activities on Judge Moon's part, nor any evidence that he was predisposed to sentence Ellison to death.  As evidence that Judge Moon had prejudged Ellison's punishment, Ellison cites comments the judge made in granting a continuance of the trial date, to the effect that he was aware of the aggravating factors proved in Finch's case, which he explained could not be "disproved, because they have more to do with the victims rather than the defendants or their conduct." (8/17/01 at 4.)  But this was simply an accurate statement of the facts with respect to the

1   aggravating factors of especial cruelty, multiple murders, and the age of the victims.  Judge

2   Moon also acknowledged that he did not know "what kind of mitigation" Ellison had.  (*Id.*)

3   Based on this record, there is no indication that Judge Moon had improperly prejudged

4   Ellison's sentence.  Thus, Ellison has failed to overcome the presumption of judicial

5   impartiality and the deference owed under AEDPA to the Arizona Supreme Court's

6   decision rejecting this claim.

7        C.      **Claim 3**

8        In Claim 3, Ellison alleges that the jury-selection process deprived him of an

9   impartial jury and a fair and reliable trial, in violation of the Fifth, Sixth, Eighth, and

10  Fourteenth Amendments.  (Doc. 21 at 65-69.)  This claim consists of two subclaims.  In

11  Claim 3(A), Ellison alleges that "[d]eath qualification is unconstitutional."  (*Id.* at 65-68.)

12  In Claim 3(B), Ellison alleges that "[e]rroneously informing the jury that it is not

13  responsible for the death verdict relieves jurors of their burden to seriously consider the

14  facts that form the basis for a death sentence."  (*Id.* at 68-69.)  Ellison further contends that

15  he raised both of these claims on direct appeal but the Arizona Supreme Court only

16  addressed the burden-shifting claim.  (*Id.* at 67.)  Respondents counter that Ellison did not

17  fairly present Claim 3(A) and therefore that subclaim is unexhausted and procedurally

18  defaulted.  (Doc. 30 at 46.)

19       Respondents have the better of this argument.  The heading of Claim III of Ellison's

20  opening brief to the Arizona Supreme Court was: "Selection of a death qualified jury

21  deprived Appellant of a fair and impartial jury, a fair trial and due process under the Sixth,

22  Eighth, and Fourteenth Amendments."  (Opening Br. at 34.)  Ellison's argument, however,

23  focused only on the burden-shifting claim raised in Claim 3(B) of his habeas petition.  (*Id.*

24  at 34-36.)  The Arizona Supreme Court addressed and denied that claim on the merits.

25  *Ellison*, 140 P.3d at 912.

26       The Ninth Circuit has explained that "[g]eneral appeals to broad constitutional

27  principles, such as due process, equal protection, and the right to a fair trial, do not establish

28  exhaustion."  *Castillo v. McFadden*, 399 F.3d 993, 1002 (9th Cir. 2005) (cleaned up).

"Exhaustion requires more than drive-by citation, detached from any articulation of an underlying federal legal theory." *Id.* at 1003.  *See also Fields v. Waddington*, 401 F.3d 1018, 1021 (9th Cir. 2005) ("Nor is a federal claim exhausted by a petitioner's mention, in passing, of a broad constitutional concept, such as due process."); *Shumway v. Payne*, 223 F.3d 982, 987 (9th Cir. 2000) ("Shumway's naked reference to 'due process' . . . was insufficient to state a federal claim. '[I]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court.'") (citation omitted).

Applying these standards, Ellison failed to fairly present Claim 3(A) in state court. His "drive-by" citations of the Sixth, Eighth, and Fourteenth Amendments in the heading of Claim III were not sufficient to alert the Arizona Supreme Court that he was raising a claim that death-qualification of capital juries resulted in a federal constitutional violation. As Respondents note, Ellison's opening brief cited *Caldwell v. Mississippi*, 472 U.S. 320 (1985), which is relevant only to his burden-shifting claim and not to the allegation that the death qualification of a jury violates the United States Constitution.  "Citation of irrelevant federal or state cases does not provide a state court with a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Castillo*, 399 F.3d at 1001 (additional quotations omitted).

At any rate, in addition to being unexhausted and procedurally defaulted, Claim 3(A) is meritless.  It is well established that death-qualification does not violate a defendant's right to a fair and impartial jury.  *Lockhart v. McCree*, 476 U.S. 162, 178 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996); *Atwood v. Schriro*, 489 F. Supp. 2d 982, 1047 (D. Ariz. 2007) ("There is no per se rule that death-qualification of a guilt-phase jury is a constitutional violation. Thus, the decision of the Arizona Supreme Court is not an unreasonable application of controlling federal law.").

Next, the Arizona Supreme Court's rejection of Claim 3(B) was not contrary to or an unreasonable application of clearly established federal law.  Ellison had argued, as he

argues here, that his guilt-phase jury was "unconstitutionally relieved of the gravity of its decision because potential jurors were told, in a questionnaire and instructions, they would have no role in determining punishment and should not consider the likely punishment." *Ellison*, 140 P.3d at 912.  In rejecting that argument, the Arizona Supreme Court noted that, under *Caldwell*, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* (quoting *Caldwell*, 472 U.S. at 328-29).  The court explained that Ellison's argument failed "because, when his jury was selected, juries were *not* responsible for deciding whether a death sentence is appropriate." *Id.*

In January 2002, when Ellison was convicted, Arizona law provided that the trial judge, not the jury, was responsible for sentencing decisions.  *Caldwell* held that a death sentence was invalid where the "sentencing jury" was misled about its responsibility for determining the appropriateness of a death sentence.  472 U.S. at 323.  Because Ellison's guilt-phase jury was not a sentencing jury, it was not misled about its responsibilities. At a minimum, the Arizona Supreme Court's interpretation of *Caldwell* as compelling this outcome was not contrary to or an unreasonable application of clearly established federal law.

D.    **Claim 4**

In Claim 4, Ellison alleges that the trial court's evidentiary rulings regarding Finch's statements to Brad Howe deprived him of his right to confront adverse witnesses and to reliable and fair proceedings, in violation of the Sixth, Eighth, and Fourteenth Amendments.  (Doc. 21 at 69-73.)

1.    Relevant Background

Before trial, Ellison asked the trial court to rule on the admissibility of certain statements that Finch made to Howe after the murders.  Ellison's theory was that Finch's statements to Howe while the men were at Red's Bar (in which Finch implicated himself in the murders) were admissible as statements against interest but that Finch's later

statements to Howe after they left Red's Bar (in which Finch also implicated Ellison in the murders) were inadmissible. *Ellison*, 140 P.3d at 913. To evaluate these claims, the trial judge held an evidentiary hearing. *Id.*

During the hearing, Howe testified that while he and Finch were drinking at a bar, Finch "started crying, and he said that he had killed two people last night." (RT 3/14/00 at 15.) Howe testified that Finch also made additional statements after they left the bar and were driving home. For example, Finch told Howe that he had gone with a person named "Slinger, Charles Ellison to rob some people." (*Id.* at 17.) Finch also told Howe that he believed Ellison was an "enforcer" for the Aryan Brotherhood. (*Id.* at 30-31.) Finch also told Howe that he believed he and Ellison "were going to threaten or scare somebody, not to kill anyone." (*Id.* at 31, 32.) According to Finch, Ellison pointed a gun at him and told him, "If she [Mrs. Boucher] doesn't stop breathing, I'm going to put a bullet in your head." (*Id.* at 32.) Finch also told Howe that Ellison held a pillow over Mr. Boucher's head. (*Id.* at 33.) Finch further told Howe that when Ellison realized Mr. Boucher wasn't dead, Ellison pointed the gun at Finch and forced him to "finish off" the victim. (*Id.* at 34.) Finch told Howe that he had "looked into these people's eyes and watched them die." (*Id.* at 23.) Finch also told Howe that Ellison removed property from the victims' home. (*Id.* at 33-34.) Finally, Howe stated that when he and Finch arrived home from the bar, Finch showed Howe some of the items stolen from the Bouchers. (*Id.* at 25.)

Judge Moon ruled that Finch's admission at the bar that he "had killed two people last night" was admissible as a statement against penal interest under Arizona Rule of Evidence 804(b)(3). (*Id.* at 50.) However, Judge Moon also ruled that if Ellison sought to admit that statement, the State would then be permitted to admit "anything inconsistent" in Finch's other statements to Howe. (*Id.*) Based on these rulings, Ellison chose not to elicit testimony at trial from Howe about Finch's specific statements.

On direct appeal, Ellison argued that "the trial court abused its discretion when it conditioned [Ellison's] use of Finch's statements to Brad Howe admitting to murdering both victims upon the State being able to introduce all of Finch's hearsay statements."

(Opening Brief at 36.)  Among other things, Ellison argued that "[a]lthough the trial court was technically correct in determining that Finch's statement that *he* killed two people could be impeached with inconsistent statements under Rule 806, the court erred by neglecting to consider whether the admission of the remainder of Finch's statements would violate the Confrontation Clause of the Sixth Amendment."  (*Id.* at 37.)

The Arizona Supreme Court rejected this claim, noting that "when a defendant seeks to admit portions of his accomplice's recorded statements, the trial judge may, under Arizona Rule of Evidence 106, admit the remaining statements *if* necessary to avoid confusing the jury."  *Ellison*, 140 P.3d at 913.  The court held that in such circumstances, "the Confrontation Clause is not even implicated." *Id.* (citation omitted).  The court stated that the "rule of completeness" addresses "the inequity of allowing a defendant to admit the beneficial part of a statement while using the Confrontation Clause to prevent the State from offering the remainder of the statement in order to avoid misleading the jury."  *Id.* at 914 n.9 (citation omitted).  The court thus concluded that Judge Moon "did not err in ruling that if Ellison offered part of Finch's hearsay statements, the State could question Howe with the remainder of the conversation."  *Id.* at 913-14.

## 2.  Analysis

Although Ellison's briefing regarding Claim 4 is not a model of clarity, the Court construes that briefing as potentially raising three distinct (if interrelated) challenges.

First, Ellison argues that the trial court's evidentiary ruling prevented him from "admit[ting] Finch's critical admission that [Finch] killed both victims."  (Doc. 21 at 71.)  In his reply, Ellison elaborates that the ruling "violated [his] right to a fundamentally fair trial at which he could present a defense."  (Doc. 38 at 33.)  Ellison continues: "The state courts could not reasonably have forced [him] to choose between his right to present a defense and his right, as then currently understood, to confront witnesses against him."  (*Id.* at 34-35.)  Respondents interpret these arguments as raising a "due process" claim premised on the theory that "the trial court's evidentiary rulings regarding Finch's statements to Howe prevented him from presenting a complete defense and admitting

relevant evidence."  (Doc. 30 at 51-52.)

To the extent Respondents' conception of Ellison's claim is correct—that is, to the extent Ellison is raising a Fourteenth Amendment due process claim that is distinct from a Sixth Amendment confrontation claim—that claim is unavailing.[13]  Although a defendant generally has a due process right to present a complete defense, *Chambers v. Mississippi*, 410 U.S. 284 (1973), "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.  A defendant's interest in presenting such evidence may thus bow to accommodate other legitimate interests in the criminal trial process.  As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (cleaned up).  *See also Moses v. Payne*, 555 F.3d 742, 757-59 (9th Cir. 2009).  "Only rarely" has the Supreme Court "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."  *Nevada v. Jackson*, 569 U.S. 505, 509 (2013) (per curiam).  This case does not resemble those limited circumstances.  Indeed, the trial court did not bar Ellison from introducing Finch's admissions regarding Finch's involvement in the murders—it simply held that the introduction of such admissions might open the door to the admission of Finch's other admissions on the topic (which implicated Ellison), and Ellison in turn decided not to elicit any testimony regarding Finch's admissions.

---

[13]  Ellison raised only a Sixth Amendment challenge in relation to the Finch/Howe testimony on direct appeal (Opening Brief at 34-38) and the Arizona Supreme Court only addressed a Sixth Amendment challenge in its decision affirming Ellison's convictions and sentences.  *Ellison*, 140 P.3d at 912-14.  Thus, it might be argued that Ellison has procedurally defaulted any Fourteenth Amendment/due process challenge.  However, Respondents have not raised a claim of procedural default as to that particular issue.  (Doc. 38 at 32 ["Respondents do not interpose a procedural defense to this claim insofar as it rests on the Sixth and Fourteenth Amendments."].)  Thus, the Court declines to consider whether this particular claim is procedurally defaulted.  *Franklin v. Johnson*, 290 F.3d 1223, 1233 (9th Cir. 2002) ("[T]he state provides no explanation whatsoever for its failure to raise a procedural default argument in the district court . . . .  Consequently, we decline to reach the state's argument that Franklin did not adequately raise in the state courts the issue he presented to the district court and argues here as well.").

Ellison's final two challenges are both premised on the Sixth Amendment's Confrontation Clause.  As explained below, the Arizona Supreme Court's rejection of Ellison's Confrontation Clause challenge was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.[14]

Ellison's first Sixth Amendment challenge is premised on the theory that the trial court's evidentiary rulings violated *Ohio v. Roberts*, 448 U.S. 56 (1980), and *Williamson v. United States*, 512 U.S. 594 (1994).  (Doc. 21 at 71-72.)  More specifically, Ellison contends that although Finch's initial statement to Howe at the bar—that Finch had killed two people—was admissible because it was self-inculpatory and accompanied by adequate indicia of reliability, Finch's subsequent statements to Howe were not reliable—and thus inadmissible under *Roberts*, which holds that statements lacking "indicia of reliability . . . [cannot be] admitted without violating [a defendant's] confrontation rights"—because they "shifted blame to Ellison" and were only "collateral to Finch's inculpatory statements." (*Id.*)

This argument is unavailing.  It is true that, in *Williamson*, the Supreme Court held that "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts."  512 U.S. at 599.  *See also United States v. Ebron*, 683 F.3d 105, 133 (5th Cir. 2012) ("In *Williamson*, the Supreme

---

[14]     Although the Arizona Supreme Court did not provide the same reasoning for rejecting Ellison's Confrontation Clause challenge that is discussed below, this is irrelevant for purposes of the AEDPA standard of review.  *Franklin*, 290 F.3d at 1233 ("Under AEDPA, a petition for habeas corpus challenging a state conviction may be granted only if the state court's decision is contrary to, or involves an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States . . . .  If—as we ultimately conclude was the case here—the state court reached the correct result with respect to petitioner's claim of constitutional violation (even if on erroneous reasoning), that is the end of our inquiry.") (citation and internal quotation marks omitted); *Sheppard v. Davis*, 967 F.3d 458, 467 n.5 (5th Cir. 2020) ("[T]he position . . . held by most of the courts of appeals . . . [is] that a habeas court must defer to a state court's ultimate *ruling* rather than to its specific *reasoning*.") (citations omitted).

Court issued a fractured opinion in which it . . . held that 'the most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.'") (citation omitted).   However, there are obvious factual differences between this case and *Williamson*.   There, the reason for the Court's finding that the declarant's statements were unreliable and inadmissible was that they were made to DEA agents after the declarant was arrested and in custody.  512 U.S. at 596, 601 ("[A]rrest statements of a co-defendant have traditionally been viewed with special suspicion.").  *See also Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (explaining that guarantees of trustworthiness were "highly unlikely" to exist for accomplice confessions that inculpate a defendant "when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice— that is, when the government is involved in the statements' production . . . .").  Finch's statements, in contrast, were made to a friend during a private conversation.  As the Fifth Circuit explained in *Ebron*, "[t]his distinction . . . is consequential.  Unlike the situation where a declarant implicates himself and the defendant in a statement made to officials, a statement made outside a custodial context does not provide the same set of incentives that create the risk of an unreliable statement."  683 F.3d at 133-34.  Indeed, courts have repeatedly found that statements made to friends and family, in contrast to custodial statements, bear indicia of trustworthiness.  *See, e.g., United States v. Smalls*, 605 F.3d 765, 783 (10th Cir. 2010) ("We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind—even one of sound mind who is not particularly honest—falsely confessed a murder to an apparent acquaintance or friend. . . . Cook most certainly was not seeking to curry favor with authorities in recounting the specifics of Gantz's murder to CI or seeking to shift or spread blame to his alleged co-conspirators so as to engender more favorable treatment from authorities. . . .  Cook responded to CI's questions as though he believed the two were engaged in casual conversation—nothing more.  From Cook's standpoint, this was indeed the case, and that makes all the difference, providing a 'circumstantial guaranty' of reliability not found in

statements, arrest, custodial or otherwise, knowingly made to law enforcement officials."); *People v. Cortez*, 369 P.3d 521, 540 (Cal. 2016) ("[T]he context in which Bernal made the statements—a conversation with a close family member in an apartment he frequented—does not suggest that Bernal was trying to improve his situation with police . . . [and instead] 'promoted truthfulness.'").

The substance of Finch's statements to Howe after admitting that he killed two people also bore indicia of trustworthiness. As Respondents note, while Finch described Ellison's actions in committing the crimes, he did not deny his own involvement and acknowledged that he killed Mr. Boucher and looked into the victims' eyes as they died. Given this backdrop, the admission of Finch's subsequent statements to Howe pursuant to the rule of completeness would not have violated *Roberts* and *Williamson*.

Ellison's other Sixth Amendment challenge is premised on the theory that the Arizona Supreme Court's decision "subvert[ed]" his rights under the Confrontation Clause in violation of *Crawford v. Washington*, 541 U.S. 36 (2004). (Doc. 21 at 72-73 ["Although application of *Crawford* would change the analysis, it would not change the result. *Crawford* precludes testimonial hearsay absent a prior opportunity for cross-examination, irrespective of its reliability."].) This argument is meritless. *Crawford* held that the Confrontation Clause prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. 541 U.S. at 59. Although the Court did not provide a definition of "testimonial," it offered the following "formulations" of the "core class" of testimonial statements: (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at

1  a later trial." *Id.* at 51-52.

2         Finch's statements to his friend at a bar and on the drive home from the bar do not

3  fall into any of these categories.  They were not in-court testimony or its functional

4  equivalent; they were not contained in formalized testimonial materials; and they were not

5  made under circumstances that would lead an objective witness to believe they would be

6  used at a later trial.  *Crawford*, 541 U.S. at 51-52 ("An accuser who makes a formal

7  statement to government officers bears testimony in a sense that a person who makes a

8  casual remark to an acquaintance does not.").  As the Ninth Circuit has explained,

9  *Crawford*'s discussion of the nature of testimonial statements focused on the use of

10 statements "made to a government officer with an eye toward trial, the primary abuse at

11 which the Confrontation Clause was directed." *Jensen v. Pliler*, 439 F.3d 1086, 1089 (9th

12 Cir. 2006).  *See also Delgadillo v. Woodford*, 527 F.3d 919, 927 (9th Cir. 2008) ("[T]he

13 state court's implicit conclusion that Ramirez's remarks to her coworkers did not implicate

14 Delgadillo's Sixth Amendment rights of confrontation was not contrary to, nor an

15 unreasonable application of *Crawford*."); *Desai v. Booker*, 732 F.3d 628, 630 (6th Cir.

16 2013) ("[After *Crawford*], the Confrontation Clause no longer applied to nontestimonial

17 hearsay such as the friend-to-friend confession . . . ."); *United States v. Brown*, 441 F.3d

18 1330, 1360 (11th Cir. 2006) ("[T]he private telephone conversation between mother and

19 son . . . was not testimonial."); *Ramirez v. Dretke*, 398 F.3d 691, 695 & n.3 (5th Cir. 2005)

20 (co-defendant's statement that petitioner had hired him to kill a fireman was not

21 testimonial: "There is nothing in *Crawford* to suggest that 'testimonial evidence' includes

22 spontaneous out-of-court statements made outside any arguably judicial or investigatory

23 context.").  It follows that the challenged evidentiary ruling regarding the admissibility of

24 Finch's later statements to Howe did not violate *Crawford*.  *Whorton v. Bockting*, 549 U.S.

25 406, 420 (2007) (noting "*Crawford*'s elimination of Confrontation Clause protection

26 against the admission of unreliable out-of-court nontestimonial statements").

27      …

28      …

1

E.     **Claim 5**

2     In Claim 5, Ellison alleges that the trial court's evidentiary rulings excluding Finch's

3     statements to fellow inmate Daymond Hill deprived him of his right to reliable and fair

4     proceedings in violation of the Eighth and Fourteenth Amendments. (Doc. 21 at 73-78.)

5     Ellison argues he presented this claim to the Arizona Supreme Court on direct appeal. (*Id.*

6     at 73-74.)  Respondents contend the claim is procedurally defaulted because Ellison did

7     not fairly present a federal basis for the claim.  (Doc. 30 at 55.)

8     Respondents are correct.  To properly exhaust state remedies on a claim, a habeas

9     petitioner must "present the state courts with the same claim he urges upon the federal

10    court." *Picard v. Connor*, 404 U.S. 270, 276 (1971).  A claim is "fairly presented" if the

11    petitioner has described the operative facts and the federal legal theory on which his claim

12    is based in a manner that provides the state courts with a fair opportunity to apply

13    controlling legal principles to the facts bearing upon the constitutional claim. *Harless*, 459

14    U.S. at 6.  A petitioner has not "fairly presented" (and thus exhausted) a federal claim in

15    state court unless he specifically indicated to that court that the claim was based on federal

16    law.  *See, e.g.*, *Lyons v. Crawford*, 232 F.3d 666, 669-70 (9th Cir. 2000), *as amended by*

17    247 F.3d 904 (9th Cir. 2001) ("Lyons's general reference in his state habeas petition to

18    insufficiency of evidence, his 'right to be tried by an impartial jury,' 'ineffective assistance

19    of counsel' and being 'shammed' into waiving a preliminary hearing, lacked the specificity

20    and explicitness required for the purported federal constitutional dimension of such claims

21    to have been 'fairly presented' to the Nevada courts under our precedent."); *Shumway v.*

22    *Payne*, 223 F.3d 982, 987-88 (9th Cir. 2000) ("Shumway's naked reference to 'due

23    process' in Issue I was insufficient to state a federal claim. It is not enough to make a

24    general appeal to a constitutional guarantee as broad as due process to present the substance

25    of such a claim to a state court.  Therefore, Shumway's statement of the issue presented

26    did not 'fairly present' her federal claim to the Washington Supreme Court.") (cleaned up);

27    *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("The mere similarity between a

28    claim of state and federal error is insufficient to establish exhaustion.").  A petitioner must

make the federal basis of a claim explicit by citing specific provisions of federal statutory or case law, *Gatlin*, 189 F.3d at 888, or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson*, 319 F.3d at 1158.

Before the guilt phase of trial, Ellison filed a motion *in limine* seeking to admit Finch's statements to Hill.  (ROA, Vol. II, Doc. 60.)  According to Hill, Finch stated that he was arrested for "a couple of burglaries" and "there was a couple of murders too, that he killed some people."  (RT 2/24/2000 at 20.)[15]  According to Hill, Finch did not mention an accomplice or a weapon or being under duress.  (*Id.*)  According to Hill, Finch used the singular "he" rather than "we" when describing the crimes and "said something about he strangled them or choked them or something."  (*Id.* at 21-22.)

The trial court denied the motion *in limine*, concluding that under Rule 401 of the Arizona Rules of Evidence, Finch's statements were not relevant because they did "not have any tendency to make Ellison's involvement in the crimes more or less probable than it would be without the evidence."  (ROA, Vol. II, Doc. 77 [minute entry dated March 1, 2000].)

On direct appeal, Ellison argued that "[t]he trial court abused its discretion when it precluded Appellant from presenting the testimony of Daymond Hill that Finch admitted that he had killed both victims."  (Opening Br. at 40.)  In support of this argument, Ellison did not mention the Sixth Amendment or the Confrontation Clause—he simply argued that Finch's statements were relevant under Arizona Rule of Evidence 401 and constituted statements against penal interest under Rule 803(b)(4).  (Opening Br. at 40-41.)  The Arizona Supreme Court, in turn, determined that the trial court did not abuse its discretion because the statements lacked indicia of trustworthiness as required under Rule 804(b)(3) and were not relevant to Ellison's guilt under state law.  *Ellison*, 140 P.3d at 914.

As noted, Ellison did not allege a violation of his federal constitutional rights.  The claim was "devoid of any language presenting a federal" claim.  *Castillo*, 399 F.3d at 1000-

---

[15]   Hill's statements, taken from the transcript of a defense interview on April 19, 1999, were read into the record during a hearing on the motion *in limine*.  (RT 2/24/00 at 18-19.)

01 (petitioner "focused his argument" on the trial court's application of Arizona Rule of Evidence 403); *Johnson v. Zenon*, 88 F.3d 828, 830-31 (9th Cir. 1996) (finding that petitioner, who argued in state court that the admission of prior act evidence infringed on his fair trial rights, had not exhausted a federal claim because his argument was based exclusively on state evidentiary law and never apprised the court that he was asserting a federal claim). And because Ellison raised no federal constitutional claim, the Arizona Supreme Court was silent as to any federal issue. *Castillo*, 399 F.3d at 1002 ("[T]he Arizona Court of Appeals addressed each of the issues Castillo briefed and argued and issued its own reasoned state judgment. It rejected on state law grounds Castillo's argument concerning the admission of his videotaped interrogation."). *Compare Sandgathe v. Maas*, 314 F.3d 371, 376–77 (9th Cir. 2002) (federal question is raised where state court considered and decided the issue even if petitioner did not frame his claim in terms of any federal right).

Ellison notes that his opening brief cited *State v. LaGrand*, 734 P.3d 563 (Ariz. 1987), which he argues was sufficient to fairly present his federal due process claim. (Doc. 38 at 36.) Although it is true that *LaGrand* addressed a constitutional challenge to the exclusion of a confession, Ellison himself never raised such a challenge, nor did he cite the United States Supreme Court case on which the appellant in *LaGrand* relief.[16] Instead, and consistent with the argument in his opening brief, he specifically cited *LaGrand*'s lengthy discussion of Rule 804(b)(3). (Opening Br. at 41.) Although "a citation to a state case analyzing a federal constitutional issue serves the same purpose as a citation to a federal case analyzing such an issue," *Peterson*, 319 F.3d at 1158, "[f]or a federal issue to be presented by the citation of a state decision dealing with both state and federal issues relevant to the claim, the citation must be accompanied by some clear indication that the case involves federal issues," *Casey*, 386 F.3d at 912 n.13. "Where . . . the citation to the state case has no signal in the text of the brief that the petitioner raises federal claims or relies on state law cases that resolve federal issues, the federal claim is not fairly

---

[16]  *Chambers v. Mississippi*, 410 U.S. 284 (1973).

presented." *Casey,* 386 F.3d at 912 n.13.  As the Ninth Circuit later explained, "*Casey* refused to recognize any such 'signal' where the relevant brief never used the word 'federal'; did not refer expressly to the federal constitution or to any of its provisions; and did not indicate in parentheticals or elsewhere whether the state cases the brief did cite discussed the federal constitution.'" *Arrendondo v. Neven*, 763 F.3d 1122, 1138 (9th Cir. 2014) (cleaned up).  Ellison's citation to *LaGrand* contained none of these indications or signals that he was raising a federal claim.  Thus, Ellison did not "present the state courts with the same claim he urges upon the federal court." *Picard*, 404 U.S. at 276.  And because the federal claim was not fairly presented in state court, it is procedurally defaulted and Ellison is precluded from presenting it to the state courts in a successive post-conviction proceeding.  *See* Ariz. R. Crim. P. 32.1(b)-(h), 32.2(a) & (b).

Ellison contends that Rule 32.2(a)(3) does not apply to claims that "affected a right of constitutional magnitude" if the petitioner did not personally waive the claim.  (Doc. 38 at 36-37.)  But Claim 5 does not fall within the limited framework of claims requiring a knowing, voluntary, and intelligent waiver before a finding of preclusion. *See* Ariz. Rule Crim. Proc. 32.2(a)(3) cmt. (West 2004) (explaining that most claims of trial error do not require a personal waiver); *Stewart v. Smith*, 46 P.3d 1067, 1070 (Ariz. 2002) (identifying the right to counsel, right to a jury trial, and right to a 12-person jury under the Arizona Constitution as the type of claims that require personal waiver); *State v. Swoopes*, 166 P.3d 945, 954 (Ariz. Ct. App. 2007) ("An alleged violation of the general due process right of every defendant to a fair trial, without more, does not save that belated claim from preclusion.").

Finally, Ellison argues that the claim's default is excused by the ineffective assistance of appellate and PCR counsel. (Doc. 38 at 37-38.)  He is incorrect.  First, ineffective assistance of appellate counsel may be used as cause to excuse a procedural default only where the particular ineffective-assistance allegation was first exhausted in state court as an independent constitutional claim. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Murray v. Carrier*, 477 U.S. 478, 489-90 (1986).  Ellison did not raise such a

claim of ineffective assistance of appellate counsel.   Second, under *Martinez,* the ineffective assistance of PCR counsel can only excuse the default of claims of ineffective assistance of trial counsel.  *Hunton v. Sinclair*, 732 F.3d 1124, 1126-27 (9th Cir. 2013) ("While Hunton agrees, as he must, that he did procedurally default on his *Brady* claim, he asserts that he may still pursue it because he was deprived of counsel at his [PCR] proceeding.  However, that pursuit is blocked by a barrier that the Supreme Court clearly recognized . . . [when it] declared that the petitioner's assertion that a claim had been defaulted at his [PCR] proceeding due to ineffective assistance of counsel at that proceeding must fail . . . .  In [*Martinez*], the Court did create one exception . . . where ineffective assistance of counsel in a [PCR] proceeding results in a failure to assert that there was ineffective assistance of counsel in the trial proceedings, the claim would be cognizable.  But . . . [t]he Court made it plain that the exception extended no further.") (citations omitted); *Martinez*, 926 F.3d at 1225 ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel."); *Pizzuto v. Ramirez*, 783 F.3d 1171, 1177 (9th Cir. 2015).

For these reasons, Claim 5 is defaulted and barred from federal review.

## F.   **Claim 6**

In Claim 6, Ellison alleges that the admission of false testimony from Vivian Brown deprived him of his right to reliable, fair, and nonarbitrary proceedings, in violation of the Eighth and Fourteenth Amendments.  (Doc. 21 at 78-80.)  Ellison argues he presented this claim to the Arizona Supreme Court on direct appeal.  (*Id.*)  Respondents contend the claim is procedurally defaulted because Ellison did not fairly present a federal basis for the claim.  (Doc. 30 at 58-59.)

Respondents have the better of this argument.  On direct appeal, Ellison raised a claim that the trial court abused its discretion by limiting his cross-examination of Vivian Brown, the victims' daughter, who testified that she saw Ellison working at a house two doors down from her parents' home in July or August 1998.  (Opening Br. at 42-43.) Ellison argued that he was entitled under Rule 608(b) of the Arizona Rules of Evidence to

1   challenge Brown's credibility on cross-examination with records showing that he had been

2   in custody at the time Brown claimed to have seen him. (*Id*.)  The Arizona Supreme Court

3   determined that the trial court did not abuse its discretion because the custody records were

4   not evidence of the witness's conduct (as required for admissibility under Rule 608(b)) and

5   because they constituted hearsay and Ellison did not try to admit them under a hearsay

6   exception.  *Ellison*, 140 P.3d at 914-15.

7        Ellison did not expressly allege a violation of his federal constitutional rights in his

8   opening brief to the Arizona Supreme Court—he cited only Arizona cases and Arizona

9   rules of evidence in support of his claim that the trial court had committed an abuse of

10  discretion.  (Opening Br. at 42-43.)  Notwithstanding this, Ellison now contends that the

11  Arizona cases he cited were sufficient to fairly present a federal claim. That argument is

12  unavailing.  Although one of Ellison's cited cases, *State v. Salazar*, 898 P.2d 982, 987-88

13  (Ariz. Ct. App. 1995), agreed with the defendant's contention that the trial court had abused

14  its discretion in applying Arizona's rules of evidence and also proceeded to find that the

15  trial court's limitations on cross-examination violated the defendant's confrontation rights

16  under the Sixth Amendment, Ellison's opening brief gave no indication that his claim

17  concerned federal issues.  Thus, his citation to *Salazar* was insufficient to fairly present a

18  federal claim.  *Casey*, 386 F.3d at 911-12; *Arrendondo*, 763 F.3d at 1138.  *See also*

19  *Peterson*, 319 F.3d at 1158-59 ("In his petition for review to the Oregon Supreme Court,

20  Peterson cited two Oregon cases to support his right to counsel claim.  Both cases

21  [*Krummacher* and *Chew*] analyzed right to counsel claims under the Sixth and Fourteenth

22  Amendments to the United States Constitution and under Article I, Section 11, of the

23  Oregon Constitution.  But Peterson, who was represented by counsel, did not simply claim

24  in his petition that he had been denied his constitutionally guaranteed right to counsel and

25  then cite the two Oregon cases.  Instead, he specified that he had been denied 'adequate'

26  assistance of counsel under the Oregon Constitution and cited the two cases.  Since the

27  citation to *Krummacher* and *Chew* was preceded by an explicit reference to the usual term

28  referring to the state version of the constitutional right, as well as by an explicit reference

1    to the Oregon Constitution, a fair reading of Peterson's counseled petition was that the

2    cases were cited only to support a state-law claim.") (citations omitted).

3         For the reasons discussed in relation to Claim 5, Claim 6 is procedurally defaulted

4    and the default is not excused by the performance of appellate or PCR counsel. *Carpenter*,

5    529 U.S. at 453; *Martinez*, 926 F.3d at 1225.  Claim 6 is thus denied as procedurally

6    defaulted and barred from federal review.

7         G.    **Claim 7**

8         In Claim 7, Ellison alleges that the prosecution violated his rights under the Sixth

9    and Fourteenth Amendments by introducing inadmissible hearsay. (Doc. 21 at 80-84.) The

10   evidence at issue is testimony from Detective Watson about Finch's physical reaction

11   during his custodial interrogation when he began discussing Ellison. (*Id.* at 81.)

12        Ellison argues that he fairly presented this claim to the Arizona Supreme Court.  The

13   Court agrees.  In his opening brief, Ellison claimed that the evidence was "inadmissible

14   hearsay admitted in violation of the Sixth and Fourteenth Amendments." (Opening Br. at

15   43.)  He then argued that the evidence was "admitted in violation of the Confrontation

16   Clause." (*Id.* at 42-43.)   The Arizona Supreme Court characterized Ellison's claim as

17   arguing that Watson's testimony was "inadmissible hearsay that violated the Confrontation

18   Clause." *Ellison*, 140 P.3d at 915.  Under these circumstances, the claim is exhausted. *See*

19   *Gatlin*, 189 F.3d at 888; *Sandgathe*, 314 F.3d at 376-77.

20        Nevertheless, the claim is meritless.  During the guilt phase of trial, the prosecution

21   sought to elicit testimony from Detective Watson about Finch's body language during his

22   interrogation when they spoke about "Slinger"/Ellison.  (RT 1/15/02 at 156-57 ["Without

23   telling us anything he said, what was his body language and what was he acting like?"].)

24   The defense immediately objected and the trial court sustained the objection, ruling that

25   Detective Watson could not speculate about the cause of Finch's reaction.  (*Id.* at 157-59.)

26   However, the court permitted the prosecution to ask the Detective Watson whether there

27   was "any difference in [Finch's] demeanor and his body language when he was discussing

28   Slinger and the particular subject of Slinger as opposed to answering any of your other

- 46 -

1    questions about his involvement in the crimes." (*Id.* at 159-60.)   In response to that
2    question, Detective Watson answered: "Yes.  His [Finch's] hands would shake.  His voice
3    broke a couple of times.  And at one point during the interview it appeared like his eyes
4    were starting to well up like he was going to have tears."  (*Id.* at 160.)

5         In denying this claim on appeal, the Arizona Supreme Court found that the
6    admission of Detective Watson's testimony was not fundamental error because Finch's
7    nonverbal conduct "[did] not appear intended as an assertion" and therefore was not
8    hearsay under Rule 801 of the Arizona Rules of Evidence. *Ellison*, 140 P.3d at 915.  Ellison
9    now alleges that this ruling was contrary to and involved an unreasonable application of
10   *Bruton v. United States*, 391 U.S. 123 (1968), and *Crawford*.  (Doc. 21 at 82-84.)

11        As already noted, the Confrontation Clause prohibits the admission of testimonial
12   hearsay at a criminal trial unless the witness is unavailable to testify and the defendant had
13   a prior opportunity for cross-examination.  *Crawford*, 541 U.S. at 59.  Like *Crawford*,
14   *Bruton*, which limits the introduction of a co-defendant's out-of-court statement, concerns
15   only testimonial hearsay.  *Lucero v. Holland*, 902 F.3d 979, 987-88 (9th Cir. 2018) ("[T]he
16   *Bruton* limitation on the introduction of codefendants' out-of-court statements is
17   necessarily subject to *Crawford*'s holding that the Confrontation Clause is concerned only
18   with testimonial out-of-court statements."); *Tennessee v. Street*, 471 U.S. 409, 414 (1985)
19   ("The *nonhearsay* aspect of [accomplice] Peele's confession . . . raises no Confrontation
20   Clause concerns."); *United States v. Dargan*, 738 F.3d 643, 651 (4th Cir. 2013) ("*Bruton*
21   is simply irrelevant in the context of nontestimonial statements.").

22        The Supreme Court has not ruled on when nonverbal conduct constitutes hearsay
23   under *Crawford. United States v. Ibarra-Diaz*, 805 F.3d 908, 923 n.7 (10th Cir. 2015).
24   However, lower courts considering the issue have applied the definition set forth in Rule
25   801(a) of the Federal Rules of Evidence, under which nonverbal conduct cannot be hearsay
26   unless it constitutes a statement, meaning that the declarant "intended it as an assertion."
27   S*ee, e.g.*, *United States v. Taylor*, 688 F. App'x 638, 642 (11th Cir. 2017); *United States v.*
28   *Marshall*, 259 F. App'x 855, 860-61 (7th Cir. 2008).  Rule 801(a) places the burden on the

party claiming there was an intention to make an assertion. *United States v. Kool*, 552 F. App'x 832, 834 (10th Cir. 2014); *see also* Fed. R. Evid. 801, advisory committee note to 1972 proposed rules ("The rule is so worded as to place the burden upon the party claiming that the intention existed; ambiguous and doubtful cases will be resolved against him and in favor of admissibility").

Ellison has not met his burden of showing that Finch's nonverbal conduct was intended as an assertion. The "nonverbal emotional reactions" described by Detective Watson do not qualify as an assertion. *United States v. Campbell*, 507 F. App'x 150, 154 (3d Cir. 2012) ("The court allowed Walter to testify that when William Campbell heard the news about his son, he was angry and in shock. Campbell acknowledges that nonverbal conduct is only hearsay if it is intended as an assertion, but claims that requirement is met here. . . . Contrary to Campbell's assertion, the Rules of Evidence and our case law make clear that testimony concerning a person's nonverbal emotional reaction does not qualify as an assertion."). In *United States v. Kiel*, 658 F. App'x 701 (5th Cir. 2016), the district court allowed an investigator to testify that a friend of one of the defendants, when shown surveillance footage of a bank robbery, "fell back into her chair and put her hand over her mouth and started crying." *Id.* at 710. The Fifth Circuit held that the court did not plainly err in admitting the testimony:

> Sims's reaction to the video . . . is not hearsay because it was not intended as an assertion. In other words, although a jury might infer from Sims's visceral reaction that she knew the individual in the surveillance footage, it does not follow that she intended to identify the individual in the footage. Furthermore, Marshall has not provided any authority that such non-assertive actions constitute "testimony" and therefore invoke the protections of the Confrontation Clause.

*Id.* (citations omitted).

Finch's nonverbal behavior—shaking hands, breaking voice, and tears welling in his eyes—is indistinguishable from the nonverbal emotional reactions addressed in *Campbell* and *Kiel*. As the Arizona Supreme Court correctly found, the behavior was not intended as an assertion and therefore was not hearsay. At a minimum, that determination

1    was not contrary to, or an unreasonable application of, clearly established federal law and
2    was not based on an unreasonable determination of the facts in light of the evidence
3    presented in state court.

4           H.     **Claim 8**

5         In Claim 8, Ellison alleges that his rights under the Eighth and Fourteenth
6    Amendments were violated when the trial court admitted evidence of a handgun linked to
7    him which was found in a car parked in the garage of his girlfriend.  (Doc. 21 at 84-87.)
8    Respondents contend this claim is procedurally defaulted.  (Doc. 30 at 65-66.)

9         Respondents are correct.  On direct appeal, Ellison alleged only that the trial court
10   abused its discretion by admitting the evidence, which he argued was a violation of Arizona
11   Rule of Evidence 403.  (Opening Br. at 44.)  He did not allege a violation of the federal
12   constitution or cite any cases analyzing a federal issue.  (*Id.*)  The Arizona Supreme Court
13   denied the claim, finding that the trial court did not abuse its discretion because the
14   "evidence establishes that Ellison possessed a gun before and after the crime, and combined
15   with other evidence that Finch did not possess a gun, makes less likely Ellison's story that
16   he participated only because Finch threatened him with a gun."  *Ellison*, 140 P.3d at 915-
17   16.  The court did not consider any claim of a violation of Ellison's federal constitutional
18   rights.  *Id.*

19        Ellison did not exhaust a federal claim in state court.  For the reasons discussed
20   above, the procedural default of the claim is not excused by the performance of appellate
21   or PCR counsel.  *Carpenter*, 529 U.S. at 453; *Martinez*, 926 F.3d at 1225.  Thus, Claim 8
22   is denied as procedurally defaulted and barred from federal review.

23          I.     **Claim 9**

24        In Claim 9, Ellison alleges that the trial court improperly admitted a hearsay
25   statement by Finch implicating Ellison in the crime, in violation of the Sixth, Eighth, and
26   Fourteenth Amendments.  (Doc. 21 at 87-90.)  On direct appeal, the Arizona Supreme
27   Court denied Ellison's claim that the admission of the statement violated his Sixth
28

1    Amendment confrontation rights.  *Ellison*, 140 P.3d at 916.[17]

2         At issue is testimony by Detective Auld who, when asked by the prosecutor what

3    he was looking for when that he searched the home of Ellison's girlfriend, replied: "Any

4    evidence associated with the crime, some of the property that was taken, the phone cords,

5    the tape, the gun *that was described to us by Mr. Finch*."  (RT 1/16/02 at 170, emphasis

6    added.)   Defense counsel did not raise an immediate objection to the testimony and

7    ultimately the parties agreed that it would not be stricken so as to avoid drawing the jury's

8    attention to it.  (*Id.* at 210-13.)  The prosecutor also agreed not to use the statement in his

9    closing argument. (*Id.* at 212.)

10        On direct appeal, Ellison argued that the testimony about Finch's statement violated

11   the Sixth Amendment and that the trial court should have *sua sponte* ordered a mistrial.

12   (Opening Br. at 45-46.)   The Arizona Supreme Court denied the claim, finding no

13   fundamental error:

14        Detective Auld's reference was brief and the State did not use this statement
15        in closing.  Additionally, the jurors did not hear any specific evidence or
          argument regarding Finch's duress claim and likely were not even aware that
16        Finch claimed Ellison pointed a gun at him.  As the State points out, the jury
17        might have thought that Auld's reference concerned one of the guns taken
          from the Bouchers' house.
18

19   *Ellison*, 140 P.3d at 916.

20        Ellison alleges that the ruling was contrary to and involved an unreasonable

21   application of *Crawford* and *Bruton* and was based on an unreasonable determination of

22   the facts.  Respondents counter that *Crawford* and *Bruton*, which apply only to hearsay

23   statements, are inapplicable to Detective Auld's testimony.  (Doc. 30 at 70.)  The Court

24   agrees.

25        Hearsay is an out-of-court statement offered to prove the truth of the matter asserted.

26   *See, e.g.*, Fed. R. Evid. 801(c).  "*Crawford* applies only to testimonial *hearsay*, and does

27   ──────────────
     [17]    Respondents acknowledge that Ellison raised a Sixth Amendment claim on direct
28   appeal but contend that any Eighth Amendment claim is procedurally defaulted.  (Doc. 30
     at 68.)

1    not bar the use of testimonial statements for purposes other than establishing the truth of

2    the matter asserted." *United States v. Wahchumwah*, 710 F.3d 862, 871 (9th Cir. 2013)

3    (citation omitted).  For example, "[a]n out-of-court statement used to explain why police

4    took a certain action in their investigation is not hearsay."  *United States v. Velazquez-*

5    *Rivera*, 366 F.3d 661, 666 (8th Cir. 2004).  *See also United States v. Taylor*, 569 F.3d 742,

6    749 (7th Cir. 2009) ("We have recognized repeatedly that statements offered to establish

7    the course of the investigation, rather than to prove the truth of the matter asserted, are

8    nonhearsay and therefore admissible.") (cleaned up).  *See generally United States v.*

9    *Johnson*, 875 F.3d 1265, 1278-79 (9th Cir. 2017) (acknowledging this rule while noting

10   that "[c]ourts must exercise caution to ensure that out-of-court testimonial statements,

11   ostensibly offered to explain the course of a police investigation, are not used as an end-

12   run around *Crawford* and hearsay rules, particularly when those statements directly

13   inculpate the defendant").

14       Detective Auld's testimony that officers were looking for items associated with the

15   crime, including "the gun that was described to us by Mr. Finch," was not offered to prove

16   the truth of any assertion.  Rather, it was offered in the context of Auld's explanation of

17   the officers' actions in carrying out the search.  *Taylor*, 569 F.3d at 749 ("The government

18   offered [non-testifying declarant's] statement in the context of the officers' testimony to

19   explain the course of law enforcement's investigation, not as evidence that Taylor

20   possessed the gun.").

21       Alternatively, even assuming the testimony was hearsay and therefore was admitted

22   in violation of *Crawford*, Ellison would not be entitled to relief.  Confrontation Clause

23   errors are subject to harmless error analysis.  *Coy v. Iowa*, 487 U.S. 1012, 1021-22 (1988);

24   *Woods v. Sinclair*, 764 F.3d 1109, 1125 (9th Cir. 2014); *Ocampo v. Vail*, 649 F.3d 1098,

25   1114 (9th Cir. 2011).  Under that standard, a federal court may not grant habeas relief for

26   a Confrontation Clause error unless the error had a "substantial and injurious effect or

27   influence" on the verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993); *see also*

28   *Brown v. Davenport*, 596 U.S. 118, 122 (2022) ("When a state court has ruled on the merits

of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA.").

Any error here did not affect the verdict. As the Arizona Supreme Court noted, the statement at issue was brief, ambiguous, and isolated. *Ellison*, 140 P.3d at 916. The prosecutor did not use the statement in his closing argument or elsewhere in the case against Ellison. *Compare United States v. Silva*, 380 F.3d 1018, 1021 (7th Cir. 2004) (*Crawford* error not harmless where prosecutor "explicitly used some of the hearsay as evidence of Silva's guilt" and court denied defendant's objections and failed to give curative instruction).

J.    **Claim 10**

In Claim 10, Ellison alleges that the cumulative effect of the trial court's guilt-phase evidentiary errors violated his right to due process under the Eighth and Fourteenth Amendments. (Doc. 21 at 90-92.) On direct appeal, the Arizona Supreme Court denied Ellison's claim of cumulative error, explaining that the court "usually does not subscribe to the cumulative error doctrine" and that none of the alleged errors "independently prove[d] prejudice." *Ellison*, 140 P.3d at 916.

The parties disagree on the claim's procedural status. Because the claim is plainly meritless, the Court need not address this issue. *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (courts may bypass the procedural default issue in the interest of judicial economy when the merits are clear but the procedural default issues are not).

The United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."), *corrected on rh'g*, 307 F.3d 459 (6th Cir. 2002); *cf. Morris v. Sec'y Dep't of Corr.*, 677 F.3d 1117, 1132 n.3 (11th Cir. 2012) ("We need not determine today whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application

of clearly established law."). *But see Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) ("Under traditional due process principles, cumulative error warrants habeas relief only where the errors have so infected the trial with unfairness as to make the resulting conviction a denial of due process.") (citation omitted). At any rate, the Court has not identified any constitutional errors arising from the trial court's guilt-phase evidentiary rulings. Therefore, "is enough to say that [Ellison's] cumulative error claim clearly fails in light of the absence of any individual errors to accumulate." *Morris*, 677 F.3d at 1132 n.3. *See also McGill v. Shinn*, 16 F.4th 666, 685 (9th Cir. 2021) ("If there are no errors, there is no need to consider their cumulative effect."). At a minimum, the Arizona Supreme Court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law.

### K.   **Claim 11**

In Claim 11, Ellison alleges that the reasonable-doubt instruction impermissibly lowered the State's burden of proof in violation of the Sixth and Fourteenth Amendments. (Doc. 21 at 92-93.) The Arizona Supreme Court's rejection of this claim, *Ellison*, 140 P.3d at 916, was neither contrary to nor an unreasonable application of clearly established federal law.

During both the guilt and sentencing phases of trial, the trial court defined proof beyond a reasonable doubt as "proof that leaves you firmly convinced of" "a defendant's guilt," "the fact in dispute," and "the aggravating circumstance." (RT 1/15/02 at 15; RT 1/18/02 at 13; RT 2/6/04 at 49; RT 2/9/04 at 102.) Relying on an opinion from an intermediate appellate court of Hawaii, Ellison argues that the phrase "firmly convinced" "reduced the State's burden of proof to something less than reasonable doubt; it is akin to 'clear and convincing.'" (Doc. 21 at 93.)

This argument is unavailing. "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). As long as the jury is instructed that the defendant must be found

guilty beyond a reasonable doubt, "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, taken as a whole, the instructions must correctly convey the concept of reasonable doubt to the jury." *Id.* (cleaned up).

The instruction provided in Ellison's case was based on the pattern instruction adopted by the Federal Judicial Center. *State v. Van Adams*, 984 P.2d 16, 25-26 (Ariz. 1999). Ellison cites no controlling authority holding that the instruction impermissibly lowers the burden of proof, and, in *Victor*, Justice Ginsburg praised the instruction as "clear, straightforward, and accurate." 511 U.S. at 26 (Ginsburg, J., concurring). The Ninth Circuit has upheld identical or substantially similar instructions. *See, e.g.*, *United States v. Artero*, 121 F.3d 1256, 1257-59 (9th Cir. 1997); *United States v. Velasquez*, 980 F.2d 1275, 1278 (9th Cir. 1992) ("Considering the instruction given as a whole, the use of the 'firmly convinced' language did not indicate to the jury that the prosecutor had a lesser burden than that implied by the use of the term 'reasonable doubt' standing alone.").

L.     **Claim 12**

In Claim 12, Ellison alleges that the trial court erroneously denied his motion for judgment of acquittal despite insufficient evidence of premeditated murder, in violation of the Sixth, Eighth, and Fourteenth Amendments. (Doc. 21 at 93-97.)

As background, at the close of the State's guilt-phase case, Ellison moved for a directed verdict that he was not death-eligible. (RT 1/17/2002 at 47-49.) He argued that the evidence did not support a finding that he killed or intended to kill either victim or that he acted with recklessness sufficient to satisfy the *Enmund/Tison* criteria for felony murder. (*Id.*)[18] Judge Moon denied the motion, concluding that circumstantial evidence supported a finding either that Ellison committed premeditated murder or was guilty of felony murder and satisfied the *Enmund/Tison* requirements. (*Id.* at 52-54.) The jury then found Ellison

---

[18]     Under *Tison v. Arizona*, 481 U.S. 137 (1987), and *Enmund v. Florida*, 458 U.S. 782 (1982), a defendant convicted of felony murder can be sentenced to death only if he actually killed, attempted to kill, or intended to kill, or if he was a major participant in the underlying felony and acted with reckless indifference to human life.

1   guilty of both premeditated and felony murder.  It also made specific findings that the

2   *Enmund/Tison* factors were satisfied.

3       On direct appeal, the Arizona Supreme Court rejected Ellison's argument that the

4   trial court erred in denying his motion for acquittal.  *Ellison*, 140 P.3d at 917-18.  With

5   respect to premeditated murder, the court first recited the statutory definition of the offense,

6   stating that a person commits premeditated murder if "[i]ntending or knowing that the

7   person's conduct will cause death, such person causes the death of another with

8   premeditation."  *Id.* at 917 (quoting A.R.S. § 13-1105(A)(1)).  The court then explained

9   that to establish premeditation, "the state must prove that the defendant acted with either

10  the intent or knowledge that he would kill his victim and that such intent or knowledge

11  preceded the killing by a length of time permitting reflection."  *Id.*  (quotation omitted).

12  The court further explained that a defendant may be liable as an accomplice "only for those

13  offenses the defendant intended to aid or aided another in planning or committing."  *Id.*

14  (quoting *State v. Phillips*, 46 P.3d 1048 (Ariz. 2002)).  As part of that discussion, the court

15  rejected Ellison's argument that "duress should be a defense to accomplice liability,

16  because a person acting under duress does not have the specific intent to aid or assist a

17  premeditated murder."  *Id.*  The court observed that "Ellison confuses the distinct concepts

18  of motive and intent" and then elaborated:

19      Just as we have refused to recognize duress as a defense to felony murder
20      even when the defendant did not physically kill the victim, we now decline
        to recognize duress as a defense to accomplice liability for murder.  *Phillips*
21      does not require a contrary rule.  The focus, rather, is on whether the facts
        show Ellison's specific intent to aid or assist Finch in the murders apart from
22      his intent to assist Finch in committing burglary.  If a defendant has the
        specific intent to assist in murder, even though his sole motivation is duress,
23      *Phillips* is satisfied.

24      A reasonable fact-finder could have inferred that Ellison intentionally aided
25      or assisted Finch in killing the Bouchers, or even killed Mr. Boucher himself.
        The evidence indicated that Ellison knew the victims, planned the night-time
26      invasion of their home, and did not attempt to conceal his identity from them.
        Ellison supplied the gloves he and Finch used in committing the crimes and
27      led Finch to the scene.  As the State notes, the manner in which Ellison and
        Finch killed the Bouchers also shows premeditation.  They bound them,
28

making them helpless to stop the robbery, but still suffocated them. The medical examiner testified that suffocation takes several minutes to complete. The medical examiner also testified that the victims had defensive wounds on their bodies. Ellison's argument under *Phillips* fails.

*Id.* (citation omitted).

This decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable factual determination.

First, the Court rejects Ellison's argument that the Arizona Supreme Court's "failure to follow *Phillips* in finding accomplice liability for premeditated murder" represents a violation of federal due process. (Doc. 21 at 97.) The United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Next, the United States Supreme Court has "made clear that [insufficient-evidence] claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam). The first layer is the standard of review for insufficient evidence claims, which is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under this standard, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). Consequently, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Id. See also Johnson*, 566 U.S. at 656 ("[T]he only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality.").

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. A reviewing court

1  "faced with a record of historical facts that supports conflicting inferences must presume—

2  even if it does not affirmatively appear in the record—that the trier of fact resolved any

3  such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

4  "A jury's credibility determinations receive near-total deference under *Jackson.*" *Bruce v.*

5  *Terhune*, 376 F.3d 950, 957 (9th Cir. 2004); *see also Schlup v. Delo*, 513 U.S. 298, 330

6  (1995) ("[U]nder *Jackson*, the assessment of the credibility of witnesses is generally

7  beyond the scope of review.").

8      Layered on top of the *Jackson* standard is the "additional layer of deference"

9  required by AEDPA.   This requires a petitioner to establish that the state court

10  unreasonably applied *Jackson* to the facts of the case.   *Emery v. Clark*, 604 F.3d 1102,

11  1111 n.7 (9th Cir. 2010); *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005).

12  Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency

13  of the evidence challenge simply because the federal court disagrees with the state court.

14  The federal court instead may do so only if the state court decision was 'objectively

15  unreasonable.'" *Cavazos*, 565 U.S. at 2 (citation omitted).

16      Applying these layers of deference, Ellison is not entitled to relief.   First, under

17  *Jackson*, a reasonable trier of fact, viewing the evidence in the light most favorable to the

18  prosecution, could conclude that Ellison intentionally aided or assisted in the murder of the

19  Bouchers.   The trial evidence showed that Ellison, who unlike Finch was familiar with

20  Kingman, the Bouchers' neighborhood, and the Bouchers themselves, planned the burglary

21  and led Finch to the house.   Ellison did not attempt to conceal his identity even though the

22  Bouchers knew him, supplied the gloves used in the burglary, and had access to a handgun.

23  Ellison and Finch bound the victims, and Ellison suffocated and may have killed Mr.

24  Boucher.   The suffocation itself would have taken several minutes.   The evidence also

25  showed that Finch was "simple," was unable to handle money, didn't own a gun, didn't

26  own a car, and had never been to Kingman.   (RT 1/17/02 64-68, 76.)

27      At any rate, when viewed with the additional deference required by AEDPA, the

28  Arizona Supreme Court's rejection of the claim was not "objectively unreasonable."

1 *Cavazos*, 565 U.S. at 2.

2     M.    **Claim 52**

3     In Claim 52, Ellison alleges that the State "violated its duty to disclose information

4 about its witnesses, knowingly presented false evidence, and/or failed to correct false

5 evidence, in violation of the Fourteenth Amendment." (Doc. 21 at 308-18.) More

6 specifically, Ellison asserts that the prosecution violated *Napue v. Illinois*, 360 U.S. 264

7 (1959), by (1) presenting false testimony from Detectives Watson and Auld; and (2)

8 presenting false testimony from Vivian Brown. (*Id.*)[19]

9     1.    <u>Detectives Watson And Auld</u>

10     Before turning to the specifics of Ellison's first *Napue* claim, it is helpful to provide

11 some context. As discussed in relation to Claim One, Ellison raised a pretrial *Miranda*

12 challenge to the admissibility of his confession. During the ensuing suppression hearing,

13 one of the key disputed issues was whether Ellison had made an unambiguous request for

14 an attorney at the outset of his interrogation. Ellison testified that he had, in fact, made

15 such a request. Detective Watson, in contrast, testified that (1) during the initial portion of

16 the interrogation, which Detective Watson had attempted to surreptitiously record using a

17 hidden tape recorder, Ellison stated "I think I might want a lawyer"; (2) after this portion

18 of the interrogation was over, Detective Watson realized that the cassette in the tape

19 recorder was blank; (3) Detective Watson then returned to the jail in an attempt to get "the

20 highlights of the interview clarified on tape";[20] (4) during this re-interview, which was

21 _____

22 [19]     In *Napue*, the Supreme Court held that "a conviction obtained through use of false
evidence, known to be such by representatives of the State, must fall under the Fourteenth

23 Amendment." 360 U.S. at 269. "A claim under *Napue* will succeed when '(1) the
testimony (or evidence) was actually false, (2) the prosecution knew or should have known

24 that the testimony was actually false, and (3) the false testimony was material.'" *Sivak*,
658 F.3d at 908-09 (quoting *Jackson v. Brown*, 513 F.3d 1057, 1071-72 (9th Cir. 2008)).

25

26 [20]     Detective Watson further testified that he was "very upset" when he realized that
the first session hadn't been recorded and that "[t]he truth of the matter is . . . I wanted it

27 clear on tape that I *Mirandized* him [Ellison], that he had stated—made it an inference that
he wanted an attorney, and that he had made it very clear to us, because I knew that was

28 going to be an issue later at trial. That was what upset me the most was the fact that that

1   recorded and which occurred about 20-25 minutes after the first interview had ended,[21]

2   Detective Watson summarized Ellison's statement during the initial interview as "you said

3   you wanted an attorney"; and (5) Detective Watson's summary as reflected on the

4   recording was inaccurate because, as Detective Watson had earlier testified, Ellison

5   actually said "I think I might want a lawyer" during the first portion of the interview.

6   Detective Auld also testified during the suppression hearing and provided an account that

7   was consistent with Detective Watson's.  At the conclusion of the hearing, Judge Moon

8   rejected Ellison's testimony as incredible and denied the suppression request.

9        In Claim 52, Ellison identifies two reasons why the suppression-hearing testimony

10   of Detectives Watson and Auld was false and, relatedly, why the prosecution's presentation

11   of that false testimony should be deemed to have violated *Napue*: (1) the cassette; and (2)

12   the handwritten note.

### a.   **The Cassette**

14        Ellison's first *Napue* theory involves the cassette from the first portion of his

15   interrogation (which, as noted, Detective Watson testified was blank, thus necessitating the

16   re-interview).  According to Ellison, an expert retained by his habeas counsel has now

17   analyzed the original cassette and determined that it was *not* blank—instead, it contains a

18   brief portion "in which voices are discernable, followed by 25 minutes of an erased

19   recording." (Doc. 21 at 312.)  According to Ellison, this expert will further opine that "[t]o

20   do this, the officers would have had to knowingly record over the interrogation—it could

21   not have been the mishap of failing to press record that Watson described in his testimony."

22   (Doc. 38 at 164.)   Thus, Ellison contends, "Watson's and Auld's testimony about the

23   'blank' tape was false.  The correct and truthful testimony would have been that Watson

24   did not fail to press record, the recording was in fact not blank, there was an audible portion

25   of the recording, and the recorded interrogation was erased."  (Doc. 21 at 312.)

---

27   was going to be contested and we didn't have that clearly laid out on the recorded
    interview."  (RT 7/20/99 at 59.)

28   [21]   *See* RT 7/20/99 at 37-38 (Detective Watson, agreeing to this timeframe).

In response, Respondents raise an array of reasons why Ellison should not be granted habeas relief based on the audio cassette component of Claim 52. (Doc. 30 at 215-23.) Because the Court agrees that two of those reasons are independently dispositive, it is unnecessary to reach Respondents' other arguments.

Ellison acknowledges he did not raise a *Napue* claim based on the audio cassette during his state-court proceedings. (Doc. 21 at 315 ["The above allegations regarding Auld's and Watson's false testimony were not raised in state court."].) As a result, Respondents argue this claim is procedurally defaulted. (Doc. 30 at 216.) Ellison, meanwhile, contends he can establish the cause and prejudice necessary to overcome the procedural default. (Doc. 21 at 315-17.) As for the cause requirement, Ellison's theory is that "the reason for his failure to develop [the claim] was the State's suppression of the relevant evidence." (*Id.*, quoting *Banks v. Dretke*, 540 U.S. 668, 691 (2004).) More specifically, Ellison argues in his habeas petition that the prosecution never produced during discovery (or otherwise made available to him during discovery) the original version of the audio cassette that his expert has now analyzed—instead, the prosecution only produced a purported copy of the audio cassette, which did not contain proof of the erasure. (Doc. 21 at 313 ["As part of discovery, trial counsel was provided a copy of the microcassette by the State, which was then passed on to postconviction counsel. That copy, it turns out, was not properly dubbed and did not accurately represent what was on the original. When trial counsel's copy is played there are no audible voices and therefore no clear indication that the tape was not 'blank.'"]; *id.* at 318-19 [arguing, in relation to Claim 53, that the prosecution "fail[ed] to provide trial counsel with . . . a proper copy of the original microcassette recording of Ellison's first interrogation" and that "[a]lthough the State did provide a copy to trial counsel, it was not dubbed correctly, so none of the audio was recognizable as voices"].)[22] However, in his reply, Ellison acknowledges in a footnote

---

[22]    *See also* Doc. 21 at 314 ("[T]he original microcassette from the first interrogation . . . was sealed in an envelope and entered into Kingman Police Department as item LSW33. But LSW33 was not stored with all the other police evidence in the case. Instead, the item had been stored in the prosecutor's file in the Mohave County Attorney's Office.").

that the factual assertions on this issue in his petition are inaccurate:

> In the Petition, Ellison referred to one copy of the microcassette containing the first interrogation that was improperly dubbed.  Undersigned counsel believed at the time that this was the only copy of the first interrogation provided to defense counsel and that it was provided to trial counsel specifically.  ***Since the Petition was filed, undersigned counsel discovered another cassette in previous counsel's files.  It is unclear at this time which of these copies were provided to trial counsel and which to postconviction counsel.  The newly discovered cassette seems to begin with part of the recording of the first interrogation followed by the full recording of the second interrogations***.  This is all on one side of the cassette; the other side is blank.  The cassette seems to include only a portion of the first interrogation, and then it continues onto the recording of the second interrogation.  Because both recordings were put on the same side and the copy of the recording of the first interrogation is truncated, without having listened separately to an accurate copy of the first interrogation this dual copy does not alert the listener as to what if any part of the audible portion came from the first interrogation.

(Doc. 38 at 163 n.26, citations omitted and emphasis added.)  Nevertheless, Ellison argues that if "this claim should have been raised postconviction, . . . Ellison will demonstrate that postconviction counsel was ineffective in failing to raise this claim."  (*Id.* at 165.)[23]

In light of the clarification in his reply, Ellison has not demonstrated the cause necessary to overcome the procedural default of his *Napue* claim based on the audio cassette.  Although "the state's suppression" of evidence can "establish[] cause . . . when it is the reason for [a habeas petitioner's] failure to develop facts in state court proceedings," *Henry v. Ryan*, 720 F.3d 1073, 1082 (9th Cir. 2013), that principle is inapplicable here because the original audio cassette was not suppressed from Ellison in a manner that prevented him from developing his *Napue* claim during the state-court proceedings.  To the contrary, the original audio cassette was provided to Ellison's state-court counsel, who nevertheless failed to retain an expert to perform sort of analysis and

---

[23]    Ellison makes the same argument in his request for evidentiary development: "[I]f the State did not suppress this information, then the failure to present it to the state courts resulted from the ineffective assistance of postconviction counsel, which in turn provides cause for the default and establishes prejudice."  (Doc. 41 at 40-41 n.6.)

testing that Ellison has now (via his habeas counsel) retained an expert to perform.  Under these circumstances, Ellison cannot argue that the state's suppression of evidence qualifies as cause to excuse the procedural default of his claim.  *Henry*, 720 F.3d at 1083-85 (concluding that habeas petitioner failed to show that suppression established cause for the procedural default of a *Brady* claim because he "had evidentiary support for his claim more than a decade before commencing federal habeas proceedings" and noting, in relation to a related *Napue* claim, that because "[t]he facts underlying this claim were developed not by analyzing evidence that was produced in federal habeas proceedings, but rather by [the] analysis [by experts retained by habeas counsel] of evidence that had been in Henry's possession for years," "[t]he factual predicate for this claim could previously have been discovered through diligence").

As for Ellison's fallback argument that the ineffective assistance of his PCR counsel (presumably, in not retaining an expert to perform the sort of testing on the audio cassette that Ellison's habeas counsel have now retained an expert to perform) qualifies as cause to overcome the procedural default of his *Napue* claim, that argument is foreclosed by Ninth Circuit law.  *Martinez*, 926 F.3d at 1225 ("[I]neffective assistance of PCR counsel can constitute cause only to overcome procedurally defaulted claims of ineffective assistance of trial counsel.").

Finally, separate from the issue of cause, Ellison also cannot establish prejudice in relation to the audio cassette.  *Frost v. Gilbert*, 835 F.3d 883, 889-90 (9th Cir. 2016) (affirming denial of habeas relief because petitioner had only demonstrated cause, but not prejudice, as to procedurally defaulted *Napue* and *Brady* claims); *Sivak*, 658 F.3d at 914 ("[T]here was no prejudice during the guilt phase on account of the *Napue* and *Brady* violations.").  As Respondents correctly note, Ellison's tape-erasure theory is based on a series of highly speculative inferences, including that "the deleted audio would have actually refuted Watson's and Auld's testimonies during the voluntariness hearing—instead of verifying their testimonies."  (Doc. 30 at 220-21.)  Indeed, the premise underlying Ellison's tape-erasure theory is that Detective Watson must have realized that

Ellison's unqualified request for counsel during that interview posed a *Miranda* problem and thus felt it necessary to erase the evidence of that request (the tape from the first interview) and return to the jail for another recorded interview.  Otherwise, there would have been no reason to conduct the second interview.  But in that hypothetical scenario, the scheming, evidence-destroying officer would surely make a point of clarifying during the second interview that the suspect's request for counsel during the first interview was equivocal (and thus insufficient to trigger *Miranda*).  Why else go to the trouble of erasing the recording of the first interview?  Here, unlike in the hypothetical scenario, the recording from the second interview is not favorable to law enforcement with respect to the *Miranda* issue—on the recording, Detective Watson describes Ellison's request for counsel during the first interview as unequivocal ("you said you wanted an attorney").  It makes no sense that Detective Watson would have erased the recording of the first interview containing that statement just to turn around and make another recording of himself attributing the same statement to Ellison.

### b.    The Handwritten Note

The other basis for Ellison's *Napue* claim is a handwritten note that the original prosecutor, Craig Friesner, made on an intake summary form on the day Detectives Watson and Auld interviewed Ellison.  The passage at issue, an excerpt from several pages of shorthand notes, reads:

> Slinger fd in van
>
> ~~I th~~ "I want a lawyer"
>
> Then: "I'll talk"

(Doc. 21 at 313; *see* Doc. 42-5 at 54, Ex. 19, ¶ 2 [actual note].)  According to Ellison, this note constitutes Friesner's "contemporaneous record of what Watson reported to Friesner about what happened in the interrogation of Ellison."  (Doc. 38 at 164.)  Ellison contends this evidence shows that Detectives Watson and Auld lied when they testified that Ellison said "I think I might want a lawyer" instead of "I want a lawyer."  (Doc. 21 at 313-15.)

Ellison acknowledges he did not raise a *Napue* claim based on the handwritten note

1   during his state-court proceedings.  (Doc. 21 at 315.)  As a result, and as with the *Napue*

2   claim based on the audio cassette, Respondents argue this claim is procedurally defaulted.

3   (Doc. 30 at 216.)  Ellison, in turn, contends once again that he can overcome the procedural

4   default by showing cause and prejudice, with cause established via the state's suppression

5   of evidence.  (Doc. 21 at 315-17.)

6          The suppression analysis is complicated by the fact that the parties seem to disagree

7   about whether the handwritten note was disclosed to Ellison's trial counsel.  In his petition,

8   Ellison asserts that "the State failed to disclose the Mohave County Attorney's Office

9   Intake Summary . . . .  It was simply never given to trial counsel."  (Doc. 21 at 329.)  In

10  response, Respondents contend that, "[a]s an initial matter, Ellison has not even

11  demonstrated that the State did not disclose purported information from the previous

12  prosecutor[]."  (Doc. 30 at 227.)  In reply, Ellison asserts: "[Respondents] offer conjecture

13  that the Intake Summary was not suppressed and that trial counsel may have received a

14  copy.  Respondents however do not point to any trial disclosure by the State to demonstrate

15  that the Intake Summary was provided to trial counsel, which is the only way trial counsel

16  could have obtained it.  The copy of the State disclosures in the defense files does not

17  include the Intake Summary.  There was no copy of the Intake Summary in any of defense

18  files received by undersigned counsel.  Undersigned counsel obtained the summary when

19  they obtained the Mohave County Attorney's file from that office. Respondents therefore

20  fail to demonstrate the summary was not suppressed."  (Doc. 38 at 166-67.)

21         The Court finds it unnecessary to resolve this issue (or hold an evidentiary hearing

22  to develop it further) because, even assuming the handwritten note was suppressed in a

23  manner that establishes cause for the procedural default, Ellison has failed to show

24  prejudice.  To prevail on his *Napue* claim, Ellison would need to show, among other things,

25  that Detectives Watson and Auld *knew* they were testifying falsely when they testified

26  during the suppression hearing that Ellison stated "I think I might want a lawyer" during

27  the interrogation, rather than "I want a lawyer."  *Henry*, 720 F.3d at 1084 ("We need not

28  reach the question of whether Detective Patterson's knowledge must be imputed to the

prosecution, because we agree with the district court that Henry has not established that Patterson knowingly provided false testimony during trial.").  Friesner's handwritten note does not establish that the detectives' testimony on this point was knowingly false.  At most, the note suggests that when Detective Watson initially described the interrogation to Friesner, he summarized Ellison's testimony in the same manner he summarized it during the recorded second interview (*i.e.*, as an unqualified request for a lawyer).  But as discussed, Detective Watson testified that this summary was inaccurate and that Ellison's words were, in fact, "I think I might want a lawyer."  Judge Moon, who was aware that Detective Watson had provided inconsistent descriptions of Ellison's statement, still credited Detective Watson's testimony.  Given this backdrop, the handwritten note from Friesner does not establish that Detectives Watson and Auld knowingly lied when testifying about Ellison's statement.  *Henry*, 720 F.3d at 1084 ("Although Henry has provided evidence rebutting Patterson's version of the facts, he has provided no evidence that Patterson *knew* his testimony was inaccurate at the time he presented it, rather than Patterson's recollection merely being mistaken, inaccurate or rebuttable.  Henry's conclusory assertion that, because Patterson must have known where he stepped while investigating the crime scene, any testimony inconsistent with the truth must be not only inaccurate but also perjured does not constitute evidence sufficient to make out a *Napue* claim.").  *See also United States v. Rampoldi*, 825 F. App'x 490, 490-91 (9th Cir. 2020) (rejecting *Napue* claim: "Rampoldi failed to show the witness's testimony was false, as opposed to merely inconsistent, and the witness attempted to explain the apparent inconsistencies.  Rampoldi at most points to evidence creating an inference of falsity, which is not sufficient.  Moreover, defense counsel extensively and effectively cross-examined Weigand about the alleged inconsistencies.") (cleaned up); *United States v. Renzi*, 769 F.3d 731, 752 (9th Cir. 2014) ("We also question whether Renzi met the first two prongs of the *Napue* test.  Mere inconsistencies or honestly mistaken witness recollections generally do not satisfy the  falsehood requirement.").

            …

1

2.     Vivian Brown

2        Ellison's other *Napue* theory relates to the testimony of the victims' daughter,

3   Vivian Brown.  At both the guilt and sentencing phases of trial, Brown testified that in

4   October 1997 she was present on the patio of her parents' house while her mother spoke

5   with a man Brown later identified as Ellison, who had been doing repair work on a wall in

6   the Bouchers' backyard.  (RT 1/15/02 at 47-50; RT 2/6/04 at 107-08.)  According to Brown,

7   Ellison commented on the view from the Bouchers' yard, noting that you could see all of

8   Kingman.  (RT 1/15/02 at 49-50.)  Brown also testified that she saw Ellison a second time,

9   working on an electrical box at a home two doors down from her parents' house.  (RT

10  1/15/02 at 51; RT 2/6/04 at 131-32.)  At the guilt phase of trial, she testified that this second

11  sighting of Ellison occurred during the monsoon season of 1998, on a warm day, possibly

12  in July or August.  (RT 1/15/02 at 51.)   At the sentencing phase, she testified that the

13  sighting could have happened in April or May of 1998.  (RT 2/6/04 at 132.)

14        As part of Claim 52, Ellison argues that Brown's testimony about seeing him a

15  second time in 1998 was necessarily false because he was in custody throughout that year,

16  being released in January 1999.  (Doc. 317-18.)  Ellison further argues that *Napue* is

17  implicated because the prosecutor, who had possession of his prison records, must have

18  known that he was incarcerated during that period.  (*Id.*)

19        An initial question raised in the parties' briefing is whether this claim is procedurally

20  defaulted.  Ellison contends it is not because he "raised the *Napue* claim related to Brown's

21  false testimony in his [PCR] petition and in his petition for review."  (Doc. 21 at 317.)

22  Respondents, meanwhile, contend that "Claim 52 is procedurally defaulted . . . because

23  Ellison failed to present it in state court, and he has not established any excuse to overcome

24  the default."  (Doc. 30 at 215.)   Respondents do not, however, seem to acknowledge

25  Ellison's contention that he raised a *Napue* claim related to Brown during his PCR

26  proceedings.  (*Id.* at 215-24.)  In reply, Ellison clarifies that he does not concede a lack of

27  exhaustion as to this claim.  (Doc. 38 at 165.)

28        The Court agrees with Respondents that Ellison's *Napue* claim related to Brown's

- 66 -

testimony is procedurally defaulted without excuse.  During his direct appeal, Ellison did not raise a *Napue* claim related to Brown's testimony.  Thus, under Arizona Rule of Criminal Procedure 32.2, he was precluded from raising such a claim in a PCR proceeding.  *See, e.g., Cotham v. Shinn*, 2022 WL 20595113, *15 (D. Ariz. 2022) ("Petitioner asserts a *Napue* claim alleging he was denied a fair trial because the prosecutor 'knowingly presented perjured testimony.'  Petitioner did not raise this claim on appeal.  Petitioner raised it in his PCR petition but the PCR court determined it was precluded under Ariz. R. Crim. P. 32.2.  The Arizona Court of Appeals found no abuse of discretion in that determination.  The claim is therefore expressly procedurally defaulted.") (citations omitted).  Presumably for this reason, Ellison's PCR petition did not raise a standalone *Napue* claim.  Instead, Ellison raised a claim of "Ineffective Assistance at the Guilt Phase" and then argued, in one of the subheadings in this section of his petition, that his trial counsel engaged in ineffective assistance by failing to obtain his jail records, which could have been used to impeach Brown.  (PCR Pet. at 62, 73-75).  Admittedly, this portion of the petition also included several references to *Napue* and an assertion that "the prosecutor let his witness testify more than once to a fact he knew was incorrect."  (*Id.* at 73-75.)  However, the PCR court did not construe the PCR petition as raising a *Napue* claim—instead, the court construed Ellison's arguments on this point as raising a claim of ineffective of counsel and then summarily denied relief because the issue was "of little moment or relevance to guilt or punishment."  (PCR Ruling, 7/16/12 at 5.)  Given this backdrop, it cannot be said that Ellison exhausted his *Napue* claim as required by Arizona law.

Alternatively, Ellison would not be entitled to habeas relief on this claim even if it were exhausted.  If, as Ellison contends, the PCR court considered and rejected his *Napue* claim on the merits, then § 2254(d)'s deferential standard of review would apply.  Under that standard, Ellison would bear the heavy burden of establishing that the PCR court's decision was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.  Ellison has not met that burden

here.  In particular, under the third prong of *Napue*, Ellison was required to establish a "reasonable likelihood" that the introduction of Brown's false testimony about the date of the second sighting "could have affected the judgment of the jury." *Jackson*, 513 F.3d at 1076.  Although this is not a particularly exacting standard, it also "does not create a *per se* rule of reversal." *Id.* (cleaned up).  It would not have violated § 2254(d) for the state court to conclude that Ellison failed to make the required showing on that issue.  The significant date in Brown's testimony was October *1997*, when she observed Ellison speaking with her mother at her parents' home. This established that Ellison was familiar with the Kingman location, the victims, and their house.  Her testimony that she later saw Ellison in 1998, at a different location in the neighborhood, was cumulative.  Even if the second sighting could not have occurred during the timeframe she described, impeaching her on this point would have done little to impeach her testimony that she saw Ellison at her parents' home in 1997, especially given she acknowledged that she got a much better look at him during that first encounter than when she saw him the second time. (RT 1/15/02 at 92.)  Brown also testified that Ellison recognized her as the Bouchers' daughter when she spoke to him in person following his arrest, despite there being no intervening contact between them.  (*Id.* at 94.) This supports Brown's testimony that the two met in October 1997.  Finally, it cannot be overlooked that the evidence of guilt in this case included Ellison's recorded confession.  *See, e.g., Juniper v. Davis*, 74 F.4th 196,  246 (4th Cir. 2023) ("[T]here is no reasonable likelihood that this evidence could have affected the judgment of the jury.  It in no way undermines the significant forensic evidence against Juniper, Smith's testimony of hearing a confession, or the independent testimony of Rashid and Mings.  And it only slightly undermines the credibility of the police and Murray.  No reasonable juror who voted to convict based on the evidence presented at trial would change their vote based on the *Napue* evidence presented in this case."); *Sivak*, 658 F.3d at 913-14 ("In light of this strong evidence of guilt under either a direct felony-murder theory or an aiding-and-abetting felony murder theory, the *Napue* violations could not have changed the jury's guilt determination."); *United States v. Mickling*, 642 F.App'x 821, 825-

26 (10th Cir. 2016) (finding no plain error even assuming a *Napue* violation where a witness falsely testified that she met the defendant in 2010, a period when he was incarcerated, because the focus of the case and witnesses' testimony was on 2013 when the defendant was arrested).

### N.   Claim 53

In Claim 53, Ellison alleges that the State violated its duty under *Brady v. Maryland*, 373 U.S. 87 (1963), to disclose relevant and material evidence.  (Doc. 21 at 318-21.)  More specifically, Ellison contends that the State "fail[ed] to provide trial counsel with [1] the Mohave County Attorney Office's Intake Summary and [2] a proper copy of the original microcassette recording of Ellison's first interrogation, and [3] to disclose the fact that the recording of Ellison's first interrogation had been erased."  (*Id.* at 318, brackets added.)[24] Ellison acknowledges that "[t]his claim was not raised in state court."  (*Id.* at 321.)  As a result, Respondents contend the claim is procedurally defaulted without excuse.  (Doc. 30 at 224.)

The *Brady* analysis regarding Friesner's handwritten note in some ways mirrors the *Napue* analysis regarding the note.  Even assuming for the sake of argument that the note was suppressed, which could qualify as cause for the procedural default, Ellison has not established prejudice due to his failure to establish the materiality element of his *Brady* claim—that is, "a reasonable probability that, had the [note] been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  *See also Banks*, 540 U.S. at 691 ("[C]oincident with the third *Brady* component (prejudice), prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes.").  As discussed elsewhere, Judge

---

[24]   *Brady* requires the State to disclose material evidence favorable to the defense. 373 U.S. at 87.  To succeed on a *Brady* claim, a petitioner bears the burden of showing that the evidence was (1) favorable to the accused, either as exculpatory or impeachment evidence; (2) suppressed by the prosecution, either willfully or inadvertently; and (3) material, so that prejudice to the defense resulted from its suppression.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Moon (the factfinder during the suppression hearing) was fully aware that Detective Watson had provided conflicting accounts of Ellison's statement during the interrogation—although Detective Watson testified during the suppression hearing that Ellison said "I think I might want a lawyer" (RT 7/20/99 at 12), Detective Watson described this very same statement as "you said you wanted an attorney" during the recorded second interview (*id.* at 26).   During the suppression hearing, Detective Watson was confronted with discrepancy and avowed that the correct version was "I think I might want a lawyer."  (*Id.* at 26-27.)  After hearing that testimony, as well as Ellison's contrary account, Judge Moon accepted Detective Watson's account and rejected Ellison's.  (RT 11/23/99 at 49-50 ["I find that [Ellison] did not clearly invoke his right to an attorney or request an attorney, but he made an equivocal statement to the effect that he thought he might want an attorney . . . .  And that Detective Watson's testimony about that exchange is the more credible evidence."].)  Notably, this determination was based in part on Judge Moon's incredulity that Ellison would have been confused about how the interrogation process works in light of Ellison's familiarity with the criminal justice system.  (*Id.* at 49 ["I find the defendant's testimony to be highly suspect for a few reasons.  No. 1, because of his prior felony convictions."].)  Given this background, there is not a "reasonable probability" that Judge Moon would have reached a different decision during the suppression hearing had he been aware that Detective Watson provided Friesner with the same (inaccurate) summary of Ellison's statement that Detective Watson provided during the second recorded interview. *United States v. Marashi*, 913 F.2d 724, 732 (9th Cir. 1990) (rejecting *Brady* claim, even though government had suppressed notes that contained evidence of an inconsistent statement by a witness, because the government had produced other evidence of the witness making the same inconsistent statement and the witness had been impeached with that evidence at trial: "Well before trial, the government provided Marashi the transcript of Smith's July 18, 1985 statement to the IRS which contained a reference to patient ledger cards virtually identical to that in Agent Abrahamson's notes.  In this light, the notes contained merely cumulative impeachment evidence and thus are not *Brady* material.").

Turning to the next piece of allegedly suppressed evidence—"a proper copy of the original microcassette recording of Ellison's first interrogation"— the *Brady* analysis again mirrors that *Napue* analysis. In light of Ellison's acknowledgement in his reply that the audio tape was provided to his counsel during the state-court proceedings, the evidence was not suppressed within the meaning of *Brady*. Thus, Ellison cannot establish cause for the procedural default. *Banks*, 540 U.S. at 691 ("Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence . . . ."). Separately, Ellison has not established prejudice for the reasons discussed in relation to his *Napue* claim—it is nonsensical that Detective Watson would have intentionally deleted the recording of the first interview during the 20-25 minute interval between the first and second interviews just so he could return to the jail and make another recording of himself attributing, to Ellison, to very same statement he had just taken pains to delete.

Finally, to the extent Ellison argues that "the fact that the recording of Ellison's first interrogation had been erased" qualifies as a distinct basis for his *Brady* claim (Doc. 21 at 318), this claim fails for the same reasons as his *Brady* claim premised on the "proper copy" of the original cassette—first, he cannot show cause in light of the State's production of the original cassette during his state-court proceedings (which, according to his theory, contains evidence of the erasure); and second, he cannot show prejudice in light of the nonsensical nature of his erasure theory and his possession and use of other evidence (namely, the recording of the second interview) that could be used to impeach Detective Watson's testimony about what was said during the first interview.

O.      **Claim 55**

In Claim 55, Ellison alleges that the State committed prosecutorial misconduct in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (Doc. 21 at 322-25.) More specifically, Ellison argues that "[t]he prosecutor in Ellison's case engaged in multiple acts of misconduct. The prosecutor failed to investigate, disclose, or

1   timely disclose material evidence.  The prosecutor knowingly or with implied knowledge
2   elicited false testimony and evidence or allowed false testimony and evidence to go
3   uncorrected.  The prosecutor also argued different theories at Finch's trial than he did at
4   Ellison's. . . .  The prosecutor failed to maintain or supervise the proper handling and
5   maintenance of crucial evidence, specifically the microcassette from the first interrogation
6   of Ellison.  In postconviction, the prosecutor continued to represent the State despite
7   conflicts of interest. . . .  Moreover, and as discussed throughout this petition, the prosecutor
8   introduced hearsay testimony and evidence in violation of Ellison's fair trial, due process,
9   and confrontation rights, and which violated the rules of court and evidence which protect
10  those constitutional rights." (*Id.*, citations omitted.)

11      Ellison acknowledges he did not raise this claim in state court.  (*Id.* at 322.)  He
12  argues that the "deficient performance of state court counsel," including trial and PCR
13  counsel, excuses the claim's default.  (*Id.*)  In response, Respondents contend that PCR
14  "counsel's alleged ineffectiveness cannot serve as cause to excuse the procedural defaults
15  because the underlying claims do not allege trial counsel's ineffectiveness.  And appellate
16  counsel's alleged ineffectiveness cannot constitute cause because that claim is itself
17  procedurally defaulted and Ellison has not excused the default."  (Doc. 30 at 231.)

18      Respondents are correct.  Ellison did not exhaust independent claims that either trial
19  or appellate counsel was ineffective by failing to raise a claim of prosecutorial misconduct.
20  Therefore, ineffective assistance of trial or appellate counsel cannot serve as cause for the
21  underlying claim's default.  *Carpenter*, 529 U.S. at 453 ("[A]n ineffective-assistance-of-
22  counsel claim asserted as cause for the procedural default of another claim can itself be
23  procedurally defaulted . . . ."); *Cockett v. Ray*, 333 F.3d 938, 943 (9th Cir. 2003) ("To
24  constitute cause for procedural default of a federal habeas claim, the constitutional claim
25  of ineffective assistance of counsel must first have been presented to the state courts as an
26  independent claim.  Because Cockett's claim of ineffective assistance of trial counsel was
27  procedurally defaulted, trial counsel's performance cannot constitute cause.") (citation
28  omitted).  Again, *Martinez* applies only to claims of ineffective assistance of trial counsel,

1   so PCR counsel's performance in failing to raise this claim does not excuse its default.

2   *Martinez*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177; *Hunton*, 732 F.3d at 1126-27.  Claim

3   55 is therefore procedurally defaulted and barred from federal review.

4       P.      **Claim 45(D)**

5       Claim 45 consists of allegations that defense counsel performed ineffectively during

6   both phases of Ellison's trial.  (Doc. 21 at 210.)  In Claim 45(D), Ellison alleges six forms

7   of ineffective assistance during the guilt phase.  (*Id.* at 275-87.)

8               1.      Clearly Established Federal Law

9       Claims of ineffective assistance of counsel are governed by the principles set out in

10  *Strickland v. Washington*, 466 U.S. 668 (1984).  "The benchmark for judging any claim of

11  ineffectiveness must be whether counsel's conduct so undermined the proper functioning

12  of the adversarial process that the trial cannot be relied on as having produced a just result."

13  *Id.* at 686.  To prevail under *Strickland*, a petitioner must show that counsel's representation

14  fell below an objective standard of reasonableness and the deficiency prejudiced the

15  defense.  *Id.* at 687-88.  Unless both showings are made, "it cannot be said that a conviction

16  or death sentence resulted from a breakdown in the adversary process that renders the result

17  unreliable."  *Id.* at 687.

18      The inquiry under *Strickland* is highly deferential.  *Id.* at 689.  "A fair assessment

19  of attorney performance requires that every effort be made to eliminate the distorting

20  effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and

21  to evaluate the conduct from counsel's perspective at the time."  *Id.*  The "standard is

22  necessarily a general one," *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009), because "[n]o

23  particular set of detailed rules for counsel's conduct can satisfactorily take account of the

24  variety of circumstances faced by defense counsel or the range of legitimate decisions

25  regarding how best to represent a criminal defendant," *Strickland*, 466 U.S. at 688–89.

26      Deficient performance is established by "showing that counsel made errors so

27  serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the

28  Sixth Amendment."  *Id.* at 687.  To make this showing, a petitioner must overcome "the

presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation omitted).

"The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The defendant bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy." *Murtishaw*, 255 F.3d at 939 (citing *Strickland*, 466 U.S. at 689). "[T]he relevant inquiry . . . is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Murray*, 745 F.3d at 1011 (quoting *Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998)).

With respect to *Strickland*'s second prong, a petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693).  The petitioner "bears the highly demanding and heavy burden [of] establishing actual prejudice." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) (quoting *Williams*, 529 U.S. at 394).  The strength of the prosecution's case factors into the determination of prejudice.  *Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); *Riley v. Payne*, 352 F.3d 1313, 1321 n.8 (9th Cir. 2003) ("[O]ur evaluation of *Strickland* prejudice must be considered in light of the strength of the government's case.").

Under AEDPA, claims of ineffective assistance of counsel are subject to two layers of deference.  "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," *Richter*, 562 U.S.

at 105; *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (under AEDPA, the reviewing court "gives both the state court and the defense attorney the benefit of the doubt"). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105; *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (discussing the "doubly deferential judicial review that applies to a *Strickland* claim under the § 2254(d)(1) standard"). Therefore, the "only question that matters" under § 2254(d) is whether the state court's decision was "so obviously wrong as to be 'beyond any possibility for fairminded disagreement.'" *Kayer*, 592 U.S. at 112 (quoting *Richter*, 562 U.S. at 102, 103); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) ("The federal habeas scheme . . . authorizes federal-court intervention only when a state-court decision is objectively unreasonable.").

### 2.   Analysis

Ellison raises six claims of guilt-phase ineffective assistance of counsel. (Doc. 21 at 275-87.) PCR counsel raised, and the PCR court denied on the merits, five of these claims. (PCR Ruling, 7/16/12, at 5-6.)

### a.   **Change Of Venue/Voir Dire**

Ellison alleges that trial counsel performed ineffectively by failing to adequately voir dire the jury or move for a change of venue. (Doc. 21 at 276-77.) The PCR court rejected this claim, finding that counsel's failure to conduct a more detailed voir dire was a matter of "trial strategy" and noting that the jurors completed a "detailed questionnaire" and "the trial judge conducted a thorough voir dire independently of counsel's questions." (PCR Ruling 7/16/12 at 5.) The PCR court also concluded that Ellison was not prejudiced by counsel's failure to move for a change of venue because jury deliberations took place three years after the crime and there was "no evidence" that the jury was "affected by pretrial publicity." (*Id.* at 6.)

A motion for change of venue must be supported by evidence of presumed or actual prejudice. *Ainsworth v. Calderon*, 138 F.3d 787, 795-96 (9th Cir. 1998). Ellison appears

1   to argue that both presumed and actual prejudice warranted a change of venue.  The PCR

2   court found that such evidence did not exist, so trial counsel did not perform ineffectively

3   in failing to move for a change of venue or in their conduct of voir dire.  As explained

4   below, the PCR court's conclusion as to this issue was reasonable, so habeas relief is not

5   warranted.

6         In deciding whether a defendant is entitled to a change of venue based on a

7   presumption of juror prejudice, a court considers "any indications in the totality of

8   circumstances that petitioner's trial was not fundamentally fair."  *Murphy v. Florida*, 421

9   U.S. 794, 799 (1975).  "The constitutional standard of fairness requires that a defendant

10   have 'a panel of impartial, indifferent' jurors.'"  *Id.* (quoting *Irvin v. Dowd*, 366 U.S. 717,

11   722 (1961)).  "Qualified jurors need not, however, be totally ignorant of the facts and issues

12   involved."  *Id.* at 799–800; *see also State v. Bible*, 858 P.2d 1152, 1166 (Ariz. 1993) ("Juror

13   exposure to information about an offense charged ordinarily does not raise a presumption

14   that a defendant was denied a fair trial.").

15         Presumptive prejudice exists where the "trial atmosphere . . . was utterly corrupted

16   by press coverage."  *Skilling v. United States*, 561 U.S. 358, 380 (2010) (quoting *Dobbert*,

17   *v. Florida*, 432 U.S. 282, 303 (1977)); *see also Bible*, 858 P.2d at 1166 (prejudice is

18   presumed where "defendant can show pretrial publicity so outrageous that it promises to

19   turn the trial into a mockery of justice or a mere formality").

20         Several factors are pertinent in determining whether presumed prejudice exists.

21   These include "the size and characteristics of the community in which the crime occurred";

22   whether the associated media coverage included a "confession or other blatantly prejudicial

23   information of the type readers or viewers could not reasonably be expected to shut from

24   sight"; and the length of time that elapsed from the crime until the trial and the degree of

25   media coverage during that time.  *Skilling*, 561 U.S. at 382-83.  These factors demonstrate

26   that it was reasonable for the PCR court to conclude that a finding of presumed prejudice

27   was not warranted with respect to Ellison's trial.

28         Kingman, with a population in the early 2000s of around 25,000, and Mohave

County, with a then-population of around 185,000, are relatively small, but that factor is not dispositive.  In *Bible*, a case involving the murder of a nine-year-old child, the Arizona Supreme Court rejected the appellant's argument that the trial court erred in denying his change-of-venue motion.  The court explained that "[t]he burden to show that pretrial publicity is presumptively prejudicial clearly rests with the defendant and is 'extremely heavy.'"  858 P.2d at 1167 (quoting *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir. 1985)).  The court first noted that "[b]ecause of the extensive pretrial publicity and the size of Flagstaff and Coconino County (respective populations of approximately 45,000 and 100,000), nearly all potential jurors had some knowledge of the case."  *Id.* at 1166. The court explained, however, that "for the most part" the news reports about the case were "factually based."  *Id.* at 1167.  Although other reports "discuss[ed] inadmissible evidence, [were] inaccurate, or approach[ed] the 'outrageous' standard used in determining presumptive prejudice," they "were months apart and came months before the trial began" and were "exceptions to the largely factual information in the great bulk of the news reports."  *Id.*  The court thus concluded that the appellant failed to carry his burden of showing presumed prejudice from the extensive pretrial publicity. *Id.* at 1168.  The pretrial publicity in Ellison's case was less problematic in extent and substance than that at issue in *Bible*, and far less egregious than the publicity in the "rare and unusual cases where this this difficult showing [presumed prejudice] has been made." *Id.*[25]

---

[25]     The United States Supreme Court appears to have found presumed prejudice in only three cases: *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). In *Rideau*, the defendant made a detailed 20-minute confession to robbery, kidnapping, and murder that was broadcast on television three times; nearly 100,000 people saw or heard the broadcast, in a community of 150,000. 373 U.S. at 724.  In *Estes*, "reporters and television crews overran the courtroom and 'bombard[ed] . . . the community with the sights and sounds of' the pretrial hearing.  The media's overzealous reporting efforts . . . led to considerable disruption" and denied the "judicial serenity and calm to which [Billie Sol Estes] was entitled." *Skilling*, 561 U.S. at 379–80 (quoting *Estes*, 381 U.S. at 536).  In *Sheppard*, "massive, pervasive and prejudicial publicity," much of it not fact-based or objective but sensational and openly hostile, prevented the defendant from receiving a fair trial.  384 U.S. at 335.  "In addition, only three months before trial, Sheppard was examined for more than five hours without counsel

Ellison refers to newspaper articles and transcripts of radio broadcasts that were attached to Finch's motion for a change of venue. (Doc. 21 at 276.) These materials date to 1999, three years before Ellison's trial. The only newspaper article Ellison directly cites is dated March 17, 2001, or 10 months before jury selection in Ellison's case, and reports on the sentencing verdict in Finch's trial. The reports were fact-based and unsensational, in contrast to some of the articles in *Bible* and other cases where presumptive prejudice has been found.[26] Accordingly, a change of venue motion based on a presumption of prejudice would have been futile, *see Skilling*, 561 U.S. at 382-83; *Bible*, 858 P.2d at 1167-68, and, in fact, Judge Moon had denied such a motion in Finch's case.

A motion seeking a change of venue based on actual prejudice would have fared no better. "When a motion to change venue is based on actual prejudice resulting from pretrial publicity, the defendant must show that the 'prejudicial material will probably result in the [defendant] being deprived of a fair trial.'" *Bible*, 858 P.2d at 1169 (quoting Ariz. R. Crim. P 10.3(b)). "Actual prejudice . . . exists when voir dire reveals that the jury pool harbors actual partiality or hostility against the defendant that cannot be laid aside." *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (quoting *Harris v. Pulley*, 885 F.2d 1354, 1363 (9th Cir. 1988) (cleaned up). "This inquiry focuses on the nature and extent of the voir dire examination and prospective jurors' responses to it." *Id.* at 510 (citing *Skilling*, 561 U.S. at 385-89).

Ellison contends that counsel performed ineffectively by failing to voir dire the jurors about the effect of pretrial publicity. (Doc. 21 at 277.) He argues that prejudice is demonstrated by the jurors' awareness of the publicity. (*Id.*) He also asserts that the juror questionnaire and the voir dire itself, which lasted four and a half hours (*see* RT 1/14/02),

---

during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium. . . ." *Id.* at 354.

[26]    Rather than sensationalizing the case, one of the radio reports cited in Finch's motion for a change of venue states that the police were seeking to "dispel rumors" based on "false information" provided by one of the co-defendants that the murders were a gang-related hit. (PCR Pet., Ex. 13.)

were insufficient.  (Doc. 21 at 276-77.)  These arguments are unavailing, particularly in light of the deference owed to the PCR court's contrary determination.

First, the fact that jurors were exposed to information about the case does not, alone, deprive a defendant of due process.  *Skilling*, 561 U.S. at 380; *Murphy*, 421 U.S. at 799 (rejecting "the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process").  Next, the Supreme Court has reiterated that "[n]o hard-and-fast formula dictates the necessary depth or breadth of *voir dire*."  *Skilling*, 561 U.S. at 386.  "Jury selection . . . is 'particularly within the province of the trial judge.'" *Id.* (quoting *Ristaino v. Ross,* 424 U.S. 589, 594-95 (1976)).  "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.'"  *Id.* (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)).

In *Skilling*, the petitioner argued that voir dire was insufficient with respect to pretrial publicity because it lasted only five hours, the judge's questions of the jurors were conclusory, and the judge took the jurors at their word when they indicated they could be fair.  561 U.S. at 387.  The Supreme Court rejected this characterization, noting that the trial court used a questionnaire to screen potential jurors and then questioned jurors individually.  *Id.* at 388.  The result, the Court concluded, was an impartial jury.  *Id.* at 398-99.

The questionnaire filled out by Ellison's prospective jurors included four questions on pretrial publicity.  (ROA, Vol. IV, Doc. 156.)  The first such question described the alleged crime and noted that Finch and Ellison were being tried separately.  (*Id.*)  The questionnaire then asked whether the potential juror had "heard, discussed or read anything about either case? If so, briefly describe the information you received."  (*Id.*)  The next question asked where the juror "obtained the information."  (*Id.*)  The next question was, "Based upon that information, have you formed any opinion or belief about what

1   happened?" (*Id.*)  Finally, the questionnaire asked whether the juror "feel[s] confident that

2   you can set aside that information, and any such opinion or belief, and reach a fair and

3   impartial verdict in this case based only on the evidence presented during trial?" followed

4   by "If not, why not?" (*Id.*)

5           During voir dire, Judge Moon questioned jurors who indicated they had received

6   information about the case from friends or from reading newspaper articles.  (RT 1/14/02

7   at 25-26, 28, 161-62.)  The court dismissed jurors who indicated they couldn't set aside

8   what they had heard and judge the case from the evidence presented in court.  (*Id.* at 26.)

9           These circumstances do not support a finding that counsel performed deficiently or

10  that Ellison suffered prejudice.  The issue of pretrial publicity was addressed by the

11  questionnaire and the court's follow-up questions during voir dire.  *Sechrest v. Baker*, 816

12  F. Supp. 2d 1017, 1037-39 (D. Nev. 2011) (finding counsel not ineffective during voir dire

13  for failing to question the panel of prospective jurors regarding the effect of pre-trial

14  publicity, where jurors who admitted forming opinions about the case were excused, there

15  was no showing that any biased juror was seated, and petitioner did not identify any

16  additional action counsel should have taken), *aff'd,* 603 F.App'x 548 (9th Cir. 2015).

17          "The conduct of voir dire 'will in most instances involve the exercise of a judgment

18  which should be left to competent defense counsel.'"  *Hovey v. Ayers*, 458 F.3d 892, 909-

19  10 (9th Cir. 2006) (quoting *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980));

20  *see also Wilson v. Henry,* 185 F.3d 986, 991 (9th Cir. 1999) (no ineffective assistance

21  where counsel relied on jurors' statements that they would be fair and follow the law,

22  without asking about their views on criminal history).  Ellison contends there was no

23  support for the PCR court's determination that counsel's failure to conduct detailed voir

24  dire was a matter of trial strategy because "there was no evidence of such a strategy."  (Doc.

25  21 at 277.)  But under *Strickland*, the presumption is that counsel's action might be a matter

26  of sound trial strategy.  466 U.S. at 689; *see also Fields v. Woodford*, 309 F.3d 1095, 1108

27  (9th Cir. 2002) ("[W]e cannot say that failure to inquire beyond the court's voir dire was

28  outside the range of reasonable strategic choice or that it would have affected the

1    outcome.").

2         Ellison also fails to show prejudice resulting from counsel's performance.  Prejudice

3    exists if counsel fails to question a juror during voir dire or move to strike a juror and that

4    juror is found to be biased, because this evinces "a reasonable probability that, but for

5    counsel's unprofessional errors, the result of the proceeding would have been different."

6    *Fields v. Brown*, 503 F.3d 755, 776 (9th Cir. 2007) (en banc) (quoting *Strickland*, 466 U.S.

7    at 694).  But Ellison does not argue that any biased jurors were empaneled.  *Sechrest*, 816

8    F. Supp. 2d at 1039 ("Sechrest does not make any allegation . . . that any individual who

9    was actually seated on the jury was biased. Therefore, Sechrest cannot show that any

10   conceivable shortcoming of his counsel's performance with respect to juror voir dire

11   caused him prejudice."); *Campbell v. Bradshaw*, 674 F.3d 578, 594 (6th Cir. 2012)

12   (rejecting ineffective assistance claim where petitioner failed to "identif[y] any juror who

13   was actually seated that indicated an inability to set aside any prior knowledge about the

14   case or to judge the case fairly and impartially").

15        In sum, the PCR court's rejection of this claim was neither contrary to nor an

16   unreasonable application of clearly established federal law, nor was it based on an

17   unreasonable determination of the facts.

18                          b.    **Gun Evidence**

19        Ellison alleges that counsel performed ineffectively by "failing to adequately object

20   to and challenge improper evidence the State presented to suggest Ellison took a handgun

21   to the crime."  (Doc. 21 at 277-78.)  The PCR court denied this claim, finding that it

22   "involve[d] an issue of little moment or relevance to guilt or punishment."  (PCR Ruling,

23   7/16/12 at 5.)

24        As noted, the State presented evidence at trial of a handgun (a Jennings .22

25   semiautomatic) found in the trunk of a vehicle in the garage of Ellison's then-girlfriend,

26   Cathie Webster-Hauver.  (RT 1/15/02 at 207-08; RT 1/16/02 at 171-72.)  Over Ellison's

27   objection, a latent-print examiner for the Arizona Department of Public Safety testified that

28   one of the eight prints she lifted from the gun could be identified as Ellison's right index

finger.  (RT 1/16/02 at 113-14.)  Ellison objected to the gun evidence on relevance grounds, arguing there was no evidence connecting the gun to the crimes.  (*Id.* at 110-12.)  Judge Moon overruled the objection, explaining: "[T]he standard being whether it would tend to make a material fact more or less likely since it was found in the trunk of a car where he [Ellison] was living, and there's evidence that somebody had a gun . . . ."  (*Id.* at 112.)

After the testimony of Detective Auld and the print examiner, Ellison's counsel renewed his objection, arguing the gun was not relevant under Rule 401 of the Arizona Rules of Evidence because there was no admissible evidence connecting it with the crimes. (*Id.* at 206.)  Judge Moon then elaborated on his basis for denying the objection:

> There is testimony in the record that the defendant said Finch had a gun.  So even aside from the issue of who really had the gun . . . , the presence of the gun in that place in those circumstances at that time frame has probative value on the issue of who had the gun or, if nothing else, the possible *Enmund/Tison* issue. . . .  I think even if it had been sort of undisputed that Finch had the gun, the fact that it ended up where it did and allowing the State to argue a reasonable inference that that was the gun, it has probative value.  How much, it's not my job to decide.

(*Id.* at 209.)

Following the guilty verdicts, Ellison's counsel filed a motion for a new trial. (ROA, Vol. V, Doc. 172.)  Counsel argued that the gun "was not relevant to the case and should not have been admitted."  (*Id.* at 3.)  He also asserted that "[t]he prejudice stemming from the admission of this evidence is obvious, for it permitted the jury to speculate that Defendant had been armed with a gun prior to his entry into the Boucher home.  It certainly cannot be said that it did not contribute to the verdicts returned by the jury."  (*Id.*)  The court denied the motion, finding that the evidence was neither irrelevant nor "unfairly prejudicial."  (RT 3/15/02 at 7.)  As noted, on direct appeal the Arizona Supreme Court found that Judge Moon did not abuse his discretion in admitting the evidence because it "establishes that Ellison possessed a gun before and after the crime, and combined with other evidence that Finch did not possess a gun, makes less likely Ellison's story that he participated only because Finch threatened him with a gun."  *Ellison*, 140 P.3d at 916.

1      Ellison now alleges that counsel performed ineffectively by not objecting to the gun

2  evidence as more prejudicial than probative under Arizona Rule of Evidence 403.  (Doc.

3  21 at 278.)  He also contends counsel was ineffective in failing to object to and move to

4  strike previous testimony about the gun, including hearsay testimony from Detective

5  Watson; failing to impeach Detectives Watson and Auld with their prior testimony; and

6  failing to object to "the State's repeated, false assertions that Finch did not have access to

7  any gun."  (*Id.* at 280.)

8      Under Rule 403, "[t]he court may exclude relevant evidence if its probative value is

9  substantially outweighed by a danger of . . . unfair prejudice. . . ."  In denying Ellison's

10 motion for a new trial, Judge Moon specifically found that the gun evidence was not

11 "unfairly prejudicial."  (RT 3/15/02 at 7.)  Therefore, it would have been futile for counsel

12 to have raised an objection based on unfair prejudice under Rule 403 rather than relevance.

13 *James v. Borg*, 24 F.3d 20, 27 (9th Cir. 1994) (counsel was not ineffective for failing to

14 move to strike a special circumstance finding where the motion would have been futile).

15     Under cross-examination by defense counsel, Detective Watson testified that Ms.

16 Webster-Hauser stated that Ellison had been in possession of the Jennings handgun and

17 that Webster-Hauser's daughter stated that Ellison had been staying at their house since

18 February 24, 1999.  (RT 1/16/02 at 11.)  Ellison contends that counsel should have objected

19 and moved to strike these hearsay responses.  (Doc. 21 at 279.)  Respondents contend that

20 Ellison cannot show prejudice from counsel's performance because, if counsel had

21 objected to the statements on hearsay grounds, the prosecution could have called Webster-

22 Hauser and her daughter as witnesses, thereby satisfying Ellison's Confrontation Clause

23 rights.  (Doc. 30 at 194.)  They also note that evidence of the gun, found at Ellison's

24 residence and bearing his fingerprint, was admissible notwithstanding the hearsay

25 testimony.  (*Id.*)  For these reasons, and based on the strength of the evidence against

26 Ellison, there was not a reasonable probability of a different verdict if counsel had objected

27 to Detective Watson's testimony.  *Delgadillo*, 527 F.3d at 930 n.4 (upholding the denial of

28 an ineffective assistance claim where counsel failed to object to cumulative testimony and

petitioner "fail[ed] to establish that but for the admission of that testimony 'there was a reasonable probability that . . . the result of the proceeding would have been different'").[27]

Ellison next argues that counsel performed ineffectively by failing to impeach Detectives Auld and Watson with their prior testimony, during grand jury proceedings and at a bail hearing, that Ellison told them the handgun Finch used to threaten Ellison was the one he and Finch took from the Bouchers' house. (Doc. 21 at 280.) According to Ellison, this would impeach Auld's trial testimony that "in the first interrogation, Ellison did not identify the gun he said Finch pointed at him." (*Id.*) Ellison does not provide a citation to the trial transcript containing any such testimony by Detective Auld (*see* Doc. 21 at 280), and the Court's review of the transcript does not reveal trial testimony from either detective claiming that Ellison did not identify the gun Finch allegedly pointed at him. In the absence of such testimony, there was nothing to impeach, and trial counsel did not perform ineffectively. Alternatively, and at any rate, Ellison has failed to establish that any failure was prejudicial, given the strength of the evidence against him and the state court's reasonable determination that the handgun issue was "of little moment or relevance to guilt or punishment."

Finally, Ellison argues that counsel performed ineffectively by failing to object to "the State's repeated, false assertion that Finch did not have access to any gun." (Doc. 21 at 280.) Again, however, Ellison fails to support his allegation that the prosecution repeatedly and falsely argued to the jury that Finch had no access to a gun. Ellison cites only a snippet from the prosecutor's guilt-phase closing argument: "Ellison said that Richard Finch pointed a gun at him. All of a sudden in the story we have a gun pointed at him. And nobody's ever found a gun associated with Richard Finch. . . ." (RT 1/18/02 at 15). This single statement, taken in context, is not misleading. It clearly refers to the lack of evidence of Finch having a gun before the attack on the Bouchers, as supported by Brad

---

[27] Ellison also fails to meet his burden of showing that counsel's performance was deficient. As with respect to the testimony about the police searching for the gun mentioned by Finch, it is possible the "failure" to object was a matter of sound strategy, with counsel choosing not to bring additional attention to the testimony.

Howe's testimony.  It would be nonsensical for the prosecutor to argue, or the jury to believe, that Finch didn't have access to a gun when the State's own evidence proved that guns were among the property Finch took from the victims' house.  This interpretation of the prosecutor's statement is confirmed when he noted, in his rebuttal closing argument, that one reason Howe had become frightened of Finch was that "now there is a gun in the house."  (RT 1/18/02 at 47.)

Accordingly, the PCR court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

### c.   **Hearsay Evidence**

Ellison alleges that trial counsel was ineffective in failing to object to "rampant hearsay that violated the Confrontation Clause." (Doc. 21 at 282.)  The claim refers to testimony by Detectives Watson and Auld and by Howe relating statements made by Finch, and the testimony by Detective Watson about statements made by Ms. Webster-Hauver and her daughter about Ellison's access to the gun.  (*Id.* at 282-83.)  Ellison argues that the testimony violated *Crawford* and *Bruton* and that counsel should have objected, asked that the testimony be stricken, or moved for a mistrial "after each reference to these inadmissible statements." (*Id.* at 283.)  The PCR court denied this claim without comment as not colorable. (PRC Ruling  7/16/12, at 6.)

For the reasons previously discussed, hearsay objections to testimony regarding Finch's statements would have been futile.  Finch's statements to Detectives Watson and Auld were not offered for the truth of the matter but to explain police action, including their search for evidence and the arrest of Finch.  "An out-of-court statement used to explain why police took a certain action in their investigation is not hearsay." *Velazquez-Rivera*, 366 F.3d at 666; *Johnson*, 875 F.3d at 1279; *Taylor*, 569 F.3d at 749. Finch's statements to Howe were also nontestimonial and therefore not violative of *Crawford*. *Bruton* does not apply to non-testimonial hearsay, *see, e.g.*, *Dargan*, 738 F.3d at 651, nor does it apply to statements offered for nonhearsay purposes, *Street*, 471 U.S. at 413-14.

Separately, and as also previously discussed, counsel's failure to object to Detective Watson's testimony about statements made by Ms. Webster-Hauver and her daughter amounted to neither deficient nor prejudicial performance.

The PCR court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

### d.  **Vivian Brown's Testimony**

Ellison alleges that trial counsel was ineffective in failing to obtain his jail records to rebut Vivian Brown's testimony that she saw Ellison twice at or near her parents' home. (Doc. 21 at 283-85.)  The PCR court denied this claim, finding that it "involve[d] an issue of little moment or relevance to guilt or punishment."  (PCR Ruling, 7/16/12 at 5.)  Ellison contends that this decision was "factually and legally unreasonable" because evidence that Brown could not have seen him a second time was relevant to her credibility, which in turn was relevant to issues of his "culpability and premeditation."  (Doc. 21 at 284-85.)

As discussed, Brown testified that she saw Ellison at her parents' house in October 1997 and saw him again at a neighbor's house in 1998 during the monsoon season. Ellison's counsel attempted to impeach Brown with records from the Arizona Department of Corrections showing that Ellison was in custody from May 29, 1998 to January 1999, but the trial court ruled that the records were hearsay and could not be used in cross-examination unless counsel sought to admit them under a hearsay exception.  The Arizona Supreme Court held that this ruling was not an abuse of discretion.  *Ellison*, 140 P.3d at 915.

Ellison argues that counsel should have obtained and presented additional, available records showing that he had been incarcerated in the Mohave County Jail from December 1997 until he was transferred to prison (for a parole violation) in May 1998.  (Doc. 21 at 284.)  However, even assuming for the sake of argument that counsel's failure to obtain and attempt to admit those records was deficient (and not a matter of sound trial strategy), Ellison cannot demonstrate a reasonable probability that the outcome of his trial would

have been different had counsel obtained and attempted to use the records at issue.

As discussed above, although Brown's credibility may have been impeached by records showing that Ellison was in custody throughout 1998, the key face-to-face encounter between Brown and Ellison, in October *1997*, was supported by evidence that Ellison subsequently recognized Brown as the Bouchers' daughter.  (RT 1/15/02 at 94.)

Additionally, Ellison's familiarity with the Kingman neighborhood where the Bouchers lived was supported by evidence independent of Brown's testimony.  For example, the police measured the distance between the home of Ellison's parents and the Boucher home as less than a quarter of a mile.  (RT 1/16/02 at 200.)  Also, it was Ellison who drove to the Bouchers' home and it was a glove from Ellison's tattoo shop that was found at the crime scene.  Finally, Howe testified that Finch did not own a vehicle and, as far as Howe knew, had never been to Kingman.  (RT 1/17/02 at 76.)  Accordingly, the Court agrees with Respondents that "even if the jail records established that Vivian was incorrect as to the time of her second contact with Ellison, the records would not have undermined her testimony regarding her first and most significant contact with Ellison, which established his familiarity with the victims, their home, and their backyard.  As a result, the state post-conviction court's rejection of this claim was neither contrary to, nor an unreasonable application of, *Strickland* . . . ."  (Doc. 30 at 198.)

### e.    **Confession**

Ellison alleges that trial counsel performed ineffectively by "failing to properly challenge" the admission of his confession.  (Doc. 21 at 285-86.)  He contends that counsel should have investigated and presented evidence that he suffers from Fetal Alcohol Spectrum Disorder ("FASD"), such that his waiver of his *Miranda* rights was not knowing, intelligent, or voluntary.  (*Id.*)[28]  The PCR court denied the claim as "simply not supported by the law," explaining that "the best evidence of the police interviews is the actual words

---

[28]    In his petition, Ellison refers to his condition as FASD.  The Court will follow that usage except when referring to specific diagnoses rendered by Ellison's experts or quoting transcripts or other materials.

- 87 -

recorded by the police, wherein it is clear that the Defendant understood his rights and waived his Constitutional protections."  (PCR Ruling, 7/16/12 at 6.)   In addition, as discussed in more detail below, the court found that Ellison failed to prove he had FASD.

Courts consider various factors when determining whether a waiver is knowing and intelligent, including the "background, experience, and conduct of the accused."  *Cook v. Kernan*, 948 F.3d 952, 967 (9th Cir. 2020) (quotation omitted).  Other factors include "the defendant's maturity, education, physical condition, mental health, and age."  *Id.* at 968-69 (quotation omitted).

At the time of his statement to Detectives Watson and Auld, Ellison was 33 years old and, like the defendant in *Cook*, "had been arrested and provided *Miranda* warnings on several occasions in the past."  *Id.* at 968.  He told the detectives he understood his *Miranda* rights.  His IQ, most recently measured as 89, was average.[29]  When Ellison did confess, he assigned primary responsibility for the crimes to Finch.  *Id.* at 970 (voluntariness finding supported by the fact that when Cook finally confessed, he made only "vague admissions" to "facts that minimize[d] his culpability for the crimes").   The interviews were short, totaling approximately half an hour (RT 1/15/02 at 231), and Ellison responded coherently to the detectives' questions.  *Cf. Cook*, 948 F.3d at 969 (interrogation lasted seven hours before Cook confessed); *State v. Fardan*, 773 N.W.2d 303, 314-15 (Minn. 2009) (upholding the *Miranda* waiver of a juvenile who claimed to have FASD and low intellectual function but demonstrated no intimidation, confusion, or indecision during a reading of *Miranda* warning or custodial interrogation).

In *Cook*, the California Supreme Court summarily denied the appellant's claim that his confession was not knowing, intelligent, and voluntary.  948 F.3d at 966.  The Ninth Circuit, applying AEDPA's deferential standard, held that the state court "had a reasonable basis" for rejecting Cook's claim that his waiver wasn't knowing and intelligent and that

---

[29]    Dr. Paul Connor, a neuropsychologist, testified during the PCR evidentiary hearing that he measured Ellison's full-scale IQ at 89, which contrasted with the higher scores of around 100 that Ellison achieved when tested in school.  (RT 8/18/14 at 68-69.)

1   "Cook utterly fail[ed] to show how the conclusion that his confession was voluntary under
2   the totality of the circumstances is 'inconsistent with the holding in a prior decision of the
3   Supreme Court.'" *Id.* at 968-69 (citations omitted).

4          For similar reasons, the PCR court's ruling was not contrary to or an unreasonable
5   application of clearly established federal law or based on an unreasonable determination of
6   the facts.

7                        f.      **False Testimony**

8          Ellison argues, "[i]n the alternative to Claims 52 and 53," which allege violations
9   under *Brady* and *Napue*, that trial counsel was ineffective in failing to obtain and present
10  evidence that Watson's and Auld's testimony about his interrogation was false.  (Doc. 21
11  at 286-87.)  Ellison concedes he didn't raise this ineffective-assistance claim in state court
12  but argues that its default is excused under *Martinez* by the ineffective assistance of PCR
13  counsel.  (*Id.* at 287.)

14         As discussed above, the *Brady* and *Napue* claims are meritless.  Therefore, neither
15  trial counsel, in failing to discover the withheld evidence or false testimony, nor PCR
16  counsel, in failing to raise a claim of trial counsel ineffectiveness, performed ineffectively.
17  *Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2016); *Atwood*, 870 F.3d at 1060.
18  "Cause" under *Martinez* is absent, so this claim is barred from federal review.

19                       g.      **Cumulative Prejudice**

20         Ellison alleges that trial counsel's guilt-phase errors, considered cumulatively with
21  the penalty-phase errors, prejudiced him at both stages of trial. (Doc. 21 at 287.)  The
22  parties disagree whether this claim is exhausted.  Whatever its procedural status, it is
23  meritless.

24         As noted, the Supreme Court has not specifically recognized the doctrine of
25  cumulative error as an independent basis for habeas relief.  *Lorraine*, 291 F.3d at 447;
26  *Morris*, 677 F.3d at 1132 n.3.  Although the Ninth Circuit has suggested that the cumulative
27  effect of several errors may prejudice a defendant, *Parle*, 505 F.3d at 927, here the Court
28  has identified no constitutional errors so there is nothing to accumulate to the level of a

1    constitutional violation.

2    II.    Sentencing-Phase Claims

3          A.    **Claim 13**

4          In Claim 13, Ellison alleges that the evidence did not support the jury's

5    *Enmund/Tison* findings.  (Doc. 21 at 97-99.)   Under *Tison* and *Enmund*, a defendant

6    convicted of felony murder can be sentenced to death only if he actually killed, attempted

7    to kill, or intended to kill, or if he was a major participant in the underlying felony and

8    acted with reckless indifference to human life.   The jury determined that Ellison "either

9    killed, intended to kill, or acted with reckless indifference towards the life or death" of both

10   Mr. and Mrs. Boucher.  (ROA, Vol. VI, Docs. 168, 169 [verdict forms].)

11         The Arizona Supreme Court rejected Ellison's argument that the State failed to

12   prove he acted with reckless indifference.  *Ellison*, 140 P.3d at 917-18.  The court noted

13   that "Ellison . . . was not merely present during the burglary and subsequent murders.  He

14   directly participated in binding the victims and holding a pillow over Mr. Boucher's face.

15   A reasonable factfinder could conclude that Ellison acted at least with reckless indifference

16   to the victims' lives." *Id.*

17         Again, under *Jackson*, the question is whether any rational trier of fact could have

18   found that the *Enmund/Tison* requirements had been satisfied—namely, that Ellison was a

19   major participant in the burglary and acted with reckless indifference to the victims' lives.

20   This standard is satisfied.  Evidence showed that Ellison, like the defendants in *Tison*, "was

21   actively involved in every element" of the underlying crime and was "physically present

22   during the entire sequence of criminal activity culminating in the murder." *Tison*, 481 U.S.

23   at 158.  Ellison also, at the very least, "watched the killing" and then "chose to aid" Finch

24   "rather than their victims." *Id.* at 152.  Finally, the additional level of deference mandated

25   by AEDPA provides further reason why Ellison is not entitled to habeas relief. *Cf. Dickens*

26   *v. Ryan*, 740 F.3d 1302, 1316 (9th Cir. 2014) ("In *Tison*, the U.S. Supreme Court concluded

27   that the defendants exhibited reckless indifference, in part, because they watched the killing

28   and then chose to aid those whom they had placed in the position to kill rather than their

victims.  Nothing suggests the defendants in *Tison* knew anyone had survived.  Rather, the relevant factors were the defendants' knowledge that victims had been shot and their decision to aid the shooters over the victims.  Dickens, like the *Tison* defendants, watched Amaral shoot the Bernsteins, but decided to aid Amaral over the Bernsteins by picking him up and driving him to his brother's home.  There is no evidence that Dickens attempted to aid the Bernsteins, summon medical assistance, or otherwise notify the authorities.  Instead, he helped Amaral.  Because Dickens's uncontested knowledge of the Bernsteins' shooting, rather than Bryan's survival, is the critical factor in the *Enmund/Tison* reckless indifference analysis, the Arizona Supreme Court did not base its decision on an unreasonable determination of the facts.") (cleaned up).

### B.  Claims 14 and 15

In Claim 14, Ellison alleges that because his indictment "did not refer to capital murder, aggravating circumstances, or otherwise reflect the State's intention to seek a death sentence," he was not indicted for a capital crime, in violation of the Fifth, Sixth, and Fourteenth Amendments.  (Doc. 21 at 991-04.)  In Claim 15, Ellison alleges that the State's failure to give proper, timely notice of the aggravating factors deprived him of his rights to notice, the effective assistance of counsel, and reliable proceedings, in violation of the Sixth, Eighth, and Fourteenth Amendments.  (Doc. 21 at 104-06.)  The Arizona Supreme Court rejected these claims on direct appeal.  *Ellison*, 140 P.3d at 918-19.  As explained below, those rulings were neither contrary to nor an unreasonable application of clearly established federal law, nor were they based on an unreasonable determination of the facts.

The State filed an indictment in Mohave County Superior Court in March 1999 charging Ellison with two counts of first-degree murder and one count of first-degree burglary.  (ROA, Vol. I, Doc. 2.)  On April 1, 1999, the State noticed its intent to seek the death penalty.  (ROA, Vol. I, Doc. 13.)  On January 29, 2002, following Ellison's convictions, the State noticed its intent to prove six aggravating circumstances.  (ROA,

1     Vol. VI, Doc. 173.)[30]

2          The Fifth Amendment's Grand Jury Clause, which guarantees indictment by a grand

3     jury in federal prosecutions, was not incorporated by the Fourteenth Amendment to apply

4     to the states.  *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972) ("[I]indictment by grand

5     jury is not part of the due process of law guaranteed to state criminal defendants by the

6     Fourteenth Amendment . . . .").

7          Although Ellison contends that *Ring II* and *Apprendi v. New Jersey*, 530 U.S. 466

8     (2000), support his position, in neither of those cases did the Supreme Court address this

9     issue, let alone hold that aggravating factors must be included in an indictment and

10    subjected to a probable cause determination.  *Ring II*, 536 U.S. at 597 n.4 ("Ring does not

11    contend that his indictment was constitutionally defective.");  *Apprendi*, 530 U.S. at 477

12    n.3 ("Apprendi has not here asserted a constitutional claim based on the omission of any

13    reference to sentence enhancement . . . in the indictment.").  *See also Williams v. Haviland*,

14    467 F.3d 527, 532 (6th Cir. 2006) (noting that *Apprendi* and *Ring II* do not address any

15    "indictment requirements").  In addition, as the Arizona Supreme Court noted, the penalty

16    phase of Ellison's trial ultimately occurred in 2004, two years after he received notice of

17    the aggravating factors, so he was not prejudiced by the timing of the disclosure.

18         C.    **Claim 16**

19         In Claim 16, Ellison alleges that he was deprived of his rights to a fair and impartial

20    jury, a fair trial, and due process when the trial court erroneously struck one prospective

21    juror for cause and failed to strike another.  (Doc. 21 at 107-14.)

22                1.    Juror 19

23         Ellison alleges that the trial court violated his rights under *Wainwright v. Witt*, 469

24    U.S. 412 (1985), and *Witherspoon v. Illinois*, 391 U.S. 510 (1968), by striking Juror 19 for

25    cause based on her views about the death penalty.  The Arizona Supreme Court denied this

26    claim on direct appeal.    *Ellison*, 140 P.3d at 920-21.   The court first noted that jury

27    _____

28    [30]     As the Arizona Supreme Court noted, under then-existing law, notice of aggravating
      factors was required only after conviction.  *Ellison*, 140 P.3d at 918.

1     selection for Ellison's sentencing included both "extensive oral voir dire" and a

2     questionnaire asking whether the possibility of the death penalty would "prevent or

3     substantially impair" a potential juror's ability to fairly decide Ellison's sentence.  *Id.* at

4     920.  The court then turned to Ellison's challenge to the dismissal of Juror 19.

5         The court explained that "[a] death sentence cannot be upheld if the jury was

6     selected by striking for cause those who 'voiced general objections to the death penalty or

7     expressed conscientious or religious scruples against its infliction.'"  *Id.* (quoting

8     *Witherspoon*, 391 U.S. at 522).  The court noted, however, that a judge "may strike for

9     cause a potential juror whose views regarding the death penalty 'would prevent or

10    substantially impair the performance of his duties as a juror.'"  *Id.* (quoting *Wainwright*,

11    469 U.S. at 424).  The court added: "Such views need not be proven with 'unmistakable

12    clarity.'"  *Id.* (quoting *Wainwright*, 469 U.S. at 424).  The court also explained that "even

13    if a juror is sincere in his promises to uphold the law, a judge may still reasonably find a

14    juror's equivocation 'about whether he would take his personal biases in the jury room'

15    sufficient to substantially impair his duties as a juror, allowing a strike for cause."  *Id.*

16    (quoting *State v. Glassel*, 116 P.3d 1193, 1208 (Ariz. 2005)).

17        Applying these standards, the court concluded that Judge Moon did not abuse his

18    discretion in allowing the prosecution to strike Juror 19 for cause.  *Id.* at 921.  The court

19    explained that Juror 19 "expressed reservations and conflict about the death penalty.  She

20    could not definitely say whether her beliefs would cause her to ignore the law. . . .  [J]uror

21    19 gave statements indicating her beliefs could substantially impair her ability as a juror,

22    even though she also promised to uphold her oath."  *Id.* at 920–21.

23        This decision was neither contrary to nor an unreasonable application of clearly

24    established federal law, nor was it based on an unreasonable determination of the facts.

25    "In *Witherspoon*, [the Supreme] Court set forth the rule for juror disqualification in capital

26    cases."  *White v. Wheeler*, 577 U.S. 73, 77 (2015).  Under that rule, capital defendants are

27    entitled to a jury not "uncommonly willing to condemn a man to die."  *Witherspoon*, 391

28    U.S. at 521.  But the Supreme Court "with equal clarity has acknowledged the State's

'strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.'" *Wheeler*, 577 U.S. at 77 (quoting *Uttecht v. Brown*, 551 U.S. 1, 9 (2007)); *see also Adams v. Texas,* 448 U.S. 38, 45 (1980) ("The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.").

A juror may be excused for cause if he or she is "substantially impaired in his or her ability to impose the death penalty under the state-law framework." *Uttecht*, 551 U.S. at 9 (citing *Witt*, 469 U.S. at 424). This standard is met "where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Witt*, 469 U.S. at 425-26.

Juror 19, a female nurse, described herself during voir dire as "[p]retty much pro-life." (RT 2/4/04 at 140.) When Judge Moon asked if it would be "fair to say, based on your questionnaire and kind of reading between the lines, that you do not favor the death penalty," Juror 19 responded: "I'm really pro-life. I am. So I don't know if I could do the death penalty or not. I'm being honest now. I don't know if I could." (*Id.*) Although Juror 19 indicated she thought she could be open-minded and give both sides a "level playing field," she stated: "But I still don't know if I would get—if it come [sic] to the point could I be for the death penalty, I don't know if I could do that. I might say no, I can't do that." (*Id.* at 141.) She stated it was possible—she put the odds at 60/40— that she would "ignore the law and the judge's instructions" and vote for life even if the jury found multiple aggravating factors and no mitigating circumstances. (*Id.* at 142-43.) At other points she indicated she could "probably" follow the law but she "would still not feel well about doing it. . . . It would be hard for me to do that." (*Id.* at 145.) She continued: "[I]t would still be really hard to vote for the death penalty, even if it's all right there in front of my nose." (*Id.* at 146.) Toward the end of the questioning, the prosecutor asked whether there was "a possibility that you would just disregard the law and vote against the death penalty, even if the law was pretty clear." (*Id.* at 148.) Juror 19 replied: "I might." (*Id*.) In granting the motion to strike, Judge Moon noted that Juror 19 "expressed several

times her concern about her ability to follow the law.  So she went . . . beyond being against the death penalty, but somebody saying she's just not sure she can follow the law." (*Id.* at 150.)

A state court's determination that a juror's views would substantially impair the discharge of his or her duties is a factual finding entitled to a presumption of correctness on federal habeas review.  *Witt*, 469 U.S. at 426 ("[D]eference must be paid to the trial judge who sees and hears the juror."); *Uttecht*, 551 U.S. at 9 ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical  importance in assessing the attitude and qualifications of potential jurors.").  A trial court's "finding may be upheld even in the absence of clear statements from the juror that he or she is impaired. . . ."  *Uttecht*, 551 U.S. at 7.  Finally, AEDPA requires an additional, "independent, high standard" of deference.  *Id.* at 10.

In *Uttecht*, the Court clarified that "[t]he need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses no basis for a finding of substantial impairment."  *Id.* at 20.  However, where there has been "lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion."  *Id.*  Here, there was a diligent and thoughtful voir dire process, which included the completion of a questionnaire and examination of potential jurors by the court and the parties.  The questioning of Juror 19 occurred over 11 transcript pages.  (RT 2/4/04 at 139-50.)  Judge Moon therefore had broad discretion and the record supports his finding of substantial impairment based on Juror 19's answers on the questionnaire and during voir dire.

"A juror's voir dire responses that are ambiguous or reveal considerable confusion may demonstrate substantial impairment."  *United States v. Fell*, 531 F.3d 197, 215 (2d Cir. 2008).  "[A]ssurances that [the juror] would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements

that in fact he would be substantially impaired in this case . . . ." *Uttecht*, 551 U.S. at 18. "Because appellate judges are absent from voir dire, when a prospective juror fails to express herself 'carefully or even consistently . . . it is [the trial] judge who is best situated to determine competency to serve impartially.'" *United States v. Allen*, 605 F.3d 461, 466 (7th Cir. 2010) (quoting *Patton v. Yount*, 467 U.S. 1025, 1039 (1984)). Juror 19's statements were not always consistent, or even coherent, but she did persistently indicate that her "pro-life" views would make it difficult or impossible for her to vote for a death sentence. Judge Moon thus "properly considered all of [Juror 19's] responses in the context in which they were given and did not err in concluding that [her] views would significantly interfere with [her] duties as juror." *Fell*, 531 F.3d at 215. To the extent any ambiguity remained in Juror 19's attitude about the death penalty after her questioning by the parties, Judge Moon was "entitled to resolve it in favor of the State." *Uttecht*, 551 U.S. at 7 (quoting *Witt*, 469 U.S. at 434).

### 2. Juror 17

Ellison also argues that the trial court erred in refusing to strike Juror 17 for cause due to his pro-death-penalty views. The Arizona Supreme Court considered and rejected this claim. *Ellison*, 140 P.3d at 921 n.16 ("Ellison also appeals Judge Moon's denial of his motion to strike potential juror 17 for cause. Juror 17 did not ultimately sit on the jury; thus, any error is harmless."). As explained below, this determination was not contrary to or an unreasonable application of clearly established federal law.

Although a defendant has a "due process right to remove for cause a juror who will automatically vote for the death penalty," *United States v. Mitchell*, 502 F.3d 931, 954 (9th Cir. 2007) (citing *Morgan v. Illinois*, 504 U.S. 719 (1992)), failure to strike a biased juror does not violate a defendant's rights when the juror did not sit on the jury, even if the defendant had to use a peremptory challenge to strike him. "So long as the jury that sits is impartial, . . . the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000). Juror 17 did not sit on Ellison's jury, so he is not

1    entitled to relief on this claim.[31]

2        D.    **Claim 17**

3        In Claim 17, Ellison alleges that his rights to a jury trial, to have his sentencing jury

4    consider all relevant evidence, and to due process were violated because he was sentenced

5    by a "jury that did not adjudicate his guilt."  (Doc. 21 at 115-18.)

6        On direct appeal, the Arizona Supreme Court rejected Ellison's argument that the

7    use of a separate sentencing jury deprived him of his right to an individualized sentence.

8    *Ellison*, 140 P.3d at 919.  The court noted that it had previously denied such claims and

9    explained that "Ellison cannot complain that evidence relevant to sentencing was presented

10   at the guilt proceeding" because "nothing prevented him from introducing evidence from

11   the guilt proceeding at his sentencing proceeding."  *Id.* (citing *State v. Anderson*, 111 P.3d

12   369 (Ariz. 2005)).  The court also rejected Ellison's argument that the guilt-phase jury was

13   impermissibly allowed to shift responsibility to the sentencing jury.  *Id.*

14       Ellison cites no clearly established federal law holding that the use of a separate

15   sentencing jury in a capital case violates a defendant's constitutional rights.  Nor has the

16   Court, through its own research, found any such authority. *Powell v. Quarterman*, 536 F.3d

17   325, 334 (5th Cir. 2008) (noting that "no clearly established law decided by the Supreme

18   Court" requires "the same jury to determine guilt and punishment"); *Mitchell v. Sharp*, 798

19   F.App'x 183, 197-98 (10th Cir. 2019) ("Mr. Mitchell . . . alleges a due process right to

20   have the same jury decide both guilt and punishment in a capital case. . . .  Because there

21   is no clearly established federal law to resolve Mr. Mitchell's . . . claim, . . . our analysis

22   ends.") (cleaned up).

23       …

24

---

25   [31]    Ellison also asserts that the trial court's "disparate treatment" of Juror 17's

26   "waffling" on whether he could consider mitigating evidence and Juror 19's "failure to
     guarantee that she could return a death verdict" "demonstrates that [the court] applied a

27   standard to [Juror 19] that was more restrictive than *Witt* and *Witherspoon* allow."  (Doc.
     21 at 112.)  This argument does not alter the Court's analysis of the Arizona Supreme

28   Court's decision under § 2254(d).

E.     **Claim 18**

In Claim 18, Ellison alleges that being "subjected to a second trial, with a different jury, on the issue of aggravation and punishment" violated the Double Jeopardy Clause. (Doc. 21 at 118-20.)  Quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949), Ellison argues that the use of a second jury for sentencing violated his "valued right to have his trial completed by a particular tribunal."  (*Id.*)

The Arizona Supreme Court's denial of this claim on direct review, *Ellison*, 140 P.3d at 919, relied on its earlier decision in *Ring v. Arizona* ("*Ring III*"), 65 P.3d 915 (Ariz. 2003), which cited *Arizona v. Rumsey*, 467 U.S. 203 (1984), *Poland v. Arizona*, 476 U.S. 147 (1986), and *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109 (2003), for the proposition that double jeopardy does not bar a capital defendant from being resentenced to death when he was not "acquitted" of death in the original sentencing.  *Ring III*, 65 P.3d at 932.  The *Ring III* court also noted that in *Wade* itself, the Supreme Court denied a double jeopardy claim where charges were dropped in one military tribunal and reinstituted in another.  *Id.* (citing *Wade*, 336 U.S. at 687-88).  The *Ring III* court thus reasoned that "[t]he ability to resentence a capital defendant by a different set of jurors is implicit" in *Rumson*, *Poland*, and *Wade*.  *Id.*

Ellison has not demonstrated that the Arizona Supreme Court's analysis of this issue was contrary to, or an unreasonable application of, clearly established federal law.  *See, e.g.*, *Hampton v. Ryan*, 2019 WL 979896, *24 (D. Ariz. 2019) ("No clearly established federal law holds that empaneling a second jury for sentencing implicates the Double Jeopardy Clause."); *Garcia v. Shinn*, 2022 WL 1166408, *41-42 (D. Ariz. 2022) (same).

F.     **Claim 19**

In Claim 19, Ellison alleges that his due process rights were violated when a death sentence was imposed "pursuant to a statute not in effect at the time of [his] trial."  (Doc. 21 at 121-24.)  The Arizona Supreme Court denied this claim on direct review.  *Ellison*, 140 P.3d at 920.

Ellison relies on *Coleman v. McCormick*, 874 F.2d 1280 (9th Cir. 1989).  There, the

defendant was originally tried and convicted under a statute which provided for a mandatory death sentence whenever a defendant was found guilty of aggravated kidnapping.  *Id.* at 1282.  On appeal, the state supreme court held the law was unconstitutional because it did not allow the trial court to consider any mitigating circumstances. *Id.*  The court remanded the case for resentencing in accordance with a newly-enacted statute that provided for a separate sentencing hearing at which the judge would determine the existence of any aggravating and mitigating circumstances.  *Id.*  If the judge found at least one aggravating factor and determined there were no mitigating circumstances sufficiently substantial to call for leniency, he would be required to impose a death sentence. *Id.* at 1285.  Coleman was again sentenced to death. *Id.*  In reversing the sentence, the Ninth Circuit explained:

> The defendant is due at least that amount of process which enables him to put on a defense during trial knowing what effect such a strategy will have on the subsequent capital sentencing, the results of which may be equally if not more critical to the defendant than the conviction itself.

*Id.* at 1288.  Because the defendant "made countless tactical decisions at trial aimed solely at obtaining [his] acquittal, without even a hint that evidence . . . would be considered as either mitigating or aggravating factors," the due process violation was pervasive and not harmless error.  *Id.* at 1289.

No such due process violation occurred here.  "*Ring II* impacted only the identity of the trier of fact at sentencing, not the process itself."  *State v. Murdaugh*, 97 P.3d 844, 853 (Ariz. 2004).  Unlike the defendant in *Coleman*, Ellison was aware during the guilt phase of his trial that if he were convicted there would be a sentencing phase involving the presentation of aggravating and mitigating factors.  Although the sentencer changed from the trial judge to a jury, Ellison had two years after his conviction to prepare for his for sentencing before a jury.

At a minimum, Ellison fails to cite any clearly established federal law that would render the Arizona Supreme Court's denial of this claim unreasonable under § 2254(d)(1).

…

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

G.      **Claim 20**

In Claim 20, Ellison alleges that the "especially cruel, heinous, or depraved" aggravating circumstance is "unconstitutionally vague in light of *Ring* and violates the Eighth Amendment." (Doc. 21 at 124-27.)  On direct appeal, the Arizona Supreme Court rejected this argument, including the argument that the shift from judge to jury sentencing rendered the factor vague. *Ellison*, 140 P.3d at 921-22.  That decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

In *Walton v. Arizona*, 497 U.S. 639 (1990), *overruled on other grounds by Ring II*, 536 U.S. 584, the Supreme Court held that Arizona's "especially heinous, cruel or depraved" aggravating circumstance was facially vague but also held that the vagueness was remedied by the Arizona Supreme Court's clarification of the factor's meaning. *Id.* at 654 ("In this case there is no serious argument that Arizona's 'especially heinous, cruel or depraved' aggravating factor is not facially vague.  But the Arizona Supreme Court has sought to give substance to the operative terms, and we find that its construction meets constitutional requirements.").  Under the narrowing definition approved in *Walton*, a murder is especially cruel "when the perpetrator inflicts mental anguish or physical abuse before the victim's death" and that "mental anguish includes a victim's uncertainty as to his ultimate fate." *Id.* (citation omitted).  That definition, the Court concluded, was "constitutionally sufficient because it gives meaningful guidance to the sentencer." *Id.* at 655.

Here, the jury received the following instruction regarding the especially-cruel factor[32]:

In order to find that the especially cruel aggravating circumstance is present as to either murder, you must find that the State has proven beyond a reasonable doubt that the murder was especially cruel due to the infliction of

---

[32]      As Ellison notes, "[t]he trial court granted a motion for judgment of acquittal as to the heinous/depraved prong of the aggravating circumstance, but sent cruelty to the jury." (Doc. 21 at 125, citing RT 2/9/04 at 86.)

either extreme physical pain or extreme mental anguish upon that victim.

In order to find extreme physical pain, the State must prove each of the following three things:

No. 1, the victim suffered extreme physical pain.

And, No. 2, the defendant caused the victim to suffer this extreme physical pain.

And, No. 3, the defendant intended or knew that the victim would suffer this extreme physical pain.

Extreme physical pain means that all three of the following are true:

No. 1, the victim was alive and conscious when he or she experienced the pain.

And, No. 2, the pain was great and extreme.

And, No. 3, the pain was more than brief in duration and was not merely incidental to a quick death.

In order to prove extreme mental anguish, the State must prove each of the following three things.

No. 1, the victim experienced extreme mental anguish while conscious.

And, No. 2, the defendant caused the victim to experience this extreme mental anguish.

And, No. 3, the defendant intended or knew that the victim would experience this extreme mental anguish.

Extreme mental anguish means that the victim experienced extreme fear or extreme anxiety by being made aware that he or she was going to die.

(RT 2/9/04 at 99-100.)  These instructions satisfy *Walton*'s narrowing requirements.

Despite this, Ellison contends that *Walton* was premised on the fact that the Arizona judges who made the sentencing decisions at that time were presumed to know and apply the law, including the narrowed construction of the especially-cruel factor.  (Doc. 21 at 125.)  Thus, Ellison contends that "*Walton* does not apply in the context of jury sentencing."  (*Id.*)

This argument is unavailing.  Ellison cites no clearly established federal law holding that the transition to jury sentencing affects this analysis, and the Ninth Circuit has rejected the argument that habeas relief is available in this circumstance.  *Smith v. Ryan*, 823 F.3d

1270, 1294-95 (9th Cir. 2016) ("In an effort to avoid the U.S. Supreme Court decisions approving Arizona's narrowing construction, Smith argues that [*Ring II*] implicitly overruled *Walton* on this point because it held that jurors rather than judges must find aggravating factors, thereby abrogating *Walton*'s contrary determination. . . .  Smith's argument does not support granting habeas relief. . . .  Irrespective of whether invalidation of the jury instructions in *Walton* . . . is the logical next step after *Ring*, the [Supreme] Court has not yet taken that step, and there are reasonable arguments on both sides—which is all Arizona needs to prevail in this AEDPA case.") (cleaned up).  *See also Dixon v. Ryan*, 2016 WL 1045355, *45 (D. Ariz. 2016), *aff'd*, 932 F.3d 789 (9th Cir. 2019) ("There is no clearly established federal law holding that jury instructions based on the Arizona Supreme Court's narrowing construction are inadequate. . . .").

### H.   **Claim 21**

In Claim 21, Ellison alleges that the trial court's accomplice-liability instruction "permitted the jury to impute Finch's conduct to Ellison for purposes of establishing [three] aggravating circumstances, in violation of the narrowing requirement of the Eighth Amendment."  (Doc. 21 at 128-31.)

> During the aggravation phase of trial, the court instructed the jury as follows:

> A person is criminally accountable for the conduct of another if the person is an accomplice of such other person in the commission of the offense.  An accomplice is a person who, with intent to promote or facilitate the commission of an offense, aids, counsels, agrees to aid, or attempts to aid another person in planning or committing the offense.

(RT 2/9/04 at 101-02.)

With respect to the three aggravating factors at issue here (pecuniary gain, especially cruel, and multiple murders),[33] the court's more specific instructions were as follows: (1) "In order to find that the pecuniary gain aggravating circumstance is present as to either murder, you must find . . . that the expectation of pecuniary gain was the defendant's

---

[33]    Although the trial court provided instructions on more than three aggravating circumstances, Ellison only contends that "[t]hree aggravating circumstances were impermissibly applied to [him] based on Finch's conduct."  (Doc. 21 at 128.)

motive, cause, or impetus for the murder"; (2) "In order to find that the especially cruel aggravating circumstance is present as to either murder, you must find . . . [*inter alia*] the defendant caused the victim to [suffer] this extreme physical pain [and extreme mental anguish] . . . [and] the defendant intended or knew that the victim would suffer this extreme physical pain [and extreme mental anguish]"; and (3) "In order to find that the other murder aggravating circumstance is present as to either murder, you must find . . . that the defendant committed another murder during the commission of the murder for which the State is seeking the death penalty." (*Id.* at 98-100.)

The Arizona Supreme Court held that the accomplice instruction "properly required the jury to find Ellison had the specific intent to promote or facilitate the offense that he actually aided, counseled, agreed to aid, or attempted to aid." *Ellison*, 140 P.3d at 921. The court also found that the "instructions for the especially cruel and pecuniary gain aggravators properly focused on Ellison's personal intent and motivation. They did not tell the jury to impute Finch's intent to Ellison." *Id.* Finally, with respect to the multiple-murders aggravating factor, the court explained that the statute "requires only that the defendant be *convicted* of 'one or more other homicides . . . which were committed during the commission of the offense.' Here, Ellison was convicted of both premeditated murder and felony murder for each victim," thus satisfying the intent element for both murders. *Id.* (citing A.R.S. § 13-703(F)(8)).

Ellison argues that this decision was contrary to and an unreasonable application of clearly established federal law. (Doc. 21 at 128.) He contends that an accomplice liability instruction can never "be constitutionally delivered during the aggravation phase of a sentencing proceeding." (Doc. 38 at 83.) He further argues that the instructions in his case led the jury to impermissibly apply the aggravating factors to him based on Finch's conduct. (Doc. 21 at 128-31.)

These arguments lack merit. Ellison cites no authority (let alone clearly established federal law) for the proposition that accomplice liability is inapplicable at the aggravation stage of a capital sentencing, and the Court has found none. Additionally, Ellison's

assertion that the accomplice instruction allowed Finch's conduct to be imputed to him is belied by the record (and, at a minimum, the Arizona Supreme Court did not act unreasonably by concluding otherwise).

On federal habeas review of a claim of instructional error by a state court, federal courts are bound by a state court's interpretation of state law. *Richey*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Estelle*, 502 U.S. at 71-72 (the assertion that a jury instruction "was allegedly incorrect under state law is not a basis for habeas relief").  Federal habeas relief based on instructional error is warranted only if the petitioner shows "both that the instruction was ambiguous and that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.'" *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (quoting *Estelle*, 502 U.S. at 73 n.4).  "Our habeas precedent places an 'especially heavy' burden on a defendant who . . . seeks to show constitutional error from a jury instruction that quotes a state statute." *Id.* at 190.  In making this determination, "the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). The Supreme Court has explained that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam).  "[I]t is not enough that there is some 'slight *possibility*' that the jury misapplied the instruction." *Waddington*, 555 U.S. at 191 (quoting *Weeks v. Angelone*, 528 U.S. 225, 236 (2000)). Rather, "the pertinent question 'is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* (quoting *Estelle*, 502 U.S. at 72).

Viewing the jury instructions as a whole along with the trial record, and taking into account that this Court is bound by the Arizona Supreme Court's interpretation of Arizona

law, Ellison is not entitled to relief.  The instructions were not erroneous under Arizona law.  Nor did they permit the jury to impute Finch's action to Ellison.  The accomplice instruction provided that Ellison himself must have acted with "intent to promote or facilitate" the murders.  In addition, the instructions with respect to the three aggravating circumstances at issue required the jury to "focus on Ellison's personal intent and motivation." *Ellison*, 140 P.3d at 921.  Thus, the accomplice liability instruction did not 'by itself so infect[]' the proceedings that Ellison's sentence violates due process. *Waddington*, 555 U.S. at 191.

Ellison relies on *Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010), for the proposition that "[t]here is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering."  (Doc. 21 at 130.)  But *Robinson* and the case on which it relied, *State v. Carlson*, 48 P.3d 1180 (Ariz. 2002), involved factual scenarios that are readily distinguishable from this case.

In *Carlson*, the defendant ordered the killing of the victim by two accomplices whom she drove to the victim's apartment. 48 P.3d at 1185.  One of the accomplices closed his eyes before stabbing the victim multiple times, causing the victim to suffer both mentally and physically. *Id.*  The Arizona Supreme Court held that "cruelty was not properly found" by the trial court because the defendant was not a witness to the murder, "did not plan how the murder would be committed and could not have known that [the accomplice] would bungle it by closing his eyes while he repeatedly stabbed [the victim]." *Id.* at 1193.

Similarly, in *Robinson*, there was no evidence that the defendant was present at the murder, planned for the manner of the murder, or planned that the murder be committed at all. 595 F.3d at 1106.  There was "no basis to conclude that Robinson's home-invasion plan was reasonably *certain* to cause death, let alone death following suffering," nor could Robinson "have foreseen with any certainty that his accomplices would 'bungle' the home invasion and murder [the victim] in the manner they did." *Id.*

In contrast to those cases, Ellison was not only present at the murders but admitted

1  to binding both victims and holding a pillow over Mr. Boucher's face.  His actions directly

2  caused "mental anguish" sufficient to satisfy the "especially cruel" aggravating factor.

3  *Ellison*, 140 P.3d at 925.  He also directly participated in the "a plan intended or reasonably

4  certain to cause suffering," which was "absent" in *Robinson* and *Carlson*.  *Robinson*, 595

5  F.3d at 1105.

6      I.      **Claim 22**

7       In Claim 22, Ellison alleges that the application of the especially-cruel, pecuniary-

8  gain, and multiple-murders aggravating circumstances violated his rights under the Sixth,

9  Eighth, and Fourteenth Amendments.  (Doc. 21 at 131-41.)  The Arizona Supreme Court,

10  independently reviewing Ellison's death sentence, rejected his contention that those factors

11  were not supported by the evidence.  *Ellison*, 140 P.3d at 924-27.  Ellison now argues that

12  the court's decision was contrary to and an unreasonable application of clearly established

13  federal law and based on an unreasonable determination of the facts.  (Doc. 21 at 131.)

14       Whether a state court misapplied an aggravating factor to the facts of a case is a

15  question of state law.  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  Federal habeas review

16  of a state court's application of an aggravating factor is not some "sort of *de novo* review"

17  but instead "is limited, at most, to determining whether the state court's finding was so

18  arbitrary or capricious as to constitute an independent due process or Eighth Amendment

19  violation."  *Id.*

20       In *Jeffers*, the Supreme Court held that the appropriate standard for federal habeas

21  review of a state court's application of an aggravating circumstance is the "rational

22  factfinder" test: "whether, after viewing the evidence in the light most favorable to the

23  prosecution, *any* rational trier of fact could have found the essential elements" of the

24  aggravating factor.  *Id.* (quoting *Jackson*, 443 U.S. at 319).  If the facts support conflicting

25  inferences, reviewing courts "must presume—even if it does not affirmatively appear in

26  the record—that the trier of fact resolved any such conflicts in favor of the prosecution,

27  and must defer to that resolution."  *Cavazos*, 565 U.S. at 6 (quoting *Jackson*, 443 U.S. at

28  326).

Additionally, as noted above, AEDPA requires federal courts to apply "additional deference" to *Jackson* sufficiency-of-the-evidence claims.  *Coleman*, 566 U.S. at 651 ("*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."); *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (noting "this twice-deferential standard").  The Ninth Circuit has stated that this  "double dose of deference . . . can rarely be surmounted."  *Boyer v. Belleque*, 659 F.3d 957, 964-65 (9th Cir. 2011).

### 1.    Especially Cruel

During the aggravation phase of trial, Judge Moon instructed the jury on the especially-cruel prong of the "especially cruel, heinous or depraved" factor.  (RT 2/9/04 at 99-100.)[34]  The jury found that the factor had been proved and the Arizona Supreme Court agreed on direct appeal.  *Ellison*, 140 P.3d at 925 ("The State proved the especially cruel aggravator based on extreme mental anguish beyond a reasonable doubt.").

"In order to show a murder was especially cruel, the State must prove beyond a reasonable doubt that the victim suffered either physical pain or mental distress."  *Id.* at 924.  "The defendant must intend that the victim suffer or reasonably foresee that there is a substantial likelihood that the victim will suffer as a consequence of the defendant's acts."  *Id.* at 925 (quotation omitted).  The Arizona Supreme Court "examine[s] the entire murder transaction and not simply the final act that killed the victim."  *Id.* (quotation omitted).  Especially-cruel cruelty can be proved by showing the victim suffered physical pain or mental anguish.  *Id.* at 924-25.  "Mental anguish is established if the victim experienced significant uncertainty as to her ultimate fate, or if the victim was aware of a loved one's suffering."  *Id.* at 925 (quotation omitted).  In its independent review of this factor, the Arizona Supreme Court found that "the evidence here establishes that the victims were conscious when they were bound and aware of each other's suffering.  The evidence also

---

[34]     "[T]he (F)(6) aggravator is stated in the disjunctive, indicating that evidence of any one of the statutory prongs, 'heinous,' 'cruel,' or 'depraved' will support a finding that the (F)(6) aggravator is present."  *State v. Cromwell*, 119 P.3d 448, 456 (Ariz. 2005).

establishes that the Bouchers were uncertain as to their ultimate fate after being attacked and bound by two men in their own house at night, and they then heard one ordering the other to kill Mr. Boucher." *Id.*

Ellison asserts that the finding of mental anguish was unsupported. (Doc. 21 at 132-35.)  He also argues that any suffering was too brief to satisfy the especially-cruel factor. (*Id.* at 134.)

As noted, this Court must apply two levels of deference to its assessment of the Arizona Supreme Court's determination that the especially-cruel factor was proved.  The Court first concludes that a rational factfinder, viewing the evidence in the light most favorable to the prosecution, could have found that the victims suffered mental anguish. *Jeffers*, 497 U.S. at 780; *Jackson*, 443 U.S. at 319.  The jury heard testimony that when Ellison entered the house (at which point Finch had already been inside for 10 minutes), Mrs. Boucher was in the living room and Mr. Boucher was in the bedroom.  (RT 2/9/04 at 10.)  Upon entry, Ellison gathered cords and tape to be used to "tie up the Bouchers." (*Id.*)[35] Mrs. Boucher was then ordered to go to the bedroom and sit on the floor.  (*Id.* at 11.)  Finch then pulled out a gun and instructed Ellison to it to "kill the old man." (*Id.*)  Finch then strangled Mrs. Boucher while Ellison held a pillow over Mr. Boucher's face "for a period of time." (*Id.* at 11-12.)  Ellison then removed the pillow while Mr. Boucher's "chest was still moving" and "told [Finch] that he would have to finish him off."  (*Id.* at 12.)  Additionally, when her body was discovered, Mrs. Boucher had bruises and blood on her face.  (RT 2/6/04 at 139.)  From these facts, a rational factfinder could easily find that the victims suffered mental anguish, consisting of both significant uncertainty as to their ultimate fate and awareness of a loved one's suffering.

That conclusion is reinforced by the second level of deference required under AEDPA.  The Arizona Supreme Court's determination that the especially-cruel factor was

---

[35]    Although Ellison initially denied that he personally tied up the Bouchers, "[l]ater in the interview he did say that he had actually assisted [Finch] in tying up both of the Bouchers."  (RT 2/9/04 at 13.)

proved was not "objectively unreasonable."  *Cavazos*, 565 U.S. at 6.

2.   Pecuniary Gain

Under the law in effect at all relevant times, an aggravating factor existed where "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."[36]

"Under Arizona law, a finding that a murder was motivated by pecuniary gain for purposes of section 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus for the murder, not merely the result of the murder."  *Moormann v. Schriro*, 426 F.3d 1044, 1054 (9th Cir. 2005).  However, "pecuniary gain aggravation does not require a motive to kill.  Aggravation under this factor may also be based upon a causal connection between the pecuniary gain objective and the killing."  *State v. Canez*, 42 P.3d 564, 590 (Ariz. 2002), *supplemented*, 74 P.3d 932 (Ariz. 2003).  "The needed connection between expectation of pecuniary gain and a motive for murder often results from a finding that one of the defendant's motives in committing the murder was to facilitate the taking of or ability to retain items of pecuniary value."  *State v. Sansing*, 26 P.3d 1118, 1125 (Ariz. 2001), *vacated on other grounds*, 536 U.S. 954 (2002).  In *Sansing*, the Arizona Supreme Court explained that "an unexpected or accidental death that occurs during the course of or flight from a robbery, but which was not committed in furtherance of pecuniary gain, does not provide sufficient basis for an F.5 finding.  Similarly, the sole fact that a defendant takes items or money from the victim does not establish pecuniary gain as a motive for the

---

[36]      In 2019, Arizona repealed and replaced this factor.  *State v. Greene*, 527 P.3d 322, 331 (Ariz. 2023) ("With respect to § 13-751(F)(5), the legislature amended its language, combined it with the § 13-751(F)(4) aggravating circumstance, and renumbered the new provision as § 13-751(F)(3)."). Under the new version, an aggravating factor exists where: "The defendant procured the commission of the offense by payment, promise of payment, or anything of pecuniary value, or the defendant committed the offense as the result of payment, or a promise of payment, or anything of pecuniary value."  A.R.S. § 13-751(F)(3). The new factor is "prospective only" and does "not provide a basis for relief" for capital sentences that were constitutionally imposed before the amendment.  *Greene*, 527 P.3d at 328.

murder." *Id.*  In other words, Arizona law distinguishes between cases in which "one of the defendant's motives in committing the murder was to facilitate the taking of or ability to retain items of pecuniary value" and cases of "robberies gone bad." *Id*.  The Arizona Supreme Court has explained, however, that when "the killing and robbery take place almost simultaneously, we will not attempt to divine the evolution of the defendant's motive in order to discern when, or if, his reason for harming the victim shifted from pecuniary gain to personal 'amusement' or some other speculative nonpecuniary drive." *Canez*, 42 P.3d at 591.

Ellison first argues that "the evidence adduced at the sentencing phase did not support a finding that the murders themselves—rather than the burglary more broadly— were committed in the expectation of pecuniary gain."  (Doc. 21 at 135.) The Arizona Supreme Court rejected this argument:

> The record demonstrates that Ellison's motive for the murders was to facilitate the burglary.  Ellison admits going to the Bouchers' home with the intent to commit a burglary.  Evidence showed that Ellison was familiar with both the area and the Bouchers.  He and Finch wore gloves while inside the Bouchers' home but did not attempt to disguise their identities.  Although Ellison argued he did not intend to kill anyone and that Finch forced him to participate in the murders at gunpoint, the State presented contrary evidence. We find this evidence establishes that Ellison planned the burglary and, in order to escape and avoid identification, killed the Bouchers.

> Ellison also argues that the evidence the victims were bound actually supports the conclusion that the burglary was complete *before* the victims were killed.  Thus, there was a different motive for the murders.  This argument is not persuasive.  Ellison admitted to police that Finch and he took property from the Bouchers' bodies and residence *after* they were killed. Moreover, if Ellison was motivated to kill the Bouchers in order to avoid identification, it does not matter whether the burglary or the murders occurred first.

*Ellison*, 140 P.3d at 926.

These conclusions were not unreasonable.  As Respondents note, despite Ellison's assertion that Finch planned the burglary and picked the Bouchers' house, it was Ellison who was familiar with the Kingman neighborhood where the Bouchers lived because it

was only two blocks from his parents' home, and in fact Ellison had personally interacted with the Bouchers when he worked on their house.  (RT 2/6/04 at 108.)  Ellison admitted that he used his girlfriend's van to drive to Kingman with Finch.  (RT 2/9/04 at 16.)  Ellison also supplied the latex gloves worn during the crimes.  (*Id.*)  It was thus reasonable for the Arizona Supreme Court to determine that "this evidence establishes that Ellison planned the burglary and, in order to escape and avoid identification, killed the Bouchers."  *Ellison*, 140 P.3d at 926 (citations omitted).

Sansing is not to the contrary.  There, the Arizona Supreme Court rejected the argument that the defendant murdered the victim in order to "facilitate escape and hinder detection by the police."  26 P.3d at 1127.  The court noted that, after the murder, Sansing left the victim's body in his backyard (where it was visible over a fence) and then drove to his sister's home to confess.  *Id.*  The court also noted that killing the victim "did not eliminate the only witness to the crime: the defendant's wife and their children were present during the entire chain of events."  *Id.*  This case is easily distinguishable.  Even though, as Ellison emphasizes, Ellison may not have disguised his identify when speaking with the bartender at a bar near the Bouchers' house (Doc. 21 at 137), the bottom line is that he and Finch killed the only two witnesses to the burglary.

Notably, *Sansing* cited *State v. Greenway*, 823 P.2d 22 (Ariz. 1991), as a case where a "murder committed to facilitate escape and/or hinder detection by police furthers the pecuniary interest of the criminal."  *Sansing*, 26 P.3d at 1126.  "In *Greenway*, the defendant murdered his victims execution-style after robbing their home.  Greenway entered the home knowing the victims were present and made no attempt to disguise his identity; the practical effect of the murders was to eliminate the only witnesses to the crime."  *Sansing*, 26 P.3d at 1126.  It was reasonable for the Arizona Supreme Court to conclude that the same was true here.

Ellison also argues that the jury's consideration of pecuniary gain "resulted in impermissible double counting," with burglary serving both as the predicate offense for felony murder and as an aggravating factor.  (Doc. 21 at 138-39.)  Ellison asserts that under

these circumstances the pecuniary gain factor does not "genuinely narrow the class of persons eligible for the death penalty." (*Id.* at 139, quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).  The Arizona Supreme Court rejected this argument, relying on *Greenway*. *Ellison*, 140 P.3d at 926.

Ellison's arguments are foreclosed by *Woratzeck v. Stewart*, 97 F.3d 329 (9th Cir. 1996).  There, the habeas petitioner argued "that aggravating factor (F)(5)—that the crime was committed with the expectation of receiving anything of pecuniary value—failed . . . to channel the discretion of the sentencer . . . [because] factor (F)(5) is automatically found in cases where one is convicted of robbery felony-murder." *Id.* at 334.  The Ninth Circuit disagreed, explaining that "[a]n examination of the application of factor (F)(5) in Arizona does not support Woratzeck's argument. . . .  It is not true that everyone convicted of robbery felony-murder is automatically death eligible.  The State needs to prove at sentencing that the killing was done with the expectation of pecuniary gain.  Even if it is true that under many circumstances a person who kills in the course of a robbery is motivated to do so for pecuniary reasons, that is not necessarily so." *Id.*

At any rate, applying the double layers of deference required under *Jackson* and AEDPA, Ellison's challenge to the state courts' application of the pecuniary-gain factor is meritless.

### 3.   Multiple Murders

To satisfy Arizona's multiple-murders aggravating circumstance, "[i]t is not enough for the jury to convict the defendant of multiple homicides.  The murders must have a temporal, spatial, and motivational relationship such that they were a part of a continuous course of criminal conduct.'" *Ellison*, 140 P.3d at 926  (cleaned up).  "The multiple murders aggravator applies so long as the defendant was found criminally liable, even if he himself did not physically commit the murders." *Id.*

In denying this claim on direct appeal, the Arizona Supreme Court explained:

Ellison was convicted of both felony murder and premeditated murder in the deaths of each victim.  The guilt proceeding jury also made *Enmund/Tison* findings regarding the murders.  The Bouchers, a married couple residing

> together, were both killed in the same room at approximately the same time.
> According to Ellison, he and Finch went to the Bouchers' home to commit a
> burglary.  He does not claim the two victims were killed for different reasons.

*Id.*  The court concluded that the evidence thus established the required "temporal, spatial, and motivational relationship" between the two murders, "regardless of whether Ellison physically committed the murders." *Id.*

Ellison argues that the Arizona Supreme Court unreasonably found that the motivations for the murders were related because "[t]he evidence at trial was undisputed that Finch killed Lillian Boucher.  If . . . Ellison caused Joseph Boucher's death, the evidence at trial showed that he was coerced by Finch.  Ellison's motive therefore was unrelated to Finch's.  If, instead, . . . Finch killed both victims, then [the Arizona Supreme Court] found this aggravating circumstance based on Finch's conduct rather than Ellison's.  By interpreting the (F)(8) aggravating circumstance to preclude an individual determination of Ellison's culpability relative to a codefendant who actually committed the murders, the Arizona Supreme Court violated the U.S. Supreme Court's precedents requiring individualized assessment."  (Doc. 21 at 140.)

This argument is unavailing.  Under Arizona law, the fact that Ellison was convicted of premeditated and felony murder with respect to both victims satisfies the motivational relationship requirement.  *State v. Prasertphong*, 76 P.3d 438, 442 (Ariz. 2003) (rejecting defendant's argument that the multiple-murders aggravator did not apply to him "because he was not the killer, and did not share in [co-defendant's] motivation to kill the victims").  At any rate, applying the double layers of deference required under *Jackson* and AEDPA, Ellison's challenge to the state courts' application of the multiple-murders factor is meritless.

### J.  **Claim 23**

In Claim 23, Ellison alleges that Arizona's death-penalty statute created a "presumption of death" by requiring him to prove that he was entitled to a life sentence, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. 21 at 141-44.)

The Arizona Supreme Court's denial of this claim, *Ellison*, 140 P.3d at 922, was

neither contrary to nor an unreasonable application of clearly established federal law. The United States Supreme Court has rejected the argument that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty. *Walton*, 497 U.S. at 651-52; *see also Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).

### K.     **Claim 24**

In Claim 24, Ellison alleges that his rights under the Eighth and Fourteenth Amendments were violated when the trial court instructed the jury, pursuant to Arizona law, that they were required to determine unanimously whether he should be sentenced to death.  (Doc. 21 at 145-46.)

The Arizona Supreme Court's denial of the claim, *Ellison*, 140 P.3d at 922, was neither contrary to nor an unreasonable application of clearly established federal law.  In *Mills v. Maryland*, 486 U.S. 367 (1988), the Supreme Court reversed a capital sentence because jurors viewing the instructions and verdict form "well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."  *Id.* at 384.  Similarly, in *McKoy v. North Carolina*, 494 U.S. 433 (1990), the Supreme Court reversed a death sentence where "the instructions and verdict form expressly limited the jury's consideration to mitigating circumstances unanimously found."  *Id.* at 444 n.8.

But here, unlike in *Mills* and *McCoy*, unanimity was not required with respect to individual mitigating circumstances.  Instead, the jury was instructed that unanimity was required only with respect to the verdict, not with respect to any particular mitigating circumstance:

> The jurors do not have to all agree that a mitigating circumstance has been proven to exist.   Each juror may consider any mitigating circumstances found by that individual juror.  In determining whether to impose a sentence of death, each individual juror shall take into account the aggravating circumstances that all the jurors have found to be proven and shall take into account any mitigating circumstances that the individual juror has found to be proven.

(RT 2/10/04 at 4-5.)

It was not contrary to or an unreasonable application of clearly established federal law for the Arizona Supreme Court to conclude that this instruction was permissible under *Mills* and *McKoy*. *See, e.g., Smith v. Spisak*, 558 U.S. 139, 148 (2010) (finding no violation of *Mills* and *McKoy* where "the instructions did not say that the jury must determine the existence of each individual mitigating factor unanimously"); *Howard v. Gittere*, 392 F. Supp. 3d 1205, 1223 (D. Nev. 2019) ("As one can readily see, the relevant instructions and verdict form provided Howard's jury bear faint resemblance to those in *Mills*. Nowhere did they say or imply that the jury must determine the existence of a mitigating factor unanimously. A unanimity requirement was imposed only as to the verdict . . . ."); *Garcia*, 2022 WL 1166408 at *47 ("Garcia's argument that the unanimity requirement impermissibly limited the jury's consideration of mitigating evidence fails because unanimity was not required with respect to individual mitigating circumstances. Instead, the jury was properly instructed that unanimity was required only with respect to the verdict.").

L.     **Claim 25**

In Claim 25, Ellison alleges that the trial court violated his Eighth and Fourteenth Amendments rights by precluding him from presenting mitigating evidence related to the disparity in sentences between himself and Finch. (Doc. 21 at 146-49.) The Arizona Supreme Court denied this claim on direct review. *Ellison*, 140 P.3d at 922-23.

During the penalty phase of trial, defense counsel elicited testimony that Finch received a life sentence. As a result, the state asked to present evidence regarding the mitigating circumstances found in Finch's case. (RT 2/12/04 at 123.) Ellison's counsel, in turn, refused to stipulate to admission of the special verdict from Finch's sentencing. (*Id.* at 123-25.) Upon agreement of the parties, Judge Moon eventually instructed the jurors that Finch and Ellison were tried separately before different juries, that "[s]ome of the evidence was different," and that the "aggravating circumstances and mitigating circumstances proven in the Finch case were different." (*Id.* at 202.) The court concluded: "There is no way to explain all of the differences to you [the jury] under our legal system.

Therefore you are instructed to accept as evidence only that on the basis of those circumstances, the codefendant, Richard Finch, was not sentenced to death for either murder." (*Id.*)  The court directed the jury not to speculate about the aggravating or mitigating circumstances present in Finch's case "beyond any differences that will be or have been presented by the testimony in this case." (*Id.*)  Following that instruction, Detective Watson testified that Finch was "somewhat slow," was not on parole at the time of the murders, and had no prior record of "serious offenses." (*Id.* at 204-05.)

On direct appeal, Ellison argued that "by limiting the evidence regarding Finch's sentence, the trial judge effectively prohibited the jury from considering the disparate sentences." *Ellison*, 140 P.3d at 922-23.  In denying the claim, the Arizona Supreme Court noted that although a disparity in sentences between codefendants and or accomplices can be a mitigating circumstance, "[o]nly the *unexplained* disparity is significant." *Id.* at 923.  The court then stated that Ellison had waived any argument that the entire special verdict from Finch's sentencing should have been admitted. *Id.*  The court explained that it would be unfair to admit only certain facts about Finch's verdict, such as the judge's determination that the State failed to the prove pecuniary gain aggravating factor. *Id.*  The court the reiterated that "[a] disparity in sentences is constitutionally relevant only if it is unexplained" so "if particular facts about Finch's sentence were admitted, all of the differences between the aggravators and mitigators of each case should be admitted to avoid misleading the jury." *Id.*  The court concluded:

> Here, there was no unexplained disparity.  In Finch's case, Judge Moon determined that Ellison, as the ringleader, forced Finch to kill Mrs. Boucher. Judge Moon determined that Finch acted under duress and was not motivated by pecuniary gain.  Additionally, Finch, unlike Ellison, was not on parole and had no serious felonies in his criminal background.  Thus, Judge Moon did not abuse his discretion in limiting the evidence so as to accommodate Ellison's disparate sentences argument while avoiding undue prejudice to either side.

*Id.* (citations and footnote omitted).

Ellison now contends this decision "turns on unreasonable factual determinations"

about Finch's criminal history.  (Doc. 21 at 149.)  Ellison notes that Judge Moon found that Finch "was previously convicted of at least three felonies, possession of controlled substance in 1997, forgery in 1997, and possession of stolen property in 1998."  (*Id.*)  Ellison also states that Finch "appears to have had at least one outstanding warrant from Washington." (*Id.*)

As Respondents note, these assertions do not establish that any of the Arizona Supreme Court's findings were inaccurate with respect to the aggravating factors that helped account for the disparity in sentences between Ellison and Finch.  The felonies in Finch's record were not "serious offenses" for purposes of A.R.S. § 13-703(F)(2), and Finch was not on parole when the murders were committed, § 13-703(F)(7).  Both of those aggravating factors, in contrast, applied to Ellison.

Ultimately, this claim fails because the jury heard evidence of the disparity in sentences and any disparity was explained.  *See, e.g.*, *Sims v. Singletary*, 155 F.3d 1297, 1316 (11th Cir. 1998) (rejecting claim that it was error for the sentencing court not to consider sentencing disparity between Sims and his co-defendants where Sims was the triggerman and the jury and court knew that co-defendants were receiving sentences of two and ten years); *Jackson v. Bradshaw*, 2007 WL 2890388, *78 (S.D. Ohio 2007), *aff'd*, 681 F.3d 753 (6th Cir. 2012) ("[T]here was already evidence before the jury regarding the disparity in sentences.").  Ellison cites no clearly established federal law that would render the Arizona Supreme Court's denial of this claim objectively unreasonable.

## M.   **Claim 26**

In Claim 26, Ellison alleges that the trial court improperly admitted irrelevant and prejudicial victim-impact evidence in violation the Eighth and Fourteenth Amendments.  (Doc. 21 at 149-54.)  The Arizona Supreme Court denied this claim on direct appeal.  *Ellison*, 140 P.3d at 923-24.

After the parties rested during the sentencing phase of trial, Vivian Brown, the

victims' daughter, made a victim impact statement pursuant to A.R.S. § 13-703.01(R).[37] Before her statement, Judge Moon had told her she could not recommend a sentence. Brown spoke about the "impact on what happened to my mother and father," showed the jury family photographs, and provided "a little history" of her parents' lives so the jury would "know who they were." (RT 2/12/2004 at 209-13.) Brown then "touch[ed] a little bit on—on how this has affected us." (*Id.* at 213-14). At this point, Brown stated:

> But I—what I want to try to express is this impact, because in my heart I know my mother and father so well. I know how they—when they were dying, I know how they were trying to help each other. I live with that memory every day. I have their pictures out, because I will not put them away. They are my mother and father. And every day I look at them, and I have wonderful thoughts, and then all of a sudden there it is. They're dying. Tied, taped, struggling to help each other. They could hear. I know they could still hear. Any time they were sick, they were worried sick about each other. They were totally concerned, totally bonded, totally in love. They fought like—like anybody. I mean, it was a normal relationship. But they had that total love. And that's what I live with every day, is how they died.

(RT 2/12/04 at 215-16.) Brown concluded: "I just don't know what else to say. But this is how it's impacted me and my family and my brother and his family." (*Id.* at 217.) The parties declined the judge's invitation to have Brown sworn and cross-examined. (*Id.*) Over Ellison's objection, the trial court also granted the prosecution's request to allow one in-life photograph of the victims to be taken to the jury room during deliberations. (RT 2/13/04 at 3-10.)

In his final penalty-phase instructions, Judge Moon informed the jurors that the purpose of the victim-impact statement is to allow them "to see each murder victim as a unique person and to see the loss resulting from their murders." (*Id.* at 20-21.) It was only

---

[37] The statute, now codified at A.R.S. § 13-752(R), provides that a victim "may present information about the murdered person and the impact of the murder on the victim and other family members and may submit a victim impact statement in any format to the trier of fact."

for this "limited purpose" that the jury could consider the victim-impact information about the victims. (*Id.* at 21.) Judge Moon explained that the jurors "must not consider any opinion you feel the victims' family may have about the appropriate sentence for either murder." (*Id.*) He instructed the jury that the victim-impact information "is not an aggravating circumstance and must not be considered by you as an aggravating circumstance" and that jurors may not "consider the relative worth of human beings" in making their sentencing decision. (*Id.*) Judge Moon then reiterated that the jury must make its "penalty phase decision based solely upon [its] evaluation of the aggravating and any mitigating circumstances." (*Id.*) He told the jury its decision "must be based on reason rather than emotion." (*Id.* at 20.)

The presentation of victim-impact evidence in a capital sentencing is not *per se* unconstitutional. In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that the introduction of a victim-impact statement to a capital sentencing jury violated the Eighth Amendment. However, in *Payne v. Tennessee*, 501 U.S. 808 (1991), the Court overruled *Booth* in part. *Payne* explained that the "State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to this family." 501 U.S. at 825 (cleaned up). "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827. Therefore, the Court concluded, "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* However, the Court left intact *Booth*'s prohibition on the admission of characterizations and opinions about the crime, the defendant, or the appropriate sentence. *Id.* at 830 n.2. *See generally Bosse v. Oklahoma*, 580 U.S. 1, 2 (2016) ("In [*Booth*], this Court held that the Eighth Amendment prohibits a capital sentencing jury from considering victim impact evidence that does not relate directly to the

circumstances of the crime.  Four years later, in [*Payne*], the Court granted certiorari to reconsider that ban on victim impact evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family.  The Court held that *Booth* was wrong to conclude that the Eighth Amendment required such a ban.") (cleaned up).

In denying Ellison's claim on appeal, the Arizona Supreme Court first upheld the constitutionality of A.R.S. § 13-703.01(R), finding that victim-impact statements in capital cases "are relevant to the issue of the harm caused by the defendant" and, so long as the victim does not recommend a particular sentence, do not violate the Eighth Amendment. *Ellison*, 140 P.3d at 923-24.  The court noted that Judge Moon "properly instructed Brown not to make a sentencing recommendation" and "instructed the jurors that they could consider Brown's statements only to understand the victims as unique individuals; they could not consider her statements as establishing an aggravating circumstance or as providing a sentencing recommendation."  *Id.* at 924.  With respect to the photograph, the court "recognize[d] the danger that photos of the victims may be used to generate sympathy for the victim and his or her family" but explained that "it has refused . . . to adopt a per se rule barring all in-life photos in capital murder cases," leaving it to the trial court "in each instance to exercise sound discretion in balancing probative value against the risk of unfair prejudice."  *Id.* (quotations omitted).  The court concluded that Judge Moon "did not abuse his discretion in allowing the jurors to take into their deliberations one in-life photo, which was 'benign' as compared to the victims' post-death photos."  *Id.* (citations omitted).

Ellison contends that portions of Brown's victim-impact statement violated *Booth* and *Payne* by going beyond the effects of the crime on her life and offering impermissible characterizations about the crime, such as "Tied, taped, struggling to help each other. They could hear. I know they could still hear."  (Doc. 21 at 150-51.)  He argues that the Arizona Supreme Court unreasonably applied *Payne* by failing to recognize that the decision left intact *Booth*'s prohibition on characterizations and opinions about the crime, as well as

1

recommendations about the appropriate sentence.  (*Id.* at 152.)[38]

2

Brown's statement did not offer characterizations of the defendant or a

3

recommendation as to the appropriate sentence.  *Payne*, 501 U.S. at 830 n.2.  Nevertheless,

4

the Court agrees with Ellison that Brown, in describing the emotional effect of the murders,

5

offered opinions and characterizations of the facts of the crimes.  Notwithstanding the

6

context in which they were offered, in which Brown was expressing her feelings about the

7

loss of her parents, these comments likely fall into one of the categories that remain

8

prohibited under *Payne* and *Booth*.  *See, e.g.*, *Lockett v. Trammell*, 711 F.3d 1218, 1238

9

(10th Cir. 2013) (admission of statement describing details of the crime and speculating

10

about the victim's thoughts and feelings during the crime violated the Eighth Amendment).

11

*But see Simmons v. Bowersox*, 235 F.3d 1124, 1134 & n.4 (8th Cir. 2001) (penalty-phase

12

testimony by victim's family members describing in detail her thoughts and feelings during

13

the crime was "not meaningfully distinguishable from that approved by the Supreme Court

14

in *Payne*").

15

Even so, the admission of these comments did not have a "substantial and injurious

16

effect or influence in determining" Ellison's sentence.  *Brecht*, 507 U.S. at 637; *see Floyd*

17

*v. Filson*, 949 F.3d 1128, 1149 (9th Cir. 2020) (applying harmless error standard to

18

admission of mother's victim-impact statement); *Hooper v. Mullin*, 314 F.3d 1162, 1174

19

(10th Cir. 2002) ("[T]he trial court erred by admitting this victim-impact testimony during

20

Petitioner's capital sentencing proceeding.  Nonetheless, this constitutional error was

21

harmless because it did not have a 'substantial and injurious effect or influence in

22

determining the jury's verdict.'").  Given the record as a whole, including the trial court's

23

---

24

[38]     In support of his argument that the Arizona Supreme Court misread *Payne*, Ellison cites the court's reliance on *Lynn v. Reinstein*, 68 P.3d 412 (Ariz. 2003), asserting that in *Lynn* as in *Ellison*, the court misinterpreted *Payne* as barring only sentencing recommendations and not characterizations of the crime.  This is incorrect.  In *Lynn*, the court accepted jurisdiction in a special action to consider whether a victim's sentencing recommendations were admissible.  Contrary to Ellison's argument, however, the court acknowledged that *Payne* left in place the prohibition on a victim's characterization of the crime.  68 P.3d at 416 & n.4.

25

26

27

28

instructions that clearly outlined the limited purposes for which Brown's statement could be considered, the admission of any improper comments was harmless.  In *Lockett*, for example, the Tenth Circuit applied the harmless error standard to a victim-impact statement that "involved two types of evidence prohibited by the Eighth Amendment: characterization of the crime and the defendant and a sentencing recommendation."  711 F.3d at 1238.  Among other things, the statement "speculated about Ms. Neiman's thoughts and feelings during the crime," including her refusal to cooperate with Lockett, explaining that "Stephanie is going to stand up for her rights no matter what. . . .  Maybe that's what Clayton [Lockett] was so scared of."  *Id.* (citation omitted).  The statement "ended with an unambiguous plea to the jury to sentence Mr. Lockett to death."  *Id.*   Nevertheless, the Tenth Circuit concluded that the admission of the statement was harmless because it did not have a substantial and injurious effect on the jury.  *Id.* at 1239.  The court noted that a single statement was involved; the statement did not characterize the defendant; and the most powerful parts of the statement were constitutionally permissible accounts of "the effect the murder had on them as a family" and the victim's "unique and positive qualities."  *Id.*  The court also noted that the "jury was correctly instructed that its sentencing decision was 'limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence.'"  *Id.* (citation omitted).  Finally, the court noted that the strength of the aggravating factors militated against any finding that the erroneously admitted portions of the victim-impact statement was prejudicial.  *Id.* at 1240.

So, too, here.  The admission of Brown's statement, which did not include a recommendation that Ellison be sentenced to death, did not have a substantial and injurious effect on the jury's sentencing decision.  She did not characterize Ellison, hers was the only victim-impact statement the jury heard, and the bulk of her statement consisted of permissible descriptions of her parents as unique individuals and the effect of their loss on her and her family.  Additionally, the jury was properly instructed on the limited purposes for which the statement could be considered, and the aggravating evidence was powerful.

For the same reasons, the Court finds that any error was harmless with respect to

the in-life photo of the victims that was provided to the jurors during their deliberations. *See, e.g., Plascencia v. Alameida*, 467 F.3d 1190, 1203 (9th Cir. 2006) ("Even if the admission of the photographs was improper, the error could not have had 'a substantial and injurious effect on the jury's verdict.'") (citation omitted); *United States v. Chanthadara*, 230 F.3d 1237, 1274 (10th Cir. 2000) (victim-impact testimony did not render trial fundamentally unfair where testimony of murder victim's husband and young children was "amplified with numerous colored photographs of [the victim] while she was alive" and jury was allowed to take into the jury room "letters the children had written to their dead mother and a daily journal which described one child's loss.").

N.     **Claim 27**

In Claim 27, Ellison alleges that the trial court violated his rights under the Eighth and Fourteenth Amendments by failing to instruct the jury that a life sentence would not include the possibility of parole.  (Doc. 21 at 154-63.)  He concedes he did not raise this claim in state court.  (*Id.*)  He contends, however, that the ineffective assistance of appellate and PCR counsel excuse the default.  (*Id.*)

The Court has already dismissed Claim 27 as meritless.  (Doc. 68.)  At any rate, Ellison's attempt to overcome the procedural default of this claim is unavailing.   As discussed elsewhere, the ineffective assistance of appellate counsel may be used as cause to excuse a procedural default only where the particular ineffective-assistance allegation was first exhausted in state court as an independent constitutional claim.  *Carpenter*, 529 U.S. at 453; *Carrier*, 477 U.S. at 489-90.  Ellison did not raise such a claim of ineffective assistance of appellate counsel here.  Meanwhile, under *Martinez*, the ineffective assistance of PCR counsel can only excuse the default of claims of ineffective assistance of trial counsel.  *Hunton*, 732 F.3d at 1126–27; *Martinez*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at 1177.

O.     **Claim 28**

In Claim 28, Ellison alleges that the trial court violated the Eighth and Fourteenth Amendments by denying his motion to retain a prison expert.  (Doc. 21 at 163-66.)  He

concedes that he did not raise the claim in state court but again argues that the default is excused by the ineffective assistance of appellate and PCR counsel.  (*Id.* at 163-64.)  He is incorrect for the reasons just stated with respect to Claim 27.

P.     **Claim 29**

In Claim 29, Ellison alleges that his sentence "must be vacated because of the cumulative prejudicial effect of all trial-court sentencing errors in this case."  (Doc. 21 at 167-69.)  The parties disagree about the claim's procedural status.  Because the claim is plainly meritless, the Court need not address the exhaustion issue.  *Lambrix*, 520 U.S. at 524-25.

As noted elsewhere, the United States Supreme Court has not specifically recognized the doctrine of cumulative error as an independent basis for habeas relief.  Thus, the Arizona Supreme Court's denial of this claim was not contrary to nor an unreasonable application of clearly established federal law.  Alternatively, because the Court has identified at most one harmless sentencing-related error (concerning victim-impact evidence), any cumulative-error claim fails for that reason as well.  *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012) ("There can be no cumulative error when a defendant fails to identify more than one error.").

Q.     **Claim 45(C)**

In Claim 45(C), Ellison alleges that counsel performed ineffectively during the sentencing phase of his trial.  (Doc. 21 at 216-75.)  He raises 10 subclaims of ineffectiveness.  (*Id.*)

As explained above, to establish deficient performance under *Strickland*, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  Although trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Id*. at 691.  In assessing counsel's investigation, courts

"must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted); *see also Rompilla v. Beard*, 545 U.S. 374, 381 (2005). "As long as a reasonable investigation was conducted, we must defer to counsel's strategic choices." *Cox v. Ayers*, 613 F.3d 883, 899 (9th Cir. 2010).

In the context of a capital sentencing, prejudice is assessed by "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. The "totality of the evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Id.* at 536 (citation omitted). "If the difference between the evidence that could have been presented and that which actually was presented is sufficient to 'undermine confidence in the outcome' of the proceeding, the prejudice prong is satisfied." *Duncan v. Ornoski*, 528 F.3d 1222, 1240 (9th Cir. 2008) (quoting *Strickland*, 466 U.S. at 694). The burden of showing prejudice is "highly demanding and heavy." *Allen*, 395 F.3d at 1000 (citation omitted).

### 1. Additional background

#### a. **Sentencing**

During the sentencing phase of trial, defense counsel called seven witnesses over two days to testify in support of five proposed mitigating circumstances: (1) absence of love and guidance during Ellison's childhood; (2) drug addiction; (3) diminished capacity; (4) lack of genuine violence in prior convictions; and (5) Ellison's family members cared about him and did not want him to die.

Darnell Sells, the first mitigation witness, was a correctional officer at the Sunrise Community Correctional Center, a group home for juvenile offenders. (RT 2/10/04 at 20.) Ellison, then 15, was a resident at Sunrise during Sells's tenure there. (*Id.*) Sells testified that Ellison's family was not very involved in his case despite living close to the facility. (*Id.* at 21.) Sells stated that there were not many visits from Ellison's family and "certainly

not many very productive" meetings.  (*Id.* at 28.)  Sells described Ellison's mother's relationship with the program as having "no substance to it" and stated that Ellison's older siblings never visited at all.  (*Id.*)  Sells stated that only Ellison's father was "reasonable . . . [about] coming to see his son." (*Id.* at 27.)  Sells also recalled that Ellison had one or two "very important and significant surgeries" on his feet while at Sunrise; they were "quite emotional to Charlie at the time." (*Id.* at 22.)  Before one of the surgeries, Ellison's family moved to Oregon without telling him or leaving him forwarding information.  (*Id.* at 23-24.)  Sells described Ellison as a "very capable student," "very verbal" but also "private" and a "loner" who would "go along to get along" and was more of a follower than a leader. (*Id.* at 26-27.)  Sells stated that Ellison gravitated toward him because he provided a safe emotional space and because Ellison "enjoyed positive attention from adults."  (*Id.* at 30.) Sells opined that Ellison was a "sensitive soul" who "has run from himself and his circumstances and the people that have hurt him." (*Id.* at 31.)  Sells believed that Ellison had been "jilted, neglected, disregarded, unwanted, abandoned emotionally somewhere down the line," probably by his family.  (*Id.*)  Sells testified that Ellison had "personal redeeming value." (*Id.* at 32.)  According to Sells, Ellison was not "a dangerous mind, a dangerous soul" but a "lost, lonely soul." (*Id.* at 33.)  According to Sells, Ellison was "capable of things that he doesn't know he's capable of.  He could be a good, decent human being." (*Id.*)

The second witness was Russell Reardon.  He testified that he met Ellison in 1991 or 1992, when Ellison was around 26 years old.  (*Id.* at 42.)  Reardon testified that they were close for about a year and a half.  (*Id.* at 43.)  Reardon testified that his relationship with Ellison was "very sick"—they were both "very needy and very lonely." (*Id.*)  Like Sells, Reardon described Ellison as a "lost soul." (*Id.*)  Reardon testified that he gave Ellison money, which Ellison used to buy alcohol and cocaine. (*Id.* at 44.)  Reardon stated that Ellison's drug use progressed until he was using cocaine just about every day.  (*Id.* at 45.)  Reardon acknowledged that he had harmed Ellison by giving him money and facilitating his substance abuse.  (*Id.* at 51.)  Reardon also testified about his observations

of Ellison's family.  He stated that Ellison loved his father and they were very close.  (*Id.* at 45.)  Ellison's mother, however, was "Ice. Cold"—the coldest woman Reardon had ever met.  (*Id.*)  Reardon stated that she would have no contact with Ellison and "barely let him come around.  He almost had to crawl to get any attention from her."  (*Id.* at 45-46.)  Reardon stated that Ellison said he was raised by the television, because all his mother did when he growing up was sit in front of the television.  (*Id.* at 48.)  Reardon also testified that Ellison was molested by Ellison's older brother, Mike.  (*Id.* at 46.)  Reardon stated that the molestation still bothered Ellison in his 20s.  (*Id.*)  Reardon further testified that Ellison was not a bully.  (*Id.*)  "He thought he was, but he wasn't."  (*Id.*)  According to Reardon, Ellison "acted bad . . . [b]ut underneath, he was always really kind-hearted and was dying for love."  (*Id.*)  When Reardon heard about Ellison's involvement in the crimes, he couldn't believe it because he had never seen Ellison "violent in any way, shape, or form."  (*Id.* at 47.)  Reardon stated that the only person Ellison would hurt was himself.  (*Id.*)  Reardon did not believe that Ellison premeditated the murders.  (*Id.* at 49, 53.)  According to Reardon, Ellison "[l]ived in the now" and "didn't know how to plan or . . . to prepare himself for the future."  (*Id.* at 52.)  Reardon also described Ellison's positive qualities, stating that Ellison was artistic, talented, intelligent, and "very sensitive."  (*Id.* at 51.)  Finally, Reardon opined that Ellison "[n]ever had a chance" in life because, aside from his father, his family offered no love, support, or guidance.  (*Id.* at 54.)  Reardon stated that he had "never seen a family where people were so cold like that."  (*Id.*)

The third witness was Ellison's older brother, Ken.  Ken testified that Ellison was born with a club foot which required at least two surgeries to correct.  (*Id.* at 70.)  Ken stated that the condition caused Ellison pain and made it difficult for him to get around.  (*Id.* at 71-72.)  Ken stated that Ellison was also ridiculed by neighbors and schoolmates.  (*Id.* at 86.)  Ken testified that his mother was not a "warm and involved parent" and was "pretty constantly angry" at Ellison.  (*Id.* at 72, 74.)  According to Ken, her anger "was pretty much there all the time," even when Ellison was only two or three years old.  (*Id.*)  Ken testified that his mother abused him physically, beating him with a belt, and that this

type of physical discipline happened "all the time." (*Id.* at 75-76.) Ken described Ellison's role in the family as the "scapegoat." (*Id.* at 77.) "[H]e took the brunt of anybody's frustration." (*Id.* at 78.) According to Ken, Ellison was "picked on" by his mother and older sister "all the time," even when he hadn't done anything wrong. (*Id.* at 88.) Ken also testified that another brother (Mike) and Ellison used drugs together when Mike was 22 and Ellison was only 14. (*Id.* at 80.) Ken stated that he later learned that the two used drugs intravenously. (*Id.* at 82.) When asked what he would like the jury to consider in making its sentencing decision, Ken explained that his brother "has always had to struggle uphill. . . . He never got a break. . . . There were never any success. Nothing to celebrate. It was always something negative, whether it be his physical handicap or just the breaks in life." (*Id.* at 89.) Ken testified that Ellison never "had a chance to ever have anybody to fall back on. To say I'm here for you, let's work through this. He's had to do it on his own from as long as I remember . . . ." (*Id.*) Ken stated that the only people who accepted Ellison "were friends that were already down the wrong path." (*Id.* at 90.) Finally, on redirect examination, Ken testified that Ellison had been in a motorcycle accident which left him in a coma. (*Id.* at 93-94.)

The fourth witness was Karl Orr, who testified that he had been Ellison's juvenile probation officer when Ellison was nine or ten.[39] (*Id.* at 99.) Orr testified that Ellison was "special" and stuck in his mind. (*Id.* at 100.) Orr stated that Ellison was "a kid that tries. He gets knocked down, he gets up. . . . He was looking for a friend. . . . Somebody to lean on, somebody to help him." (*Id.* at 102.) Orr testified that Ellison was a follower, not a leader, and "he needed someone strong to follow." (*Id.*) Orr further testified that Ellison "did fabulously well under structure" but his family couldn't provide the stability he needed. (*Id.* at 100.) Referring to Ellison's mother, Orr testified that never in his life had he "met a person . . . who was as cold as this lady was about her son." (*Id.*) Orr described Ellison's father as a "good man" who tried his best to help Ellison but "didn't have a whole

---

[39]     On cross-examination, Orr acknowledged that the records showed that his contact with Ellison occurred when Ellison was 14. (RT 2/10/04 at 118-19.)

lot of influence on his . . . wife." (*Id.* at 101.) Orr stated that Ellison's siblings "weren't around for him." (*Id.*) Orr opined that they ignored him because of his handicap. (*Id.*) Orr testified that Ellison would be picked last for games and then "be made fun of by the rest of the kids" when he did participate. (*Id.* at 106.) According to Orr, Ellison never got a "fair shake" in life or a "chance to shine" because of his physical problems and family circumstances. (*Id.* at 107.) Orr also noted that Ellison had positive qualities, including a "willingness to help" and a "willingness to be involved." (*Id.* at 109.) Orr also described Ellison as a "great artist." (*Id.*) Orr testified that the jury should take into consideration Ellison's ability to succeed in a structured environment as well as the "family situation" he experienced growing up. (*Id.* at 110, 111.) Orr opined that Ellison may still have something to offer society. (*Id.*) Finally, Orr testified that he saw cuts and bruises on Ellison that were consistent with physical abuse. (*Id.* at 115-16.) According to Orr, Ellison stated that his parents had caused the injuries. (*Id.*)

The fifth witness was Mark Goff, an investigator whose firm was retained by the defense to handle mitigation. (RT 2/12/04 at 4.) Goff was responsible for arranging travel for defense witnesses. (*Id.*) Goff testified that Ken had been late to court on the first day of the sentencing hearing because he could not find his mother, sister, and brother-in-law, who were gambling at a casino in Laughlin where his mother was on a "hot streak." (*Id.* at 5-6.)

The sixth witness was Dr. Douglas Tucker, a psychiatrist specializing in addiction medicine. (*Id.* at 9.) Dr. Tucker reviewed a "life history" of Ellison, an "overview" that listed and highlighted various documents. (*Id.* at 10-11.) Dr. Tucker also received police reports and prior psychological evaluations. (*Id.* at 11.) Dr. Tucker did not examine or perform any tests on Ellison. Dr. Tucker defined addiction, or dependence, as where a "person's use of a chemical . . . has been long-standing, has been intensive, and has reached the point where it's changed . . . [the] brain." (*Id.* at 11-12.) Dr. Tucker stated that addiction involves increased tolerance, withdrawal, reduced ability to control use of the drug, and continued use despite negative consequences. (*Id.* at 12.) Dr. Tucker opined that

genetics and environment are risk factors for addiction.  (*Id.* at 17.)  Dr. Tucker also identified early trauma, early loss, early physical and sexual abuse, and psychiatric disorders (*e.g.*, schizophrenia, depression, anxiety and mood disorders, and attention deficit disorder) as risk factors.  (*Id.* at 17-18.)  Dr. Tucker testified that methamphetamine is a neurotoxic drug that causes permanent damage to the brain's nerve cells.  (*Id.* at 24.)  According to Dr. Tucker, these changes in the brain leave you "much more vulnerable to drug use." (*Id.* at 29-30.)  Dr. Tucker explained that although addicts are responsible for the choices they make, they are not responsible for the genes they are born with, or their parents, or any emotional or physical abuse they suffered as children.  (*Id.* at 27, 29.)

Counsel then asked Dr. Tucker to assume a series of hypotheticals that mirrored the circumstances of Ellison's life: a child raised by a neglectful family, unwanted by his parents and largely ignored; a child born with a congenital orthopedic defect requiring a series of surgeries from infancy through teen years; a child given the role of scapegoat in the family; a family that moved frequently; a child sexually abused by his older brother who also introduced him to alcohol and hard drugs; a child sent to reform school for a short period with little participation by the family, with the family moving out of state before another of the child's scheduled surgeries; self-medication using drugs or alcohol to counter depression; and a child diagnosed with ADHD in his middle to late teenage years.  Dr. Tucker addressed each of these hypotheticals.  He testified that a neglectful family and parental rejection can lead to depression and social withdrawal.  (*Id.* at 30.)  He elaborated that the congenital defect can cause peer rejection and impact self-esteem and character development, while the physical pain can make it difficult to focus or participate in activities.  (*Id.* at 32-33.)  Dr. Tucker also stated that a child who is scapegoated and verbally abused internalizes the criticism which becomes their sense of self.  (*Id.* at 33.)  Dr. Tucker explained that a child experiencing these circumstances is "being molded in . . . a toxic environment."  (*Id.* at 33-34.)

Dr. Tucker next testified that a child whose family moves frequently is unable to "form long-term attachments to peers."  (*Id.* at 34.)  Dr. Tucker explained that if the child

does not have other peers or long-term relationships, he will be impaired as an adult in his "ability to form long-term relationships." (*Id.* at 35.) Dr. Tucker also stated that having a physical deformity makes the process more difficult because it may take even longer for the child to get past the "freak show stage" and be accepted by his peers and form relationships. (*Id.* at 36.)

Next, Dr. Tucker explained that "sexual abuse is devastating for anyone who's gone through that as a kid." (*Id.* at 36-37.) According to Dr. Tucker, the child usually feels "a profound loss of sense of self and of identity and who you are," as well as a "profound type of rage" and a "profound type of depression." (*Id.* at 37.) Dr. Tucker opined that such a child develops a "type of mistrust," "a loss of capacity for trust in others, because this is what they'll do to you, and that this loss of trust is exacerbated when the perpetrator is the older brother "who's supposed to be looking out for you." (*Id.* at 38.) According to Dr. Tucker, when that same brother introduces the child to alcohol and intravenous methamphetamine use, "it's almost too much to think about together in one person." (*Id.* at 39.) Dr. Tucker opined that the child's "capacity to relate to other people, their emotional responses to people and to life in general are going to be vastly different" than those of a child who hasn't experienced such damage and that, at this point, "the path has been paved for him to become a hard core drug addict and criminal." (*Id.* at 39-40.)

Counsel next questioned Dr. Tucker about the effects of detention in a juvenile facility, with the caveat that the child's parents "aren't terribly involved in his treatment" and in fact moved out of state without leaving a forwarding address or phone number while the child was still in the facility and was scheduled to undergo another surgical procedure. (*Id.* at 42-45.) Dr. Tucker responded that such parental behavior constitutes "abandonment or rejection" at "exactly the time when they could come in and something could change." (*Id.* at 45.) According to Dr. Tucker, such abandonment and a major surgical procedure "would have a major sort of impact on [the child's] ability to benefit" from his placement in the facility. (*Id.* at 46.)

Next, Dr. Tucker agreed that the scenario he had been describing was consistent

with the self-medication model, in which an individual uses drugs or alcohol to "feel better" if they are depressed.  (*Id.* at 46-47.)

The final hypothetical counsel asked Dr. Tucker to consider was that the child, in his middle or late teen years, was diagnosed with ADHD.  (*Id.* at 61.)  Dr. Tucker explained that ADHD is a neuropsychiatric disorder whose symptoms include physical hyperactivity, difficulty paying attention, and impulsivity.  (*Id.* at 61-62.)  Dr. Tucker stated that ADHD is a disorder of the frontal lobes of the brain, which "have a lot to do with inhibition of impulses and control over our behavior."  (*Id.* at 62, 64.)  Dr. Tucker described ADHD as a potentially "devastating disorder." (*Id.* at 62.)  He testified that untreated ADHD is a risk factor for substance abuse, depression, unemployment, and criminal behavior.  (*Id.* at 65.)

Dr. Tucker acknowledged that although individuals with any of these experiences or conditions do not necessarily become killers, "the tapestry of things here going on is sort of a setup for him—just in terms of criminal behavior, he's at a much greater risk."  (*Id.* at 49-52.)  As risk factors for criminal conduct, Dr. Tucker cited intoxication and withdrawal from drugs and alcohol, brain changes caused by drug and alcohol abuse, rage resulting from the abuse the child has suffered, and a feeling of alienation from society and authority figures.  (*Id.* at 52-53.)  Dr. Tucker reiterated that a person with all of these factors "is at much greater risk for a whole variety of what we might call deviant behavior," including suicide and "committing a whole variety of crimes."  (*Id.* at 53.)  Dr. Tucker explained that the scenario defense counsel described was "kind of a conglomeration of . . . situations and traumas, any one of which would probably be the . . . life organizing trauma for that person, where everything's really about coping with that, having some self-esteem in spite of that." (*Id.* at 55.)  He testified that "maybe one or two of these things is fairly workable," but "[m]ore than that, you're getting into a very severe population."  (*Id.* at 58.)  He testified that "the damage done in childhood really does carry on beyond adolescence into adulthood."  (*Id.* at 59.)

The seventh and final mitigation witness was Dr. Richard Lanyon, a clinical

psychologist, who testified by speaker phone.[40]  Dr. Lanyon performed psychological and neuropsychological examinations of Ellison.  (*Id.* at 137-38.)   Before conducting his examinations, Dr. Lanyon "read a very large quantity of records," including Ellison's juvenile records from Phoenix and Oregon, school records from Phoenix, Oregon, and Indiana, police records from Phoenix and Kingman, records from the Mohave County Jail, probation records from Maricopa County, and various interviews, including interviews of Ellison, Ellison's parents, and Ellison's girlfriend.  (*Id.* at 139-40.)  Dr. Lanyon testified that his neuropsychological examination of Ellison revealed no impairment due to physical damage in the brain.  (*Id.* at 139.)  Dr. Lanyon's psychological examination included a detailed, structured interview, several psychological questionnaires, and a test of general intelligence.  (*Id.* at 141-42.)  With this information, Dr. Lanyon was "professionally able" to testify about Ellison's "psychological health" and the "various factors that have throughout his life influenced that psychological health."  (*Id.* at 143.)

The first factor Dr. Lanyon identified was that Ellison was born with club feet, a serious physical condition that required many surgeries and caused "tremendous physical pain."  (*Id.* at 144.)  Dr. Lanyon testified that Ellison "was a small, sensitive boy, and he was constantly ridiculed by other children, called names like gimpy, stumpy.  And he would cry."  (*Id.*)  Dr. Lanyon also stated that Ellison's family moved frequently so he would encounter new sets of school children "who would ridicule him all over again."  (*Id.*)  Dr. Lanyon testified that, as a result of the surgeries, Ellison fell behind in school and dropped out in ninth grade "because he just couldn't make it despite average intelligence."  (*Id.* at 144-45.)

Dr. Lanyon testified that other factors influencing Ellison psychological health included "significant physical abuse from his father" and from his brother.  (*Id.* at 146.)  Dr. Lanyon stated that Ellison was chosen as the family's problem child and was not only "punished for tiny, little things he did" but also for things his siblings did.  (*Id.*)  Dr. Lanyon

---

[40]      The court told the jury that Dr. Lanyon's health issues prevented him from testifying in person.  (RT 2/12/04 at 97.)

testified that "the only person that paid any attention to [Ellison] at all was his brother Mike, who then sexually molested him and threatened to kill him." (*Id.*)

Another factor discussed by Dr. Lanyon was Ellison's ADHD, which wasn't diagnosed until his teenage years because "nobody paid any attention" to him and which "interfere[d] with his ability to function properly in school." (*Id.* at 147.)  According to Dr. Lanyon, Ellison was a "lonely kid" who was "simply ignored." (*Id.* at 148.)  Dr. Lanyon noted that a juvenile court psychologist had described Ellison as a "timid little mouse." (*Id.*)

The next factor noted by Dr. Lanyon was the constant pain Ellison experienced, both physical and mental. (*Id.* at 148-49.)  Dr. Lanyon testified that the only way Ellison was able to deal with the pain was by doing things to get attention. (*Id.* at 149.)  Dr. Lanyon testified that this dysfunctional, attention-seeking behavior included the armed robbery for which Ellison did prison time. (*Id.*)

The next factor identified by Dr. Lanyon, Ellison's "very problematic" use of drugs and alcohol, began when Ellison was a "fairly young teenager." (*Id.* at 151.)  Dr. Lanyon testified that this drug and alcohol use was a "way to escape intolerable thoughts and feelings," which is why Ellison became addicted so readily as a teenager. (*Id.* at 151-52.)

Dr. Lanyon also testified that his view of Ellison was clarified by the results of the questionnaires he had administered. (*Id.* at 152.)  For example, Dr. Lanyon testified that the results of the Minnesota Multiphasic Personality Inventory ("MMPI-2") revealed that Ellison "wanted to be viewed as severely psychiatrically disturbed." (*Id.*) "[T]he purpose for doing that . . . is they want to get attention and be seen as very, very needy." (*Id.* at 153.)  Dr. Lanyon testified that the results of another questionnaire "show[] him as a person who avoided other people, wanted to be alone. . . ." (*Id.*)  Dr. Lanyon interpreted that result as Ellison trying to portray a "tough guy," loner image when in fact Ellison "desperately needs, desires, craves love, support, security, attention." (*Id.*)  Dr. Lanyon believed that Ellison exaggerated his symptoms to get attention so that people would feel sorry for him and try to help him. (*Id.* at 184.)

Dr. Lanyon summarized Ellison's "psychological reality" by explaining that "his life as a child was so painful that he learned to be exclusively preoccupied" with his pain and ways of deadening the pain.  (*Id.* at 154.)  Dr. Lanyon described Ellison's substance abuse as something to deaden the pain.  (*Id.*)  Dr. Lanyon testified that Ellison "[n]ever had the opportunity to look forward to reflect upon what the future might be, and that's how one often develops judgment."  (*Id.*)

Dr. Lanyon did not diagnose Ellison with a "formal psychiatric disorder except that he would be chronically depressed and he's made suicide attempts."  (*Id.* at 160.)  Dr. Lanyon related the depression to "situational factors, rather than being a normal psychiatric illness."  (*Id.*)  Dr. Lanyon "did not see anything to indicate that [Ellison] had . . . a character disorder."  (*Id.*)  Instead, Dr. Lanyon found that Ellison was a person "whose experience as a child was so painful that he has never recovered" and has no idea what a "satisfactory" life is "let alone how to get there."  (*Id.* at 161.)

On cross-examination, Dr. Lanyon elaborated that Ellison, in taking the MMPI-2, "clearly and deliberately set about to exaggerate the extent of his psychopathology."  (*Id.* at 173.)  Dr. Lanyon opined that Ellison also attempted to "simulate severe antisocial personality disorder."  (*Id.* at 174.)  Dr. Lanyon repeated that he found no evidence of schizophrenia, delusions, hallucinations, or organic brain damage.  (*Id.* at 176.)

The following day, the trial court instructed the jury and counsel made their closing arguments.  (RT 2/13/04.)  The case went to the jury at 11:55 a.m.  (*Id.* at 94.)  At 4:37 p.m., the jury announced that it would be unable to reach a verdict that day.  (*Id.*)  The jury returned to deliberate four days later, at 9:00 a.m. on February 17, 2004.  It reached its verdict at 3:37 p.m.  (RT 2/17/04 at 1.)

The jury's findings with respect to the mitigating circumstances were as follows: (1) two jurors found that Ellison had proved the "absence of love and guidance" circumstance; (2) seven jurors found that Ellison had proved drug addiction; (3) no jurors found that Ellison had proved diminished capacity; (4) one juror found that Ellison had proved absence of genuine violence in prior convictions; and (5) seven jurors found that

1    Ellison had proved that Ellison's family members care about him and do not want him to

2    die.  (*Id.* at 2-4.)  Nevertheless, the jury found that Ellison should be sentenced to death for

3    both murders. (*Id.* at 4.)

### b.   PCR Evidentiary Hearing

5        In his PCR petition, Ellison raised various claims of ineffective assistance at

6    sentencing.  The PCR court summarily denied most of those claims but concluded that

7    Ellison was "entitled to an evidentiary hearing . . . on two issues: (1) whether [Ellison] was

8    denied the effective assistance of counsel at Sentencing in the failure of trial counsel to

9    gather and present mitigating evidence; and (2) whether [Ellison] was denied the effective

10   assistance of counsel at Sentencing in the failure of trial counsel to discover, investigate

11   and present evidence of Fetal Alcohol Syndrome."  (PCR Ruling 7/16/12 at 6.)

12       The hearing was held over four days in August 2014.  (PCR Ruling 7/13/15 at 1.)

13   Ellison called four experts, including three members of "FASDExperts," a team formed in

14   2007 to perform multidisciplinary assessments in "high-stakes criminal cases."  (RT 8/8/14

15   at 24, 226.)   Ellison also called three witnesses who had testified at his sentencing (his

16   brother Ken, Reardon, and Orr); his trial judge, Judge Moon; his first attorney, Kenneth

17   Everett; his lead trial counsel, Iannone; his second-chair trial counsel, Engan; and his

18   mitigation specialists, Mary Durand and Dana Gavin.  The State called Detective Auld.

19       Ellison's first witness was Dr. Paul Connor, a clinical neuropsychologist.   (RT

20   8/8/14 at 14.)  Dr. Connor testified that by 1996, fetal alcohol syndrome ("FAS") and fetal

21   alcohol effects were diagnosable disorders.  (*Id.* at 27.)  Dr. Connor further testified that in

22   2004, the CDC established guidelines for diagnosing FAS.  (*Id.* at 28–29.) Dr. Connor

23   testified that the newly-published DSM-5[41] included a diagnosis of "neurodevelopmental

24   disorder associated with prenatal alcohol exposure."  (*Id.* at 32.)  Dr. Connor testified that

25   before the DSM-V, the only comparable diagnosis was "cognitive disorder not otherwise

26   specified," or "NOS."  (*Id.* at 33-34.)  Dr. Connor testified that alcohol is a teratogen—a

27   substance that damages or kills developing cells.  (*Id.* at 35.)  Dr. Connor explained that

28   —————————————

[41]    Diagnostic and Statistical Manual of the American Psychiatric Association.

prenatal exposure to alcohol causes "functional deficits" and that alcohol consumption during weeks four and five of the embryo's life can cause limb problems, including club feet. (*Id.* at 36, 42.)  Dr. Connor testified that disabilities associated with FASD include mental health problems, disrupted school experiences, and trouble with the law. (*Id.* at 48.)

Dr. Connor performed a neuropsychological examination of Ellison, testing a number of domains, including IQ, achievement, and executive functioning.  Dr. Connor measured Ellison's full-scale IQ at 89, which is in the average range.  (*Id.* at 69.)  Dr. Connor found "considerable impairments" in Ellison's adaptive functioning (communication, daily living skills, and socialization).  (*Id.* at 81.)  Dr. Connor further testified that Ellison's academic skills were lower than his IQ and that Ellison's adaptive functioning skills were much lower, which Dr. Connor testified is "exactly what he would expect to see in individuals with FASD."  (*Id.* at 80.)  Dr. Connor also testified that Ellison demonstrated deficits in reading comprehension, spatial construction, visual spatial learning in memory, sustained attention, executive functions such as planning and problem solving, and the three adaptive skills.  (*Id.* at 83.)  Dr. Connor stated that the existence of such deficits, despite an IQ of 89, is seen "extremely commonly" in "FASD people." (*Id.*)  Dr. Connor "ultimately diagnosed Mr. Ellison with cognitive disorder, NOS" and found that his "pattern of neuropsychological functioning was consistent with the diagnostic guidelines for fetal alcohol spectrum disorders."  (*Id.* at 84.)

Ellison's next witness was Dr. Richard Adler, a forensic and clinical psychiatrist who examined Ellison in 2010.  (*Id.* at 109.)  Dr. Adler performed a psychiatric interview, did a physical examination, and reviewed magnetic resonance imagining ("MRI") and diffuser tensor imaging ("DTI") studies.  (*Id.* at 112.)  Dr. Adler testified that the use of FASD in the courtroom "goes back certainly to 1990."  (*Id.* at 115.)  Dr. Adler also explained that his report was written in 2011, before the publication of the DSM-5 in 2013, which first included a diagnosis of "neurodevelopmental disorder associated with prenatal alcohol exposure."  (*Id.* at 119.)

In making his diagnosis, Dr. Adler used the criteria established by the Institute of

Medicine ("IOM").  (*Id.* at 119-22.)  Dr. Adler explained that first IOM criterion for the condition of partial fetal alcohol syndrome disorder ("pFASD") is "confirmed maternal alcohol exposure."  (*Id.* at 123.)  Dr. Adler testified that in the report of Dr. Novick Brown, another defense expert, Ellison's mother indicated that "she attended a Halloween party, and this was after she had missed her first period, but before she knew that she was pregnant and that she drank to the point of clear intoxication."  (*Id.* at 123-24.)  Dr. Adler also noted that, in the same report, Mrs. Ellison "recollect[ed] drinking on two additional occasions while pregnant."  (*Id.* at 124.)  Dr. Adler testified that this is a sufficient amount of alcohol consumption to satisfy the first IOM criterion.  (*Id.*)

Dr. Adler explained that the next IOM criterion is facial anomalies.  (*Id.* at 125.)  Dr. Adler used a computer program, which has been available since 2001, to measure Ellison's facial features.  (*Id.* at 131.)  The resulting code, according to Dr. Adler, was "considered to be an indicia of the FAS facial abnormalities."  (*Id.* at 134.)

Dr. Adler explained that the next IOM criterion was cognitive abnormalities.  (*Id.* at 135.)  Dr. Adler testified that this criterion was satisfied by Dr. Connor's findings.  (*Id.* at 140.)

Dr. Adler then testified about his review of Ellison's imaging studies.  (*Id.* at 142.)  According to Dr. Adler, the MRI showed that Ellison's corpus callosum was abnormal.  (*Id.* at 144-45.)  Dr. Adler explained that the abnormalities were related to the frontal lobe and "very pertinent" to executive functions.  (*Id.* at 150.)  Dr. Adler also testified that the DTI showed a decrease in white matter fibers.  (*Id.* at 151-54.)  According to Dr. Adler, the abnormalities were "located in those particular areas that are emblematic of FASD."  (*Id.* at 161.)  Dr. Adler also testified that DTI was available in the 1990s and MRI was available before that.  (*Id.* at 157-58.)  Dr. Adler stated that the abnormalities in Ellison's brain were not consistent with binge drinking or traumatic brain injury.  (*Id.* at 161-63.)

Dr. Adler testified that his diagnosis at the time of his examination and report in 2010-11 was cognitive disorder NOS under the DSM-IV-TR, the predecessor of the DSM-V.  (*Id.* at 165.)  Dr. Adler also diagnosed Ellison with pFASD under the 1996 diagnostic

criteria of the IOM.   (*Id.* at 166.)[42]   Under the DSM-5, his diagnosis was "neurodevelopmental disorder associated with prenatal alcohol exposure." (*Id.*)

On cross-examination, Dr. Adler acknowledged that the attending neuroradiologist for Ellison's MRI, Dr. John Karis, found it "unremarkable."  (*Id.* at 186.)  Dr. Adler also testified that he was skeptical that Ellison or any criminal defendant would malinger in an attempt to be diagnosed with antisocial personality disorder, as Dr. Lanyon found in reviewing Ellison's MMPI-2.  (*Id.* at 208.)  Dr. Adler also testified that people with FASD are highly suggestible.  (*Id.* at 207.)

Ellison's next witness was Dr. Natalie Brown, a psychologist who worked with Drs. Connor and Adler on the FASDExperts team.  Dr. Brown focused on mental health and behavioral issues.  She first testified about the cognitive deficits caused by FASD that create "problematic behaviors." (RT 8/19/14 at 8.)  According to Dr. Brown, these include memory and attention deficits, boundary problems that lead to assaultive behavior, difficulty remembering what one has learned in the past, "chattiness" or poor judgment in communication, susceptibility to peer pressure, and suggestibility.  (*Id.* at 10-11.)  Dr. Brown testified that it was Ellison's suggestibility that caused him to continue talking with the detectives.  (*Id.* at 15.)  She also stated that Ellison had a "lifelong tendency to follow the lead of others."  (*Id.* at 24.)  Dr. Brown agreed that from 1998 onward, it was well-recognized in her field that FASD caused social and emotional development delays.  (*Id.* at 27.)  Dr. Brown testified that Ellison's mother told her she drank once a month while she was pregnant with Ellison and recalled one episode of binge drinking while she was six weeks pregnant.  (*Id.* at 29-30.)  Dr. Brown explained that mothers typically under-

---

[42]      Dr. Adler explained that the word "partial" in pFASD just means that the "full facial features are not present."  (RT 8/8/14 at 166.)  According to Dr. Adler, pFASD is a "worse" diagnosis than FASD because the absence of distinct facial features means "the rate at which their difficulties are discerned and picked up is less" and they are less likely to receive the "interventions that are well-known to ameliorate the intensity and the negative effects" of the condition.  (*Id.* at 166-67.)

report their drinking, but that even one incident of binge drinking can "damage the developing brain of the fetus." (*Id.* at 30.)  Dr. Brown further testified that Ellison's mother was drinking during the first six weeks of pregnancy, "which is the most vulnerable time for an embryo developing." (*Id.* at 32.)  Dr. Brown also noted that Mrs. Ellison did not want to be pregnant and rejected Ellison. (*Id.* at 31.)  According to Dr. Brown, this "harsh upbringing" was also "part of the reason for the offense behavior." (*Id.*)

Dr. Brown next testified about the behaviors Ellison exhibited throughout his childhood that were consistent with a diagnosis of FASD: poor and inconsistent academic performance, hyperactivity, distractibility, impulsivity, and behavioral problems such as talking back to teachers, fighting, and truancy. (*Id.* at 37-54.)  Dr. Brown testified that Dr. Lanyon did not take "seriously any of the cognitive deficits that he noted," instead focusing on Ellison's birth defect and home environment. (*Id.* at 65–66.)

Dr. Brown then testified about Ellison's "childhood adversities": surgeries for his club feet, emotional neglect and rejection by his parents, physical abuse by his father and older brother, sexual abuse by his oldest brother, early exposure to substance abuse and criminal behavior, school instability caused by the family's frequent moves, and constant rejection by his peers. (*Id.* at 70-73.)  Dr. Brown opined that there were no meaningful interventions to address these factors and Ellison "fell through the cracks essentially." (*Id.* at 77-79.)

Next, Dr. Brown listed Ellison's "secondary disabilities," or adverse consequences resulting from his brain damage. (*Id.* at 82–84.)  According to Dr. Brown, these consisted of mental health problems including polysubstance abuse and undiagnosed ADHD; academic disruptions, including failing grades and eventually dropping out of school; trouble with the law starting at age 14; dependent living, including living with his parents as an adult; employment problems, such as being unable to stay at a job for more than a few months; and making inappropriate sexual comments. (*Id.*)

Dr. Brown also testified that Ellison scored in the top one percent on a test measuring suggestibility. (*Id.* at 103.)  Dr. Brown stated that Ellison "acquiesced" to all of

1   the detective's leading questions when he was interrogated.  (*Id.* at 103-04.)  Dr. Brown
2   noted that others, including Ellison's brother Ken and Orr, described Ellison as a timid
3   follower and that a psychologist at one of Ellison's juvenile facilities noted that he tended
4   to set himself up as a scapegoat in his interactions with peers.  (*Id.* at 104.)

5       Dr. Brown testified that Ellison's past crimes displayed executive dysfunction and
6   suggestibility, including the armed robbery where he gave the store clerk his address.  (*Id.*
7   at 113–14.)  Dr. Brown also testified that his "offense conduct" in burglarizing and
8   murdering the Bouchers showed "flawed planning, very high risk with an unknown benefit
9   and an inability to foresee consequences with virtually every step he took and importantly,
10  inability to extricate himself from the situation."  (*Id.* at 120.) Dr. Brown opined that FASD
11  "certainly did influence the offense conduct."  (*Id.*)  Dr. Brown also testified that Finch had
12  no executive function deficits and therefore was more likely to have been the leader despite
13  Ellison's higher IQ.  (*Id.* at 121-24.)

14      Finally, Dr. Brown discussed "red flags" that should have put sentencing counsel
15  on notice that FASD was a potential issue.  (*Id.* at 127-35.)  Dr. Brown testified that the
16  record available to Dr. Lanyon indicated that Ellison's mother drank; that that were red
17  flags for "educational impairment" available in the records at the time, including Ellison's
18  placement in special education classes; that there were red flags for ADHD and
19  impulsivity; and that "most counsel" know that splits in IQ scores between verbal and
20  nonverbal skills "might mean brain damage."  (*Id.*)  Dr. Brown concluded: "[T]here were
21  numerous red flags . . . [that] should have alerted trial counsel, as well as Dr, Lanyon, that
22  prenatal alcohol exposure was at least a possibility. . . .  [T]here were multiple cognitive
23  deficits in several areas that indicated a high likelihood of brain damage . . . ."  (*Id.* at 138-
24  39.)

25      The next witness was Dr. Joseph Wu, a neuropsychiatrist who reviewed Ellison's
26  MRI and DTI studies.  (*Id.* at 229.)  Dr. Wu testified that DTI studies began to be used in
27  the mid-1990s with studies being published in the late 1990s and early 2000s about DTI
28  findings in conditions such as alcoholism and brain injuries.  (*Id.* at 236.)  Dr. Wu testified

1    that DTI is capable of detecting the compromised integrity of the axons in the cerebral

2    tracts of the corpus callosum associated with fetal alcohol syndrome.   (*Id.* at 237.)

3    According to Dr. Wu, the reason Dr. Karis read Ellison's MRI as normal is that Dr. Karis

4    did not look closely at the DTI but instead reviewed the MRI for "acute issues."   (RT

5    8/20/14 at 10.)  Dr. Wu testified that the abnormalities in Ellison's corpus callosum could

6    not be accounted for by head trauma or drug use.  (*Id.* at 20, 31.)  Dr. Wu opined that

7    Ellison had "significant pathology in the integrity of his axons in cerballar [sic] tracts in a

8    manner that would be highly consistent with . . . fetal alcohol spectrum disorder" and

9    inconsistent with traumatic brain injury.  (*Id.* at 30-31.)  Dr. Wu testified that people with

10   FASD suffer from executive dysfunction, including "impaired social judgment and

11   impaired ability to regulate social behavior." (*Id.* at 32.)  He explained that under the DSM-

12   V, an anti-social personality disorder is precluded if the behavior is explained by a

13   neurocognitive disorder due to prenatal alcohol exposure.   (*Id.* at 35.) On cross-

14   examination, Dr. Wu acknowledged that he was not using DTI technology in the years

15   2003-05.  (*Id.* at 51.)

16        Ellison next called Judge Moon, who testified that he didn't believe he needed to

17   recuse himself from Ellison's trial despite findings made while presiding over Finch's trial.

18   (*Id.* at 75, 77.) Judge Moon agreed that he would have considered brain damage and mental

19   impairment to be significant sentencing factors.  (*Id.* at 76-77.)

20        Ellison next called Orr, his juvenile probation officer.  (*Id.* at 83.)  Orr testified, as

21   he did at Ellison's sentencing, that Ellison was "a skinny little kid" who "looked like he

22   needed a friend." (*Id.* at 84, 86.)  Orr testified that Ellison "seemed to be a pretty nice little

23   man with a family that wasn't worth a damn." (*Id.* at 86.)  Orr testified that he considered

24   placing Ellison with an aunt and uncle, "but the only thing they could actually tell me was

25   that mom had a drinking problem"—"supposedly drinking a 6 pack to a 12 pack per day."

26   (*Id.* at 87.)   Orr testified that Ellison "blossomed in structure" but "couldn't sort out

27   between right and wrong."  (*Id.* at 88.)  "If it was wrong, he'd do it anyway."  (*Id.*)  Orr

28   described Ellison as a "follower" who got into trouble by choosing the wrong people

follow.  (*Id.* at 89.)  Orr now ascribed Ellison's misbehavior to "fetal alcoholism."  (*Id.*)  Orr characterized Ellison as "spacey," "scattered," unable to stay on topic, subject to mood swings, and lacking self-esteem.  (*Id.* at 92-94.)   Orr testified that Ellison shoplifted but gave away the items he stole.  (*Id.* at 94-95.) Finally, Orr reiterated that the other children ridiculed Ellison because of his club feet.  (*Id.* at 96.)

The next witness was Ellison's brother, Ken.  (*Id.* at 114.)  Ken testified that at the time of Ellison's sentencing he was confused, didn't understand the lawyers' questions, and "really didn't know why [Ken] was at that trial."  (*Id.* at 115.)  Ken stated that because he didn't understand his role in the mitigation case, he was defensive when asked at sentencing about his family's dysfunction. (*Id.* at 117.)  Ken further testified that Ellison's trial counsel did not ask him about his impressions of Ellison's mental health.  (*Id.* at 118.)  Ken testified that Ellison was a needy child who tried to act tough.  (*Id.* at 126.)  Ken stated that Ellison's trial counsel had not asked him about Ellison's behavior, and he did not mention it to them out of naivety, shock, and denial.  (*Id.* at 129.)  Ken also stated that he was in shock when he testified at sentencing by seeing Ellison's arrogance and lack of remorse or understanding of the trouble he was in.  (*Id.* at 131-32.)  Finally, Ken testified that his family members "100%" had "addictive-type personalities."  (*Id.* at 132-33.)

On cross-examination, Ken acknowledged that he had been reluctant to provide information to trial counsel, which was not counsel's fault.  (*Id.* at 139.)  Ken also stated that he had spoken face-to-face with Ellison's counsel and co-counsel at his apartment before the sentencing hearing.  (*Id.* at 141-42.)

Ellison's next witness was Reardon, who testified that Ellison "seemed like a lost soul and reminded me of my kid brother."  (*Id.* at 163.)  Reardon further testified that his own mother was a heavy drinker and smoker when she was pregnant with his little brother, who weighed only 2.5 pounds at birth. (*Id.* at 163-64.)  Reardon stated that his family "babied" and "spoiled" his brother, showing a "level of concern" that Reardon did not see from Ellison's family.  (*Id.* at 164-65.)  Reardon testified that, at the time he was in a relationship with Ellison, Ellison had no plans for the future and didn't want any

commitments. (*Id.* at 165-66.) Reardon also testified that Ellison once had to quit working because he refused to wear a shirt to cover his tattoos. (*Id.* at 166.) Reardon also recounted an episode in which Ellison acted belligerently when a clerk refused to sell him beer because he didn't have an ID. (*Id.* at 167.) According to Reardon, Ellison "would be inappropriate like that at times. You never knew when it was going to happen." (*Id.* at 173.) Reardon stated that when he became upset at Ellison's refusal to follow social norms, like leaving for weeks at a time without informing Reardon, Ellison would make no effort to understand why Reardon was angry. (*Id.* at 168-69.) Reardon stated that he "knew something was wrong with" Ellison. (*Id.* at 169.)

Reardon testified that trial counsel visited him about a year before trial and spoke with him for a few minutes "right before" his testimony. (*Id.* at 170, 172.) Reardon stated that counsel didn't ask if he had observed "anything unusual in [Ellison's] behavior." (*Id.* at 171.) Instead, Reardon contended, they asked about Reardon's relationship with Ellison and how well he knew Ellison. (*Id.*)

Ellison next called Dana Gavin, his mitigation specialist for the PCR proceedings. (*Id.* at 190.) Gavin stated that she traveled to Indiana to interview Ellison's mother. (*Id.*) Gavin testified that FASD was an issue that had not been investigated previously so she needed to speak with Ellison's mother about whether she drank while she was pregnant. (*Id.* at 191.) Gavin stated that Ellison's mother agreed to testify on his behalf but passed away before she could do so. (*Id.* at 193.) Gavin further stated that Ellison's oldest brother (Mike) and sister would not testify. (*Id.* at 193-94.) Gavin described the Ellison family as "[v]ery self-absorbed, very dysfunctional, self-centered." (*Id.* at 194.)

The next witness was Engan, who served as second-chair counsel during Ellison's trial and sentencing. (*Id.* at 200.) Engan testified that he had the requisite experience for that position. (*Id.* at 201.) However, Engan could not recall whether he had completed "the right amount of capital defense continuing legal education" required under the rules. (*Id.*) Ellison's trial was Engan's first capital case. (*Id.* at 221.) Engan testified that he believed Dr. Lanyon's testimony was "critical" and that eliciting his testimony in person would

"have a significantly better impact on a jury."  (*Id.* at 206.)  Engan could not recall if testimony by video was a viable option at the time of Ellison's sentencing.  (*Id.* at 207.)  Engan testified that lead counsel declined to subpoena Dr. Lanyon because he didn't think it appropriate to subpoena a fellow professional, a decision with which Engan disagreed.  (*Id.* at 207-08.)  Engan testified that he was concerned about Dr. Lanyon's finding that Ellison "clearly and deliberately set about to exaggerate the extent of his psychopathology." (*Id.* at 210.)  Engan explained that if he were presented with this finding as lead counsel, he would have discussed the matter with the expert and, if he didn't get a satisfactory explanation, would "probably consult with a second expert."  (*Id.* at 212-13.)  Engan further testified that if he had been "responsible for the case," he would have had Dr. Tucker meet personally with Ellison as a way of gaining more information than a review of the records would provide.  (*Id.* at 216.)  Engan further opined that, "although hazardous, it would probably be a good idea if Mr. Ellison did testify." (*Id.* at 220.)  Engan clarified that Ellison did not "demand to testify" after being made aware of that right, although he had the "absolute right" to testify if he chose to do so.   (*Id.* at 222.)  Engan stated that he and lead counsel "probably" had "in-depth discussions" with Ellison about whether to testify.  (*Id.*)  Engan testified that lead counsel may have persuaded Ellison not to testify, which to Engan suggested that Ellison was a follower.  (*Id.* at 233, 237.)

Ellison next called Iannone, his lead counsel at trial and sentencing.  Iannone testified that, before his appointment in Ellison's case, he had tried nine felony jury trials and served as second-chair counsel in one capital case—Ellison's case was his first capital case as lead counsel.  (*Id.* at 243-44.)  Iannone recalled taking seminars in jury sentencing following the decision in *Ring II*.  (*Id.* at 246.)  Iannone testified that Mary Durand was the first mitigation specialist in the case but, after she became ill in 2000 or 2001, she was replaced by Mark Goff of Public Service Investigations.   (*Id.* at 247.)  Iannone was "impressed" by both Durand and Goff and believed that Durand had a good relationship with Ellison.  (*Id.* at 248.)  Iannone testified that he did not call Ellison to testify because he worried Ellison might be a "volunteer" and because Ellison would say something that

would "irretrievably alienate the jury." (RT 8/21/04 at 112.) In Iannone's view, Ellison was "competent" but "[h]eavily damaged." (*Id.* at 113.) Iannone testified that although he viewed Ellison as a "follower who desperately wanted to be a leader," he did not pursue the "follower/leader" issue because it was a "veritable minefield" given that Ellison was the only one with a connection to Kingman and the one who provided the transportation and the latex gloves worn during the crimes. (*Id.* at 128, 131-32.) Iannone testified that he believed Ellison was the leader and Finch the follower. (*Id.* at 164.)

As for the possibility of introducing FASD evidence, Iannone testified that he did not "recall giving it any thought at all." (*Id.* at 133-34.) Iannone explained that in examining Dr. Lanyon at trial, he "drew the sting" out of the negative information in Dr. Lanyon's report by questioning him about the malingering issue, and eliciting Dr. Lanyon's explanation, before the prosecutor could raise it on cross-examination. (*Id.* at 147-50.) Iannone agreed that he had spoken with Dr. Lanyon about his findings and that his approach in examining Dr. Lanyon was a matter of "trial strategy and tactics." (*Id.* at 150.)

Turning to Durand, Iannone testified that he and Durand had a lot of conversations while she was on the case, but she had to withdraw due to health issues. (*Id.* at 166.) Iannone testified that he couldn't remember if he considered calling Durand to testify at sentencing. (*Id.* at 137.) Iannone testified that Durand never told him that Ellison could be suffering from pFASD or FAS and that he "didn't recall anyone bringing that up." (*Id.* at 168.) Iannone testified that he relied on Dr. Lanyon's finding that Ellison did not suffer from brain damage. (*Id.* at 169-70.)

Iannone could not recall why Dr. Lanyon testified telephonically. (*Id.* at 175.) He testified that he "really wasn't happy doing it by telephone" but, as he recalled, "it was either this or nothing, so we had to bite the bullet and do it" because the "information [was] of critical importance." (*Id.*) Iannone also testified that in addition to Drs. Lanyon and Tucker, Dr. Gwenn Levitt, a Phoenix psychiatrist, evaluated Ellison. (*Id.* at 178.) Iannone then testified: "May I just—may I just tell the Court that after evaluating Mr. Ellison, Gwen told me that I didn't want to call her." (*Id.*)

Finally, in response to questions by the court, Iannone testified that the new mitigation firm came onto the case because of Durand's health problems and that his "perception" was that doing the mitigation work was "damaging Mary's health, that she needed to get her strength up and recover and that she was no longer perceiving herself as being an active member of the Ellison defense team." (*Id.* at 179.)  Iannone also testified that there was no information Durand had gathered that he was not "able to present to the sentencing jury." (*Id.*)

The next witness was Kenneth Everett, Ellison's first defense attorney and the Mohave County Public Defender from 1997 to July 2000. (*Id.* at 6.)  Everett was appointed during the PCR proceedings to serve as a "*Strickland* expert." (*Id.* at 14.)  Everett testified that after his appointment, he contacted Durand because he knew that Ellison's background contained a number of mitigation issues. (*Id.* at 19.)  He testified that the experts on whom Iannone relied were "woefully inadequate." (*Id.* at 35.)  According to Everett, Dr. Lanyon's report should have led counsel to "other important mitigation." (*Id.* at 36.) Everett testified that there is an "inherent tension in a system where the judge is responsible for appointing experts" and overseeing the budget because an attorney may hesitate to ask for the appointment of an expert and risking the judge's "ill will." (*Id.* at 38-39.)  Everett testified that the failure to call a mitigation witness to testify in person fell below "the standard of care" and therefore it was imperative to subpoena Dr. Lanyon and if necessary to ask for a continuance. (*Id.* at 40–42.)  Everett opined that it is "absolutely essential" to put a mitigation specialist on the stand during the penalty phase of a capital trial and that the applicable ABA Guidelines mandated an investigation into mitigating circumstances from the client's birth to the time of sentencing. (*Id.* at 44.)  Everett further testified that several red flags were raised in Dr. Lanyon's report that called out for more thorough investigations by the mitigation specialist and additional experts, including "several significant head injuries, a coma for 36 hours, sexual abuse by family members, substance abuse of every kind, shape, and form . . . , addiction, two club feet, childhood issues." (*Id.* at 47.)  Everett also noted that Dr. Lanyon's report contained the findings of a mitigation

specialist named Scharlette Holman who outlined similar "significant factors" that influenced Ellison's "development and functioning." (*Id.* at 48.) Everett opined that the testimony of a mitigation specialist is crucial to contextualizing and explaining how mitigating circumstances affected a defendant. (*Id.* at 50.) Everett also testified that constitutionally effective assistance requires that an expert meet personally with the client. (*Id.* at 54.)

Next, Everett explained that the ABA Guidelines mandate a "team concept" in representing a capital defendant and that the team approach "was totally lacking" in Ellison's case. (*Id.* at 56.) Everett testified that the lead attorney is responsible for asking an expert whether further testing is necessary. (*Id.* at 55-56.) According to Everett, Iannone was "completely ineffective" at sentencing in advancing the theory that Ellison was the follower and Finch the leader. (*Id.* at 62.) Everett concluded by testifying that the sentencing investigation and presentation in Ellison's case was "one of the least professional and weakest" he had ever seen. (*Id.* at 70.)

On cross-examination, Everett admitted he "did not consider fetal alcohol syndrome" despite meeting with Ellison frequently over the 15 months he represented him and "didn't do anything to investigate the possibility of fetal alcohol syndrome." (*Id.* at 80.) He also testified that Durand, one of the best and experienced mitigation specialists, "did not suspect or investigate for partial fetal alcohol syndrome" despite meeting with Ellison a number of times, investigating his life history and background, and speaking with friends and relatives. (*Id.* at 83-84.) Everett also acknowledged that Durand never raised the subject of pFSAD with him. (*Id.* at 84.) Everett further testified that he was aware of Durand's health issues but was "not sure of the timing . . . specifically in regard to this case." (*Id.* at 100.) Nevertheless, Everett testified that it was "certainly [his] belief that she could have, would have and must have testified in this case and was ready, willing, and able to do so." (*Id.*)

Ellison's final witness at the PCR evidentiary hearing was Durand. (*Id.* at 183.) Durand testified that she interviewed Ellison on "many occasions" and "spent a lot of time

with him . . . face-to-face" and also interviewed "a lot" of Ellison's family members, including Ellison's mother "several times." (*Id.* at 216.) Durand testified that Ellison's mother was drinking during one of their interviews, that Ellison's mother admitted she believed she was drunk on the night Ellison was conceived, and that Ellison's mother also made it plain that she never loved Ellison and was a cold and neglectful mother. (*Id.* at 192-96.)

Duran testified that she also reviewed Ellison's school records, psychological reports, prison and jail records, and the police reports. (*Id.* at 217.) Durand stated that she "did not even consider the possibility of fetal alcohol effects anytime in [her] involvement in [the] case" and "never had a discussion with any of the lawyers . . . about fetal alcohol syndrome." (*Id.* at 217-18.) Durand opined, however, that if "the proper mitigation had been done . . . one of the experts would have seen it." (*Id.* at 199.) Duran explained that she "missed the fetal alcohol because [she] didn't see it in his face" and was "consumed with these co-occurring issues" such as the sexual abuse Ellison suffered. (*Id.* at 198.)

Durand also opined that regular team meetings, sharing of information, and brainstorming are critical in capital sentencing but did not happen in Ellison's case. (*Id.* at 196.) Durand testified that she recommended Dr. Lanyon to Iannone "to do a neuropsych evaluation of Mr. Ellison" but opined that Dr. Lanyon should have performed additional tests after finding no organic brain damage. (*Id.* at 199, 201.) Durand also testified that Dr. Tucker should have met personally with Ellison and that a PET scan should have been performed. (*Id.* at 197.) Durand also stated that she would have visited the prison to speak with an inmate named "Booger Red" who extorted inmates, including Ellison, by providing protection in exchange for sex. (*Id.* at 197-98.) Durand stated that she would have called six additional expert witnesses at Ellison's sentencing, including a child development specialist from Washington, D.C., and a prosecutor from the Maricopa County Sex Crimes Unit. (*Id.* at 208-09.) Durand also opined that the testimony of a mitigation specialist is necessary to "put it all together" in a "coherent form," "contextualize" the mitigating circumstances, and "talk about what the effects of what happened to him are and how that

1   affected his behavior for his entire life." (*Id.* at 204-05.)  Durand acknowledged, however,

2   that due to her health problems she had stopped actively working on Ellison's case the year

3   before the sentencing proceedings.  (*Id.* at 210.)

4          The State presented the testimony of Detective Auld to counter Ellison's contention

5   that he suffered from executive dysfunction that was manifested in the circumstances of

6   the crime.  (*Id.* at 223-68.)

7                     2.    Analysis

8          As noted, Ellison's habeas petition raises ten subclaims of ineffective assistance of

9   counsel at sentencing. (Doc. 21 at 216-75.)  Subclaims 1 and 2 were the subject of the

10  evidentiary hearing outlined above.  Following the evidentiary hearing, the PCR court

11  issued a written order denying relief as to those subclaims.  (PCR Ruling, 8/13/15.)  The

12  PCR court also issued a subsequent written order denying Ellison's motion for

13  reconsideration as to those subclaims.  (PCR Ruling, 11/16/15.)  As for subclaims 3-8, they

14  were summarily denied by the PCR court in its initial ruling  (PCR Ruling, 7/16/12.)

15  Subclaims 9 and 10 were not raised in state court.

16               a.    **Subclaim 1: Mitigation Evidence**

17         The PCR court addressed, and rejected, the following allegations of ineffective

18  assistance related to mitigation evidence: (1) failing to insist that Dr. Lanyon testify in

19  person rather than by phone; (2) failing "to ask another neuropsychologist to re-test

20  Ellison"; (3) failing to call Durand as a mitigation witness; and (4) failing to adequately

21  prepare mitigation witnesses Ken Ellison, Karl Orr, and Russell Reardon.  (PCR Ruling,

22  7/13/15 at 5-13.)  The court "reject[ed] Ellison's claims of alleged failure to gather and

23  present mitigating evidence, finding that they are not supported by the record of the

24  sentencing trial or evidentiary hearing." (*Id.* at 7.)

25         With respect to the presentation of Dr. Lanyon's telephonic testimony, the PCR

26  court found:

27         There is no claim that his testimony was deficient or inaccurate.  Rather,
           Ellison claims Dr. Lanyon's testimony would have been more effective if it
28         had been delivered in person, rather than telephonically.

The record clearly reflects that Judge Moon instructed the jurors that the reason Dr. Lanyon would testify telephonically was due to Lanyon's health problems.  The record does not show if or when Dr. Lanyon might have been available to testify in person, but Iannone testified at the evidentiary hearing that the only way the defense could present Dr. Lanyon's testimony was via telephone.  The decision whether to call a witness telephonically, or to move to postpone the trial is a matter of trial strategy.  This question is one of weighing the efficacy of a telephonic testimony versus the antagonism of the jury created by a postponement of the trial.  Without knowing when Dr. Lanyon might be available in person, this court will not second-guess defense counsel's tactical [and] apparently sound decision to present Dr. Lanyon's testimony telephonically.

(*Id.* at 8, footnotes omitted.)

The PCR court next discussed counsel's failure to consult an additional neuropsychologist.  (*Id.* at 9-10.)  The court first noted that counsel retained Dr. Lanyon after Ellison was evaluated by psychiatrist Dr. Gwen Levitt, who indicated that her testimony "would not be helpful to the defense."  (*Id.* at 9.)  Dr. Lanyon, whom the PCR court referred to as a "neuro-psychologist," concluded that Ellison "suffered from no organic brain damage and that he was malingering as to symptoms of mental illness." (*Id.*)  The court continued:

The record reflects that Ellison's attorneys consulted numerous expert witnesses in their investigation of possible mitigating circumstances.  In addition to doctors Levitt and Lanyon, they also consulted with doctors Grogan, Aitken [sic], and Tucker.[43]  Iannone testified at the evidentiary hearing that he did not see any need for additional experts, and if he had, he would have requested their appointment by the court.  Iannone testified that he specifically directed Dr. Douglas Tucker to not perform any interview or testing of Ellison personally.  Iannone wanted Dr. Tucker to tell the jury about the debilitating effects of drug addiction and the effects on Ellison's life.  He was concerned that an interview or testing would reveal negative things about Ellison (possibly anti-social personality disorder), and mindful that Dr. Lanyon's MMPI test results were invalid—as deliberately manipulated by Ellison.

The court finds a clear strategic decision by counsel to avoid exposing

---

[43]    Dr. Thomas Grogan was an orthopedist the defense consulted about Ellison's club feet.  James Aiken, an expert on prisons and correctional security, is not a doctor.

Ellison to additional psychological interviews or testing that might reveal negative information about Ellison.  Dr. Levitt warned Iannone that he should not call her as a witness.  Iannone testified that there are some things counsel do not want to know.  He intentionally avoided presenting evidence that Ellison acted under duress (by Finch) because of certain contra-indications, which demonstrated that Ellison was the likely ringleader, not Finch.  Iannone believed that Ellison was the person who selected the victims in this case.  Under these circumstances, counsel's strategic decision to avoid further evaluations of Ellison appeared sound.

(*Id.* at 9-10, footnote omitted.)

Next, the PCR court found that "counsel's failure to call Mary Durand as a witness was not deficient performance." (*Id.* at 10.)  The court explained:

[T]he substance of Mary Durand's knowledge of Ellison's childhood and social history were presented in substance to the jury through the testimony of Dr. Richard Lanyon and Dr. Tucker.  Iannone testified at the evidentiary hearing that he did not believe there was further information, not already provided to the jury, to which Mary Durand might have testified.  The choice of which witness to use to present important mitigating testimony is a matter of trial strategy.

(*Id.*)

Finally, the court rejected Ellison's claim that defense counsel inadequately prepared witnesses Ken Ellison, Orr, and Reardon.  (*Id.* at 11-13.)  The court noted that counsel met personally with the three witnesses and elicited relevant mitigating testimony about family dysfunction, lack of love and guidance, Ellison's physical disability, his mother's coldness and antagonism, and his substance abuse.  (*Id.*)

In challenging the PCR court's ruling on these points, Ellison contends that the PCR court made several unreasonable factual determinations and unreasonably applied *Strickland*.  (Doc. 21 at 227-31.)  More specifically, Ellison first notes that the PCR court erroneously referred to Dr. Lanyon as a "neuropsychologist."  (*Id.* at 227.)  In fact, Dr. Lanyon was a psychologist who performed a neuropsychological examination of Ellison.  Ellison argues that "the court's assumption that Iannone in fact consulted an expert trained in neuropsychology was an unreasonable determination of fact."  (*Id.* at 228.)

This argument is unavailing.  Although the PCR court got Dr. Lanyon's title wrong,

- 152 -

1    Ellison offers no support for the proposition that Lanyon was not trained in

2    neuropsychology, nor does he argue that Lanyon was unqualified to perform a

3    neuropsychological exam.   Indeed, the record reflects that Durand recommended Dr.

4    Lanyon to defense counsel to perform a "neuropsych evaluation."  (RT 8/21/04 at 199.)

5            Next, Ellison argues that the PCR court made "unreasonable determinations of fact

6    and unreasonable applications of *Strickland*" when it rejected his allegations of

7    ineffectiveness related to trial counsel's reliance on Dr. Lanyon.   (Doc. 21 at 228-29.)

8    Ellison seems to contend this ineffectiveness took two discrete, if related, forms: (1)

9    "fail[ing] to investigate to determine if Dr. Lanyon's conclusions were valid"; and (2)

10   failing to "hav[e] Ellison tested or evaluated by another psychologist or neuropsychologist

11   because if the results were negative, trial counsel could then put them aside and go forward

12   with Dr. Lanyon."  (*Id.*)  Ellison also faults the PCR court for characterizing the latter as

13   an unreviewable strategic choice and for describing James Aiken as a "doctor" (when, as

14   discussed elsewhere, Aiken is not a doctor).  (*Id.*)

15           Ellison is not entitled to habeas relief on this basis.   The starting point for the

16   analysis is the principle that "[a]ttorneys are entitled to rely on the opinions of properly

17   selected, adequately informed and well-qualified experts."  *Crittenden v. Ayers*, 624 F.3d

18   943, 966 (9th Cir. 2010).  *See also Sims v. Brown*, 425 F.3d 560, 585-86 (9th Cir. 2005)

19   ("Attorneys are entitled to rely on the opinions of mental health experts, and to impose a

20   duty on them to investigate independently of a request for information from an expert

21   would defeat the whole aim of having experts participate in the investigation.") (citation

22   omitted).  Indeed, "[i]f an attorney has the burden of reviewing the trustworthiness of a

23   qualified expert's conclusion before the attorney is entitled to make decisions based on that

24   conclusion, the role of the expert becomes superfluous."  *Hendricks v. Calderon,* 70 F.3d

25   1032, 1039 (9th Cir. 1995).  *See also Morris v. Carpenter*, 802 F.3d 825, 841 (6th Cir.

26   2015) ("Attorneys are entitled to rely on the opinions and conclusions of mental health

27   experts."); *Nelson v. Davis*, 952 F.3d 651, 663–64 (5th Cir. 2020) ("We have consistently

28   found that death penalty counsel is not ineffective if they rely on a medical expert's

- 153 -

assessment of the defendant's mental functioning to inform their punishment phase strategy instead of pushing ahead with their own investigation or hiring new experts who may have reached a different diagnosis.") (cleaned up).  Thus, to the extent Ellison faults trial counsel for relying on the opinions of Dr. Lanyon (and not realizing, for example, that Dr. Lanyon had overlooked the existence of FASD), this criticism is a non-starter.  At a minimum, there is no clearly established federal law supporting Ellison's criticism on this point.  *See, e.g., Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) ("An expert's failure to diagnose a mental condition does not constitute ineffective assistance of *counsel*, and [a defendant] has no constitutional guarantee of effective assistance of experts."); *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) ("Even though Dr. Chiappone as a trained psychologist failed to detect any evidence of PTSD, Campbell asks us to declare that his counsel's independent failure to make the same diagnosis is an objectively unreasonable mistake, depriving him of his Sixth Amendment right to the effective assistance of counsel.  There is no evidence that Dr. Chiappone was incompetent, or that Campbell's lawyers had any reason to question Chiappone's professional qualifications.  We conclude, therefore, that it was objectively reasonable for Campbell's trial counsel to rely upon Dr. Chiappone's diagnosis and, further, trial counsel's failure to independently diagnose PTSD was not unreasonable.") (citation omitted); *Boggs v. Shinn*, 2020 WL 1494491, *48 (D. Ariz. 2020) (failure of petitioner's experts to diagnose petitioner with fetal alcohol syndrome was not ineffective assistance of counsel).

A corollary to the aforementioned principle is that an attorney has no obligation under *Strickland* to seek out the opinion of another expert after obtaining the opinion of the first qualified expert.  As the Ninth Circuit has noted, "the Supreme Court's precedent does not support the theory that if counsel had 'nothing to lose' by pursuing a defense, then counsel is deficient for failing to pursue it. . . .  An argument that counsel could have relied on any number of hypothetical experts whose insight might possibly have been useful is speculative and insufficient to establish that counsel was deficient." *Atwood v. Ryan*, 870 F.3d 1033, 1064 (9th Cir. 2017) (cleaned up).  Thus, to the extent Ellison faults his trial

counsel for not seeking out additional experts after receiving Dr. Lanyon's opinions, that criticism is again unavailing (and, at a minimum, the PCR court did not violate clearly established federal law or make an unreasonable determination of the facts by concluding otherwise).[44]

Next, Ellison challenges the PCR court's rejection of his claim that trial counsel performed ineffectively by failing to have Dr. Lanyon testify in person. (Doc. 21 at 229.) According to Ellison, this determination was predicted on an unreasonable factual determination—that Dr. Lanyon's health problems prevented him from testifying in person. (*Id.*) In an effort to show that this determination was unreasonable, Ellison points to Engan's representation during a December 2003 status conference that he expected Dr. Lanyon to be "'in the full swing of things" by January 2004 and expected Dr. Lanyon to be able to testify on "any date from mid-January onward." (RT 12/5/03 at 3.) Ellison also argues that the expressions of frustration from Engan and mitigation specialist Goff at Iannone's failure to subpoena Dr. Lanyon suggest that Lanyon was healthy enough to appear in person.

Ellison is not entitled to habeas relief on this basis. As an initial matter, Ellison has not met his heavy burden of demonstrating, by clear and convincing evidence, that the challenged factual determination was unreasonable. The transcript from the status

---

[44] This conclusion is not undermined by the fact that certain aspects of the PCR court's analysis related to Dr. Lanyon may be subject to criticism. As noted, the PCR incorrectly described Aiken as a "doctor" in the course of describing trial counsel's efforts to obtain other expert opinions, beyond those of Dr. Lanyon, to be used for mitigation purposes. But as discussed in the text, no clearly established law required trial counsel to look beyond Dr. Lanyon or question Dr. Lanyon's conclusions. Thus, any factual error in describing Aiken was immaterial. For similar reasons, although the Court tends to agree with Ellison's contention that PCR court erred by characterizing trial counsel's "decision to avoid further evaluations of Ellison" by other experts as an example of an unreviewable "clear strategic decision" (PCR Ruling, 7/13/15 at 9-10)—as noted in *Weeden v. Johnson*, 854 F.3d 1063 (9th Cir. 2017), there is no *strategic* downside to consulting with an additional expert, as "simply procuring a report does not mean it must be produced," *id.* at 1070—the broader point is that no clearly established law required trial counsel to provide a strategic justification for this (in)action. Instead, counsel was entitled to rely on Dr. Lanyon's opinions.

conference shows that after Engan expressed hope that Dr. Lanyon would recover by mid-January 2004, Judge Moon responded that he was "hoping that [Dr. Lanyon] was basically ready to go but for the critical medical condition, and that he doesn't have to then take more time to be prepared for trial once he's healthy enough to travel." (RT 12/5/03 at 3-4.) Engan replied that he couldn't "venture an opinion on that." (*Id.* at 4.) This exchange fails to clearly and convincingly establish that Dr. Lanyon's health was no longer an issue at the time of his testimony on February 12, 2004.

The notes cited by Ellison are also insufficient to make this showing. Although the typewritten notes, dated February 5, 2004, reflect concern over the fact that "Ian[n]one had not subpoenaed witnesses," there is no specific discussion there of *Dr. Lanyon's* health or availability—in fact, the one expert who is discussed by name is Dr. Tucker. (PCR Pet., Ex. C) Meanwhile, on the handwritten notes on the following page, there is an indication that Iannone was going to speak with Dr. Lanyon that night about his testimony. (*Id.*) This is insufficient to overcome, by clear and convincing evidence, the presumption of correctness that attaches to the PCR court's factual findings about Dr. Lanyon's health and inability to testify in person. *See* 28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

Alternatively, even assuming for the sake of argument that the PCR court made an unreasonable factual determination when explaining why trial counsel allowed Dr. Lanyon to testify telephonically rather than in person (and, thus, also erred in evaluating whether counsel's performance was deficient), the PCR court separately found that Ellison had not demonstrated prejudice: "If one assumes for purposes of evaluating all the legal issues that Ellison's trial counsel performed deficiently, the issue of prejudice remains. . . . The errors and deficiencies that Ellison claims his attorneys made in the sentencing trial are not sufficiently substantial to create a doubt that a rational jury would have found the proffered mitigating circumstances sufficiently substantial to call for leniency." (PCR Ruling, 7/13/15 at 16-17.) Ellison has failed to meet his burden under § 2254(d) of showing error in this analysis. Although Ellison asserts in conclusory fashion that testifying by phone, rather than in person, rendered Dr. Lanyon's testimony "ineffectual" (Doc. 21 at 232), he

1    cites no law to support that assertion, let alone clearly established federal law. *Cf. Cox v.*

2    *Del Papa*, 542 F.3d 669, 683 (9th Cir. 2008) ("Nor was it unreasonable for counsel to

3    comment upon the expert statements in the record rather than call the experts to testify

4    directly to the court. Cox offers no reason to believe that the court would have learned

5    anything different or in addition to their reports, and he does not mention any expert who

6    might have offered a new and more powerful mitigating argument.").

7         Finally, Ellison asserts that the PCR court's rejection of his ineffective-assistance

8    claim predicted on counsel's failure to call Durand as a mitigation witness was "legally

9    and factually unreasonable." (Doc. 21 at 230.)  As noted, the PCR court found that "the

10   substance of Mary Durand's knowledge of Ellison's childhood and social history were

11   presented in substance to the jury through the testimony of Dr. Richard Lanyon and Dr.

12   Tucker." (PCR Ruling, 7/13/15 at 10.)  Ellison contends this finding is erroneous because

13   Dr. Tucker "presented virtually no testimony of actual events in Ellison's childhood or

14   social history." (Doc. 21 at 230.)  This is incorrect.  Dr. Tucker was asked by defense

15   counsel to assume a series of hypotheticals that directly reflected the facts of Ellison's

16   childhood and social history.  (RT 12/4/04 at 30-59.)  Dr. Lanyon and the lay witnesses

17   also testified at length about actual events Ellison experienced in his childhood and youth,

18   including parental neglect, sexual abuse, and drug use.

19        Ellison also argues that, if Durand had testified, she "would have been able to give

20   a detail[ed] account of Ellison's complete life history," including his mother's indifference

21   and cruelty, "the horrific details of the sexual abuse" committed by his older brother, and

22   his rape by a "dangerous and violent bunkmate in prison" when Ellison was in his early

23   20s.  (Doc. 21 at 230.)  But the PCR court correctly found that "[t]he choice of which

24   witness to use to present important mitigating testimony is a matter of trial strategy." (PCR

25   Ruling, 7/13/15 at 10.)  "Few decisions a lawyer makes draw so heavily on professional

26   judgment as whether or not to proffer a witness at trial." *Lord v. Wood,* 184 F.3d 1083,

27   1095 (9th Cir. 1999); *see also Rhode v. Hall*, 582 F.3d 1273, 1284 (11th Cir. 2009) ("Which

28   witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and

1    it is one that we will seldom, if ever, second guess").

2          Iannone did not recall whether he asked Durand to testify.  (RT 8/21/14 at 137.)
3    However, he had "a lot of discussions with [her] while she was on the case."  (*Id.* at 166.)
4    Iannone's decision not to call Durand thus qualifies as an informed and strategic choice
5    made after a thorough investigation, which, under *Strickland*, means it is "virtually
6    unchallengeable."  466 U.S. at 690.  At any rate, the record is not clear about Durand's
7    ability to testify at the sentencing hearing and, as the PCR court found, Iannone found other
8    ways to present the mitigating evidence Durand had gathered while she was active on the
9    case.  Under these circumstances, Ellison has not overcome the strong presumption that
10   counsel's decision not to call Durand was made in the exercise of sound trial strategy.
11   *Strickland*, 466 U.S. at 690.

12         In sum, counsel's mitigation-related performance at sentencing was "well within the
13   range of professionally reasonable judgments."  *Van Hook*, 558 U.S. at 12 (quoting
14   *Strickland*, 466 U.S. at 699).  In *Van Hook*, defense counsel spoke with the defendant's
15   mother, father, aunt, and a family friend; met with two expert witnesses; reviewed military
16   and medical records; and "looked into" retaining a mitigation specialist. *Id.* at 9-10. At
17   sentencing, counsel presented mitigating evidence about the defendant's traumatic
18   childhood, which was a "combat zone" of physical and sexual violence by the father against
19   the mother, and his impairment due to drugs and alcohol on the day of the crime.  *Id.*  The
20   Supreme Court found that the scope of counsel's investigation was reasonable even though
21   counsel did not interview all of the defendant's relatives or a psychiatrist who treated his
22   mother.  *Id.* at 11.  By this standard, Ellison's counsel's performance in investigating and
23   presenting mitigation evidence was not deficient.  With the report prepared by Dr. Lanyon
24   and the extensive social history evidence gathered by the mitigation specialists, there was
25   no reason for counsel to suspect that "worse details" about Ellison's background existed.
26   *Id.*  This was not a case in which counsel "failed to act while potentially mitigating evidence
27   stared them in the face."  *Id.*; *see also McGill*, 16 F.4th at 698 ("McGill has not shown that
28   counsel performed deficiently under *Strickland* at the penalty phase of his trial.  The PCR

court reasonably concluded that counsel's preparation, investigation, and presentation of mitigation evidence was thorough and reasoned. As a whole, the defense team uncovered a 'not insignificant' amount of mitigation evidence that spanned decades of McGill's life and presented a comprehensive picture to the jury."); *Murray*, 745 F.3d at 1012-14.

Nor was this a case where counsel presented mitigating evidence "to the jury only in the vaguest of terms," *Bean v. Calderon*, 163 F.3d 1073, 1081 (9th Cir. 1998), or introduced Ellison's social history "in a cursory manner that was not particularly useful or compelling," *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003), or failed to "explain the significance of the mitigating evidence" that was presented, *Mayfield v. Woodford*, 270 F.3d 915, 928 (9th Cir. 2001). The lay witnesses, Dr. Tucker, and Dr. Lanyon presented concrete details to the jury about the horrific emotional, physical, and sexual abuse Ellison suffered. The experts also expressly linked that suffering, together with Ellison's psychological issues, to his criminal behavior.

At any rate, once the additional layer of deference mandated by the AEDPA is applied, *see Titlow*, 571 U.S. at 15, the PCR court's determination that counsel did not perform deficiently in the investigation and presentation of mitigating evidence was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

        b.    **Subclaim 2: Investigating And Presenting FASD Evidence**

In subclaim 2 of Claim 45(C), Ellison contends that "in addition to their other failures in mitigation, trial counsel failed to investigate, develop, or present any evidence related to FASD. That failure was deficient and prejudicial." (Doc. 21 at 235.)

The PCR court denied this claim following the evidentiary hearing. (PCR Ruling, 7/13/15 at 13-17.) First, the court noted that "at the time of the Ellison sentencing trial in 2004, none of his attorneys, nor any other members of the defense team or experts considered fetal alcohol syndrome as a possibility." (*Id.* at 13.) The court also noted that Everett, Ellison's first defense attorney and his *Strickland* expert at the evidentiary hearing, "testified that he never thought of it (PFAS), either." (*Id.*) Likewise, the court noted that

1    Durand "never considered [FAS or PFAS] because she did not see it in Ellison's face (most

2    frequently, symptoms of fetal alcohol syndrome include deformities of the facial features,

3    which are not evident in Ellison's face)." (*Id.* at 13-14.)  The court also noted that "[d]uring

4    the time prior to Ellison's sentencing trial in 2004, fetal alcohol syndrome and partial fetal

5    alcohol syndrome were not universally recognized within the medical community as a

6    significant diagnosis.  The DSM IV did not recognize fetal alcohol syndrome as a mental

7    illness or defect." (*Id.* at 14.)

8           The court next considered the testimony of Dr. Brown and summarized her

9    testimony as follows:

10          She explained that fetal alcohol syndrome means in most cases a high risk of
            criminal behavior.  A person who suffers from fetal alcohol syndrome will
11          be a high risk to reoffend.  Much like people with anti-social personality
            disorders, persons with fetal alcohol syndrome will have poor impulse
12          control, poor judgment, little or no empathy towards their victims, and poor
            communication skills.  The most frequently observed criminal offenses
13          committed by persons with fetal alcohol syndrome are crimes against
            persons.  Dr. Brown also testified that she and Dr. Adler first testified about
14          fetal alcohol syndrome in 2007—3 years after Ellison's sentencing trial.
15
            Dr. Brown acknowledged that Dr. Richard Lanyon described a diagnosis of
16          attention deficit disorder during his testimony in the sentencing trial.  She
            agreed that Ellison does suffer from an attention deficit disorder.  She further
17          explained that the ADHD diagnosis has similar elements to the diagnosis of
            fetal alcohol syndrome. . . .
18
            Most importantly to this court, was Dr. Brown's acknowledgement under
19          cross-examination that significant essential elements of PFAS or FASD
            diagnosis were absent in Ellison's case.  Ellison's detailed and good memory
20          was inconsistent with her findings of partial fetal alcohol syndrome disorder.
            She also acknowledged that Ellison's canny or savvy behavior with the
21          police (during his interrogation where he sought a 'deal' with the police)
            showed significant executive functioning abilities—again inconsistent with
22          her findings of partial fetal alcohol syndrome disorder.  Sufferers from PFAS
            were followers, not leaders, per Dr. Brown.  And, as Iannone explained in
23          his testimony, there was strong evidence that Ellison was the leader, not
            Finch in the Bouchers' murder.
24

25   (*Id.* at 19-20.)
26
            The court also "discounted" the testimony of Drs. Adler and Wu, who opined on the
27

28

- 160 -

brain imaging results obtained by the MRI and DTI.  (*Id.* at 15 n.24.)  The court noted that a neuro-radiologist, Dr. Karis, had read Ellison's MRI as within normal limits and unremarkable and that DTI studies "are not readily or fully understood by other experts in the field as they relate to normal vs. abnormal brains."  (*Id.*)

The court concluded that "Ellison has failed to prove that he does suffer from either fetal alcohol syndrome disorder or from partial fetal alcohol disorder."  (*Id.* at 15.)  The court elaborated:

> Specifically, it appears that virtually all of the symptoms evidencing partial or complete fetal alcohol syndrome disorder are also the symptoms for attention deficit disorder (which were diagnosed by Dr. Lanyon and presented to Ellison's sentencing jury), or an anti-social personality disorder.  An anti-social personality disorder is not a mitigating circumstance; rather it might be considered an aggravating circumstance.  That is, that Ellison has a lack of empathy, is impulsive, he has no remorse, he is prone to criminality, and he is dangerous and likely to recidivate—all are *not* mitigating circumstances.  And, finally, Ellison's good memory and canny, savvy, non-follower behavior are strong indications that he does not suffer from any form of fetal alcohol syndrome.  However, they are consistent with anti-social personality disorder.

(*Id.* at 15-16.)

The court then considered the issue of prejudice, concluding there was not a reasonable probability of a different outcome had counsel presented FASD evidence.  (*Id.* at 16-17.)  The court described the six aggravating factors found by the jury as "compelling evidence of the jurors' conclusions that Ellison is dangerous, cruel, and incapable of empathy." (*Id.* at 16.)  The court also emphasized that "[t]he <u>factual information</u> regarding Ellison's difficult childhood, his drug use, his impaired ability/capacity to conform his conduct to society's standards, and the other proposed mitigating circumstances were presented" at sentencing.  (*Id.* at 16-17.)  The court continued:

> If evidence of Partial Fetal Alcohol Syndrome had been presented, it is likely that the state would have presented evidence that these symptoms also indicated an anti-social personality disorder—and the inherent dangers that individuals with this disorder present to the public at large.   Most importantly, the murders of Joseph and Lillian Boucher were horribly cruel murders committed by a person without empathy. . . .  That jury saw that

Ellison was a dangerous person previously convicted of serious crimes and on parole at the time of the murders. It is difficult, if not impossible, to imagine that any reasonable juror would find that the proposed mitigating circumstances (assuming that all mitigating circumstances suggested by Ellison in these proceedings were proven) were sufficiently substantial to call for leniency for this brutal, cruel crime. I find that no reasonable juror would so find.

(*Id.* at 17.)

The PCR court's ruling was neither contrary to nor an unreasonable application of clearly established federal law, nor was it the result of unreasonable factual determinations. First, counsel's performance was not deficient. Before the guilt phase of trial, Iannone moved for the appointment of Dr. Levitt, a forensic psychiatrist, to evaluate Ellison and report any "psychiatric issues" to counsel "with specific reference to the exploration of a possible mental health defense . . . and the exploration of mental-health based mitigation factors." (ROA, Vol. IV, Doc. 121.) The trial court granted the motion. (ROA, Vol. IV, Doc. 127.) Dr. Levitt subsequently cautioned Iannone not to call her as a witness. (RT 8/21/04 at 178,)

Following the guilty verdicts, Iannone moved for authorization to retain an expert to evaluate Ellison and consult with counsel "regarding any neuropsychological issues that should be presented to the Court prior to sentencing." (ROA, Vol. V, Doc. 179.) The trial court granted the motion. (ROA, Vol. V, Doc. 180.) Dr. Lanyon was "well-recommended"—including, in Ellison's case, by mitigation specialist Durand—and Iannone recalled having worked with him on several previous cases. (RT 8/21/14 at 141, 199.) Dr. Lanyon conducted a psychological evaluation, performed a battery of neuropsychological tests, and prepared a 17-page report. (*See* EIR Doc. 111, Ex. E20.)[45] Dr. Lanyon concluded that despite a serious head injury suffered as a teenager and a history of drug and alcohol abuse, Ellison's "neuropsychological evaluation showed no overall impairment of the type that is due to brain dysfunction." (*Id.* at 17.)

---

[45]     "EIR" refers to the documents number in the Electronic Index of Records prepared in Case No. CR-15-425-PC.

1     In deciding not to pursue evidence of organic brain damage, including FASD,

2  Ellison's counsel were entitled to rely on the findings and opinions of Drs. Levitt and

3  Lanyon.  *See, e.g., Crittenden*, 624 F.3d at 966 ("Attorneys are entitled to rely on the

4  opinions of properly selected, adequately informed and well-qualified experts.").   In

5  *Fairbank v. Ayers*, 650 F.3d 1243 (9th Cir. 2011), the Ninth Circuit rejected a similar

6  habeas claim of ineffective assistance of counsel.  There, the defense presented two experts

7  at sentencing.  *Id.* at 1249.  The first was a psychiatrist specializing in addiction medicine

8  who testified "generally" about the effects of cocaine use and drug psychosis.  *Id.*  The

9  second was a psychologist, Dr. Fricke, who conducted a psychological exam and referred

10 Fairbank for a neuropsychological evaluation.  *Id.* at 1249, 1252.  Based on those test

11 results, Dr. Fricke "ruled out psychosis, mental illness, and neurologic impairment" and

12 instead "concluded that Fairbank had Antisocial Personality Disorder."  *Id.* at 1252.  In

13 seeking habeas relief, Fairbank presented the opinions of new experts, including a

14 neuropsychologist, who opined that he suffered from brain damage at the time of the crime

15 "and that this damage should have been apparent when Fricke conducted his review."  *Id.*

16 Fairbank also argued that additional mitigating evidence could have been discovered if Dr.

17 Fricke had personally interviewed his health care providers.  *Id.*  Nevertheless, the Ninth

18 Circuit rejected the habeas claim, explaining: "Even assuming all the allegations are true,

19 Fairbank cannot prove a *Strickland* violation, because an expert's failure to diagnose a

20 mental condition does not constitute ineffective assistance of *counsel*, and a petitioner has

21 no constitutional guarantee of effective assistance of experts."  *Id.* (cleaned up).

22     Similarly, in *Earp*, two psychologists and a psychiatrist examined the defendant at

23 the time of trial and found no organic brain damage.  623 F.3d at 1075-76.  Some 11 years

24 later, during his habeas proceedings, Earp offered the opinion of a neuropsychologist who

25 concluded that he had "brain damage that was diagnosable at the time of trial."  *Id.* at 1076.

26 Nevertheless, the Ninth Circuit determined that defense counsel was not ineffective:

27        Earp's defense counsel was pursuing the possibility of organic brain
          damage—there was just no evidence to support that theory. . . .  We cannot
28        fault trial counsel for failing to further investigate potential mitigating

- 163 -

evidence of organic brain damage when the thorough defense investigation, that explicitly pursued the possibility of organic brain damage, uncovered no helpful information.  Furthermore, [the] contradictory diagnosis of organic brain damage, received eleven years after Earp's trial, is insufficient to overcome the contemporaneous documentation that indicated that Earp did not have organic brain damage. . . .  The fact that Earp can now present a neuropsychologist who is willing to opine that he had organic brain damage at the time of his trial does not impact the ultimate determination of whether Earp's trial counsel insufficiently investigated that possibility.

*Id.*

As *Crittenden*, *Earp*, and a host of similar Ninth Circuit decisions[46] make clear, Ellison's trial counsel cannot be said to have engaged in deficient performance under these circumstances.

It is also important to note, as the PCR court did, that neither Everett (Ellison's first counsel and his *Strickland* expert at the post-conviction evidentiary hearing) nor Durand (an experienced and skilled mitigation specialist), both of whom met with Ellison frequently, ever considered the possibility of FASD.  Indeed, even when imaging of Ellison's brain was taken several years after his sentencing, the results were disputed.  Dr. Karis, a neuroradiologist, read an MRI taken in 2010 and found it "unremarkable" with "the midline structures . . . within normal limits."  (RT 8/18/14 at 185-87.)  Dr. Karis determined that this was "entirely normal, in every respect a normal MRI."  (*Id.* at 146.)  These considerations amplify why Ellison's trial counsel cannot be said to have rendered ineffective assistance by failing to discover and present the FASD evidence that Ellison's habeas counsel now believes should have been presented.

---

[46]     *See, e.g., see Boyer v. Chappell*, 793 F.3d 1092, 1103 (9th Cir. 2015); *Leavitt v. Arave*, 646 F.3d 605, 609-10 (9th Cir. 2011); *West v. Ryan*, 608 F.3d 477, 488-89 (9th Cir. 2010); *Mitchell v. United States*, 790 F.3d 881, 893 (9th Cir. 2015) ("In 2009, habeas counsel managed to find a doctor, Pablo Stewart. M.D., who would give them a declaration stating that in 2001 Mitchell suffered from post traumatic stress disorder and substance-induced psychotic disorder. . . .  At most, Dr. Stewart's new diagnosis of Mitchell's mental state, eight years after-the-fact, is a difference in medical opinion, not a failure to investigate.") (cleaned up).

Finally, the parties disagree about the extent to which a diagnosis of FASD or other fetal alcohol disorders was available as a mitigating circumstance at the time of Ellison's sentencing in 2004. There is no dispute that at the time such diagnoses were not contained in the DSM-IV-TR; nor, however, is there any dispute that the conditions had been recognized since at least the 1990s. *See, e.g.*, *Williams v. Calderon*, 52 F.3d 1465, 1471 (9th Cir. 1995) (discussing claim that counsel failed to present mitigating evidence that defendant "apparently suffered from fetal alcohol syndrome"). Nevertheless, the *availability* of FASD as a mitigating circumstance is ultimately a secondary issue. Again, "the relevant inquiry . . . is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable." *Murray*, 745 F.3d at 1011 (citation omitted). Here, for the reasons already discussed, counsel proceeded reasonably after obtaining an opinion from a qualified expert that their client did not have organic brain damage. *Cf. Anderson v. Kelley*, 938 F.3d 949, 957 (8th Cir. 2019) ("Though his case may have benefitted had his counsel investigated FASD, we consider 'not what is prudent or appropriate, but only what is constitutionally compelled.'") (citation omitted).

Alternatively, even if Ellison had shown that counsel performed deficiently in failing to uncover and present evidence that he suffers from FASD, this claim fails to satisfy *Strickland*'s prejudice prong. As noted, in finding that Ellison was not prejudiced by the omission of FASD evidence, the PCR court noted that such evidence is double-edged, would have been cumulative to the factual evidence presented at sentencing, and would have been insufficient to call for leniency given the strength of the aggravating factors. (PCR Ruling, 7/13/15 at 16-17.)

The jury found six aggravating factors, one of which, the multiple-murders aggravator, carries "extraordinary weight" in the sentencing calculus. *State v. Hampton*, 140 P.3d 950, 968 (Ariz. 2006). There is not a reasonable probability that the jury would have reached a different sentence had counsel presented evidence that Ellison suffered from FASD, particularly in light of the powerful mitigation evidence they did present detailing Ellison's severely dysfunctional family life, chronic substance abuse, and ADHD.

*Byram v. Ozmint*, 339 F.3d 203, 211 (4th Cir. 2003) ("[E]ven if additional information or records on Byram's childhood could have been obtained, this is not a case where counsel's failure to thoroughly investigate kept the jury completely in the dark as to defendant's alleged mental problems.") (cleaned up).  Dr. Tucker testified that methamphetamine is a "neurotoxin" that causes permanent damage to the brain and that ADHD is a "devastating" "neuropsychiatric disease."  (RT 2/12/04 at 24, 61.)  Drs. Tucker and Lanyon also testified about the effects of Ellison's birth defect, his mother's emotional cruelty, and the sexual abuse perpetrated by his older brother—factors which led Ellison to self-medicate with drugs and alcohol.

Although the Ninth Circuit has recognized that "[i]n some cases, FASD evidence might be sufficiently different from . . . other evidence of mental illness and behavioral issues to raise a reasonable probability that a juror would not have imposed the death penalty had it been presented," *Floyd v. Filson*, 949 F.3d 1128, 1141 (9th Cir. 2020) (cleaned up), courts have also consistently recognized that FASD evidence can be a double-edged sword.  *See, e.g.*, *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (unpresented FASD evidence was "'double-edged' because, although it might permit an inference that he is not as morally culpable for his behavior, it also might suggest that he, as a product of his environment, is likely to continue to be dangerous in the future.") (cleaned up); *Trevino v. Davis*, 861 F.3d 545, 551 (5th Cir. 2017) ("This is a significant double-edged problem . . . .  Jurors could easily infer from this new FASD evidence that Trevino may have had developmental problems reflected in his academic problems and poor decisionmaking, but that he also engaged in a pattern of violent behavior toward both Cruz and Salinas that he understood was wrong.").  Thus, whether the omission of such evidence results in prejudice is a function of the mitigating evidence that was presented and the strength of the aggravating factors.  *Floyd*, 949 F.3d at 1140-41.

Ellison's counsel presented a substantial case in mitigation advancing, among other circumstances, psychological impairments for which Ellison bore no blame, including ADHD and a constellation of significant emotional problems caused by his handicap and

his abusive and neglectful family life.  For example, Dr. Tucker testified that ADHD, which has a genetic component, is a disorder of the frontal lobes of the brain where executive functioning, judgment, and reasoning occur.  (RT 2/12/04 at 62-64.)  Dr. Tucker also testified that impulsivity is one of the symptoms of ADHD and that untreated ADHD is a risk factor for substance abuse, depression, unemployment, and criminal behavior.  (*Id.* at 62, 65.)  Both Dr. Lanyon and Dr. Tucker testified that the number and severity of the negative factors to which Ellison was subjected—which Dr. Tucker testified were "almost too much to think about together in one person" (*id.* at 39)—prevented Ellison from developing judgment and coping skills and placed him at a much greater risk for criminal behavior.  (*Id.* at 52-53.)  Given this backdrop, it was reasonable for the PCR court to conclude that linking Ellison's poor judgment and impulsivity to FASD instead of ADHD would not have produced substantial additional mitigating value.  *See, e.g., Floyd*, 949 F.3d at 1140 ("[A] capital petitioner is not necessarily prejudiced when counsel fails to introduce evidence that differs somewhat in degree, but not type, from that presented in mitigation."); *Bible v. Ryan*, 571 F.3d 860, 870-71 (9th Cir. 2009) (finding no prejudice from failure to present medical evidence of neurological damage that would have differed only in degree from evidence counsel did present concerning brain damage from persistent drug and alcohol abuse and other causes); *Sells v. Stephens*, 536 F. App'x 483, 495 (5th Cir. 2013) ("Equally unconvincing is Sells's assertion that evidence of a fetal alcohol disability would likely have mitigated his sentence. . . .  While Sells argues that the blameless nature of fetal alcohol impairment could have had a 'powerful mitigating effect,' he ignores the fact that the trial evidence already established that Sells suffered from serious personality and adaptive impairments for which he bore no blame . . . so it is doubtful that Sells would have derived any mitigating benefit merely by linking that diagnosis to fetal alcohol syndrome.  Moreover, we have previously found that evidence of fetal alcohol syndrome-related deficiencies is not necessarily beneficial to a criminal defendant.").

Put another way, Ellison's counsel did not "present[] a much weaker-than-available mitigation argument that was insufficient to overcome an also weak aggravating argument

that clearly troubled some jurors." *Floyd*, 949 F.3d at 1141  As an example of such a case, the Ninth Circuit has cited *Williams v. Stirling*, 914 F.3d 302 (4th Cir. 2019), where the state presented only one aggravating factor and the jury sent a note to the judge on the second day of deliberations indicating it was deadlocked.  *Floyd*, 949 F.3d at 1141.  In contrast to *Williams*, the aggravating factors in Ellison's case were both numerous and weighty, and there was no evidence that the jury, which deliberated for about a day, had difficulty reaching its verdict.   This underscores why the PCR court did not act unreasonably in finding that Ellison was not prejudiced by counsel's failure to pursue FASD as a mitigating circumstance.   *See also Trevino*, 861 F.3d at 550 (rejecting ineffective assistance claim based on failure to present mitigating FASD evidence because counsel "did present evidence from Trevino's life history" and the FASD evidence would have been outweighed by aggravating evidence); *Carter v. Chappell*, 2013 WL 1120657, *99-100 (S.D. Cal. 2013) (rejecting petitioner's argument that "despite the substantial evidence in aggravation, additional testimony regarding his abusive upbringing and evidence of FASD and brain impairments 'might well have' affected the jury's verdict" in part because "[u]nlike in *Williams*, Petitioner's trial counsel presented a substantial amount of mitigating evidence, calling twenty witnesses who traced Petitioner's upbringing in Nome, his foster home and juvenile institutional placements, later incarcerations, and his marriage, children, and divorce, providing the jury with a picture of Petitioner's background and circumstances" and also "presented evidence of his neglect and abuse at the hands of his parents"); *Anderson*, 938 F.3d at 958 ("Anderson has not shown that it is reasonably probable that the jury would have reached a different conclusion had they been presented with evidence of FASD.  Anderson's counsel presented an extensive mitigation case that convinced the jury to find thirty mitigating circumstances.  And the jury heard related evidence on Anderson's brain limitations . . . .").

In an effort to establish prejudice, Ellison cites *Wiggins v. Smith*, 539 U.S. 510 (2003), *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Porter v. McCollum*, 558 U.S. 30 (2009).  (Doc. 21 at 231, 234, 256.)  Those citations are unavailing because the weight of

the mitigating evidence that Ellison argues should have presented in his case falls far short of the omitted evidence the Supreme Court found sufficient to satisfy *Strickland*'s prejudice prong in those cases. *Washington v. Shinn*, 46 F.4th 915, 930-34 (9th Cir. 2022) (finding no prejudice from counsel's failure to present evidence of head injuries, harsh discipline, and a "more complete picture of [petitioner's] background" where the evidence was "not comparable" to the omitted mitigating evidence in *Wiggins*, *Rompilla*, and *Porter*); *Rhoades*, 638 F.3d at 1051.

In *Wiggins*, for example, counsel offered only one mitigating circumstance (no violent prior convictions) and failed to present evidence that the defendant suffered consistent abuse during the first six years of his life, was the victim of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," was sometimes homeless, and had diminished mental capacities. 539 U.S. at 535. In *Rompilla*, counsel neglected to present evidence that the defendant was beaten by his father with fists, straps, belts, and sticks; that his father locked him and his brother in a dog pen filled with excrement; that he grew up in a home with no indoor plumbing and was not given proper clothing; and that test results pointed to schizophrenia, fetal alcohol syndrome, and stunted mental development. 545 U.S. at 391-92. In *Porter*, "[t]he sum total of the mitigating evidence was inconsistent testimony about Porter's behavior when intoxicated and testimony that Porter had a good relationship with his son." 558 U.S. at 32. Counsel failed to present mitigating evidence about "(1) Porter's heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." *Id.* at 41.

Unlike counsel in *Wiggins*, *Rompilla*, and *Porter*, Ellison's counsel supported several mitigating circumstances by presenting humanizing evidence through both lay and expert witnesses that detailed the extraordinary set of obstacles Ellison faced growing up, as well as expert testimony about Ellison's mental health issues, including his depression, substance abuse, and ADHD. *Compare Porter*, 558 U.S. at 41 (noting that the "judge and

jury at Porter's sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability"); *Rompilla*, 545 U.S. at 393 (finding that the evidence discovered after trial "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury"); *Stankewitz v. Woodford*, 365 F.3d 706, 716-20 (9th Cir. 2004) (granting evidentiary hearing on ineffective assistance claim where counsel failed to investigate and present "an excess of privation and abuses" experienced by petitioner as a child, including severe beatings, foster care, organic brain damage to the point of borderline mental retardation, and drug and alcohol abuse, particularly in the days leading up to the killing).

As noted, for purposes of *Strickland*'s prejudice analysis, the "totality" of the mitigating evidence includes that adduced at trial and in subsequent proceedings. *Wiggins*, 539 U.S. at 534, 526. With respect to the latter category, such evidence includes the FASD diagnosis, the omission of which the PCR court reasonably found not to be prejudicial, but little else. The PCR evidentiary hearing did not demonstrate there was other mitigating evidence that should have been presented and which, added to the mitigating evidence that was offered, would have resulted in a reasonable probability of a life sentence. Rather, the hearing showed that testimony from better-prepared lay witnesses, or from Durand, or live rather than telephonic testimony from Dr. Lanyon, would have duplicated the evidence presented at sentencing and "barely . . . altered the sentencing profile presented" to the jury. *Strickland*, 466 U.S. at 700; *see also Babbitt*, 151 F.3d at 1175 (finding no prejudice where counsel failed to present cumulative mitigating evidence).

At a minimum, in light of the double layers of deference required by *Strickland* and AEDPA, the PCR court's rejection of the claim that defense counsel performed ineffectively with respect to FASD evidence was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. *Titlow*, 571 U.S. at 15.

c.   **Subclaim 3: Obtaining A Prison Expert**

In subclaim 3 of Claim 45(C), Ellison alleges that counsel performed ineffectively

by failing to "obtain a prison/future dangerousness expert." (Doc. 21 at 256-60.)

As background, on October 13, 2003, counsel filed a "motion for authorization to retain consultants." (ROA, Vol. VI, Doc. 246.) The motion identified two consultants—James Aiken, a North Carolina-based former prison warden and an expert in the "correctional field"; and Russell Van Vleet, Ph.D., an expert in the juvenile justice system—and provided their resumes. (*Id.*)

The trial court held a brief hearing on the motion. (RT 10/24/03.) Counsel agreed with Judge Moon that one of the areas the defense wished to explore with Aiken was whether Ellison could be safely "locked up" but indicated that Aiken had not yet formulated an opinion on that issue. (*Id.* at 4.) Judge Moon stated that he didn't know how Aiken could have any foundation to opine about whether Ellison could be rehabilitated, whether he was an escape risk, "or would or would not ever pose a threat to others." (*Id.* at 6.) Judge Moon then expressed skepticism that such testimony would be helpful to the trier of fact. (*Id.*) The court took the request for Aiken's appointment under advisement (*id.* at 7) but ultimately denied it, finding "that there is no showing that Mr. Aiken's proposed testimony or consultation will assist the jury." (ME 10/24/03.) During the same hearing, Ellison's counsel explained that Dr. Van Vleet would investigate "[h]ow Ellison's juvenile corrections experience contributed to his commission of this crime." (RT 10/24/03 at 7.) The court granted counsel's motion to retain Dr. Van Vleet. (*Id.*)

Ellison now argues that counsel performed ineffectively by failing to explain the purpose of Aiken's anticipated testimony—that is, evaluating a prisoner's record and determining if he would pose a danger to the staff or other prisoners if sentenced to life—and its relevance as mitigating evidence and by failing to file a special action to appeal the trial court's ruling. (Doc. 21 at 257-58.) Ellison further notes that, in a 2011 report prepared as part of the PCR proceedings, Aiken opined that Ellison "would not pose an unusual danger to correctional officers, officials or inmates" and that, to the contrary, Ellison himself needed to be protected from "the predatory, more dangerous, violent, and disruptive prison population." (PCR Pet., Ex. H, ¶ 19.) The PCR court summarily rejected

1    this claim as "clearly related to decisions of trial strategy," noting that although a "prison

2    expert [might] opine that the Defendant was not violent and posed no danger to society,"

3    "strong evidence to the contrary existed in the Arizona Department of Corrections'

4    records."  (PCR Ruling, 7/16/12 at 5.)[47]

5          Ellison's habeas challenge to this ruling is meritless.  The record contradicts any

6    suggestion that Judge Moon was somehow unaware that Aiken's investigation would have

7    addressed Ellison's potential for danger in prison.  Thus, it wasn't necessary for counsel to

8    further explain the purpose for which they sought Aiken's appointment.  Accordingly,

9    Ellison has failed to overcome the *Strickland* presumption that counsel's performance was

10    reasonable.  Counsel did not "limit" their investigation or "fail to pursue an expert."  (Doc.

11    21 at 259.)  To the contrary, they pursued Aiken's appointment so they could expand their

12    investigation, only for Judge Moon to disagree about the value of the requested evidence.

13    Ellison fails to cite any case in which an attorney was found ineffective for failing to re-

14    urge a request for expert assistance that had already been denied.

15          In addition, as Respondents note, Ellison cannot show prejudice.  Even if Aiken had

16    been appointed before the sentencing phase of trial and opined that Ellison would not pose

17    a danger to guards or inmates if sentenced to life, such evidence would have been of

18    minimal mitigating value, especially in view of the six aggravating factors found by the

19    jury.  Even where petitioners have shown themselves to be, unlike Ellison, "model

20    prisoners," the factor is accorded "minimal weight because of the expectation that prisoners

21    behave in prison."  *State v. Kiles*, 213 P.3d 174, 191 (Ariz. 2009).

22          In sum, Ellison has not demonstrated that counsel performed ineffectively with

23    respect to Aiken's appointment, let alone overcome the second layer of deference accorded

24    the PCR court's denial of this claim under AEDPA.  *Richter*, 562 U.S. at 105.

25

26    [47]    Aiken's 2011 report listed Ellison's disciplinary infractions, which included
threatening inmates with violence and urinating on his cell door; possession of tattooing
27    paraphernalia; refusal to exit the dining area; manufacture of a dangerous weapon (a "blow
dart made from a sharpened coaxial cable"); possession of dangerous contraband (a "lighter
28    in his anus"); and failure to produce a urine sample.  (PCR Pet., Ex. H, ¶ 12.)

1

d.      **Subclaim 4: Brown's Testimony**

2      Ellison alleges in sub-claim 4 of Claim 45(C) that trial counsel were ineffective

3 during the sentencing phase of trial (just as he alleges they were during the guilt phase of

4 trial) in failing to obtain Ellison's jail records to rebut Vivian Brown's testimony that she

5 saw Ellison in 1998 near her parents' home.  (Doc. 21 at 260-62.)  The PCR court denied

6 this claim as "of little moment or relevance to guilt or punishment."  (PCR Ruling, 7/16/12

7 at 5.)

8      Even if counsel had obtained and used the jail records, casting doubt on Brown's

9 testimony about the timing of her *second* sighting of Ellison, there was not a reasonable

10 probability that such evidence would have resulted in a different sentencing-phase verdict.

11 Ellison's leadership role in the murders was established by other evidence, including

12 Brown's testimony regarding her *first* contact with him at her parents' house in 1997.  Thus,

13 Ellison has not rebutted the strong presumption of competent performance under *Strickland*

14 or shown that he was prejudiced by counsel's performance. This claim of ineffective

15 assistance is meritless.

16

e.      **Subclaim 5: Calling Hill As A Mitigation Witness**

17      In subclaim 5 of Claim 45(C), Ellison alleges that counsel performed ineffectively

18 in failing to present the testimony of jailhouse informant Daymond Hill during the

19 sentencing phase of trial.  (Doc. 21 at 262-73.)  The PCR court concluded this subclaim

20 was not colorable because the issue was "of little moment or relevance to guilt or

21 punishment."  (PCR Ruling, 7/16/12 at 5.)

22      As described above, during the guilt phase of trial, Ellison's counsel filed a motion

23 *in limine* to admit Hill's testimony but Judge Moon found that testimony inadmissible on

24 relevance grounds.  The Arizona Supreme Court found no error, explaining that although

25 Hill's statements may have been "marginally relevant" as to the ringleader issue, they were

26 not relevant as to guilt.  *Ellison*, 140 P.3d at 914.

27      Even assuming the statements would have been admissible at sentencing, Ellison

28 cannot satisfy the doubly deferential standard that applies to this claim.  As an initial matter,

- 173 -

Ellison hasn't shown that Hill was available and willing to testify at the sentencing phase of his trial, which occurred four years after Hill provided his statement to the defense. *United States v. Harden*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (denying ineffective assistance claim based on failure to call a witness because there was "no evidence in the record which establishes that [the witness] would testify. . . .").

More important, Ellison cannot meet his burden of showing prejudice under *Strickland*. As both Judge Moon and the Arizona Supreme Court noted, Finch's alleged statements to Hill were of questionable trustworthiness. *Ellison*, 140 P.3d at 914 (noting Judge Moon's observation that Finch may have bragged about the murders to protect himself while housed in administrative segregation). And more broadly, the testimony of jailhouse informants like Hill is "met with particular skepticism by juries." *Perry v. New Hampshire*, 565 U.S. 228, 262 (2012) (Sotomayor, J., dissenting); *see also State v. Carriger*, 692 P.2d 991, 1000 (Ariz. 1984) ("We note that testimony of prisoners concerning prison events probably is scrutinized more carefully by a jury than their testimony concerning other events . . . ."). There was not a reasonable probability that Hill's testimony, with whatever mitigating value the jury assigned it, would have resulted in a finding of leniency given the strength and number of the aggravating factors the jury found.

f.     **Subclaim 6: Voir Dire Of Sentencing-Phase Jury**

In subclaim 6 of Claim 45(C), Ellison alleges that counsel performed ineffectively by conducting an "inadequate voir dire" of the sentencing jury—more specifically, by "fail[ing] to conduct a *Morgan*-based voir dire." (Doc. 21 at 263-68.) The PCR court found that Ellison had not established ineffectiveness because counsel's "failure to conduct detailed voir dire was clearly related to decisions of trial strategy" and, in a related vein, found that filing a motion for a change of venue was "not warranted . . . where the sentencing jury deliberated two years after the trial, and the trial jury deliberated three years after the crime, and [there was] no evidence that either of the juries were affected by pretrial publicity." (PCR Ruling, 7/16/12 at 5-6.)

In *Morgan*, the Supreme Court held that a defendant is entitled to "an adequate *voir dire* to identify unqualified jurors," including those who would "impose death regardless of the facts and circumstances of the conviction." 504 U.S. at 729, 735. The Court further held that simply asking potential jurors whether they can follow the law and be fair and impartial is insufficient. *Id.* at 735-36.

Ellison's challenge to counsel's sentencing-stage performance raises arguments the Court previously addressed and rejected with respect to the sufficiency of the guilt-phase voir dire and the extent and nature of the pretrial publicity. The Court will not repeat its analysis of those issues.

Ellison also argues that counsel failed to inquire about the effect the victims' ages would have on jurors in rendering a verdict. (Doc. 21 at 265-67.) This argument is unavailing. The trial court administered a juror questionnaire.[48] (RT 1/28/04 at 1 ["The record will show the presence of the defendant and a panel of 174 prospective jurors. . . . We're doing to start the process of jury selection by having all of you complete a questionnaire under oath . . . ."].) Before beginning voir dire, the court informed the panel of the aggravating factors alleged by the State, include the age of the victims. (RT 2/4/04 at 64-65.) The court also listed the potential mitigating circumstances, noted each party's burden of proof, and explained how the jury would balance aggravating and mitigating circumstances in reaching its verdict. (*Id.* at 67.) The court asked if any prospective jurors felt they would be unable to follow those procedures, and no hands were raised. (*Id.*) The court also questioned the panel about their exposure to information about the case. (RT 2/4/04 at 42-67; RT 2/5/04 at 32.) The court and counsel also questioned prospective jurors individually. Individual voir dire focused primarily on the answers the prospective jurors

---

[48] Ellison's counsel filed a motion to submit jury questionnaire before the sentencing phase. (ROA, Vol. V, Doc. 205.) Attached was a proposed 20-page, 115-question juror questionnaire. (*Id.*) The court granted the motion, took under advisement the contents of the questionnaire, and stated it would draft a questionnaire and provide it to counsel. (ME 11/15/02.) The final sentencing-phase questionnaire, however, does not appear to be a part of the state court record before this Court.

provided on their questionnaires about the death penalty.  (RT 2/4/04 at 70-264; RT 2/5/04 at 72–241.)  Defense counsel participated actively in the voir dire of these prospective jurors, including asking "life-qualifying" questions.  *Morgan*, 504 U.S. at 726.

Ellison nonetheless contends that counsel's voir dire performance was inadequate. As with his guilt-phase claim of ineffective assistance during voir dire, Ellison fails to prove either deficient performance or prejudice.  "The conduct of voir dire 'will in most instances involve the exercise of a judgment which should be left to competent defense counsel.'"  *Hovey*, 458 F.3d at 909-10 (quoting *Gustave*, 627 F.2d at 906).  Ellison again contends there was no evidentiary support for the PCR court's determination that counsel's performance was a matter of trial strategy.  (Doc. 21 at 267.)  But under *Strickland*, it is presumed that counsel's actions might be a matter of sound trial strategy.  466 U.S. at 689. Ellison fails to rebut that presumption.  *Stanford v. Parker*, 266 F.3d 442, 455 (6th Cir. 2001) ("Since our 'scrutiny of counsel's performance must be highly deferential,' and Stanford has presented no evidence to rebut the presumption that counsel's failure to ask life-qualifying questions . . . constituted sound trial strategy, we reject his ineffective assistance claim under *Strickland*'*s* performance prong.") (citation omitted).

Ellison also contends that counsel should have objected to the trial court's "misstatements of the law."  (Doc. 21 at 265.)  However, in the purported misstatement (RT 1/28/04 at 12), the court did not misstate the law.[49]  Ellison also fails to show prejudice resulting from counsel's performance.  Prejudice exists in this context if counsel fails to question or move to strike a juror who is found to be biased.  *Fields*, 503 F.3d at 776; *Davis v. Woodford*, 384 F.3d 628, 643 (9th Cir. 2004).  But Ellison does not argue that any biased jurors were empaneled.  *Sechrest*, 816 F. Supp. 2d at 1039 ("Sechrest does not make any

---

[49]     Judge Moon instructed the panel, with respect to mitigating circumstances: "Some of you might find one, some of you might find another, and you don't all have to agree on which mitigating circumstances apply, but then you do all have to agree whether or not the mitigators that you each individually find to be true—whether or not those are sufficiently substantial to call for leniency and to not impose the death penalty." (RT 1/28/2004 at 12.) Ellison does not specify what is incorrect in this formulation, but the unanimity requirement, for example, is a correct statement of the law.  *Ellison*, 140 P.3d at 922.

allegation . . . that any individual who was actually seated on the jury was biased. Therefore, Sechrest cannot show that any conceivable shortcoming of his counsel's performance with respect to juror voir dire caused him prejudice."); *Campbell*, 674 F.3d at 594 ("Notably, Campbell has not identified any juror who was actually seated that indicated an inability to set aside any prior knowledge about the case or to judge the case fairly and impartially."); *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) ("Ybarra has not made the required showing of prejudice under *Strickland*, because he has not shown that any juror who harbored an actual bias was seated on the jury as a result of counsel's failure to voir dire on the insanity defense.").

In *Stanford*, the Sixth Circuit rejected a *Morgan*-based claim of ineffective assistance during voir dire, explaining:

> Under *Strickland's* prejudice prong, Stanford's counsel's failure to ask life-qualifying questions during general voir dire did not constitute ineffective assistance of counsel. First, there is no evidence that any potential jurors were inclined to always sentence a capital defendant to death. Second, nothing in the record indicates that counsel's failure to ask life-qualifying questions led to the impanelment of a partial jury. Third, considering the totality of the evidence, there is no reasonable probability that, even if defense counsel erred, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

266 F.3d at 455. For the same reasons, Ellison cannot show he was prejudiced by counsel's performance at voir dire.

The PCR court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

### g.   Subclaim 7: Sentencing-Phase Instructions

In subclaim 7 of Claim 45(C), Ellison alleges that counsel performed ineffectively by "failing to correct the sentencing-phase instructions." (Doc. 21 at 268-70.) The PCR court rejected this claim as not colorable because Ellison's characterization of the sentencing instructions as "confusing" was merely "Defendant's unsupported opinion." (PCR Ruling, 7/16/12 at 6.)

1    Before Ellison's presentation of mitigating evidence, the trial court instructed the
2  jury that "[a] mitigating circumstance is any factor relevant in determining whether to
3  impose a sentence less than death, including any aspect of the defendant's character,
4  propensities, record, or circumstances of the offense."  (RT 2/10/04 at 4.)  At the close of
5  evidence, the court instructed the jury that "[a] mitigating circumstance is one which
6  weighs in favor of leniency and against imposition of the death penalty. Mitigating
7  circumstances relate to any aspects of the defendant's character, propensities, history, or
8  records, or any circumstances that the jury feels appropriate."  (RT 2/13/04 at 15-16.)  The
9  court also listed the five mitigating circumstances proposed by Ellison and added that the
10  jury was "not limited to these mitigating circumstances" and must "also consider any other
11  information admitted as evidence that is relevant in determining whether to impose a
12  sentence less than death."  (*Id.* at 18.)

13    Ellison contends that counsel performed ineffectively by failing to request an
14  instruction defining a mitigating circumstance as "anything that 'in fairness or mercy may
15  be considered as extenuating or reducing the degree of moral culpability or blame or which
16  justify a sentence [] less than death.'"  (Doc. 21 at 268, quoting *Kansas v. Marsh*, 548 U.S.
17  163, 175 (2006)).

18    This argument lacks merit.  In *Boyde v. California,* 494 U.S. 370 (1990), the
19  Supreme Court held that the legal standard for reviewing jury instructions that are claimed
20  to restrict a jury's consideration of relevant mitigation evidence is "whether there is a
21  reasonable likelihood that the jury applied the challenged instruction in a way that
22  prevented the consideration of constitutionally relevant evidence."  *Id.* at 380.  The trial
23  court's instructions in Ellison's case did not prevent the jury's consideration of mitigation
24  evidence. To the contrary, Judge Moon specifically instructed the jury that it was to
25  consider, as possible mitigation, "any factor relevant in determining whether to impose a
26  sentence less than death, including any aspect of the defendant's character, propensities,
27  record, or circumstances of the offense" along with any other circumstance "the jury feels
28  is appropriate" and "any other information admitted as evidence that is relevant in

determining whether to impose a sentence less than death."  (RT 2/10/04 at 4; RT 2/13/04 at 15-16, 18.)  These instructions, which are far less restrictive than the instruction upheld in *Boyde*,[50] did not preclude jurors from giving meaningful consideration to any mitigating factor, including fairness or mercy.  *See, e.g., Krawczuk v. Sec'y, Fla. Dep't of Corr.*, 2015 WL 4645838, *18 (M.D. Fla. 2015) ("The trial court did not issue any instruction that prevented the jury's consideration of mitigation evidence.  To the contrary, the trial judge specifically instructed the jury that they were to consider, as possible mitigation, 'any other aspect of the defendant's character or record, or any other circumstance of the offense.'  The instructions did not prevent jurors from giving meaningful consideration to any mitigating factor, including their feelings of mercy for Petitioner."), *aff'd*, 873 F.3d 1273 (11th Cir. 2017).

Ellison cites evidence of apparent juror confusion during voir dire about the concept of mitigation as proof that the mitigation instruction was inadequate.  (Doc. 21 at 268.)  This argument is unpersuasive because voir dire took place before the court instructed the jury on the definition of mitigation circumstances and before any argument or evidence was presented.  *Cf. Boyde*, 494 U.S. at 383 (explaining that the "context of the proceedings," including the presentation of mitigating evidence and the court's instruction that the jury was to consider all the evidence received during the case, "would have led reasonable jurors to believe that evidence of petitioner's background and character could be considered in mitigation").

Ellison has failed to meet his burden under *Strickland* or AEDPA.  This claim is meritless.

### h.   **Subclaim 8: Closing Argument**

In subclaim 8 of Claim 45(C), Ellison alleges that counsel performed ineffectively by "failing to present a coherent closing argument or to object to the prosecutor's closing

---

[50]      At issue in *Boyde* was a "catch-all" mitigating factor which supplemented the 11 statutory mitigators and provided: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." 494 U.S. at 374.

argument." (Doc. 21 at 270-72.) He asserts that counsel "failed to explain how Ellison's life story led to him being on trial for murder" and "used arguments that were counter to . . . any of the effective themes known to be persuasive with capital jurors." (*Id.*) Ellison also contends that counsel performed ineffectively by failing to object to the prosecutor's mischaracterizations of mitigating evidence. The PCR court summarily denied this claim as not colorable. (PCR Ruling, 7/16/12 at 6.)

Ellison's criticisms of counsel's closing argument miss the mark. Counsel's theme was that, although Ellison was to some degree responsible for his conduct, his degree of responsibility was compromised by a number of factors outside his control that were catastrophic when taken together. (RT 2/13/04 at 28.) The factors included Ellison's family life, a circumstance that was not of his choosing. (*Id.*) Counsel argued that Ellison was scapegoated, beaten by his father, ignored by his mother, and sexually molested by his older brother. (*Id.* at 30-33.) Counsel argued that Ellision acted out in negative ways because he was desperate for attention. (*Id.*) Counsel argued that, instead of learning coping skills, Ellison abused alcohol and drugs, including methamphetamine—which his older brother Mike taught him to use intravenously—to numb the pain. (*Id.* at 33.) Counsel argued that Ellison suffered chronic physical and emotional pain from the many surgeries and the bullying that resulted from his birth defect. (*Id.* at 31.) Counsel also emphasized that Ellison suffered from ADHD, a genetic condition. (*Id.* at 31.) Counsel argued that "pain was the central fact of Charlie's life." (*Id.* at 32.)

Counsel conceded that Ellison was legally and morally responsible for the murders, and therefore needed to be punished, but argued that his "ability to appreciate right from wrong" was "diminished by his environment," including the alcohol and drugs he used and the fact that he grew up without any positive role models. (*Id.* at 34-35.) Counsel noted as emblematic of Ellison's dysfunctional family that Ellison's mother and brother Ken had been late for their testimony because Mrs. Ellison was gambling at a casino and couldn't leave because she was on a "hot streak." (*Id.* at 35.) Counsel also argued that Ellison showed no real violence in his prior convictions, including the armed robbery offense,

which he described in detail.  (*Id.* at 41-42.)  Counsel urged that Ellison, despite his "pretty dumb decisions . . . is still a man.  He's not a monster.  He's not a caricature.  He's a human being."  (*Id.* at 43.)  Counsel concluded by arguing that pain, alcohol, and drugs had damaged Ellison's brain, but Ellison was "responsible for where he was even if he couldn't control exactly how he got there."  (*Id.* at 44.)  Counsel argued that a life sentence rather than death was the appropriate sentence.  (*Id.*)

In his rebuttal closing argument, counsel, responding to the prosecution's arguments, again asserted that Ellison's brain had been damaged by his use of methamphetamine, a neurotoxin.  (*Id.* at 79.)  Counsel also detailed the evidence supporting the allegation that Ellison was sexually abused by his brother.  (*Id.* at 76-79.)  Counsel asked the jury to weigh the mitigating circumstances fairly; to "recognize that the road Charlie took was not entirely of his own choosing" and "was not one that he was free to control in all respects"; that "he made some terrible decisions" and "did wrong"; and that he would be "punished for that."  (*Id.* at 83-84.)  Counsel concluded by stating: "But the appropriate and the just punishment . . . is life in prison.  It is not death."  (*Id.* at 84.)

"The right to effective assistance extends to closing arguments."  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  "Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."  *Id.* at 5-6.  "Closing arguments should sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers."  *Id.* at 6 (citation omitted).  "Judicial review of a defense attorney's summation is therefore highly deferential—and doubly deferential when it is conducted through the lens of federal habeas."  *Id.*

Under this highly deferential review, and applying *Gentry* as clearly established federal law, counsel did not perform ineffectively during his closing argument and the PCR court was not objectively unreasonable in rejecting the claim that he did.  Contrary to Ellison's arguments, counsel focused on the elements of Ellison's "life story [that] led him

to being on trial for murder." (Doc. 21 at 270.) This was the "unifying theme," *Gentry*, 540 U.S. at 6, throughout counsel's summation—that emotional, physical, and sexual abuse within the family, combined with the emotional and physical pain resulting from his birth defect, contributed to Ellison's alcohol and drug abuse, and all of these factors were "piled on him whether he could carry them or not." (RT 2/13/04 at 37.) Counsel emphasized that although these circumstances, some of which were beyond his control, did not absolve Ellison of responsibility, they were part of the "long, ugly, painful road" by which Ellison "got to the back door of the Boucher home." (*Id.* at 44.)

In *Gentry*, the Court observed that even where counsel omitted some "unquestionably" supportive arguments, "it does not follow that counsel was incompetent for failing to include them. Focusing on a small number of key points may be more persuasive than a shotgun approach." 540 U.S. at 7. In Ellison's case, counsel did not omit any supportive arguments in mitigation of the crimes. *Smith v. Spisak*, 558 U.S. 139, 155 (2010) ("Nor does *Spisak* tell us what other mitigating factors counsel might have mentioned.").

Ellison faults counsel for comments describing him as morally responsible for the crimes, blameworthy, and deserving of punishment and as an addict and alcoholic who made dumb, flawed decisions. (Doc. 21 at 271.) But in *Gentry*, the Court explained that "confessing a client's shortcomings . . . is precisely the sort of calculated risk that lies at the heart of an advocate's discretion. By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case." 540 U.S. at 9. By the time of counsel's closing argument, Ellison had been convicted of two murders and the sentencing-stage jury had just found six aggravating factors. Acknowledging responsibility for the crimes at that point posed very little risk. *Spisak*, 558 U.S. at 155 (finding that "a less descriptive closing argument with fewer disparaging comments about Spisak" would not have made a "significant difference" where sentencing occurred immediately after guilt phase and the gruesome facts of the crime were fresh in the jurors' minds).

Ellison also argues that counsel performed ineffectively by failing to object when the prosecutor improperly suggested that the jury must find a causal connection between the mitigating evidence and the crimes.  (Doc. 21 at 271-72.)  Although it is true that a jury cannot be prevented from giving effect to mitigating evidence solely because it has no causal nexus to the crime, *see Tennard v. Dretke*, 542 U.S. 274, 287 (2004), "the failure to establish such a connection may be considered in assessing the quality and strength of the mitigation evidence."  *State v. Newell*, 132 P.3d 833, 849 (2006); *see also Ellison*, 140 P.3d at 927.  In Ellison's case, the prosecutor did not tell the jury it could consider only evidence connected to the crime; rather, he spoke repeatedly about how much mitigating weight the jury should assign to the evidence.  (RT 2/13/04 at 48, 52, 55, 57, 60, 61.)  Because those comments were not improper, counsel did not perform ineffectively in failing to object.

As Ellison notes, there were instances in which the prosecutor arguably mischaracterized the mitigation evidence—for example, by asking the jury whether the mitigation evidence presented had "anything to do with these two murders" and by suggesting that mitigation evidence consists of things like self-defense, jealousy, retribution, or a drug deal gone bad.  (RT 2/13/04 at 64–65.)  Contrary to Ellison's argument, however, defense counsel *did* address the prosecutor's comments.  In his rebuttal closing argument, counsel asked the jury to "disregard" the prosecutor's misstatements, which he characterized as an "interesting aside, but . . . not the law," and to look instead to the court's instructions on mitigation, which counsel then repeated to the jury.  (*Id.* at 80-81.)

Counsel did not perform ineffectively in his mitigation-phase closing argument or in his handling of the prosecutor's closing argument.  The PCR court reasonably applied clearly established federal law in denying this claim.  At a minimum, under AEDPA's doubly deferential standard, Ellison is not entitled to relief.

### i.   Subclaim 9: Prosecutor's Statements About Finch

In subclaim 9 of Claim 45(C), Ellison alleges that counsel performed ineffectively by failing to rebut or object to "the prosecutor's misleading and improper statements

regarding Finch." (Doc. 21 at 272-73.)  Ellison acknowledges that he did not raise this claim in state court. (*Id.* at 273.)  He argues the default is excused under *Martinez* by the ineffective assistance of PCR counsel. (*Id.*)

During his closing argument, the prosecutor told the jury that "Mr. Finch did not have any serious priors on his record" and was not on parole. (RT 2/13/04 at 62.)  Ellison claims these statements were "misleading" because Finch had "at least three" felony convictions—possession of controlled substance, forgery, and possession of stolen property—and because there was an open warrant for his arrest in Washington when he was arrested for the crimes in this case. (Doc. 21 at 272-73.)

The prosecutor's statements about Finch's record were made in response to defense counsel's reminder to the jury that Finch received a life sentence. (RT 2/13/04 at 43, 62.)  The prosecutor was explaining the factors that distinguished Finch and Ellison, including, as aggravating factors found by the jury, that Ellison had a prior "serious" felony, as statutorily defined,[51] and was on parole when he committed the murders.  It was factually accurate for the prosecutor to draw these distinctions between Ellison and Finch (who was not on parole and whose prior convictions did not qualify as "serious" under Arizona law), so Ellison's counsel had no basis for objecting.

The underlying claim that trial counsel performed ineffectively is without merit.  Therefore, cause does not exist for the claim's default.  *Runningeagle*, 825 F.3d at 982.  The claim is thus barred from federal review.

### j.   **Subclaim 10: Ellison's Parole Ineligibility**

The trial court instructed the jury that Ellison faced two sentences, death or life imprisonment, with life imprisonment meaning either natural life or life with the possibility of release after 25 years. (RT 2/4/04 at 41.)  In subclaim 9 of Claim 45(C), Ellison relies on *Lynch v. Arizona*, 578 U.S. 613 (2016) (per curiam), to allege that counsel performed ineffectively by failing to inform the jury that he would not have been eligible for parole if

---

[51]   Under A.R.S. §13-703(H)(1)(h), armed robbery met the definition of a "serious felony" for aggravation purposes.  *Ellison*, 140 P.3d at 927.

1    sentenced to life.  (Doc. 21 at 273-75.)  Ellison acknowledges he did not raise this claim in

2    state court.  (*Id.* at 275.)  He argues its default is excused by the ineffective assistance of

3    PCR counsel. (*Id.*)   *Martinez* does not provide cause to excuse the procedural default

4    because, as set forth below, the claim is plainly meritless.

5          In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the Supreme Court held that

6    when a capital defendant's future dangerousness is at issue and state law prohibits his

7    release on parole, he has a due process right to inform the jurors of his parole ineligibility.

8    Until 2012, Arizona law permitted imposition of a parole-eligible life sentence for

9    defendants convicted of first-degree murder.  *See* A.R.S. § 13-703(A)(2000), *renumbered*

10   *as* A.R.S. § 13-751(A).  In 1994, however, Arizona effectively abolished parole for all

11   inmates convicted of felonies.  *See* A.R.S. § 41-1604.09(I). Accordingly, at the time of

12   Ellison's sentencing, Arizona defendants facing death sentences were statutorily eligible

13   to receive life-with-parole sentences but, as a practical matter, could not be paroled.

14         Critically, at that time, the Arizona Supreme Court had yet not considered

15   *Simmons*'s applicability to Arizona's capital jury-sentencing process in light of § 41-

16   1604.09(I).  However, in 2008, the Arizona Supreme Court rejected an argument that

17   *Simmons* required a trial court to "presentence" a defendant by deciding before trial

18   whether it would impose a parole-eligible life sentence and instruct the jury accordingly.

19   *State v. Cruz*, 181 P.3d 196, 207 (Ariz. 2008).  The court reasoned that *Simmons* did not

20   require reversal because "[n]o state law would have prohibited [the defendant's] release on

21   parole after serving twenty-five years, had he been given a life sentence." *Id.* (citing A.R.S.

22   § 13-703(A) (2004)).  In later years, the Arizona Supreme Court reaffirmed that *Simmons*

23   did not apply in Arizona because a defendant facing a death sentence was eligible to receive

24   a life sentence with the possibility of parole under A.R.S. § 13-751(A).  *See, e.g.*, *State v.

25   Lynch*, 357 P.3d 119, 138–39 (Ariz. 2015).

26         One year after the Arizona Supreme Court's decision in *Lynch*—and 12 years after

27   Ellison's sentencing—the United States Supreme Court overruled the Arizona Supreme

28   Court's precedent, holding that Arizona courts had incorrectly interpreted *Simmons*.

- 185 -

1    *Lynch*, 578 U.S. at 614-16.   The Court concluded, based on § 41-1604.09(I), that an

2    Arizona capital defendant is ineligible for parole within *Simmons*'s meaning.   *Id.*   The

3    Court thus held that, when future dangerousness is at issue, an Arizona capital defendant

4    has the "right to inform his jury of that fact [parole-ineligibility]." *Id.* at 616.

5           Despite this change in the law, Ellison has not met his burden of showing that

6    counsel performed deficiently by failing to object to or correct the court's instruction.   At

7    the time of Ellison's sentencing, A.R.S. § 13-751(A) expressly provided for a parole-

8    eligible life sentence and neither the Arizona Supreme Court nor the United States Supreme

9    Court had addressed how *Simmons*, § 41-1604.09(I), and § 13-751(A) interacted.   Given

10   that backdrop, reasonable counsel could have concluded that Ellison was in fact parole-

11   eligible (and, therefore, there were no grounds for an objection).   Indeed, in a series of

12   decisions issued between 2008 and 2015, the Arizona Supreme Court reached that very

13   conclusion, which establishes that reasonable counsel in 2004 could have reached the same

14   conclusion, too.   *See, e.g., Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) ("Lowry's

15   lawyer cannot be required to anticipate our decision in this later case, because his conduct

16   must be evaluated for purposes of the performance standard of *Strickland* as of the time of

17   counsel's conduct") (citation omitted); *Gerard v. Gootkin*, 856 F. App'x 645, 646-47 (9th

18   Cir. 2021) ("Lacey's counsel cannot be found ineffective for failing to argue a theory that

19   had not been developed at the time of adjudication.   Lawyers are not required to anticipate

20   future changes in the law, but rather under *Strickland* are evaluated as of the time of their

21   conduct.   The failure to predict future changes in the law cannot be considered ineffective

22   assistance.") (cleaned up); *May v. Ryan*, 807 F. App'x 632, 634-35 (9th Cir. 2020) ("Given

23   the long-standing Arizona rule . . . which provided the background for the prevailing

24   professional practice at the time of the trial, we cannot conclude that trial counsel's failure

25   to object to the constitutionality of the statute[] . . . fell below an objective standard of

26   reasonableness") (citations omitted); *Brown v. United States*, 311 F.3d 875, 878 (8th Cir.

27   2002) ("Brown . . . argues that his counsel's failure to have made an *Apprendi*-type

28   argument prior to the *Apprendi* decision constituted ineffective assistance of counsel.   We

reject Brown's argument.  Instead, we hold that his counsel's decision not to raise an issue unsupported by then-existing precedent did not constitute ineffective assistance.").  *See also Lewis v. Thornell*, 2024 WL 909810, *1 (9th Cir. 2024) ("At the time the state post-conviction petition was filed, there was widespread confusion about the availability of parole for first degree murder in Arizona, and an Arizona Supreme Court case, later disapproved, stated that parole for first degree murder was available.  The practice of lawyers and judges often assumed the availability of parole, and many defendants had been given sentences that included the possibility of parole despite the statute abolishing parole. . . .  Given those circumstances, it was reasonable for Lewis's post-conviction counsel not to raise a claim of ineffective assistance of counsel related to Lewis's illegally lenient sentence.").  For the same reason, there is no support for the proposition that the trial court would have granted an objection to the instruction.

Because the underlying claim of trial-counsel ineffectiveness is without merit, cause does not exist for the claim's default.  *Runningeagle*, 825 F.3d at 982.  The claim therefore remains barred from federal review.

III.   Systemic Challenges

Ellison raises a number of challenges to Arizona's death penalty scheme and to capital punishment in general.  Most of these clams were raised on direct appeal and summarily rejected by the Arizona Supreme Court, which pointed to its previous decisions denying similar claims.  *Ellison*, 140 P.3d at 929.  Ellison argues that AEDPA deference is inapplicable because the Arizona Supreme Court did not address the claims on the merits "but only presented the issues in its appendix."  (*See, e.g.*, Doc. 21 at 169.)  This is incorrect.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."  *Richter*, 562 U.S. at 98 ("There is no merit to the assertion that compliance with § 2254(d) should be excused when state courts issue summary rulings . . . .").

…

A.    **Claim 30**

In Claim 30, Ellison alleges that capital punishment is categorically cruel and unusual, in violation of the Eighth and Fourteenth Amendments. (Doc. 21 at 169-73.) However, he does not indicate how the Arizona Supreme Court's denial of this claim conflicts with or unreasonably applies clearly established federal law.  Supreme Court precedent holds that the death penalty does not constitute cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 169 (1976); *Glossip v. Gross*, 576 U.S. 863, 881 (2015) ("[W]e have time and again reaffirmed that capital punishment is not per se unconstitutional.").

B.    **Claim 31**

In Claim 31, Ellison alleges that execution by lethal injection is cruel and unusual punishment under the Eighth and Fourteenth Amendments.  (Doc. 21 at 173-81.)

The Arizona Supreme Court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law.  *See, e.g.*, *Baze v. Rees*, 553 U.S. 35 (2008) ("This Court has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment.").  Neither the United State Supreme Court nor the Ninth Circuit has concluded that Arizona's lethal injection protocols violate the Eighth Amendment.  *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

Ellison also raises allegations that focus on Arizona's particular lethal injection protocols and history.  But Ellison may bring a protocol-related challenge in a separate civil rights action under 42 U.S.C. § 1983.  *Hill v. McDonough*, 547 U.S. 573, 579-80 (2006); *Nance v. Ward*, 142 S. Ct. 2214, 2223 (2022).

C.    **Claim 32**

In Claim 32, Ellison alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it requires a death sentence when the jury finds one aggravating circumstance and no mitigating circumstances.  (Doc. 21 at 181-82.) The Arizona Supreme Court's denial of the claim was neither contrary to nor an

unreasonable application of clearly established federal law.

Arizona's death penalty scheme allows certain, statutorily defined aggravating factors to be considered in determining eligibility for the death penalty. For death to be an appropriate sentence, at least one aggravating factor must be found and the sentencer must determine that the mitigating circumstances do not warrant a lesser sentence. This scheme has been found constitutionally sufficient. *Jeffers*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck*, 97 F.3d at 334-35; *Smith*, 140 F.3d at 1272.

D.    **Claim 33**

In Claim 33, Ellison alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it creates a presumption that death is the appropriate sentence and requires a defendant to affirmatively prove that the jury should spare his life. (Doc. 21 at 182-84.) The Arizona Supreme Court's denial of the claim was neither contrary to nor an unreasonable application of clearly established federal law.

The United States Supreme Court has rejected the claim that Arizona's capital-sentencing scheme is impermissibly mandatory and creates a presumption in favor of the death penalty. *Walton*, 497 U.S. at 651-52; *see also Smith*, 140 F.3d at 1272.

E.    **Claim 34**

In Claim 34, Ellison alleges that Arizona's capital-sentencing scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments because it does not require the State to prove beyond a reasonable doubt that the death penalty is the appropriate sentence. (Doc. 21 at 184-88.) The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

The Constitution does not require a death penalty statute to set forth specific standards for a capital sentencer to follow when considering aggravating and mitigating circumstances. *Zant*, 462 U.S. at 875 n.13 (explaining that "specific standards for balancing aggravating against mitigating circumstances are not constitutionally required"); *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."). In *Kansas*

*v. Marsh*, the Supreme Court explained:

> In aggregate, our precedents confer upon defendants the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence.  The thrust of our mitigation jurisprudence ends here.  "[W]e have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required."

548 U.S. at 175 (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 179 (1988)).

Thus, the Constitution does not require the capital sentencer to find that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt.  *Smith*, 140 F.3d at 1272 (rejecting claim based on failure to apply beyond a reasonable doubt standard at sentencing); *Williams*, 52 F.3d at 1485 ("[T]he failure of the statute to require a specific finding that death is beyond a reasonable doubt the appropriate penalty does not render it unconstitutional."); *McGill v. Ryan*, 2019 WL 160732, *28 (D. Ariz. 2019) ("There is no Supreme Court authority requiring a jury to be instructed on a burden of proof in the sentencing phase of a capital case.").

Ellison argues that *Hurst v. Florida*, 577 U.S. 92 (2016), establishes the unconstitutionality of Arizona's capital-sentencing scheme.  (Doc. 21 at 185-86.)  This argument fails.  First, *Hurst* was not clearly established federal law at the time the Arizona Supreme Court reviewed Ellison's death sentence.  *Underwood v. Royal*, 894 F.3d 1154, 1186 (10th Cir. 2018) ("*Hurst* post-dates the [Oklahoma Court of Criminal Appeals'] decision and thus cannot serve as clearly established federal law for purposes of our review under AEDPA.").  *See also McKinney v. Arizona*, 140 S. Ct. 702, 708 (2020) ("*Hurst* do[es] not apply retroactively on collateral review."); *Ybarra v. Filson*, 869 F.3d 1016, 1032-33 (9th Cir. 2017) ("*Hurst* does not apply retroactively").

Second, even if *Hurst* were clearly established law for purposes of this claim, Ellison would not be entitled to relief.  "*Hurst* held only that Florida's scheme, in which the jury rendered an advisory sentence but the judge made the findings regarding aggravating and mitigating factors, violated the Sixth Amendment.  *Hurst* did not address the process of weighing aggravating and mitigating circumstances and made no holding

regarding the determination that the mitigators do not outweigh the aggravators." *Speer v. Thornell*, 2023 WL 2503733, *81 (D. Ariz. 2023) (cleaned up).

F.     **Claim 35**

In Claim 35, Ellison alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it is overbroad, does not genuinely narrow the murder cases eligible for the death penalty, and thereby fails to guide the sentencing jury. (Doc. 21 at 188-91.)   The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law (and the claim is, at any rate, meritless).

Again, the United States Supreme Court and the Ninth Circuit have upheld Arizona's capital-sentencing scheme against allegations that particular aggravating factors do not adequately narrow the sentencer's discretion. *Jeffers*, 497 U.S. at 774-77; *Walton*, 497 U.S. at 649-56; *Woratzeck*, 97 F.3d at 335.   The Ninth Circuit has also explicitly rejected the contention that Arizona's capital-sentencing scheme is unconstitutional because it "does not properly narrow the class of death penalty recipients." *Smith*, 140 F.3d at 1272.

G.     **Claim 36**

In Claim 36, Ellison alleges that Arizona's capital-sentencing scheme violates the Eighth and Fourteenth Amendments because it does not set forth objective standards to guide the jury in weighing the aggravating factors against the mitigating circumstances. (Doc. 21 at 192.)   The Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law (and the claim is, at any rate, meritless).

The Supreme Court has held that in a capital case "the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." *Tuilaepa*, 512 U.S. at 979-80 (citation omitted).   Additionally, the Supreme Court has "never held that a specific method for balancing mitigating and aggravating factors in a

1    capital sentencing proceeding is constitutionally required." *Franklin*, 487 U.S. at 179.

2        H.    **Claim 37**

3        In Claim 37, Ellison alleges that Arizona's capital-sentencing scheme limits the

4    jury's full consideration of mitigation evidence by requiring that mitigating circumstances

5    be proved by a preponderance of the evidence, in violation of the Eighth and Fourteenth

6    Amendments. (Doc. 21 at 193-94.) The Arizona Supreme Court's denial of this claim was

7    neither contrary to nor an unreasonable application of clearly established federal law (and

8    the claim is, at any rate, meritless).

9        The Supreme Court has specifically rejected the argument that the Arizona capital-

10   sentencing scheme is unconstitutional because it imposes on defendants the burden of

11   establishing, by a preponderance of the evidence, the existence of mitigating circumstances

12   sufficiently substantial to call for leniency. *Walton*, 497 U.S. at 649-51. The Court has

13   subsequently reaffirmed that the reasoning in *Walton* still controls regarding burdens of

14   persuasion. *Marsh*, 548 U.S. at 173 ("a state death penalty statute may place the burden

15   on the defendant to prove that mitigating circumstances outweigh aggravating

16   circumstances"). Once the state has carried its burden of establishing death eligibility, "it

17   [does] not offend the Constitution to put the burden on [defendant] to prove any mitigating

18   factor by a preponderance of the evidence." *Mitchell*, 502 F.3d at 993 (citations omitted).

19       I.    **Claim 38**

20       In Claim 38, Ellison alleges that Arizona's capital-sentencing scheme violates the

21   Eighth and Fourteenth Amendments because it affords the prosecutor unlimited discretion

22   to seek the death penalty. (Doc. 21 at 194-96.) The Arizona Supreme Court's denial of

23   this claim was neither contrary to nor an unreasonable application of clearly established

24   federal law.

25       The Supreme Court has held that prosecutors have wide discretion in deciding

26   whether to seek the death penalty. *McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987);

27   *Gregg*, 428 U.S. at 199. In *Smith*, the Ninth Circuit rejected the argument that Arizona's

28   capital-sentencing scheme is constitutionally infirm because "the prosecutor can decide

1   whether to seek the death penalty."  140 F.3d at 1272.

2       J.    **Claim 39**

3       In Claim 39, Ellison alleges that Arizona's capital-sentencing scheme discriminates

4   against indigent male defendants whose victims are white.  (Doc. 21 at 196-97.)  The

5   Arizona Supreme Court's denial of this claim was neither contrary to nor an unreasonable

6   application of clearly established federal law.

7       Clearly established federal law holds that "a defendant who alleges an equal

8   protection violation has the burden of proving 'the existence of purposeful discrimination'"

9   and must demonstrate that such discrimination "had a discriminatory effect" on him.

10  *McCleskey*, 481 U.S. at 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)).

11  Therefore, to prevail on this claim, Ellison "must prove that the decisionmakers in his case

12  acted with discriminatory purpose."  *Id.*

13      Ellison does not attempt to meet that burden.  He offers no evidence specific to his

14  case that would support an inference that his sex, race, economic status, or the race of his

15  victims played a part in his sentence.  *Richmond v. Lewis*, 948 F.2d 1473, 1490-91 (1990),

16  *vacated on other grounds*, 986 F.2d 1583 (9th Cir. 1993) (statistical evidence is insufficient

17  to prove that decisionmakers in petitioner's case acted with discriminatory purpose).

18      K.    **Claim 40**

19      In Claim 40, Ellison alleges that Arizona's capital-sentencing scheme violates the

20  Fifth, Eighth, and Fourteenth Amendments because it precludes proportionality review of

21  capital sentences.  (Doc. 21 at 197-99.)  The Arizona Supreme Court's denial of this claim

22  was neither contrary to nor an unreasonable application of clearly established federal law.

23      There is no federal constitutional right to proportionality review of a death sentence.

24  *McCleskey*, 481 U.S. at 306 ("[W]here the statutory procedures adequately channel the

25  sentencer's discretion, such proportionality review is not constitutionally required.").  The

26  Ninth Circuit has explained that the "substantive right to be free from a disproportionate

27  sentence" is protected by the application of "adequately narrowed aggravating

28  circumstance[s]."  *Ceja*, 97 F.3d at 1252.

1          L.      **Claim 41**

2          In Claim 41, Ellison cites various dissenting opinions in support of his allegation

3   that the death penalty violates his rights under the Eighth and Fourteenth Amendments

4   because it is irrationally and arbitrarily imposed, with no meaningful distinction between

5   those who receive sentences of death and those who are sentenced to life imprisonment.

6   (Doc. 21 at 199-200.)   The Arizona Supreme Court's denial of this claim was neither

7   contrary to nor an unreasonable application of clearly established federal law.  *See, e.g.,*

8   *Walton*, 497 U.S. at 655-56; *Smith*, 140 F.3d at 1272.  Ellison "simply fails to provide any

9   clearly established authority in support of his contention."  *Roybal v. Davis*, 148 F. Supp.

10  3d 958, 1111 (S.D. Cal. 2015).

11         M.      **Claim 42**

12         In Claim 42, Ellison alleges that the trial court violated the *Ex Post Facto* Clause by

13  sentencing him under Arizona's post-*Ring* capital-sentencing statute.  (Doc. 21 at 200-03.)

14  The Arizona Supreme Court's denial of this claim was neither contrary to nor an

15  unreasonable application of clearly established federal law.

16         Ellison committed the murders in February 1999.  He was convicted in January

17  2002.  On June 24, 2002, the United States Supreme Court invalidated Arizona's then-

18  applicable death penalty scheme, under which judges rather than juries found the facts

19  making a defendant eligible for the death penalty.  *Ring II*, 536 U.S. at 609.  On June 26,

20  2002, the trial court continued Ellison's sentencing indefinitely.  On August 1, 2002, the

21  Arizona legislature amended the state's death penalty statute to comply with *Ring II*.  A

22  jury sentenced Ellison to death in 2004.  Ellison argues that because there was no death

23  penalty in effect between June 24 and August 1, 2002, "[t]he trial court's application of the

24  newly enacted death-penalty statute to Ellison's case violated the prohibition on the

25  retroactive application of substantive changes in the law."  (Doc. 21 at 201.)

26         In denying this claim, the Arizona Supreme Court cited its opinion in *Ring III*

27  holding that the *Ex Post Facto* Clause did not prohibit the resentencing of capital

28  defendants after *Ring II* because the new statute only enacted procedural changes and did

1   not place defendants in jeopardy of a greater punishment. *Ellison*, 140 P.3d at 929 (citing

2   *Ring III*, 65 P.3d at 926-28). This determination was neither contrary to nor an

3   unreasonable application of clearly established federal law.

4   The *Ex Post Facto* Clause prohibits a state from "retroactively alter[ing] the

5   definitions of crimes or increas[ing] the punishment for criminal acts." *Collins v.*

6   *Youngblood*, 497 U.S. 37, 43 (1990). "[A]ny statute which punishes as a crime an act

7   previously committed, which was innocent when done; which makes more burdensome the

8   punishment for a crime, after its commission, or which deprives one charged with a crime

9   of any defense available according to law at the time when the act was committed, is

10  prohibited as *ex post facto*." *Dobbert*, 432 U.S. at 292 (citation omitted).

11  In *Dobbert*, the petitioner's "ex post facto claim [was] based on the contention that

12  at the time he murdered his children there was no death penalty 'in effect' in Florida. This

13  is so, he contends, because the earlier statute enacted by the legislature was, after the time

14  he acted, found by the Supreme Court of Florida to be invalid . . . . Therefore, argues

15  petitioner, there was no 'valid' death penalty in effect in Florida as of the date of his

16  actions." *Id.* at 287. The Supreme Court rejected this "sophistic" "and "highly technical"

17  argument," which "mocks the substance of the Ex Post Facto Clause," and clarified that

18  the changes in Florida's statute were "clearly procedural" and "simply altered the methods

19  employed in determining whether the death penalty was to be imposed; there was no

20  change in the quantum of punishment attached to the crime." *Id.* at 293-94, 297. So, too,

21  here. Although *Ring II* invalidated the procedure by which the death penalty was imposed

22  in Arizona, it did not eliminate the death penalty as a possible sentence for first-degree

23  murder. *See, e.g., Schriro v. Summerlin*, 542 U.S. 348, 353-54 (2004) ("*Ring*'s holding is

24  properly classified as procedural."); *McGill*, 16 F.4th at 703-04.

25  **N.    Claim 43**

26  In Claim 43, Ellison alleges that imposing the death penalty on a person diagnosed

27  with FASD violates the Eighth and Fourteenth Amendments. (Doc. 21 at 203-08.) The

28  PCR court denied this claim, finding it was supported by "no legal authority." (PCR

Ruling, 7/16/12 at 6.)   That decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it factually unreasonable.

Ellison argues that "the impairments associated with FASD mirror in critical ways those suffered by intellectually disabled offenders."  (Doc. 21 at 205.)  But as the PCR court correctly noted, there is no authority—let alone clearly establish federal authority— holding that individuals with FASD are exempt from capital punishment.  *In re Soliz*, 938 F.3d 200, 203 (5th Cir. 2019) (inmate failed to show that FASD "is now medically equated to intellectual disability as defined in *Atkins*"); *United States v. Fell*, 2016 WL 11550800, *7 (D. Vt. 2016) ("Fell has not shown that all persons with FASD . . . have cognitive and behavioral impairments that result in the same (or 'equivalent') diminishment in moral culpability, ability to be deterred, and capacity to assist in their defense as individuals with [intellectual disability]"); *Garza*, 2021 WL 5850883 at *105 ("There is no authority holding that individuals with FASD are exempt from capital punishment.").  In addition, Ellison has not shown that he is an intellectually disabled offender.  As noted in earlier portions of this order, Ellison's IQ was measured at 100 when he was in high school and was measured at 89 by Dr. Connor.

### O.     **Claim 44**

In Claim 44, Ellison alleges that he will be denied a fair clemency process, in violation of the Eighth and Fourteenth Amendments.  (Doc. 21 at 208-10.)

This claim is unexhausted and is not, at any rate, cognizable on federal habeas review.  Habeas relief may only be granted on claims that a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Ellison's challenge to state clemency procedures and proceedings does not represent an attack on his detention and thus does not constitute a proper ground for relief.  *Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *Woratzeck*, 118 F.3d at 653.

### P.     **Claim 46**

In Claim 46, Ellison alleges that appellate counsel performed ineffectively by failing to raise "several meritorious issues that had a reasonable probability of prevailing."  (Doc.

21 at 288-93.)  Ellison raised these allegations during his PCR proceedings.  (PCR Pet. at 36, 57, 69, 84.)  The PCR court denied Ellison's overarching claim of ineffective assistance without explicitly addressing his claims regarding appellate counsel.  (PCR Ruling, 7/16/12 at 5-6.)  The PCR did state, however, that "[w]hether specifically referred to or not in this minute entry ruling, this court has considered <u>all</u> of the claims presented by Ellison in his Petition for Post-Conviction Relief" and determined that only two were colorable.  (*Id.* at 6.)  Because the state court denied these claims on the merits, this Court applies § 2254(d) to Ellison's allegations of ineffective assistance of appellate counsel.  *Richter*, 562 U.S. at 98.

The Fourteenth Amendment guarantees a criminal defendant the right to effective assistance of counsel on his first appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that counsel's appellate advocacy fell below an objective standard of reasonableness and a reasonable probability that, but for counsel's deficient performance, the petitioner would have prevailed on appeal.  *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000).  Thus, "[a] failure to raise untenable issues on appeal does not fall below the *Strickland* standard."  *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002).  Nor does appellate counsel have a constitutional duty to raise every nonfrivolous issue requested by a petitioner.  *Miller v. Keeney*, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989) (citing *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983)).  *See also Davila*, 582 U.S. at 533 ("Declining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court.").

Ellison first alleges that appellate counsel performed ineffectively "because he failed to challenge the trial court's refusal to authorize the defense to hire James Aiken," the prison-management expert.  (Doc. 21 at 290.)  As discussed, the PCR court found that trial counsel's failure to call a prison expert to opine that Ellison was not violent and posed no danger to society was a matter "clearly related to decisions of trial strategy."  (PCR Ruling. 7/16/12 at 5.)  The PCR court further noted that "strong evidence to the contrary

1    existed in the Arizona Department of Corrections' records." (*Id.*)  The PCR court did not

2    explicitly address appellate counsel's performance or the trial court's denial of funding for

3    Aiken.

4         Ellison has not shown that the PCR court's denial of this claim was contrary to or

5    an unreasonable application of clearly established federal law or based on an unreasonable

6    determination of the facts.  A claim that the trial court erred in not approving funding for

7    Aiken was not "plainly stronger" than the other claims raised on appeal.  *Davila*, 582 U.S.

8    at 533.  Additionally, the trial court did not preclude Ellison from presenting other evidence

9    or argument during the penalty phase showing that he could be safely housed, and evidence

10   of good behavior in prison, even if it existed in Ellison's case, is entitled to little mitigating

11   value.  Thus, there was no reasonable probability of success on appeal if this claim had

12   been raised.  *Smith*, 528 U.S. at 285-86.

13        Next, Ellison alleges that appellate counsel performed ineffectively by failing to

14   challenge two of the jury instructions: (1) the sentencing-phase "sufficiently substantial to

15   call for leniency" instruction; and (2) the guilt-phase premeditation instruction.  (Doc. 21

16   at 290-92.)  These claims are meritless.

17        During the sentencing phase, the jury was instructed that "[i]f your decision is that

18   the mitigating circumstance or circumstances are not sufficiently substantial to call for

19   leniency, then your verdict shall be that the defendant is sentenced to death."  (RT 2/13/04

20   at 19-20.)  According to Ellison, this instruction, with its use of "shall," "misleadingly

21   created a presumption of death" and therefore appellate counsel should have raised a claim

22   challenging it.  (Doc. 21 at 291.)  In support of this argument, Ellison cites *State ex rel.*

23   *Thomas v. Granville*, 123 P.3d 662 (Ariz. 2005), which held that "the defendant in a capital

24   case does not bear the burden to prove by a preponderance of the evidence that the

25   mitigating circumstances are sufficiently substantial to call for leniency."  *Id.* at 668.

26        Ellison is not entitled to habeas relief on this basis.  The instruction in Ellison's case

27   did not impose a burden on him to prove that the mitigating circumstances were sufficiently

28   substantial to warrant leniency.  In addition, following its decision in *Granville*, the

Arizona Supreme Court's "subsequent cases have held that the jury can properly be told that if it concludes that there is no mitigation or the mitigation is not sufficiently substantial to call for leniency, a death verdict should result." *State v. Martinez*, 189 P.3d 348, 360 (Ariz. 2008). Therefore, the trial court's use of "shall" was not inappropriate. *See also State v. Velazquez*, 166 P.3d 91, 101 (Ariz. 2007) (rejecting claim that "a presumption of death was created when the jury was instructed '[I]f you unanimously find that the mitigation is not sufficiently substantial to call for leniency, you must return a verdict of death.'"). Appellate counsel's failure to raise this "untenable" challenge to the jury instruction did not constitute ineffective assistance. *Turner*, 281 F.3d at 872; *Smith*, 528 U.S. at 285-86.

Turning to the guilt-phase premeditation instruction, the jury was instructed that:

> Premeditation means that the defendant acts with either the intention or the knowledge that he will kill another human being when such intention or knowledge precedes the killing by any length of time to permit reflection. It is this period of time to permit reflection that distinguishes first-degree murder from intentional or knowing second-degree murder. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion.

(RT 1/18/02 at 10.)

Ellison relies on *State v. Thompson*, 65 P.3d 420 (Ariz. 2003), for his argument that this instruction was "incorrect and misleading." (Doc. 21 at 291-92.) In *Thompson*, the Arizona Supreme Court held that premeditation requires actual reflection and not the mere passage of time. 65 P.3d at 428. The court therefore disapproved of the phrase "proof of actual reflection is not required" and discouraged use of the phrase "as instantaneous as successive thoughts of the mind," both of which had previously been used in jury instructions. *Id.* However, neither phrase was present in Ellison's instruction. Indeed, in *Kiles*, the Arizona Supreme Court found that "no error occurred" when the jury was provided with a premeditation instruction indistinguishable from the one given in Ellison's case. 213 P.3d at 180 ("The superior court gave the following instruction about premeditation: 'Premeditation means the defendant acts with the knowledge that he will

1   kill another human being, when such intention or knowledge precedes the killing by a

2   length of time to permit reflection.  An act is not done with premeditation if it is the instant

3   effect of a sudden quarrel or heat of passion.'").  Ellison's appellate counsel did not perform

4   ineffectively by failing to raise the instruction challenge rejected in *Kiles*.  *Turner*, 281

5   F.3d at 872; *Smith*, 528 U.S. at 285-86.

6        Finally, Ellison alleges that appellate counsel performed ineffectively by failing to

7   challenge the improper *Miranda* warnings given by Detective Watson, specifically

8   Watson's statement: "You also have the right to refuse to answer any questions at any time

9   if you decide to do so.  And like what that last one means is if I ask you something too

10  personal about your sex life, you don't have to answer it just because I'm a cop."  (Doc. 21

11  at 292-93.)  The PCR court rejected the claim without explanation.  (PCR Ruling, 7/16/12

12  at 6.)

13       This claim was not "plainly stronger" than the other claims raised on appeal.  *Davila*,

14  582 U.S. at 533.  Appellate counsel raised a *Miranda* claim premised on Ellison's alleged

15  invocation of the right to counsel.  (Opening Br. at 18-25.)  A separate *Miranda* challenge

16  premised on the "personal" questions verbiage was not tenable where Watson properly

17  recited the four *Miranda* warnings, including the right to remain silent, and where Ellison

18  was admittedly familiar with the warning and understood his rights.  *Turner*, 281 F.3d at

19  872; *Smith*, 528 U.S. at 285-86.

20       Q.    **Claim 48**

21       In Claim 48,[52] Ellison alleges that his execution would violate the Eighth and

22  Fourteenth Amendments because he "suffers from serious mental illness that includes

23  hallucinations paranoia, depression . . . along with neurological impairments indicative of

24  FASD."  (Doc. 21 at 293-305.)  Ellison acknowledges he did not raise this claim in state

25  court but contends he can overcome the claim's default because "not reviewing the claim

26  would lead to a fundamental miscarriage of justice."  (*Id.* at 293.)  He also contends the

27

28  [52]    This order skips from Claim 46 to Claim 48 because Ellison withdrew Claim 47.
    (Doc. 21 at 293.)  Ellison also withdrew Claims 50, 51, and 53.  (*Id.* at 308, 321.)

1    default is excused by the ineffective assistance of PCR counsel.  (*Id.* at 293-94.)

2           Regardless of the claim's procedural status, it is without merit.   In *Ford v.*

3    *Wainwright*, 477 U.S. 399 (1986), the Supreme Court held that it is a violation of the Eighth

4    Amendment to execute someone who cannot comprehend that his execution is based on a

5    conviction for murder.  *Id.* at 409-10.  But Ellison does not contend that he is incompetent

6    to be executed under *Ford*, only that he has serious mental illness. *See, e.g.*, *ShisInday v.*

7    *Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007) (petitioner's execution not prohibited

8    where he contended he was mentally ill, not insane).

9           Ellison also argues that the reasoning in *Ford*, along with *Atkins v. Virginia*, 536

10   U.S. 304 (2002), which barred the execution of the intellectually disabled, and *Roper v.*

11   *Simmons*, 543 U.S. 551 (2005), which placed a categorical ban on the execution of persons

12   under the age of 18, should be extended to defendants who suffer from mental illness or

13   neurological impairment.  (Doc. 21 at 294-95.)  But Ellison offers no authoritative support

14   for such an extension.  *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1370 (11th Cir. 2009)

15   ("[S]ans a decision from the Supreme Court barring the execution of mentally ill prisoners,

16   we reject Carroll's claim that he is exempt from execution because he is mentally ill.");

17   *Rangel v. Broomfield*, 2023 WL 5417888, *97 (E.D. Cal. 2023) ("[N]either the Supreme

18   Court nor this circuit has extended the *Atkins/Roper* protections to the mentally ill whose

19   illness does not reach that of incompetency or insanity."); *Doerr v. Ryan*, 2010 WL 582198,

20   *3 (D. Ariz. 2010) ("[T]he authorities that have considered the scope of *Atkins* have all

21   rejected the proposition that the Eighth Amendment prohibits execution of the mentally

22   ill."). "Although petitioner's references to international law, public opinion data, and

23   various other reports and studies are instructive, this Court must follow Supreme Court

24   authority." *Garza*, 2021 WL 5850883 at *106 (citation omitted).

25          Finally, and at any rate, "the determination of whether an inmate is competent to be

26   executed cannot be made before the execution is imminent, *i.e.*, before the warrant of

27   execution is issued by the state." *Martinez-Villareal v. Stewart*, 118 F.3d 628, 630 (9th

28   Cir. 1997).

1

R.     **Claim 49**

2        In Claim 49, Ellison alleges that executing him after he has spent more than 14 years

3   on death row would violate the Eighth and Fourteenth Amendments.  (Doc. 21 at 305-08.)

4        This unexhausted claim is meritless.  "The Supreme Court has never held that

5   execution after a long tenure on death row is cruel and unusual punishment." *Allen v.*

6   *Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006); *see also Knight v. Florida*, 528 U.S. 990 (1999)

7   (Thomas, J., concurring in denial of certiorari) ("I am unaware of any support in the

8   American constitutional tradition or in this Court's precedent for the proposition that a

9   defendant can avail himself of the panoply of appellate and collateral procedures and then

10   complain when his execution is delayed.").  The Ninth Circuit has also held that prolonged

11   incarceration under a sentence of death does not violate the Eighth Amendment.  *McKenzie*

12   *v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995) (en banc).

13

S.     **Claims 56, 57, and 58**

14        In Claim 56, Ellison alleges that he was deprived of a reliable capital-sentencing

15   proceeding because "a wealth of mitigation evidence was never discovered, presented, or

16   considered at either Ellison's trial or during the Arizona Supreme Court's independent

17   review."  (Doc. 21 at 325-26.)  In Claim 57, Ellison alleges that the trial court's violations

18   of state law in its evidentiary rulings rendered his trial "so arbitrary and fundamentally

19   unfair as to violate the Fifth, Eighth, and Fourteenth Amendments."  (*Id.* at 327-28.)  In

20   Claim 58, Ellison alleges that his convictions and sentences must be vacated due to the

21   cumulative prejudicial effect of the errors in this case.  (*Id.* at 328-30.)

22        Ellison concedes he did not raise these claims in state court.  He argues that the

23   default of Claims 56 and 57 is excused by the ineffective assistance of PCR counsel.  (*Id.*

24   at 325, 327.)  But as noted throughout this order, the ineffective assistance of PCR counsel

25   can only excuse the default of claims of ineffective assistance of trial counsel. Claims 56

26   and 57 remain defaulted and barred from federal review.

27        Ellison argues that "[b]ecause of the bifurcated nature of state proceedings," he

28   could not have raised Claim 58 in state court.  (Doc. 21 at 328.) Whatever its procedural

1    status, Claim 58 is meritless.  As noted above, the Supreme Court has not specifically

2    recognized the doctrine of cumulative error as an independent basis for habeas relief and

3    Ellison has not identified two or more constitutional errors that could be accumulated.

4    IV.    Evidentiary Development

5        Ellison requests evidentiary development with respect to Claims 1, 2, 25, 45(C),

6    45(D), 48, 52, 53, and 55 and "to prove his *Martinez* claim."  (Doc. 41.)  Ellison seeks

7    discovery, an evidentiary hearing, and expansion of the record under Rules 6, 7, and 8 of

8    the Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.  (*Id.*)

9        A.    **Legal Standards**

10       "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to

11   discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

12   Rule 6 of the Rules Governing Section 2254 Cases provides that "[a] judge may, for good

13   cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure

14   and may limit the extent of discovery."  *Id.*  "Whether a petitioner has established 'good

15   cause' for discovery requires a habeas court to determine the essential elements of the

16   petitioner's substantive claim and evaluate whether specific allegations before the court

17   show reason to believe that the petitioner may, if the facts are fully developed, be able to

18   demonstrate that he is entitled to relief."  *Boggs v. Shinn*, 2018 WL 1794917, *3 (D. Ariz.

19   2018) (cleaned up).

20       Rule 8 of the Rules Governing Section 2254 Cases authorizes evidentiary hearings,

21   but an evidentiary hearing is not required if the issues can be resolved by reference to the

22   state-court record.  *Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("It is axiomatic

23   that when issues can be resolved with reference to the state court record, an evidentiary

24   hearing becomes nothing more than a futile exercise."); *Schriro v. Landrigan*, 550 U.S.

25   465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise

26   precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

27   Likewise, "an evidentiary hearing is not required if the claim presents a purely legal

28

1   question and there are no disputed facts." *Beardslee v. Woodford*, 358 F.3d 560, 585 (9th

2   Cir. 2004).  *See also Hendricks v. Vasquez*, 974 F.2d 1099, 1103 (9th Cir. 1992).

3        Finally, under Rule 7 of the Rules Governing Section 2254 Cases, a federal habeas

4   court is authorized to expand the record to include additional material relevant to the

5   petition.  The purpose of expansion of the record under Rule 7 "is to enable the judge to

6   dispose of some habeas petitions not dismissed on the pleadings, without the time and

7   expense required for an evidentiary hearing." *Boggs*, 2018 WL 1794917 at *4 (citation

8   omitted).  However, § 2254(e)(2) limits a petitioner's ability to present new evidence

9   through a Rule 7 motion to the same extent it limits the availability of an evidentiary

10  hearing. *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) ("[Petitioner]

11  must comply with § 2254(e)(2) in order to expand the record under Rule 7.").

12     **B.    Claims Adjudicated On The Merits In State Court**

13       Claims 1, 2, and 25 were raised and denied on the merits in state court.  Additionally,

14  most of the components of Claims 45(C) and 45(D) were raised and denied on the merits

15  in state court.[53]  This Court's "review under § 2254(d)(1) is limited to the record that was

16  before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at

17  181; *see also Gulbrandson*, 738 F.3d at 993 & n.6 (explaining that "for claims that were

18  adjudicated on the merits in state court, petitioners can rely only on the record before the

19  state court in order to satisfy the requirements of § 2254(d)" and noting that this

20  "evidentiary limitation" also applies to claims under § 2254(d)(2)).

21       Ellison contends that his claims "satisfy § 2254(d) based on the state-court record"

22  and that evidentiary development is necessary for the Court to "conduct *de novo* review."

23

24  ---

[53]    As discussed in earlier portions of this order, Claim 45(D) encompasses six guilt-
25  phase subclaims of ineffective assistance of counsel and Claim 45(C) encompasses 10
    sentencing-phase subclaims of ineffective assistance of counsel.  As further discussed in
26  earlier portions of this order, Ellison did not raise, in state court, at least one and perhaps
    two of his guilt-phase subclaims (*i..e.*, failing to obtain and present evidence that Watson's
27  and Auld's testimony about his interrogation was false and cumulative error) and did not
    raise, in state court, two of his sentencing-phase subclaims (*i.e.*, failing to object to the
28  prosecutor's statements about Finch and failing to raise parole ineligibility).

(Doc. 41 at 25.)  But as discussed in earlier portions of this order, the state-court denials of Claims 1, 2, 25, and the exhausted portions of 45(C) and 45(D) were not unreasonable under 28 U.S.C. § 2254(d).  Thus, the Court is precluded from considering new evidence in support of those claims.  *Stokley v. Ryan*, 659 F.3d 802, 809 (9th Cir. 2011).  Under these circumstances, there is no reason to hold an evidentiary hearing or expand the record and no good cause exists to authorize discovery.  *See also Sully v. Ayers*, 725 F.3d 1057, 1075 (9th Cir. 2013) ("[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief."); *Boggs*, 2018 WL 1794917 at *6 ("Boggs seeks discovery and expansion of the record in support of Claim 6 . . . [but the] Arizona Supreme Court denied this claim on direct appeal.  Under *Pinholster*, Boggs is not entitled to evidentiary development.") (citations omitted).

### C. Claims Not Adjudicated On The Merits In State Court

The remaining claims for which Ellison seeks evidentiary development, Claims 48, 52, 53, and 55 and portions of Claims 45(C) and 45(D), were not presented in state court.

Ellison is not entitled to an evidentiary hearing, expansion of the record, or discovery with respect to any of those claims.  Claim 48, in which Ellison alleges that his execution would be unconstitutional because he is mentally ill, is meritless for the reasons previously identified—Ellison does not allege he is incompetent and the ultimate determination of competence cannot, at any rate, occur until an execution warrant has been issued.  A habeas petitioner is not entitled to pursue evidentiary development in support of a claim that is meritless for reasons unrelated to the evidence the petitioner hopes to develop.  *See, e.g., Schriro,* 550 U.S. at 474; *Totten*, 137 F.3d at 1176; *Beardslee*, 358 F.3d at 585; *Hendricks*, 974 F.2d at 1103.  *See also Boggs*, 2018 WL 1794917 at *5 (denying request for evidentiary development as to similar unexhausted claim).

Next, Claims 52, 53, and 55, alleging various acts of prosecutorial misconduct and *Napue* violations, are procedurally defaulted and, in the absence of cause and prejudice, barred from federal review.  Ellison argues, and seeks to present evidence to demonstrate, that the ineffective assistance of PCR counsel provides cause and prejudice for the claims'

1   default.  (Doc. 41 at 46.)  But as noted elsewhere, *Martinez* applies only to defaulted claims

2   of ineffective assistance of trial counsel.  *Martinez*, 926 F.3d at 1225; *Pizzuto*, 783 F.3d at

3   1177.  Claims 52, 53, and 55 do not fall within that exception because, as Respondents

4   correctly note, "Claims 52, 53, and 55 assert[] trial court error."  (Doc. 50 at 40.)  Thus,

5   further evidentiary development is unwarranted.

6       Ellison also contends that the State's suppression of evidence provides cause for the

7   procedural default of Claims 52, 53, and 55.  (Doc. 41 at 40.)  But as discussed earlier, that

8   argument fails with respect to any claims predicated on the audio cassette or on Vivian

9   Brown's testimony.  Meanwhile, even assuming suppression might provide cause for the

10  procedural default of any *Napue*, *Brady*, or other prosecutorial misconduct claim premised

11  on Friesner's notes (or, for that matter, on the audio cassette), Ellison cannot demonstrate

12  prejudice for the reasons stated earlier.  Further evidentiary development is unwarranted

13  under these circumstances.  *See, e.g., Schriro,* 550 U.S. at 474; *Totten*, 137 F.3d at 1176;

14  *Beardslee*, 358 F.3d at 585; *Hendricks*, 974 F.2d at 1103.

15      Next, the portions of Claim 45(D) not adjudicated on the merits in state court are

16  (1) Ellison's claim that he received ineffective assistance during the guilt phase due to

17  counsel's failure to obtain and present evidence that Watson's and Auld's testimony about

18  his interrogation was false and, potentially, (2) Ellison's claim of cumulative guilt-phase

19  ineffective assistance.  But the former is meritless for reasons discussed elsewhere, and

20  thus further evidentiary development is unwarranted.  Likewise, it would be pointless to

21  allow further development regarding the cumulative error claim where no error has been

22  shown.

23      Finally, the portions of Claim 45(C) not adjudicated on the merits in state court are

24  Ellison's claims that he received ineffective assistance during the sentencing phase due to

25  counsel's failure to (1) object to the prosecutor's statements about Finch and (2) raise

26  parole ineligibility.  But once again, those claims are meritless for reasons that further

27  evidentiary development would not remedy.

28      …

V.      Certificate Of Appealability

        Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, a habeas petitioner cannot take an appeal unless a certificate of appealability ("COA") has been issued by an appropriate judicial officer.  Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a COA when it enters a final order adverse to the applicant.  If a COA is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).

        Under § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were otherwise "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if "jurists of reason would find it debatable whether [1] the petition states a valid claim of the denial of a constitutional right, and . . . [2] the district court was correct in its procedural ruling."  *Id.*

        The Ninth Circuit has emphasized that the standard for granting a COA "amounts to a modest standard" and  that courts "must be careful to avoid conflating the standard for gaining permission to appeal with the standard for obtaining a writ of habeas corpus."  *Silva v. Woodford*, 279 F.3d 825, 832-33 (9th Cir. 2002) (cleaned up).  In light of those principles, the Court grants a COA as to Claim 45(C)(1) (ineffective assistance during sentencing phase regarding mitigation) and Claim 45(C)(2) (ineffective assistance during sentencing phase regarding FASD)

        …
        …
        …
        …
        …

Accordingly,

**IT IS ORDERED** that:

1.      Ellison's amended habeas (Doc. 21) is **denied**.  The Clerk of Court shall enter judgment accordingly and terminate this action.

2.      Ellison's request for evidentiary development (Doc. 41) is **denied**.

3.      A certificate of appealability is granted with respect to Claims 45(C)(1) and 45(C)(2).

4.      The Clerk of Court shall forward a courtesy copy of this order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

Dated this 5th day of March, 2024.

Dominic W. Lanza
United States District Judge